**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

IN RE

**PITTSBURGH CORNING
CORPORATION,**

     Debtor.

**Bankruptcy No. 00-22876 (JKF)
Chapter 11**

**Related to Doc. Nos. 7704, 7798**

**MEMORANDUM OPINION[1]**

    The matter before the court is the confirmation of the Modified Third Amended Plan of

Debtor Pittsburgh Corning Corporation (hereinafter, "PCC" or the "Debtor").[2]  The "Plan

Proponents" include, as defined in the Modified Third Amended Plan, "[t]he Debtor, the

Committee of Asbestos Creditors, and the Future Claimants' Representative [hereinafter, the

"FCR"]."  Modified Third Amended Plan, Doc. No. 7704, at Article 1.1, p. 19.  The "Plan

Supporters" are PPG Industries, Inc. (hereinafter, "PPG") and Corning Incorporated (hereinafter,

"Corning").  Plan Proponents' and Plan Supporters' Post-Trial Brief in Support of Confirmation

of Modified Third Amended Plan of Reorganization for Pittsburgh Corning Corporation

(hereinafter, "Plan Proponents' Post-Trial Brief"), Doc. No. 7904, at 1, n.2.  For the reasons that

follow, we find the Modified Third Amended Plan to be unconfirmable but will provide the Plan

---

[1]This Memorandum Opinion constitutes the court's findings of fact and conclusions of
law.  The court's jurisdiction will be discussed in the text.

[2]The Modified Third Amended Plan at bench was filed on May 19, 2010, at Doc. No.
7704.  We note that, on June 8, 2010, the Plan Proponents filed amendments to the Modified
Third Amended Plan at Doc. No. 7798.  The Modified Third Amended Plan at issue for
confirmation incorporates both Doc. No. 7704, the two amendments at Doc. No. 7798, and all
plan documents and exhibits at those docket numbers.

Proponents with another opportunity to amend the Plan in accordance with this Memorandum Opinion.

In 2006, this court found that the Second Amended Plan of PCC was not confirmable as drafted. *In re Pittsburgh Corning Corp.*, 417 B.R. 289 (Bankr. W.D.Pa. 2006). In doing so, we explained that the scope of the Asbestos Permanent Channeling Injunction was overly broad. The Memorandum Opinion denying confirmation of the Second Amended Plan (hereinafter, the "2006 Memorandum Opinion") found that: (1) PC-Relationship[3] and Non-PC-Relationship[4] claims as to PPG that included "conspiracy theory" claims (*see* definition, *infra*, at 3) are properly within the scope of § 524(g) and can be channeled as they would be derivative of the Debtor's conduct, or claims against the Debtor, or demands on the Debtor; (2) PC-Relationship claims and "conspiracy theory" claims against Corning are properly within the scope of § 524(g) and can be channeled; and (3) Corhart[5] claims, which by definition exclude claims based on exposure to Unibestos or any other asbestos containing product manufactured, marketed or sold by PCC, cannot be channeled unless they also include a "conspiracy theory." *In re Pittsburgh Corning*, 417 B.R. at 291. After examining the Unibestos, Pyrocal and Corhart claims, and after

---

[3]"PC-Relationship" claims are claims against PPG and Corning alleging liability for personal injury sustained as a result of exposure to PCC's asbestos containing product, Unibestos. *In re Pittsburgh Corning Corp.*, 417 B.R. 289, 290 (Bankr. W.D.Pa. 2006). *See also* Debtor's Submission of "Stipulated" Findings of Fact from the Confirmation Hearing on May 3-7, 2004 Regarding Confirmation of the Modified Third Amended Plan of Reorganization (hereinafter, "Stipulated Findings of Fact" or "SFF"), Doc. No. 7735, at 16, ¶ 52.

[4]"Non-PC-Relationship" claims are "claims against PPG for a product called 'Pyrocal' . . . ." *In re Pittsburgh Corning*, 417 B.R. at 290-91. *See also* SFF ¶ 63.

[5]"Corhart" claims (also known as "Corning Fund" claims) are "claims against Corning for a product known as 'Corhart.'" *In re Pittsburgh Corning*, 417 B.R. at 291. "Corhart refers to a product of Corhart Refractories Company for which Corning is alleged to have liability." *Id.* at 291, n.4. *See also* SFF ¶ 74.

careful consideration of the Third Circuit's decision in *In re Combustion Engineering*, 391 F.3d

190 (3d Cir. 2004), we held that:

> the ruling of the Court of Appeals in *Combustion Engineering* does
> not bar the inclusion of those claims in the proposed channeling
> injunction to the extent that (1) PCC is alleged to be liable for
> Unibestos, Pyrocal or Corhart claims, (2) PPG or Corning is
> alleged to be liable for Unibestos claims as a result of ownership or
> involvement with PCC, (3) PPG or Corning is alleged to be liable
> with PCC based on allegations of conspiracy, alter ego, piercing
> the corporate veil, domination and control, concert of action,
> common enterprise, aiding and abetting, *respondeat superior*,
> negligent provision of services, principal and agent, successor in
> interest, and other joint and/or several liability theories.

*In re Pittsburgh Corning*, 417 B.R. at 293.  In this Memorandum Opinion, we refer to this last

category of claims as "conspiracy theory" claims.  *Id.* at 291.

As previously stated in the 2006 Memorandum Opinion:

> As a threshold matter, we find that the standards for imposition of
> a channeling injunction are met in that under the plan a trust is to
> be created to assume PCC's liabilities based on asbestos, §
> 524(g)(1)(B)(i)(I), the trust is to be funded by PCC's securities in
> whole or part, § 524(g)(1)(B)(i)(II),(III), and the trust assets will
> be used to pay claims and demands, § 524(g)(1)(B)(i)(IV).  We
> also find that PCC is "likely to be subject to substantial future
> demands for payment arising out of the same or similar conduct or
> events that give rise to the claims" to be enjoined, §
> 524(g)(1)(B)(ii)(I), that the actual amounts, numbers and timing of
> such future demands cannot be determined, § 524(g)(1)(B)(i)(II),
> pursuit of the claims in the tort system will threaten the plan's
> purpose to deal equitably with claims and future demands, §
> 524(g)(1)(B)(i)(III), and the plan complies with §
> 524(g)(1)(B)(i)(IV) insofar as it sets forth terms with respect to the
> injunction to be issued.

*In re Pittsburgh Corning*, 417 B.R. at 294.

Furthermore, we stated:  "[w]e do not recite the evidence regarding the plan's compliance

with § 1129 because those factors are not in dispute except as to the insurance assignment and

the scope of the § 524(g) channeling injunction. The evidence supports confirmation under § 1129 except as noted regarding the channeling injunction. Further, the plan, disclosure statement, balloting process and classification satisfy all of the requisite provisions of §§ 524(g), 1123, 1124, 1125, 1126, 1127, and 1128 of the Bankruptcy Code except as to the scope of the channeling injunction." *Id.* at 294-95.

In presenting the Modified Third Amended Plan to the court at the confirmation hearing held in June 2010, the Plan Proponents averred that "the [Modified] [T]hird [A]mended [P]lan has the same essential elements as already approved in the prior plan." Transcript of 6/3/2010 Hearing, Doc. No. 7823, at 25:10-12.

The Plan Proponents described the modifications in the Modified Third Amended Plan as threefold: (1) the narrowing of the channeling injunction to "no longer include[] wholly independent claims against the shareholders having nothing to do with [PCC], or its knowledge, or its actions, or its negligence," *id.* at 25:20-23; (2) the removal of insurance assignments; and (3) the addition of *Combustion Engineering* style insurance neutrality language. *Id.* at 26:2-6. These modifications will be addressed throughout this Memorandum Opinion.

As was the case with the Second Amended Plan, the Modified Third Amended Plan was accepted by the overwhelming majority of all voting classes, with all impaired classes, including more than 99% of asbestos creditors, voting in favor of confirmation. Plan Proponents' Post-Trial Brief, Doc. No. 7904, at 1.

Other than as described in the objections to confirmation, *infra*, there is no contention that the Modified Third Amended Plan does not meet the requirements of § 1129 or that the § 524(g) injunction is not warranted as to PCC. Our own review of the Modified Third Amended

Plan and Plan documents satisfies us that the confirmation standards that are uncontested are met. We will address the objections to §§ 1129, 524(g), 1122 and 1123(a)(4) *infra*. Thus, we find that the Modified Third Amended Plan, disclosure statement, balloting process and classification satisfy all of the requisite provisions of §§ 524(g), 1122, 1123, 1124, 1125, 1126, 1127, 1128, and 1129 of the Bankruptcy Code except as to the scope of the channeling injunction as to PPG and Corning and the insurance neutrality provision. Several objections to confirmation remain as follows:

(1) [Mt. McKinley Insurance Company and Everest Reinsurance Company's (hereinafter, collectively, "Mt. McKinley")] contention that the Plan was not proposed in good faith as required by § 1129(a)(3) and based on: (a) the alleged lack of insurance neutrality; (b) the alleged inadequacies in the medical criteria of the [Trust Distribution Procedures (hereinafter, the "TDP"]; and (c) the inclusion of allegedly unnecessary and potentially prejudicial findings of fact proposed by the Plan Proponents and Plan Supporters;

(2) Mt. McKinley's contention that the Plan fails to comply with the requirements of § 524(g)(4)(A)(ii) relating to the identification of the parties to be protected by the Asbestos Permanent Channeling Injunction;

(3) The Reaud Morgan Claimants'[6] and Mt. McKinley's allegations that the scope of the Asbestos Permanent Channeling Injunction is ambiguous and may be construed to exceed the bounds established by § 524(g) of the Bankruptcy Code;

(4) [Garlock Sealing Technologies LLC's] (hereinafter, "Garlock") contention that the Plan's placement of Indirect Asbestos Claims and Asbestos Personal Injury Claims in the same class violates the classification requirements of 11 U.S.C. § 1122;[7]

---

[6]The law firm of Reaud Morgan & Quinn represent numerous tort victims who allegedly hold Pyrocal claims against PPG and/or Corhart claims against Corning. Throughout this Memorandum Opinion, these claimants will be collectively referred to as the "Reaud Morgan Claimants."

[7]Garlock also objected on the basis of § 1123(a)(4) asserting unequal treatment. *See*

(continued...)

(5) Garlock's contention that the appointment and service of Lawrence Fitzpatrick as the [FCR] does not satisfy the requirements of § 524(g)(4)(B)(I) of the Bankruptcy Code with respect to future indirect claimants;
(6) Garlock's contention that the TDP impairs its ability to defend claims in the tort system and denies it access to information about claims settled by the Asbestos PI Trust.

Plan Proponents' Post-Trial Brief, Doc. No. 7904, at 3-4.[8]

The Plan Proponents contend that the court does not have the jurisdiction to address the merits of Mt. McKinley's objections because Mt. McKinley lacks standing to prosecute its objections. Specifically, the Plan Proponents argue that "none of [Mt. McKinley's] objections relate to provisions of the Plan that have any conceivable impact on its present legal, equitable or contractual rights or obligations." Plan Proponents' Post-Trial Brief, Doc. No. 7904, at 5. The Plan Proponents also assert that Garlock does not have standing to object to confirmation of the Modified Third Amended Plan because of its own voluntary chapter 11 petition. Thus, before addressing any objections to confirmation of the Modified Third Amended Plan, we must determine whether Garlock and Mt. McKinley have standing to raise their objections before this bankruptcy court.

### *Standing of Garlock*

Garlock objects to the Plan because it places Indirect Asbestos Claims and Direct

---

[7](...continued)
Brief Supporting Objection of Garlock Sealing Technologies LLC to Confirmation of the [Modified] Third Amended Plan of Reorganization, Doc. No. 7900 at 8; Response Brief Supporting Objection of Garlock Sealing Technologies LLC t Confirmation of the Third Amended Plan of Reorganization, Doc. No. 7944 at 16.

[8]We note that Century Indemnity Company also seeks certain findings. Century's Post-Trial Brief, Doc. No. 7906, at 1. However, because we are not confirming the Modified Third Amended Plan, we do not address that request.

Asbestos Claims in the same class. Garlock asserts that this violates the classification requirements of 11 U.S.C. §1122. The objection is premised on the theory that in cases in the tort system that arise in joint and several liability jurisdictions, Garlock would have the right to assert a contribution claim against the Debtor and to collect from the Debtor in the event Garlock would suffer a judgment that results in it paying more than its share for a liability for which PCC is also liable. Further, Garlock contends that its contribution right exists from the time a plaintiff sustains an injury. Brief Supporting Objection of Garlock Sealing Technologies LLC to Confirmation of the Third Amended Plan of Reorganization (hereinafter, "Garlock's Post-Trial Brief"), Doc. No. 7900, at 4-5. Garlock also contends that the Plan affects the setoff rights that it would have in the tort system with respect to the Debtor and because, post-confirmation, any claim that Garlock may assert against the Debtor would have to be directed against the Trust, Garlock is a person aggrieved with standing to object to the Plan.

Garlock's objections are without merit for several reasons.[9] Significantly, Garlock is not a creditor and does not assert creditor status.[10] Despite having been served with notice of the bar date, Garlock never filed a claim or participated in PCC's case until it filed its objection to this Modified Third Amended Plan. Therefore, it is not and cannot be a creditor in this case with standing to object to the Modified Third Amended Plan. Moreover, Garlock is not a party in interest. It did not even enter an appearance in this case and its objection to the Modified Third Amended Plan was its debut. Furthermore, Garlock filed its own Chapter 11 petition on June 5,

---

[9]Garlock did not object to the Second Amended Plan.

[10]Garlock asserts that its state law rights as a co-defendant in the tort system will be "eviscerated," Doc. No. 7900, at 11, and that there is no evidence that the Modified Third Amended Plan is fair and equitable regarding co-defendants. We address this in the text, *infra*.

2010. *In re Garlock Sealing Technologies*, Bankr. No. 10-31607, W.D.N.C.  As a result, it has

removed itself from the tort system and will not suffer any judgments let alone those that will

establish a joint liability with this Debtor.  Even if it had not filed its own bankruptcy case, it

could not implead or assert a claim against the Debtor in the tort system now by virtue of the

automatic stay or, in the future, if the plan is confirmed, due to the discharge injunction and the

channeling injunction.[11]  Thus, its argument that its rights are affected because it cannot assert

these hypothetical claims and it therefore has standing is without merit.  That is, it has no current

claims and no prospect of a future demand.[12]  *See infra.*  Despite Garlock's lack of standing, we

address the merits of the objections because they have been fully briefed and argued.

Garlock's objections here are similar to those it filed with respect to the plan proposed

(and confirmed)[13] in *In re W.R. Grace & Co., et al.,* Bankr. No. 01-1139 (Bankr.D.Del.).  In *W.R.*

*Grace*, the court addressed Garlock's objections noting, *inter alia*, that "the purpose of

contribution is to enable all those who contributed to a plaintiff's injuries to be brought into one

suit."  *In re W.R. Grace & Co.*, 446 B.R. 96, 121 (Bankr.D.Del. 2011), *amended on*

*reconsideration in part*, 2011 WL 832940 (Bankr.D.Del., March 4, 2011).  The right to

contribution is contingent on a finding of joint liability, even though it arises, in inchoate form,

when the plaintiff sustains an injury.  The right to recover on a contribution claim must await

---

[11]Although we are not confirming the current rendition of the Modified Third Amended
Plan, PCC will have another opportunity to modify the Plan in accordance with this opinion.

[12]If Garlock returns to the tort system and suffers a judgment for which it must pay PCC's
portion of liability, Garlock would have an Indirect Claim, as defined in the plan, and would be
paid under the terms of the Plan and the TDP.  *See* text, *infra*.

[13]The *W.R. Grace* plan confirmation remains pending before the District Court for the
District of Delaware.

payment of the joint tortfeasor's liability by the entity asserting contribution.[14] *Id.* at 121. As in *W.R. Grace*, in the instant case Garlock is not a creditor, as noted above, and because it and PCC are no longer in the tort system, there will not be any judgments entered against either of them for shared liability. Therefore, there cannot be a contribution claim and Garlock's objection is without merit. To the extent Garlock could be considered a future demand holder based on a hypothetical possibility of a future contribution claim, such claims are provided for in the Modified Third Amended Plan and the TDP and Garlock's treatment thereunder, as is the treatment of all Indirect Asbestos Claimants, is fair and equitable. *See infra*.

Garlock contends that the appointment and service of Lawrence Fitzpatrick as the FCR does not satisfy the requirements of § 524(g)(4)(B)(i) of the Bankruptcy Code with respect to future Indirect Claimants because

> Mr. Fitzpatrick testified unequivocally that he did not represent Pittsburgh Corning's future co-defendants. 6/3/10 Tr. 133:17-23 (Fitzpatrick) ("Do you represent future codefendants who might have contribution or other indirect claims against the trust? A. Absolutely not."); *id.* at 145:8-10.

Garlock's Post-Trial Brief, Doc. No. 7900, at 10. *See also* Transcript of 6/3/10 Hearing, Doc. No. 7823. We note that Garlock raised the same objection with respect to the *W.R. Grace* plan

---

[14]In its own case and in motions seeking access to Rule 2019 statements filed in this and various other cases (several of which are closed) in other jurisdictions, Garlock has argued that it is entitled to certain information from the Trusts and other parties in those cases because the information will prove that claimants and their attorneys are engaged in a fraudulent scheme to collect more than one recovery from many different asbestos defendants. Such information, Garlock asserts, will prove that the amount it will have to pay to asbestos claimants in its own case will be much less than the asbestos claimants will allege they are owed by Garlock because those claimants will already have been paid by other Trusts. That matter is pending and we mention it only to illuminate what lies behind Garlock's position with respect to its arguments in this case.

confirmation. *In re W.R. Grace,* 446 B.R. at 123, n.44. We find that here, as in *W.R. Grace*,

Garlock is not now and will not be a future co-defendant with PCC. Even if Garlock were not a

bankruptcy debtor, its hypothetical future demand for contribution or indemnity would depend

on (1) its being found co-liable with PCC and (2) its having paid PCC's liability to a future

demand holder.[15] This is, however, all speculation inasmuch as neither Garlock nor PCC is in

the tort system. Garlock has shown no immediate injury and no prospect of any future injury.

Thus, even under *In re Global Indus. Techs.*, 2011 U.S. App. LEXIS 9109, there is not even a

scintilla of likelihood of injury that would or could be relieved by the ruling it seeks from this

court.[16]

---

[15]Nonetheless, Garlock would be able to recover what the Trust would pay to the direct claimant if Garlock paid the direct claimant and the Trust had not. Section 2.6 of the TDP makes this clear when it says "any Indirect Asbestos Claims subject to the Asbestos Permanent Channeling Injunction that are payable from the Asbestos PI Trust shall be subject to the same categorization, evaluation, processing, liquidation, and payment provisions under this TDP that the claim would have been subject to if it had been brought by the original claimant against the Asbestos PI Trust." TDP, Doc. No. 7704, Exhibit B, at §2.6. Under §5.6 of the TDP, the Indirect Claimant will be paid if, *inter alia,* it "has paid in full the liability and obligation of the Asbestos PI Trust to the individual claimant to whom the Asbestos PI Trust would otherwise have had a liability or obligation under these Procedures (the "Direct Claimant"). *Id.* at §5.6. Further, "[i]n no event shall any Indirect Claimant have any rights against the Asbestos PI Trust superior to the rights of the related Direct Claimant against the Asbestos PI Trust, including any rights with respect to the timing, amount or manner of payment. In addition, no Indirect Claim may be liquidated and paid in an amount that exceeds what the Indirect Claimant has actually paid the related Direct Claimant." Section 5.6 further provides "the same liquidation and payment procedures and rights to the holders of such claims as the Asbestos PI Trust would have afforded the holders of the underlying valid Channeled Asbestos PI Trust Claims." *Id.* Moreover, "[n]othing in this TDP is intended to preclude a trust to which asbestos-related liabilities are channeled from asserting an Indirect Asbestos Claim against the Asbestos PI Trust subject to the requirements set forth herein." *Id.*

[16]In the words of the Court of Appeals in *In re Global Indus. Techs.*, Garlock has not shown a "specific, 'identifiable trifle' of injury." 2011 U.S. App. LEXIS 9109, *29 (citations omitted). It has no legally protected interests that could be affected by the Modified Third

(continued...)

Garlock's complaint that the Plan cannot be confirmed because the TDP treats co-defendants unfairly is related to its objection with respect to the FCR.  In essence, Garlock complains that there is no representative for its hypothetical future claims.   In this regard Garlock states:

> A similar failure to ensure adequate representation of co-defendants resulted in the rejection by the Second Circuit of the first attempt to restructure the TDP for the Manville Trust, via a class action settlement.  *Findley v. Blinken (In re Joint E. & S. Dist. Asbestos Litig.)*, 982 F.2d 721, 726 (2d Cir. 1992).

Garlock's Post-Trial Brief, Doc. No. 7900, at 10.  The *Findley v. Blinken*[17] case relied on by Garlock is inapposite.  *Findley* involved a class action brought by five plaintiffs in 1990 who had claims against the *Manville* Trust.  The class action was filed on behalf of all beneficiaries against the trustees of the Trust at a time when the Trust was out of funds to continue to pay claims.  The class action alleged that "[e]ach Class member has or will have a claim either for death or personal injury caused by exposure to asbestos, or a claim for warranty, guarantee, indemnification or contribution arising from an obligation of the Trust for the payment of a Trust death or personal injury claim."  *Findley*, 982 F.2d at 728.  The complaint alleged:

> a single count "Seeking to Establish An Equitable Distribution of the Trust Res" . . . .  It alleged that the Trust is required to pay all claims in full shortly after claims are liquidated, that the assets of the Trust are insufficient to permit such payment without jeopardizing the payment of the claims of other beneficiaries, that "[e]quitable principles of trust law and other applicable law require that the Court determine an equitable allocation of the Trust res

---

[16](...continued)
Amended Plan.  *Id.* at *30.

[17]The Opinion was modified on other grounds upon rehearing at 993 F.2d 7 (2nd Cir., May 5, 1993).

> among its Beneficiaries and a restructuring of the Trust's procedures for payment to its Beneficiaries," . . . that 70,000 actions are currently pending against the Trust, . . . and that continued prosecution of these actions will defeat the purposes of the Trust by depleting the Trust res . . . .  As relief, the complaint sought a judgment determining an equitable allocation of the Trust res among all beneficiaries, determining the "relative rights and priorities" of all beneficiaries, determining an equitable, efficient, and inexpensive method for fixing the amount each beneficiary is entitled to receive and for distribution of Trust assets, and "enjoining permanently all pending and future proceedings by Beneficiaries against the Trust in all state and federal courts except in accordance with the procedures determined hereby."

982 F.2d at 728 (internal citations omitted).

Simultaneously, the plaintiffs filed a proposed Stipulation of Settlement of the non-opt-out class action and a judgment approving the settlement was entered.  *Id.*[18]  The Court of Appeals for the Second Circuit found, as Garlock asserts, that the co-defendants had to have representation in a post-confirmation effort to modify the previously approved trust and its funding and distribution process, not because the classification requirements of the Bankruptcy Code were not met but because it was a Rule 23 action.  The Court of Appeals found that including the co-defendants with the health claimants violated the typicality and adequacy of representation requirements of Fed.R.Civ.P. 23(a)(3) and (4).  *Findley*, 982 F.2d at 739-40.  The change to the trust distributions would occur after determining the "relative rights and priorities" of all beneficiaries and a method for fixing the amount to be distributed to each beneficiary, a process substantially different from that approved in the confirmed plan.  The Court of Appeals

---

[18]The action was captioned as *In re Joint Eastern and Southern District Asbestos Litigation* with subcaptions of *In re Johns-Manville Corporation*, and *Findley v. Blinken* inasmuch as it invoked both diversity and bankruptcy jurisdiction.  *See Findley*, 982 F.2d 721, 728.

noted that, in the underlying bankruptcy, both the health claimants and the co-defendants were appropriately in the same class pursuant to 11 U.S.C. §1122 of the Bankruptcy Code because, at that time, "the interests of the two groups were aligned together in the reorganization, in which their only interest was to maximize the percentage of recovery from Manville of whatever claims they held under state law." 982 F.2d at 740. It was in the class action, filed to change the "mechanism for distribution of compensation" to asbestos claimants under the confirmed plan, that their interests diverged. *Id.* at 725.

In the instant matter, we are at the confirmation stage. At best, Garlock is an entity that may pay a future demand holder and thereby acquire an indirect claim. In that regard, its interests are no different from any other Indirect Claimant's interests. Its rights rise no higher than, are dependent on, and will be treated the same as, that of the future demand holder whose claim against the PCC Trust Garlock pays. The Modified Third Amended Plan and TDP provide for the reimbursement of Indirect Claims to the same extent as the Direct Claims to which the Indirect Claimants are subrogated by virtue of the payment they make to the Direct Claimants. *See* §5.6 of the TDP. To give Garlock more than the Direct Claimants under whom it claims would be unfair and inequitable to the Direct Claimants. The Modified Third Amended Plan's treatment of co-defendants/Indirect Claimants is fair and equitable. 11 U.S.C. §1123(a)(4). Therefore, the classification of Indirect Claimants with Direct Claimants is appropriate. Garlock's objections on this ground are overruled.

Garlock contends that the Plan is unconfirmable because the TDP impairs its ability to defend claims in the tort system and denies it access to information about claims settled by the Asbestos PI Trust. First, it is no longer in the tort system and could not bring the Debtor into

such actions even if it were.  Second, Garlock has provided no evidence that it would be entitled to information from the Trust in order to defend itself in that system.  Any Indirect Claim it may prove in the future[19] would not require Garlock to know what claims, other than the claim for which recovery was requested, were settled by the Trust.

Garlock is not a creditor here.  It will resolve its asbestos liabilities in its own case based on its assessment of its own liability (not PCC's) for its own asbestos products (not PCC's), and/or its own conduct (not PCC's), without recourse to PCC's Trust (except as noted above) and without the ability to pursue a reorganized PCC as a co-defendant in the tort system.  To the extent Garlock somehow obtains, in the future, an Indirect Claim, it will be paid through the Trust in accordance with the terms of the Modified Third Amended Plan and its TDP.  Garlock's objections to the Modified Third Amended Plan are without merit.

### *Mt. McKinley's Standing Based upon Alleged Lack of Insurance Neutrality*

The Court of Appeals for the Third Circuit has articulated the requirements for a party to object to the confirmation of a plan of reorganization:

> To object to the confirmation of a reorganization plan in bankruptcy court, a party must, in the first instance, meet the requirements for standing that litigants in all federal cases face under Article III of the Constitution.  See *Danvers*, 432 F.3d at 290-91.  A party seeking constitutional standing must demonstrate

---

[19]We find it significant that Garlock does not claim creditor status or contend that it suffered a judgment as to which it paid PCC's liability in the tort system  Garlock merely argues that its rights are impaired under the Modified Third Amended Plan and TDP because it was a co-defendant with PCC in the tort system and therefore the Modified Third Amended Plan should have made provisions to pay Garlock what PCC's liability might have been adjudicated to be in the tort system.  As mentioned, this contention is based on a hypothetical set of facts that will never occur as both entities are in bankruptcy.  If, somehow, Garlock would become an Indirect Claimant, it will be treated as is every other Indirect Claimant and no Indirect Claimant will recover more than the Direct Claimant from which the Indirect Claim stems.

an "injury in fact" that is "concrete", "distinct and palpable", and "actual or imminent." *Whitmore v. Arkansas*, 495 U.S. 149, 155, 110 S. Ct. 1717, 109 L. Ed. 2d (1990). Additionally, the party must establish that the injury "fairly can be traced to the challenged action and is likely to be redressed by a favorable decision." *Id.* (internal quotations omitted). [The Third Circuit has] noted that "[t]he contours of the injury-in-fact requirement, while not precisely defined, are very generous." *Bowman v. Wilson*, 672 F.2d 1145, 1141 (3d Cir. 1982). The standard is met as long as the party alleges a "specific, 'identifiable trifle' of injury," id. (quoting *United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 686-90, 690 n.14, 93 S.Ct. 2405, 37 L. Ed. 2d 254 (1973)), or a "personal stake in the outcome of [the] litigation," *The Pitt News v. Fisher*, 215 F.3d 354, 360 (3d Cir. 2000). *See In re Congoleum Corp.*, 426 F.3d 675, 685 (3d Cir. 2005) ("Article III standing need not be financial and only need be fairly traceable to the alleged illegal action.").

*In re Global Indus. Techs.*, 2011 U.S. App. LEXIS 9109, *24-25 (3d Cir. 2011). The Court

further explained:

Standing in bankruptcy cases is also governed by the terms of 11 U.S.C. § 1109(b), which provides that "[a] party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard in a case under this chapter." 11 U.S.C. § 1109(b). The list of potential parties in interest in § 1109(b) is not exclusive. On the contrary, that section "has been construed to create a broad right of participation in Chapter 11 cases." *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 214 n.21 (3d Cir. 2004). The United States Court of Appeals for the Seventh Circuit has described a party in interest as "anyone who has a legally protected interest that could be affected by a bankruptcy proceeding." *In re James Wilson Associates*, 965 F.2d 160, 169 (7th Cir. 1992). That "party in interest" test comports with our own definition of a "party in interest" as one who "has a sufficient stake in the proceeding so as to require representation." *In re Amatex*, 755 F.2d 1034, 1042 (3d Cir. 1985). [The Third Circuit] thus adopt[s] the test set forth by the Seventh Circuit in *James Wilson* as a helpful amplification of our definition in *Amatex*. Status as a party in interest is of particular relevance here because the Bankruptcy Code expressly provides that parties in interest "may object to confirmation of a plan." 11

U.S.C. § 1128(b).

> In applying the teachings of *James Wilson* and *Amatex*, [the Court is] guided by [its] previous statement that "[s]ection 1109(b) must be construed broadly to permit parties affected by a chapter 11 proceeding to appear and be heard." *Amatex*, 755 F.2d at 1042 (citation omitted) (internal quotation marks omitted). . . . Persuasive authority indicates that Article III standing and standing under the Bankruptcy Code are effectively co-extensive. *Compare, e.g., The Pitt News*, 215 F.3d at 360 (injury-in-fact requires a "personal stake" in litigation), and *Danvers*, 432 F.3d at 291 (same), with *Amatex*, 755 F.2d at 1042 (party in interest must have a "sufficient stake" in bankruptcy proceedings). Interpreting the "party in interest" requirement as an additional obstacle to bankruptcy standing would frustrate the purpose of § 1109(b), which was intended to "confer[] broad standing at the trial level," *In re PWS Holding Corp.*, 228 F.3d 224, 249 (3d Cir. 2000), and to "continue[] in [the] tradition of "encourag[ing] and promot[ing] greater participation in reorganization cases," *Amatex*, 755 F.2d at 1042.

*In re Global Indus. Techs.*, 2011 U.S. App. LEXIS 9109, *26-27.

Similar to the situation in *Global Industrial* regarding standing, the question in the case at bench is whether Mt. McKinley has demonstrated a "personal stake" in the outcome of this litigation that is fairly traceable to the Modified Third Amended Plan. The Plan Proponents assert that Mt. McKinley has neither a personal stake in the litigation nor an identifiable injury that would result if the Plan is confirmed, as all of Mt. McKinley's rights and coverages defenses are preserved by the Plan.

As explained below, we disagree and find for the reasons which follow that the Plan as drafted is not insurance neutral. A plan is considered to be insurance neutral if it neither increases an insurer's pre-petition obligations nor impairs its pre-petition contractual rights under the subject insurance policies. *In re Global Indus. Techs.*, 2011 U.S. App. LEXIS 9109, *31-32 (citing *In re Combustion Engineering*, 391 F.3d 190, 218).

Mt. McKinley argues that the Modified Third Amended Plan is not insurance neutral because it does not protect Mt. McKinley from certain findings, sought to be included in the Plan by the Plan Proponents, that can allegedly be unfairly used against Mt. McKinley in coverage litigation. Mt. McKinley Insurance Company's and Everest Reinsurance Company's Post-Trial Brief in Opposition to Confirmation of the Modified Third Amended Plan (hereinafter, "Mt. McKinley's Post-Trial Brief"), Doc. No. 7901, at 3. Mt. McKinley alleges that "[t]he proposed language is not the neutrality language approved by the Third Circuit in [*Combustion Engineering*]. Instead, as the Court has acknowledged, it is incomprehensible, and its scope is blurred by being made subject to a host of other Plan Documents which, in reality, openly gut the purported protections." *Id.* at 3.[20] The Plan Proponents contend that "[t]his third plan . . . removed all insurance assignments and also added a Combustion Engineering style insurance neutrality provision." Transcript of 10/29/10 Hearing, Doc. No. 8025, at 9:14-17. We find that the insurance assignments were deleted as asserted by the Plan Proponents. However, that deletion does not fully address the neutrality issue.

The purported "insurance neutrality" clause of the Plan, § 11.17, provides that:

> Notwithstanding anything to the contrary in the Confirmation Order or the Plan, but subject to the proviso below, nothing in the Confirmation Order or the Plan (including any other provision that purports to be preemptory or supervening, including Section 11.13.1), shall in any way operate to impair, or have the effect of impairing, the PPG Non-Participating Insurers', the Corning Protected Insurers' and/or the Corning Non-Protected Insurers'

---

[20]For the proposition that this court finds the proposed language to be "incomprehensible," Mt. McKinley cites to the Transcript of the 5/11/2010 Hearing, Doc. No. 7761, at 59:11-14 (". . . with respect to the insurance neutrality language, frankly at this point I [do not] understand what this provision means. Somebody is going to have to explain it to me better than just this language does").

legal, equitable or contractual rights, if any, in any respect. The rights of the PPG Non-Participating Insurers, the Corning Protected Insurers and the Corning Non-Protected Insurers shall be determined under the PPG Non-Participating Insurance Policies, the Corning Insurance Policies, the Other Corning Policies and related insurance settlement agreements, as applicable.

*Provided, however,* and for the avoidance of doubt, that nothing in Section 11.17 shall preclude the entry or effectiveness of the Asbestos Permanent Channeling Injunction or shall affect or limit, or be construed as affecting or limiting, the protections afforded to the Asbestos Protected Parties under the Asbestos Permanent Channeling Injunction, or shall affect or limit, or be construed as affecting or limiting the releases, covenants and/or agreements in the PPG Trust Funding Agreement, the Insurance Claims Agreement or the Stipulation (or any releases granted in connection therewith).

Modified Third Amended Plan, Doc. No. 7704, at 52-53, § 11.17.

Section 11.13.1, which is referred to in § 11.17, provides:

Notwithstanding anything to the contrary in the Confirmation Order, the Plan or any of the Bankruptcy Court's orders shall enjoin, discharge, or release "Reserved Claims" as defined herein; provided, however that this Section 11.13.1 shall not limit or otherwise affect:
(a) the releases and other agreements in Section 11.13.2, the Insurance Claims Agreement and/or the Stipulation;
(b) the releases provided by the PPG Participating Insurers in Section VII.B and VII.C of the PPG Trust Funding Agreement, or
(c) the protections afforded to the PPG Participating Insurer Entities and the PCC Settled Insurer Entities under the Plan (including, without limitation, the protection of the Asbestos Permanent Channeling Injunction) with respect to the PCC/PPG Policies (as defined in the Insurance Claims Agreement), but not with respect to the Corning Insurance Policies or Other Corning Policies.

"Reserved Claims" are any past, present or future claims, rights, remedies, liabilities, demands, defenses and/or causes of action, subject to the releases, agreements or other protections of (a), (b) and/or (c) above (which releases, agreements or other protections of (a), (b) and/or (c) are not limited, or otherwise affected by

operation of this Section 11.13.1) by any of the Corning Entities, the Corning Affiliates and/or the Corning - Affiliated Parties (hereafter "Corning Parties") and/or any insurer in connection with the Corning Insurance Policies and/or the Other Corning Policies (including, but not limited to, any claims or demands for defense, indemnity, contribution, bad-faith, breach of contract, reimbursement and/or extra-contractual remedies), ***provided, however,*** that Reserved Claims shall not include any claims for contribution, indemnity, reimbursement, equitable subrogation, or similar claims-over by a Corning Non-Protected Insurer against a Corning Protected Insurer in connection with the Corning Trust Contribution Recovery. The Reserved Claims are not subject to the Asbestos Permanent Channeling Injunction and shall not be treated as (i) Asbestos Personal Injury Claim(s); (ii) Asbestos PI Trust Claims; (iii) Channeled Asbestos PI Trust Claim(s); (iv) Indirect Asbestos Claim(s); (v) PCC/PPG Insurance Practices Claim(s); (vi) Debtor-Released Claims; and/or (vii) Plan Participation Claims under the Plan, and the Corning Parties and the Corning Insurers are not Asbestos Protected Parties among themselves with respect to the Reserved Claims. For the avoidance of doubt, except as set forth in the Stipulation and Section III.C of the Insurance Claims Agreement, and subject to Section 11.13.2 of the Plan, the Corning Parties have not released in the Plan any claims, demands and/or rights they may have under or against the Corning Insurance Policies, the Other Corning Policies and/or against the Corning Insurers.

Modified Third Amended Plan, Doc. No. 7704, at 49-50, § 11.13.1.

Ms. Cheryl Heller, counsel for the Plan Proponents, stated that "Section 11.13.1 was included in the plan to confirm that the rights of the Corning parties and/or any other insurers in connection with the Corning insurance policies and the other Corning policies . . . are preserved and that the Corning parties remain free to seek coverage under those policies for channeled and non-channeled claims." Transcript of 10/29/10 Hearing, Doc. No. 8025, at 65:14-20. A stipulation was executed by the Debtor and several insurers, whereby the majority of Corning insurers became Corning Protected Insurers and, as a result, Asbestos Protected Parties under the Modified Third Amended Plan. Pursuant to the terms of that stipulation, Corning is "left with

pursuing [its] reimbursement claim against only the Corning non-protected insurers which include Mt. McKinley." *Id.* at 66:13-15.

As explained by the Plan Proponents:

> Section 11.13.1 confirms that all claims, rights, remedies, liabilities, demands, defenses, and/or causes of action by any of the Corning parties and any insurers in connection with the Corning policies, other than those claims, rates [sic], and defenses released in agreements to which Mt. McKinley is not a party, are preserved and not affected by the operation of the plan and the asbestos permanent channeling injunction.

*Id.* at 66-67.

According to the Plan Proponents, it is not the operation of § 11.13.1 that prohibits Mt. McKinley from pursuing the Corning insurers, but instead it is the channeling injunction that does so. The Plan Proponents contend that § 11.13.1 merely "reconfirms that nothing in the plan or any of the Bankruptcy Court's orders will enjoin, discharge or release [the] reserved claims" which include "any past, present or future claims, rights, remedies, liabilities, demands, defenses, and/or causes of action by any of the Corning parties against any insurers, by any insurers against any of the Corning parties, by any insurers among themselves, in connection with the Corning policies."[21] *Id.* at 68-69.

---

[21]The Plan Proponents also contend that §11.9 preserves the economic rights and interests of Mt. McKinley through judgment reduction. We note that § 11.9(b) was amended during the June, 2010, confirmation hearing (Doc. No. 7798) and incorporated into the Modified Third Amended Plan. Specifically, § 11.9(b) states that:

> Corning shall reduce or return the amount of any final judgment or settlement, including any associated interest or costs, it obtains, recovers and/or receives in its favor in connection with any cause of action for recovery of the Corning Trust Contribution against any Corning Non-Protected Insurer (said judgment hereinafter

(continued...)

referred to as "the Corning Trust Contribution Recovery") to the extent necessary to extinguish the liability of a Corning Protected Insurer, a PCC Settled Insurer or a PPG Participating Insurer (or any other Entity allegedly liable for or on account of said PPG Participating Insurer, PCC Settled Insurer or Corning Protected Insurer), if any, with respect to Channeled Asbestos PI Trust Claims, under or pursuant to any insurance policies for such Corning Protected Insurer's or PPG Participating Insurer's allocable share of any final judgment rendered in favor of a Corning Non-Protected Insurer and/or a PPG Non-Participating Insurer against said Corning Protected Insurer, PCC Settled Insurer or PPG Participating Insurer (or any other Entity allegedly liable for or on account of any PPG Participating Insurer, any PCC Settled Insurer or any Corning Protected Insurer) for contribution, indemnity, reimbursement, or similar claims-over in respect of the Corning Non-Protected Insurer's and/or the PPG Non-Participating Insurer's allocable share of the Corning Trust Contribution Recovery (hereinafter "the Non-Protected Insurer Judgment"); provided, however, that in no event will Corning make such a reduction or reimbursement:  (1) if the Non-Protected Insurer Judgment arose from, pursuant to, or was a result of, a settlement, stipulation, and/or agreement by the party seeking to enforce this judgment reduction clause, unless Corning, in its sole discretion, consents in writing to such settlement, stipulation and/or agreement; (2) if the claims by the Corning Non-Protected Insurers and/or the PPG Non-Participating Insurers were not fully defended on behalf of the party seeking to enforce this judgment reduction clause in good faith; or (3) in an amount in excess of the amount of the Non-Protected Insurer Judgment.  Nothing herein prohibits the Corning Non-Protected Insurers from seeking a declaration or judgment regarding an allocation and/or apportionment of their liability with respect to the payment or reimbursement of the Corning Trust Contribution Recovery, in an action brought by Corning.  To the extent that such a declaration or judgment regarding an allocation of liability is made in favor of the Corning Non-Protected Insurers against the PPG Participating Insurers, the PCC Settled Insurers, the Corning Protected Insurers and/or the Corning Entities, the judgment rendered in favor of Corning shall be reduced or reimbursed in accordance with the above.

(continued...)

Mt. McKinley is correct in pointing out that both § 11.17 and § 11.13.1 contain preemptory language. While the Plan Proponents attempted to articulate the functioning of these paragraphs at the post-trial hearing on October 29, 2010, we find that, when read together, reasonable minds could disagree as to which provision - § 11.17 or § 11.13.1 - is preemptory and, thus, how Mt. McKinley's rights and defenses in coverage litigation are or are not affected by the provisions of this plan as a non-settling insurer. While the Plan Proponents provided testimony to attempt to explain how the provisions function together, the testimony fails to clarify the language used. The Plan Proponents themselves cannot seem to answer with certainty the question of which of the provisions prevails or how they function together. This finding is supported by evidence of record, including testimony cited by Mt. McKinley which established that Corning's General Counsel and Rule 30(b)(6) witness, Vincent P. Hatton, could not specify which preemptory clause controls:[22]

> Q: So the asbestos permanent channelling [sic] injunction would trump the provisions earlier in Section 11.17?

---

[...continued]
Notice of Plan Proponents' Amendments to the Modified Third Amended Plan for [PCC], Doc. No. 7798. However, for purposes of the analysis of Mt. McKinley's standing in this case, we need look only to § 11.17 and § 11.13.1 to determine that the Plan as currently drafted is not insurance neutral.

[22]Mr. Hatton's testimony describes at great length his interpretation of these paragraphs, as well as his interpretation of Corning's position regarding insurance neutrality. While the court has selected certain portions of this testimony for inclusion in this Opinion, we have not cited all testimony regarding this issue and further testimony can be found in the Designations and Counter-Designations of Mr. Hatton's 5/20/10 deposition testimony. *See* Transcript of 6/9/2010 Hearing, Doc. No. 7830, at 9. We credit his testimony on this issue. Thus, regardless of the portion of his testimony cited in this Memorandum Opinion, we once again emphasize our conclusion that the Plan is not insurance neutral.

A:  I believe that's the case.

Transcript of 5/20/10 Deposition of Vincent Hatton, at 24:19-22 (*see* Transcript of 6/9/2010

Hearing, Doc. No. 7830, at 9).  Further:

> Q:  Okay.  All right, let's turn back to Section 11.17 of the plan,
> the first sentence of the first paragraph says: "Notwithstanding
> anything to the contrary in the confirmation order or the plan, but
> subject to the proviso below, nothing in the confirmation order or
> the plan," then open parenthesis, "including any other provision
> that purports to be preemptory or supervening, including Section
> 11.13.1," and I'll stop there; do you see that?
> A:  Yes.
> Q:  So is it your understanding, sir, that Section 11.17 is supposed
> to be I guess the ultimate preemptory language in the plan?
> A:  Well –
> (objections omitted)
> A:  I mean, you have to take the language as it's written I suppose.
> It says that nothing in 11.13 will have the effect of impairing the
> rights of the nonparticipating and the enumerated parties.  I don't
> know whether that makes it a supervening paragraph or not.
> Literally –
> Q:  I'm sorry, let me, let's start with this, 11.17 is supposed to be
> preemptory and supervening, correct?
> A:  Subject to the proviso and the language that's actually used.
> Q:  Right.  And then in the third line of that provision it says that
> in fact 11.17 preempts any other provision of the plan that purports
> to be preemptory or supervening; do you see that?
> (objection omitted)
> A:  No, I don't think it does say that.  It says nothing in the
> confirmation order or the plan including anything in the
> confirmation order or the plan which is preemptory or
> supervening, which would include Section 11.13 will operate to
> impair or have the effect of impairing those rights.  That's – it's
> limited to that, that effect.
> Q:  Okay.  So do you understand it then, Section 11.17 does not
> preempt Section 11.13.1?
> (objection omitted)
> A:  Well, I don't know whether it preempts it or not.  It says
> literally that nothing in the confirmation order or the plan
> including Section 11.13 will impair or have the effect of impairing
> the legal and equitable contractual rights of those enumerated
> parties.

23

*Id.* at 46-48.

Furthermore, the purported insurance neutrality language goes far beyond the *Combustion Engineering* language as the language here contains many qualifications and provisos. If the goal of the Debtor is to create a plan with insurance neutrality, the insurance neutrality language must follow the *Combustion Engineering* analysis without the multitude of qualifications that create ambiguity in the Modified Third Amended Plan at bench. As it is, reasonable minds can differ as to what the sections actually mean and which controls.

Because the purported insurance neutrality provisions of the Modified Third Amended Plan are ambiguous as currently drafted, we find that the Modified Third Amended Plan is not insurance neutral. The confusion created by these paragraphs creates doubt as to whether Mt. McKinley's rights are impaired under the Modified Third Amended Plan and, as a result, we find that Mt. McKinley has the necessary standing to prosecute its objections to the confirmation of the Modified Third Amended Plan in this court.[23] Thus, we will address the substantive merits of Mt. McKinley's objections.

### *Scope of the § 524(g) Permanent Channeling Injunction*

This court has found that nonderivative[24] Pyrocal and Corhart claims cannot be channeled

---

[23]We note that Mt. McKinley also contends that the Modified Third Amended Plan is not insurance neutral because of certain allegedly "unnecessary" findings of fact. The court does not address the specified findings of fact at this time because the court declines to confirm the Modified Third Amended Plan as drafted.

[24]The terms "derivative" and "nonderivative" were defined by this court in its Memorandum Opinion regarding the Second Amended Plan:

> Section 524(g) does not contain the word "derivative." The term is defined in Black's Law Dictionary as "[l]iability for a wrong that a

(continued...)

into the § 524(g) Trust.  In our 2006 Memorandum Opinion, we explained that, in accordance

with the ruling of the Court of Appeals in *In re Combustion Engineering*,[25] "to the extent that

PCC, PPG and Corning are alleged to be jointly and severally liable for PCC's products

(generally Unibestos) or conduct, or allegations against them are based on conspiracy or other

joint or several liability theories, . . . the claims against the nondebtor entities are derivative and

[24](...continued)

> person other than the one wronged has a right to redress."  Black's
> Law Dictionary (8th ed. 2004).  The Oxford English Dictionary
> defines "derivative" as "[c]haracterized by transmission, or passing
> from one to another" and "[a] thing of derived character; a thing
> flowing, proceeding or originating from another."  "Liability" is
> defined, *inter alia*, as "[a]n attribute or trait which sets one at a
> disadvantage; hence, a burdensome or disadvantageous person or
> thing, a handicap."  *See* http://dictionary.oed.com.  The American
> Heritage Dictionary of the English Language, 4th ed., found at
> www.dictionary.reference.com, states the definition of "derivative"
> as "not original; secondary" and "resulting from."  The claims
> against PPG and Corning that are based on their shareholder status
> or joint liability theories fall within the definition of derivative
> liability.  Some of the derivative claims are alleged to be as a result
> of "conduct of, claims against, or demands on" PCC or based on
> nondebtors' participation in and control of PCC.  Section 524(g)
> requires only that such claims be alleged.  11 U.S.C. §
> 524(g)(4)(A)(ii).

*In re Pittsburgh Corning*, 417 B.R. at 310.  Thus, it follows that "nonderivative liability" would
be those claims that are *not* alleged to be as a result of conduct of, claims against, or demands on
PCC or based on nondebtors' participation in and control of PCC.

[25]The *Combustion Engineering* court made "it clear that the asbestos channeling
injunction protection is available only to nondebtor affiliates that meet the § 524(g)
requirements.  To the extent that there is an identifiable third party that is 'alleged to be directly
or indirectly liable for the conduct of, claims against, or demands on the debtor to the extent such
alleged liability of such third party arises by reason of,' *inter alia*, its ownership of a financial
interest in the debtor, a past or present affiliate or predecessor in interest of the debtor, its
involvement in the management of the debtor or service as, *e.g.*, a director of the debtor, or its
provision of insurance to the debtor, a § 524(g) injunction may issue.  11 U.S.C. §
524(g)(4)(A)."  *In re Pittsburgh Corning*, 417 B.R. at 302.

can be channeled under § 524(g)." *In re Pittsburgh Corning*, 417 B.R. at 293.  However, "even

though Corhart claims against PCC can be channeled, insofar as the Corhart claims against PCC

do not include Corning,[26] Corning is not subject to the § 524(g) channeling injunction.  Further,

to the extent that Corhart claims brought against Corning do not also assert conduct of PCC or

allege liability derivative of PCC, those claims against Corning cannot be channeled."  *Id.* at

294.  No evidence to the contrary was introduced in conjunction with the Modified Third

Amended Plan.

Both Mt. McKinley and the Reaud Morgan Claimants[27] object to the "scope of the

Asbestos Permanent Channeling Injunction on the grounds that the precise scope of the

injunction is not sufficiently clear and that the language used to define the injunction might be

construed in a manner that would exceed the limits allowed by the statute."  Plan Proponents'

Post-Trial Brief, Doc. No. 7904, at 25.

Under § 524(g), a channeling injunction may be extended to non-debtor parties only to

the extent that the liability of such third party is derivative of the Debtor's liability under one of

four circumstances:

> to the extent such alleged liability of such third party arises by
> reason of--
> (I) the third party's ownership of a financial interest in the debtor,

---

[26]The claims were filed against Corhart Refractories Company, an entirely different entity.

[27]The Reaud Morgan Claimants base their objections on the contention that they possess nonderivative claims against PPG for Pyrocal liability and Corning for Corhart liability and that they intend to prosecute these claims in the tort system as soon as the injunction preventing such litigation is lifted.  Reaud Morgan Claimants' Principal Post-Confirmation Hearing Brief with Respect to the Modified Third Amended Plan of Reorganization (hereinafter, "Reaud Morgan's Post-Trial Brief"), Doc. No. 7899, at 6.

a past or present affiliate of the debtor, or a predecessor in interest of the debtor;

(II) the third party's involvement in the management of the debtor or a predecessor in interest of the debtor, or service as an officer, director or employee of the debtor or a related party;

(III) the third party's provision of insurance to the debtor or a related party; or

(IV) the third party's involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of the debtor or a related party, including but not limited to–

(aa) involvement in providing financing (debt or equity), or advice to an entity involved in such a transaction; or

(bb) acquiring or selling a financial interest in an entity as part of such a transaction.

11 U.S.C. § 524(g)(4)(A)(ii)(I)-(IV). *See also In re Combustion Engineering*, 391 F.3d 190 (3d Cir. 2004).

In explaining how the Modified Third Amended Plan narrowed the scope of the Channeling Injunction to prohibit the channeling of wholly independent Pyrocal and/or Corhart claims, the Plan Proponents stated that:

the [Modified] [T]hird [A]mended [P]lan has a broad definition of what a P.I. trust claim is in order that the debtor get full protection, and in order that the protected parties[28] get full protection from claims relating to the debtor's product or actions. But it then narrows what was broader before so that the purely independent claims, having nothing to do with Pittsburgh Corning, are not included . . . .

Transcript of 6/3/2010 Hearing, Doc. No. 7823, at p. 26:12-19.

The Modified Third Amended Plan defines an "Asbestos Protected Party" as:

Any of the following Entities:

---

[28]This is a reference to a defined term in the Plan – "Asbestos Protected Party." *See* text, *infra.*

(a) the Debtor, Reorganized PCC and/or the PCC-Affiliated Parties;

(b) the PPG Entities, the PPG Affiliates and the PPG-Affiliated Parties, with respect to Asbestos PI Trust Claims that arise, in whole or in part, out of exposure to:
(1) Unibestos, or any other asbestos or asbestos-containing products manufactured, sold and/or distributed by the Debtor, or asbestos on or emanating from any PCC premises; or
(2) any other alleged asbestos or asbestos-containing product to the extent that a claimant is alleging or seeking to impose liability, directly or indirectly, for the conduct of, claims against or demands on the Debtor by reason of any of the PPG Entities', the PPG Affiliates', the PPG-Affiliated Parties' or the PPG Participating Insurer Entities':  (i) ownership of a financial interest in the Debtor; (ii) involvement in the management of the Debtor, or service as an officer, director or employee of the Debtor or a related party; (iii) provision of insurance to the Debtor or a related party; or (iv) involvement in a financial transaction affecting the financial condition of the Debtor or a related party;

(c) the PPG Participating Insurer Entities, in their capacity as such and/or as issuers of PPG Participating Insurance Policies and policies issued to or covering the Debtor;

(d) the Corning Entities, the Corning Affiliates, the Corning-Affiliated Parties and the Corning Protected Insurers, in their capacity as such and/or as issuers of the Corning Insurance Policies, with respect to Asbestos PI Trust Claims that arise, in whole or in part, out of exposure to:
(1) Unibestos, or any other asbestos or asbestos-containing products manufactured, sold and/or distributed by the Debtor, or asbestos on or emanating from any PCC premises; or (2) any other alleged asbestos or asbestos-containing product to the extent that a claimant is alleging or seeking to impose liability, directly or indirectly, for the conduct of, claims against or demands on the Debtor by reason of any of the Corning Entities', the Corning Affiliates', the Corning-Affiliated Parties' or the Corning Insurers': (i) ownership of a financial interest in the Debtor; (ii) involvement in the management of the Debtor, or service as an officer, director or employee of the Debtor or a related party; (iii) provision of insurance to the Debtor or a related party; or (iv) involvement in a financial transaction affecting the financial condition of the Debtor or a related party;

(e) without limiting any protection afforded by subsection (c) above, and for the avoidance of doubt, the PCC Settled Insurer Entities, in their capacity as such and/or as issuers of the PCC Settled Insurance Policies;

(f) any Entity (and any past, present, or future corporate parent, subsidiary, predecessor, Affiliate, officer, director, employee, consultant, attorney, accountant, advisor, administrator, representative or agent of any such Entity, in his, her or its capacity as such) that, pursuant to the Plan or after the Effective Date, becomes a direct or an indirect transferee of, or successor to, (i) any of the Entities identified in subparagraphs (a) - (e) above, (ii) the Asbestos PI Trust or (iii) the assets or stock of any of the parties referenced in clauses (i) or (ii) hereof (but only to the extent that liability is asserted to exist by reason of its becoming such transferee or successor);

(g) any Entity that, pursuant to the Plan or after the Effective Date, makes a loan to any of the Entities identified in subparagraphs (a) - (e) above (but only to the extent that liability is asserted to exist by reason of such Entity's becoming such a lender or to the extent any pledge of assets made in connection with such a loan is sought to be upset or impaired);

(h) any Entity to the extent he, she, or it is alleged to be directly or indirectly liable for the conduct of, Claims against, or Demands on the Debtor, Reorganized PCC, or the Asbestos PI Trust on account of Asbestos PI Trust Claims by reason of one or more of the following:
(1) such Entity's involvement in the management of the Debtor, Reorganized PCC or an Affiliate of the Debtor or any predecessor in interest of the Debtor, Reorganized PCC, or an Affiliate of the Debtor, including PPG and Corning;
(2) such Entity's ownership of a financial interest in the Debtor, Reorganized PCC, or a past or present Affiliate of the Debtor, or any predecessor in interest of the Debtor, Reorganized PCC, or an Affiliate of the Debtor, including PPG and Corning;
(3) such Entity's service as an officer, director, or employee of the Debtor, Reorganized PCC, or predecessor in interest and/or Affiliate of the Debtor, including PPG and Corning;
(4) such Entity's involvement in a transaction changing the corporate structure, or in a loan Of other financial transaction affecting the financial condition of the Debtor, Reorganized PCC, or a predecessor in interest and/or Affiliate of the Debtor,

including PPG and Corning.

Modified Third Amended Plan, Doc. No. 7704, at Article 1.1, ¶. 6-7.

"Asbestos PI Trust Claims" are defined as "[a]ll Asbestos Personal Injury Claims,

Indirect Asbestos Claims and PCC/PPG Insurance Practices Claims." *Id.* at Article 1.1, p. 5.

In turn, an "Asbestos Personal Injury Claim" is defined as:

> Any past, present, or future Claim, right, remedy, liability, or Demand made or brought or that could be made or brought against:
>
> (a) the Debtor, Reorganized PCC and/or the PCC-Affiliated Parties;
>
> (b) PCE;
>
> (c) any PPG Entities and/or any PPG-Affiliated Parties (including any liabilities retained or assumed by the PPG Entities arising from, based upon, or attributable to Asbestos Personal Injury Claims);
>
> (d) any PPG Participating Insurer Entities in their capacity as such, and/or as issuers of the PPG Participating Insurance Policies and policies issued to or covering the Debtor (including without limitation Claims or Demands brought pursuant to a direct action statute or similar theory of law);
>
> (e) any Corning Entities and/or any Corning-Affiliated Parties (including any liabilities retained or assumed by the Corning Entities arising from, based upon, or attributable to Asbestos Personal Injury Claims);
>
> (f) any Corning Protected Insurers, in their capacity as such, and/or as issuers of the Corning Insurance Policies (including without limitation Claims or Demands brought pursuant to a direct action statute or similar theory of law); or
>
> (g) any PCC Settled Insurers, in their capacity as such and/or as issuers of the PCC Settled Insurance Policies (including without limitation Claims or Demands brought pursuant to a direct action statute or similar theory of law);

under any statute or theory of law, equity, admiralty, or otherwise, for, arising out of, resulting from, or attributable to, directly or indirectly, bodily injury, sickness, disease, illness, ailment, death, medical monitoring for increased risk, fear of or increased risk of any of the foregoing, loss of consortium, or survivorship, arising out of or based on or attributable to, in whole or in part, exposure to asbestos or asbestos containing products or materials (including without limitation (i) such Claims or Demands arising in whole or in part out of any actual or alleged relationship on the part of either the PPG Entities or the Corning Entities with the Debtor or (ii) such Claims or Demands that are allegedly covered by (a) shared insurance policies covering both the PPG Policyholder Companies and the Debtor or policies covering either of them, or (b) shared insurance policies covering both the Corning Policyholder Companies and the Debtor or policies covering either of them), which seek damages of any kind (including but not limited to punitive or exemplary damages), costs, expenses, or other remedies, including legal, equitable or mandatory relief, under any statute or theory of law, equity, admiralty or otherwise; provided, however, that this definition shall not include (i) any PPG Asbestos Premises Claims as to the PPG Entities; (ii) any Corning Asbestos Premises Claims as to the Corning Entities; or (iii) any Workers Compensation Claims.

Modified Third Amended Plan, Doc. No. 7704, at Article 1.1, ¶. 4-5.

It is evident that these provisions have been modified subsequent to the court's denial of confirmation of the Second Amended Plan. However, the modifications did not solve the problem, which remains in the Modified Third Amended Plan.

By incorporating the language of § 524(g) into the definition of Asbestos Protected Party, the scope of the Channeling Injunction has been narrowed. Specifically, the inclusion of the language of § 524(g)(4)(A)(ii)(I)-(IV) sufficiently narrows the Channeling Injunction to include only those parties who are involved in the requisite relationship with the Debtor. While Mt. McKinley argues that mere parroting of the statutory language is insufficient, the court has articulated:

> . . . [the court does not] see any problem parroting the language in
> the plan to the extent that it applies specifically because the
> language is the language.  It [cannot] exceed the injunction terms
> that are in the Code and [the court] thinks that was the problem
> here.  The [D]ebtor was trying to articulate that it [is not] seeking
> something that's beyond the Code language and the issue is how
> do you say that.  Well you say it by saying that this is what the
> Code says we can [do] and this is what we want to do.  But you
> still have to tie it to the parties in the claims.[29]

Transcript of 10/29/10 Hearing, Doc. No. 8025, at 83:8-18.

Thus, whereas the incorporation of the language of § 524(g) is not problematic and the parties to whom the Channeling Injunction apply are appropriately identified, the issue remains that the injunction is not clear by its terms as to which <u>claims</u> the Channeling Injunction governs and is therefore over-inclusive.  At the post-trial hearing, we emphasized that the scope of the injunction must be clearly defined in either the Modified Third Amended Plan or in a confirmation order issued by this court.  It is unacceptable to define the scope of the injunction post-confirmation, as the burden to articulate its scope is on the Plan Proponents as a requisite of confirmation.  This burden cannot be placed on another party including the parties in interest or the claimants themselves.  Instead, it is imperative that the Channeling Injunction be articulated in a way that leaves no doubt as to who and what it covers.  *See* Transcript of 10/29/10 Hearing, Doc. No. 8025, at 87:2-17.  The court appreciates the Debtor's attempt to clarify and incorporate our prior finding that the purely independent, nonderivative Pyrocal and Corhart claims cannot be channeled; however, the Modified Third Amended Plan as currently drafted falls short of this goal.  We find that the problem lies first with the definition of "Asbestos Personal Injury Claim."

The definition of an Asbestos Personal Injury Claim is over-inclusive.  As to non-Debtor

---

[29]"[I]n the claims" should read "and the claims."

entities, the definition includes:

> Any past, present, or future Claim, right, remedy, liability, or Demand made or brought or that could be made or brought . . . arising out of or based on or attributable to, in whole or in part, exposure to asbestos or asbestos containing products or materials (<u>including without limitation</u> . . .) . . . .

Modified Third Amended Plan, Doc. No. 7704, at Article 1.1, ¶. 4-5 (emphasis added). This language is broad enough to include derivative and nonderivative claims regardless of the asbestos containing product. In other words, regardless of the product in question, if a claimant alleges a "conspiracy theory" claim involving the Debtor, the claim should be channeled to the trust. However, the definition of an Asbestos Personal Injury Claim does not limit the channeling to derivative claims. Furthermore, to the extent that the definition of an "Asbestos Protected Party" incorporates (in paragraph (b) regarding PPG and in paragraph (d) regarding Corning) the definition of an "Asbestos Personal Injury Claim" by reference to "Asbestos PI Trust Claim," it, likewise, is too broad as currently drafted.

Therefore, we find that the terms of the Modified Third Amended Plan remain broad enough to include claims that are nonderivative, independent claims of PPG or Corning that are wholly unrelated to PCC. As we explained in the 2006 Memorandum Opinion, "[a]s written, the plan runs afoul of the *Combustion Engineering* decision because it enjoins suits against the nondebtors PPG and Corning with respect to suits by tort claimants on actions that do not arise derivatively from PCC." *In re Pittsburgh Corning*, 417 B.R. at 312. "As structured, the [C]hanneling [I]njunction provided by this plan is not limited to those claims which satisfy § 524(g) and may be channeled." *Id.* at 312-13.

We emphasize that the Debtor is entitled to the fullest extent of protection under § 524(g)

and to the broadest channeling injunction possible under the Bankruptcy Code; however, the Channeling Injunction must be tailored with respect to all other parties including the parent companies of the Debtor.

### *Claims Against PPG and Claims Against Corning*

It is also necessary to consider the circumstances specific to PPG and Corning, respectively. This court's 2006 Memorandum Opinion discussed at length the potential claims against PPG and Corning. The evidence of record regarding the confirmation of the Second Amended Plan substantiated that PPG faced liability for both PC-Relationship claims, which involved PCC's Unibestos product, and Non-PC-Relationship claims, which involved the Pyrocal product. Nothing has changed regarding the Modified Third Amended Plan. Before, addressing the claims against PPG, we will first turn to the claims against Corning.

During the confirmation hearing related to the Second Amended Plan, "[t]here was argument that PCC had nothing to do with Corhart and, therefore, no Corhart claims could be channeled." *In re Pittsburgh Corning*, 417 B.R. at 294. We disagreed and found that, "[i]nsofar as there are suits alleging liability of Corning with PCC for Corhart based on some 'conspiracy theory' of liability, the claims can be channeled." *Id.* However, the Corhart suits against PCC failed to include Corning as a defendant. *Id.* We found that, while Corhart claims alleging liability against PCC could be channeled, those claims against PCC which do not include Corning as a defendant do not subject Corning to the Channeling Injunction. *Id.*

To clarify the issue with respect to Corning, we will restate the claims against Corning as thoroughly explained in the 2006 Memorandum Opinion, and then discuss the evidence regarding the Modified Third Amended Plan.

PC-Relationship claims involving PCC's Unibestos product also exist against Corning. At the time the Debtor's bankruptcy petition was filed, approximately 11,400 claimants had named Corning as a co-defendant along with PCC.[30]  SFF ¶ 66.  "In addition to PC-Relationship claims, Corning has also been alleged to have potential asbestos liability arising from a refractory brick product called 'Corhart' distributed by Corhart Refractories Company, which Corning and Hartford Empire Company formed in 1927."[31]  *In re Pittsburgh Corning*, 417 B.R. at 298.  *See also* SFF ¶ 74.  While none of the products actually manufactured by Corhart contained asbestos, Corhart occasionally provided spacer material for use between the refractory bricks and this spacer material allegedly contained asbestos.  *Id.  See also* SFF ¶ 77.

"There are currently approximately 10,000 pending Corhart cases, involving approximately 40,000 claimants."  SFF ¶ 78.  However, there is no allegation that these cases involve Corning.  In 2006, the record established that only one 'conspiracy theory' suit against Corning that includes PCC existed and that remains accurate to date.  However, that one suit does not identify the asbestos containing product as Corhart.  *In re Pittsburgh Corning*, 417 B.R.

---

[30]"Corning has not been a party to any trial involving Unibestos, and no judgment or finding has ever been entered or made by any court finding Corning liable or responsible for any injury allegedly caused by exposure to Unibestos or the actions of PCC in manufacturing, selling, and distributing Unibestos."  Third Amended Disclosure Statement, Doc. No. 6828, at 39.

[31]Although Corning purchased the Corhart company, Corning did not purchase the Corhart product.  To the extent that the term "Corhart" refers to both a company and a product, PCC has no involvement with either.

at 290, n.6.[32]

"PCC never had any financial involvement or owned any interest in Corhart nor did it manufacture, sell, distribute, market or supply any Corhart product. Nonetheless, it is named a defendant in most of the Corhart asbestos liability suits, 93 to 97 percent. . . . [T]o the extent the argument is that the channeling injunction is proper with respect to these suits as to Corning because there will be an impact on insurance coverage as a result of Corhart claims, . . . it is evident that such an impact will not occur unless a separate contribution or indemnity action is brought." *In re Pittsburgh Corning*, 417 B.R. at 299-300 (internal citations omitted). *See also* SFF ¶ 100. Thus, "[e]ven though at least some of the suits against Corhart name PCC and PPG, Corning is not named and a separate suit against Corning could be required to establish Corning's liability or to affect the insurance shared between PCC and Corning." *In re Pittsburgh Corning*, 417 B.R. at 299-300 (internal citations omitted). The *Combustion Engineering* decision determined that, where a separate lawsuit is required to affect the bankruptcy estate, related-to jurisdiction does not exist. *Id.* (citing *In re Combustion Engineering*, 391 F.3d at 232).

In our 2006 Memorandum Opinion, with respect to Corning, we found that PCC is an affiliate of Corning and, therefore, the insurance shared between them "is an asset of [PCC's] estate and will be affected by independent, nonderivative claims against Corning. However, in those instances where the action is against Corhart and not against Corning and, in light of *Combustion Engineering*, because the effect on this estate will not occur without a separate

<hr />

[32]As we addressed in the 2006 Memorandum Opinion, we reemphasize that Corning and Corhart are independent entities. Corning is not named in the suits against Corhart Refractories, and the Debtor has no affiliation with Corhart Refractories.

action brought against Corning, the independent, nonderivative claims cannot be channeled." *In re Pittsburgh Corning*, 417 B.R. at 306.

Finally, and importantly, we explained in our 2006 Memorandum Opinion that:

> The evidence established that there have been no events that have affected Corning's insurance that also involve PCC. No Unibestos case involving Corning ever proceeded to trial. When PCC settled a Unibestos case, it got a release as to Corning. The Corhart claims against PCC do not involve Corning and there is no evidence that Corhart claims only against Corning are derivative of PCC. Corning's Corhart claims, therefore cannot be channeled. For shared insurance to be affected on the basis of Corhart claims, Corhart would first have to suffer an adverse verdict, then seek contribution or indemnity from Corning by establishing that the liability arose from a time period in which Corning owned Corhart. Only if Corning's liability for indemnity or contribution is established would the insurance shared between it and PCC be affected. Under this scenario, the Corhart claims are Corning's independent, nonderivative liability and cannot be channeled, even though Corning shares insurance with PCC.

*In re Pittsburgh Corning*, 417 B.R. at 306.

The court finds that the same analysis and explanation remain true regarding confirmation of the Modified Third Amended Plan. The confirmation hearing regarding the Modified Third Amended Plan provided the parties with yet another opportunity to demonstrate that "conspiracy theory" claims involving Corning and PCC have existed in the past, exist now, and/or will exist in the future. However, once again no credible evidence was introduced to indicate that Corhart claims are derivative of PCC under the standards of § 524(g) to substantiate a specific link between PCC and Corning whereby a "conspiracy theory" claim was established in the past or is likely to exist in the future. The testimony of Mr. Hatton indicates as much. When asked whether he believed the Corhart claims would be resolved through confirmation of this Modified Third Amended Plan, Mr. Hatton stated that:

Corning expects to have a scope of this particular injunction as broad as it can possibly be under 524(g) in connection with all of its asbestos-related cases. Some of those certainly involve the Corehart [sic] products. Whether or not every single Corehart [sic] case is included in the injunction remains to be determined as we see whatever requirements are placed on the injunction and how the court interprets the scope of 524(g).

Deposition of Vincent C. Hatton of 10/29/09, at 123:22-25 and 124:1-7 (*see* Transcript of 6/9/2010 Hearing, Doc. No. 7830, at 9).

Furthermore, Mr. Hatton's testimony indicated the following:

Q: . . . Corehart [sic] or Corning are defendants in lawsuits alleging damage – injury, personal injury, from exposure to the Corehart [sic] spacers, correct?
A: Yes.
Q: Are there any cases of those which also allege that Pittsburgh Corning, the debtor, is responsible for injuries arising from the Corehart [sic] spacers?
A: There are – my understanding is that we have cases in which Pittsburgh Corning is named, and we have spacers in which – we have cases in which a conspiracy between Corning and Pittsburgh Corning to distribute asbestos-containing products is part of the allegations.
Q: Are part of the allegations that Pittsburgh Corning entered into a conspiracy to distribute Corehart [sic] spacers?
A: I think the pleadings are unclear as to whether it's Corehart [sic] spacers or [U]nibestos products or other products.
Q: So you're not aware of any complaint out there which specifically alleges a connection between Pittsburgh Corning and the Corehart [sic] spacer product?
A: I didn't say that. I said there are cases in which Pittsburgh Corning is named where there are allegations of conspiracy with Corning about the distribution of asbestos products. That's what's there.
Q: Is there any such case where the allegation is about distribution of Corehart [sic] spacers specifically?
A: Where the Corehart spacers are specifically named?
Q: Yes.
A: I don't have personal knowledge of that being the case.
Q: Can you name any case in which Pittsburgh Corning is alleged to be in a conspiracy with Corning or Corehart [sic] with respect to

the distribution of asbestos products?
A: I can't today name those cases, but I believe those cases do, in
fact, exist.
Q: You earlier in the deposition identified a couple of cases, the
Abernathy and Inez Martin cases?
A: Yes.
Q: Are those such cases?
A: No, I don't believe so. Those are cases in which a conspiracy
is alleged, but it doesn't seem to refer at all to the Corehart [sic]
product.

*Id.* at 91-93.

Mr. Hatton was unable to specifically name any cases involving a conspiracy between the

Debtor and Corning and the Debtor has produced no evidence that such claims exist or are likely

to exist in the future. Thus, the Debtor has not met its burden of demonstrating that Corning is

entitled to protection under the § 524(g) Channeling Injunction and the court finds that no

current Corhart claims against Corning can be channeled under §524(g).[33]

We note that we are not holding that Corning is not entitled to the protection of the

Channeling Injunction with respect to PC-Relationship (Unibestos) claims. Rather, Corning

cannot be included within the scope of the Channeling Injunction for Corhart claims unless the

claim involves a "conspiracy theory" allegation with the <u>Debtor</u> and, as we have stated

throughout this opinion, there is no evidence that such a claim has been asserted. Of course, they

may be asserted in the future.[34] To address that possibility, the court will consider whether it is

---

[33]In other words, no proof has been offered to demonstrate that the Debtor is responsible
for the Corhart claims. However, to protect the Debtor's discharge, the court can use its power
under 11 U.S.C. § 105 to enjoin any person or entity from attempting in the future to allege or
prove that Corning's liability is somehow derivative of the Debtor. This will be explained in
further detail, *infra*.

[34]Reaud Morgan has stated an intention to bring claims against Corning for Corhart. As
(continued...)

appropriate to issue an injunction under § 105(a), as explained, *infra*, to bar any present or future Corhart claims from being asserted in the tort system against Corning, based upon a "conspiracy theory" or § 524(g)(4)(A)(ii)(I)-(IV) relationship with the Debtor. If appropriate, § 105, in conjunction with §524(g)(1)(B) may apply so that such claims, if ever alleged, may only be brought through the Trust.

*Claims Against PPG*

Historically, PPG manufactured a limited number of asbestos containing products. PPG also sold a limited number of asbestos containing products manufactured by others. The majority of claims against PPG were PC-Relationship claims and these claims alleged liability "based on, *inter alia*, the fact that (1) PPG is a fifty percent shareholder of PCC, (2) its employees were on PCC's board, (3) PPG provided services to PCC at various times, (4) PPG and PCC have joint insurance coverage, (5) PPG permitted PCC to participate in its insurance coverage program, and (6) provided certain services to PCC." *In re Pittsburgh Corning*, 417 B.R. at 296. *See also* SFF ¶ 54. Prior to the year 2000, when PPG suffered its lone adverse verdict on a PC-Relationship claim, PPG had never been found liable for any Unibestos exposure claim. SFF ¶ 57. "Other theories asserted against PPG with respect to Unibestos liability included alter ego, piercing of the corporate veil, concert of action, common enterprise, conspiracy and others, its ownership of a financial interest in PCC and of its right to control and manage PCC." *In re Pittsburgh Corning*, 417 B.R. at 296-97.

By definition, as explained *supra*, Non-PC Relationship claims against PPG exclude

_____

[34](...continued)
none have yet been brought, it remains to be seen whether the allegations will include PCC.

Unibestos exposure. "Non-PC-Relationship claims are those related to Pyrocal and generally included 'conspiracy theory' claims."[35] *Id.* at 297. *See also* SFF ¶ 63. Importantly, "Pyrocal is the only asbestos-containing product that has ever given rise to a payment by PPG . . . ."[36] *In re Pittsburgh Corning*, 417 B.R. at 297, n.18. Our 2006 Memorandum Opinion explained that:

> The parties stipulated that claimants who filed Non-PC-
> Relationship claims against PPG before PCC filed its bankruptcy
> petition also asserted "conspiracy theory" claims in an attempt to
> establish PCC's liability for asbestos-related injuries based on
> PPG's relationship with PCC. Additional claims were based on
> theories of civil conspiracy, joint enterprise, and/or aiding and
> abetting PCC, among other joint and several liability theories.
> Although the testimony established that in over thirty years, no
> separate Pyrocal claim has been brought against PPG that did not
> also involve PCC, . . . the parties stipulated that there were
> approximately 800 "Asbestos PI Trust" claims against PPG that
> did not include claims against PCC.

*In re Pittsburgh Corning*, 417 B.R. at 297 (internal citations omitted).

With respect to PPG, the Debtor has demonstrated an affiliation between PPG and PCC whereby PPG has been alleged (and once proven as to Unibestos) to be responsible for PCC products and vice versa; thus, a "conspiracy theory" claim is possible. However, the Channeling Injunction on its face must be abundantly clear that claims involving Pyrocal that in no way

---

[35]Pyrocal is an asbestos containing product sold by PPG but manufactured by PABCO Industrial Products Division of the Fibreboard Corporation, a company not affiliated with PPG. *In re Pittsburgh Corning*, 417 B.R. at 297. *See also* Third Amended Disclosure Statement to Accompany the Modified Third Amended Plan of Reorganization for Pittsburgh Corning Corporation Dated January 29, 2009 Jointly Proposed by Pittsburgh Corning Corporation, the Official Committee of Asbestos Creditors and the [FCR] (hereinafter, the "Third Amended Disclosure Statement"), Doc. No. 6828, at 34.

[36]"PPG has never been found liable for any asbestos claims allegedly arising out of products it manufactured." *In re Pittsburgh Corning*, 417 B.R. at 297, n.18. *See also* Third Amended Disclosure Statement, Doc. No. 6828, at 34.

involve the Debtor, per the language of 11 U.S.C. § 524(g)(4)(A)(ii)(I)-(IV), cannot and will not be channeled under the Channeling Injunction. The evidence of record with respect to the confirmation of the Modified Third Amended Plan indicates that, as drafted, the Plan is not so clear. We find the deposition testimony of PPG's Rule 30(b)(6) witness, David C. Gallagher, regarding whether 800 Pyrocal claims are entitled to the protection of the Channeling Injunction, to be credible and indicative of the ambiguity in the Plan:[37]

> Q: Is it PPG's position that those 800 claims will be channeled to the Trust if the Third Amended Plan is confirmed?
> A: I think we'd have to see each and every one of them. And the point that's made in this paragraph in addition to some of the things I said is historically those claims viewed only from the prism of the Complaint are one thing. Those claims develop inevitably in our experience into claims that involve the Debtor. So even if on their face they would not meet either the Second or Third Amended Plan, they might eventually do that in terms of whether they're not entitled to be channeled or not.
> . . . .
> Q: Does PPG contend that those 800 claims will not be channeled to the Trust?
> A: We do not contend that.
> Q: Does PPG contend that those 800 claims will be channeled to the Trust?
> A: I don't believe as we sit here we contend anything about those 800 claims without looking at them one by one, seeing in what stage of the litigation process they're in, and whether beyond the Complaint itself there may be something that brings it within the elements we've discussed.
> Q: So any of those 800 claims PPG might contend at some time should be channeled to the Trust, is that correct?
> A: Yes.

---

[37] "[A]ccording to the best available information, as of the Petition Date, there were fewer than 800 non-premises claims against PPG that did not also assert claims against the Debtor. . . ." Third Amended Disclosure Statement, Doc. No. 6828, at 34. *See also In re Pittsburgh Corning*, 417 B.R. at 304 ("The record in this case establishes that there are approximately 800 prepetition claims against PPG alleging liability for asbestos personal injuries that do not involve PCC").

> Q: And, in fact, any Asbestos PI Trust claim PPG might contend should be channeled to the Trust; is that correct?
> A: If it meets the criteria, yes.
> Q: Or if it is changed or amended to meet the criteria; is that correct?
> A: Certainly, that's exactly what I meant, yes.

30(b)(6) Deposition of David C. Gallagher, Esq., of 10/30/09, at 74-78 (*see* Transcript of 6/9/2010 Hearing, Doc. No. 7830, at 9).

As we explained, Pyrocal claims that do not involve the required relationship or concert of action with the Debtor cannot be channeled to the Trust. However, if the Debtor is involved under a "conspiracy theory"[38] or through one of the four scenarios elucidated in § 524(g)(4)(A)(ii)(I)-(IV), PPG is entitled to the protection of the Channeling Injunction. It is the court's power under 11 U.S.C. § 105, coupled with §524(g)(1)(B), that can prevent the future channeling of the 800 Pyrocal claims that in no way involve the Debtor in the manner described in this Memorandum Opinion. To the extent, if any, that §524(g)(1)(B) does not, the § 105 injunction will prohibit the parties from proffering or producing proof in the tort system that the claims are derivative of the Debtor, as will now be discussed.

### *The § 105 Injunction*

As noted, the definitions of Asbestos PI Trust Claim and Asbestos Protected Party, to the extent it incorporates the definition of Asbestos PI Trust Claim, are over-inclusive in that, despite PCC's interpretation of what the Channeling Injunction is intended to cover, these terms as defined in the Plan can easily be construed to require channeling of nonderivative claims

---

[38]It is the Trust's responsibility to evaluate each claim presented to it to determine whether sufficient proof of a conspiracy with the Debtor or other § 524(g) relationship exists. Without such proof, a Non-PC-Relationship claim cannot be paid by the Trust.

relating to Corhart and Pyrocal.

We agree with the Reaud Morgan Claimants that the Channeling Injunction is too broad

as a result of these provisions and could result in channeling claims that should not be channeled.

Likewise, we understand the Debtor's concern, and agree, that there is a risk that artful pleading,

the introduction of evidence or theories, or requests to conform the pleadings to the evidence in a

tort action could result in adjudication of a claim in the tort system that should have been

channeled to the Trust pursuant to §524(g)(1)(B). We note that §524(g)(1)(B) provides that

> An injunction may be issued under subparagraph (A) to enjoin
> entities from taking legal action for the purpose of directly or
> indirectly collecting, recovering, or receiving payment or recovery
> with respect to any claim or demand that, under a plan of
> reorganization, is to be paid in whole or in part by a trust described
> in paragraph (2)(B)(i), except such legal actions as are expressly
> allowed by the injunction, the confirmation order, or the plan of
> reorganization.

By suggesting that a §105 injunction may be appropriate in this case, assuming an otherwise

confirmable plan would be presented for confirmation, we are not endorsing or sanctioning an

injunction in favor of Corning or PPG with respect to claims that would not otherwise be subject

to channeling under § 524(g).

Section 105(a) provides that:

> The court may issue any order, process, or judgment that is
> necessary or appropriate to carry out the provisions of this title.
> No provision of this title providing for the raising of an issue by a
> party in interest shall be construed to preclude the court from, sua
> sponte, taking any action or making any determination necessary
> or appropriate to enforce or implement court orders or rules, or to
> prevent an abuse of process.

11 U.S.C. § 105(a).

The court's power under §105 is not without limitation and § 105 does not provide an

independent source of federal subject matter jurisdiction.  *In re Combustion Engineering*, 391 at

224-25.  The power to "issue any order, process or judgment that is necessary or appropriate to

carry out the provisions" of the Bankruptcy Code, while it cannot be used to extend the

channeling injunction of § 524(g) to nondebtors when the requirements of § 524(g) are not

otherwise met, is applicable in this case to address the concerns of the Reaud Morgan Claimants

as well as those of the Plan Proponents.

     In order to issue a § 105 injunction the court must examine whether the usual standards

for injunctive relief are met.  A § 105 injunction is governed by the same standards applicable

under Fed.R.Civ.P. 65.  *In re Kaplan*, 104 F.3d, 589, 595, n.12 (3d Cir. 1997), citing *In re

Cardinal Industries, Inc.*, 109 B.R. 748, 752 (Bankr.S.D. Ohio 1989).  Two bankruptcy court

cases from the Eastern District of Pennsylvania address the standards for issuance of a § 105

injunction.  In *In re Saxby's Coffee Worldwide, LLC*, 440 B.R. 369 (Bankr.E.D.Pa. 2009),  the

court noted that

> Courts have recognized three (3) circumstances in which the entry
> of a § 105 injunction restraining creditors from proceeding against
> non-debtors may be appropriate:
>
> 1. when the non-debtor owns assets which will either be a source
> of funds for the debtor or when the preservation of the non-debtor's
> credit standing will play a significant role in the debtor's attempt to
> reorganize;
>
> 2. upon a showing that the non-debtor's time, energy and
> commitment to the debtor are necessary for the formulation of a
> reorganization plan;
>
> 3. where the relationship between the non-debtor and debtor is
> such that a finding of liability against the non-debtor would
> effectively be imputed to the debtor, to the detriment of the estate.

440 B.R. at 379, citing *McCartney v. Integra Nat. Bank North*, 106 F.3d 506, 510  (3d Cir.

1997).[39]  *In re Saxby's* relied on the test stated *In re Monroe Well Service, Inc.*, 67 B.R. 746

(Bankr.E.D.Pa. 1986), for issuance of a § 105 injunction with respect to nondebtors:

> 1. there must be the danger of imminent, irreparable harm to the
> estate or the debtor's ability to reorganize;
>
> 2. there must be a reasonable likelihood of a successful
> reorganization;
>
> 3. the court must balance the relative harm as between the debtor
> and the creditor who would be restrained;
>
> 4. the court must consider the public interest, which requires a
> balancing of the public interest in successful bankruptcy
> reorganizations with other competing societal interests.

440 B.R. at 379, citing *Monroe Well Service*, 67 B.R. at 752-53.

In this case, the relationship between nondebtors PPG and Corning and the Debtor

creates a real risk that the liabilities of PPG or Corning could be imputed to PCC.  This creates a

danger of imminent and irreparable harm to the estate.  Further, as between PCC and any

creditor or future demand holder the balance of harm lies in PCC's favor to prohibit the

"backdooring" of claims that should be channeled.  The public interest lies with PCC as well in

that the discharge and channeling injunctions may not be fully effective without addition of a §

105 injunction as described herein.  We find also that there is a reasonable likelihood of

successful reorganization if PCC adjusts the channeling injunction (and insurance neutrality)

---

[39]*McCartney* relied on *A.H. Robins Co., Inc. v. Piccinin*, 788 F.2d 994, 999 (4th Cir.),
*cert. denied*, 479 U.S. 876 (1986), recognizing that the automatic stay to nondebtors is
appropriate in "'unusual circumstances' where 'there is such identity between the debtor and the
third-party defendant that the debtor may be said to be the real party defendant and that a
judgment against the third-party defendant will in effect be a judgment or finding against the
debtor.'"  *McCartney*, 106 F.3d at 510, quoting *A.H. Robins Co.,* 788 F.2d at 999, and
recognizing that the  court in *A.H. Robins Co.* relied on both the automatic stay provision and §
105 to enjoin actions against nondebtors.

provisions.

A §105 injunction may be appropriate to bar future "conspiracy theory" and other allegations based upon § 524(g)(4)(A)(ii)(I)-(IV) that would operate to bring the Debtor's liability into consideration outside of the operation of the Plan, the TDP, and the Trust. That is, it is permissible for an injunction under § 105 to preclude pleadings, proof, amended pleadings, pleadings conformed to the evidence in a tort action, or any other method of insinuating PCC (or involvement with PCC) as the basis for liability while avoiding the effect of the Channeling Injunction and the operation of the Trust for claims that should be channeled. Any such methods of asserting a claim against PPG or Corning[40] involving proof, pleadings or evidence which, in the tort system, would involve the Debtor by reason of PPG's or Corning's relationship to the Debtor (*see* § 524(g)(4)(A)(ii)(I)-(IV)) would be enjoined by §524(g)(1)(B) and such claims would be required to be presented to the Trust in the first instance. This bar would apply to "conspiracy theory" or other methods of evading the channeling injunction of § 524(g). The § 105 injunction will assure that claims that do not involve the Debtor are not presented to the Trust.

Likewise, a § 105 injunction may be used to prevent the future channeling of those 800 Pyrocal claims that in no way involve the Debtor in the manner described in this Memorandum Opinion. If issued, a § 105 injunction would bar amendments to the pleadings or introduction of evidence in the tort system designed to prove the liability of PPG on these claims based upon its

---

[40]Again, we note that the totality of evidence established that the Debtor has no connection whatsoever to Corhart such that any allegations against Corning based upon a § 524(g)(IV)(A)(ii)(I-IV) relationship should never arise. However, the possibility of such allegations, despite the lack of probability, exists and must be addressed to protect the Debtor's discharge.

§ 524 relationship with the Debtor and "conspiracy theory" type of allegations or proof. Those types of allegations should be channeled.

Moreover, the unique circumstances of this case, where the Debtor's asbestos product is different from that of either parent's asbestos product, yet the Debtor and its parents have been (PPG), and in the future may be (PPG and Corning), alleged to be liable for the damages caused by all of the products due to the corporate affiliation and asserted "conspiracy theory" claims has made the appropriate use of the § 524(g) Channeling Injunction difficult to craft. To protect the Debtor's discharge and to assure that claims that assert joint liability are channeled but that claims for which the sole liability is asserted against PPG's or Corning's are not channeled, a § 105 injunction may be used to fill the interstices to provide the relief intended by Congress without overreaching and barring claims in the tort system that are otherwise properly in the tort system. Allegations that address only the liability of PPG and Corning, but not PCC, should not be channeled.[41] Application of § 105 in this manner does not run afoul of the statutory limitations.

Furthermore, a § 105 injunction would essentially provide the claimant with a choice – if the claimant chooses to allege a "conspiracy theory" involving the Debtor, the claim would be presented to the Trust; however, if the claimant removes the Debtor from his complaint, the claim can be prosecuted in state court but the claimant must forego the opportunity to include the Debtor as a conspirator in both allegation and proof.

### *Reaud Morgan's Proposed "Simple Fix"*

The Reaud Morgan Claimants have indicated to the court that a "simple fix" would

---

[41]All claims against PCC, PPG or Corning related to Unibestos will be channeled.

resolve their objection to the scope of the Channeling Injunction in its entirety.  Essentially, the

Reaud Morgan Claimants seek to add language to the definitions of "Asbestos Personal Injury

Claim" and "Asbestos Protected Party."  Most notably, the suggested language to be added to the

definition of "Asbestos Personal Injury Claim" would bar the inclusion of any and all Corhart

Claims as to the Corning Entities and any Pyrocal Claim as to the PPG Entities.

We find that such language is would remove Pyrocal claims that should be within the

protection offered by the Channeling Injunction (and Corhart claims, should one ever be based

on a "conspiracy theory" or the § 524(g) relationship between Corning and the Debtor) from the

scope of that injunction.  We find merit in the Plan Proponents' counter-argument that the

addition of such language would in essence amount to a "per se ruling from this Court that the

[C]hanneling [I]njunction can never, ever apply to any claim that [the Reaud Morgan Claimants]

assert involves Pyrocal or Corhart exposure no matter how derivative . . . that claim may be."

Transcript of 10/29/10 Hearing, Doc. No. 8025 at 18:6-10.  Further, the Plan Proponents express

concern that, through artful pleading, an initial allegation in a pleading could omit any mention

of PCC, thus being removed from the scope of the Channeling Injunction, and then the claimant

may introduce evidence and theories at trial which implicate the Debtor.  *Id.* at 20-21.  In that

instance, the Debtor would not be present in the tort system to defend these allegations, and PPG

and/or Corning would improperly have the burden of defense without involvement by PCC.  It

would likewise be improper for tort plaintiffs to conform the pleadings to the evidence produced

at trial under these circumstances.  Because of such possible scenarios, we do not find the

"simple fix" proposed by the Reaud Morgan Claimants to be a viable solution to the overbreadth

of the Channeling Injunction.  However, we find that a § 105 injunction may be an appropriate

"fix" to the objection of the Reaud Morgan Claimants. Section 105 can be used to enjoin inappropriate conduct, such as artful pleading, that may result in the exclusion of claims that should have been channeled to the Trust.

A § 105 injunction would also alert all parties in interest of the place where their alleged claims will be addressed – something the Modified Third Amended Plan as drafted fails to do. That is, if an allegation of the required relationship or a "conspiracy theory" claim is made, it is channeled to the Trust. Otherwise, the claim will be addressed in the tort system; however, in that event, the parties will be prohibited from including the theories that give rise to channeled claims in their tort system cases.

It is the responsibility of the Plan Proponents to articulate which claims are to be included within the scope of the Channeling Injunction. Merely quoting the language of § 524(g) is insufficient to meet this burden. The Debtor's attempt to offer full protection to its parent companies through the Channeling Injunction has resulted in the injunction being over-inclusive. Meanwhile, Reaud Morgan's "simple fix" would result in an under-inclusive channeling injunction. Thus, the onus is on the Plan Proponents to draft a channeling injunction that is precise in its scope, including only the parties and claims entitled to protection under 11 U.S.C. § 524(g). To the extent that § 105 may appropriately supplement the Channeling Injunction, its use is viable in these circumstances.

### *Mt. McKinley's Objection to the Good Faith Filing of the Modified Third Amended Plan*

Mt. McKinley also objects to confirmation of the Modified Third Amended Plan on the

basis that it has not been proposed in good faith as required by 11 U.S.C. § 1129(a)(3).[42]

"Although the Code does not define 'good faith' in the context of § 1129(a)(3), [the Third

Circuit Court of Appeals has] stated that 'for purposes of determining good faith under section

1129(a)(3) . . . the important point of inquiry is the plan itself and whether such a plan will fairly

achieve a result consistent with the objectives and purposes of the Bankruptcy Code.'" *In re*

*Combustion Engineering*, 391 F.3d at 247 (quoting *In re PWS Holding Corp.*, 228 F.3d 224, 242

(3d Cir. 2000) (citation omitted)). Although we find the Modified Third Amended Plan to be

unconfirmable because of the proposed Channeling Injunction and the lack of clarity regarding

insurance neutrality, we find this objection to be meritless as there is no evidence of record to

suggest that the Plan was proposed in bad faith. To the contrary, the Modified Third Amended

Plan was proposed by the Debtor to compensate asbestos personal injury claimants and to

resolve tort liabilities that otherwise remained actionable in the tort system. *In re Combustion*

*Engineering*, 391 F.3d at 247. The fact that we determined the Modified Third Amended Plan to

be unconfirmable does not necessitate a finding that the Plan was proposed in bad faith. Thus,

we overrule Mt. McKinley's objection on the grounds that the Modified Third Amended Plan

was proposed in bad faith and find that the requirements of 11 U.S.C. § 1129(a)(3) have been

satisfied.

### *Mt. McKinley's Objection to the Reasonableness of the TDP*

---

[42]Mt. McKinley's objections that the Debtor did not propose this Modified Third
Amended Plan in good faith essentially mimic its objections to the confirmation of the Plan.
Therefore, we have not listed and addressed each objection individually. However, a complete
list of Mt. McKinley's good faith objections to confirmation of the Modified Third Plan can be
found in its post-trial brief at Doc. No. 7901, at 49-51. We find the individual objections that
have not been addressed in this Memorandum Opinion to be without merit. The evidence does
not support those objections.

Mt. McKinley asserts several objections to the TDP of the Modified Third Amended Plan. First, Mt. McKinley contends that it is materially prejudiced by the TDP because the "lax criteria for allowance and payment of claims allow legally insufficient claims to be creatively pled to qualify for the [C]hanneling [I]njunction and paid pursuant to the TDP." Mt. McKinley's Post-Trial Brief, Doc. No. 7901, at 35. In essence, Mt. McKinley contests the medical criteria of the TDP. Second, Mt. McKinley argues that the Plan Proponents have failed to meet their burden of demonstrating the reasonableness of the TDP. *Id.* at 36.

At the confirmation hearing regarding the Modified Third Amended Plan of Reorganization, Mt. McKinley provided the expert testimony of Dr. Joseph J. Renn, III, in support of its objection. In response, the Plan Proponents, at the request of the Asbestos Claimants Committee, offered the testimony of Dr. Laura Welch to support their argument that the Plan's TDP was medically reasonable.[43] After careful consideration of the testimony of each party's expert, we find that the Plan Proponents have met their burden of demonstrating that the TDP of the Modified Third Amended Plan is reasonable. The doctors provided diametrically opposite testimony and opinions on the sufficiency of the medical criteria. Having observed the witnesses, considered their credentials, their methodology and their testimony, we credit Dr. Welch. The court finds that she sufficiently supported her use of the standards she employed in reaching her expert opinions.[44] Dr. Welch testified:

---

[43]The court "recognize[d] Dr. Welch as an expert in the fields of internal medicine, occupational medicine and indicate[d] that she is qualified to express opinions in the area of epidemiology of asbestos related diseases, and concerning the diagnosis of asbestos related diseases." Transcript of 6/10/10 Hearing, Doc. No. 7852, at 30:23-25 and 31:1-2.

[44]The court cites what it finds to be the most relevant portions of Dr. Welch's testimony
(continued...)

> [M]y understanding of the purpose of the TDP is to establish a
> process by which individuals with asbestos related disease, and in
> this case, claims against [PCC], can file a claim and have it
> adjudicated in a streamline fashion by the trust.  So, then within
> that context, I look at each one of the medical criteria for
> mesothelioma or lung cancer or non-malignant asbestos related
> diseases and say, how does this fit with what we know about
> biology and the mechanism and exposure of asbestos related
> disease.  Does this make sense?  If the trust wants to do it this way,
> is there something about it that's medically incorrect or wrong, or
> unreasonable.  So, that's kind of the process I used.  It's like the
> trust is establishing a formula, a system, for evaluating these
> claims and does that fit with what we know about asbestos related
> disease.

Transcript of 6/10/10 Hearing, Doc. No. 7852, at 33:2-17.  When asked whether she believed

that the medical and exposure criteria for asbestos related lung cancer in the PCC trust

distribution procedures are medically reasonably, Welch answered in the affirmative.  *Id.* at

45:22-25 and 46:1.  *See also id.* at 62:14-18.  When asked by counsel for Mt. McKinley, on

cross-examination, about the standards she used in reaching this opinion, Welch explained:

> In my testimony I tried to – I mean, it is my opinion that the
> provisions of the TDP, the medical and exposure criteria are
> medically reasonable.  And, I tried to explain the basis for that,
> referring to the American Thoracic Society, other consensus
> documents, like Helsinki and then specific literature that illustrates
> the basis for my conclusion that they're medically reasonable.  I
> wouldn't necessarily refer to any of those as standards.  I don't
> think the ATS document is a standard, but it's a guidance
> document.  The Helsinki criteria is a consensus document.  So,
> when [Mt. McKinley] use[s] the word standard as the background,
> on the medical literature and I gave illustrations of that . . . .

*Id.* at 69:6-20.  When questioned about how she chose the materials she used to support her

---

[44](...continued)
in this Memorandum Opinion.  However, it is important to note that we credit the entirety of her
testimony, including both direct and cross examination.

opinion, Welch further explained:

> Well, I chose ones that are illustrative. It could be that there's a
> better one, for a lot of these topics that we talked about. There is
> just – there are hundreds of papers that are relevant. But, I do
> think that the sum of the information that's available in the
> literature on any one of these questions, supports my opinion.

*Id.* at 70:2-7.

Dr. Welch's testimony at the June 10, 2010, hearing directly addressed each of Dr.

Renn's specific criticisms to the Modified Third Amended Plan's TDP. First, Dr. Welch

addressed Dr. Renn's criticism that the TDP allows the payment of mesothelioma claims for

people with benign mesothelioma:

> Q: Is there anything in the TDP, Dr. Welch, that would allow the
> trust to be able to distinguish between malignant mesothelioma and
> any other kind of benign mesothelioma?
> . . .
> A: [On Page 23 of the TDP,] it says in Footnote 6, "All diagnoses
> of mesothelioma, (disease level 8) shall be presumed to be based
> on findings that the disease involves a malignancy. However, the
> Asbestos PI Trust may rebut such presumptions." And it's my
> understanding, is that if someone produced information and it
> wasn't malignant, they could rebut the presumption that it is
> malignant."

Transcript of 6/10/10 Hearing, at 36:3-5, 36:21-25, and 37:1-2.

Second, Dr. Welch addressed another principle criticism of Dr. Renn related to the

criteria used for asbestos related lung cancer:[45]

> Q: First of all, do you believe the mesothelioma criteria in [the]
> TDP are medically reasonable?
> A: Yes, I do.
> Q: Do you believe the lung cancer criteria in the TDP are
> medically reasonable?

---

[45]The criteria for lung cancer can be found at page 15 of Plan Supporter's Exhibit 133.

A: Yes.

*Id.* at 38:1-6. Dr. Welch then stated that she disagreed with Dr. Renn's opinion that, in order for

a lung cancer to be asbestos related, there has to be an underlying diagnosis of asbestosis. She

explained that "[t]here is a universal agreement that asbestos causes cancer," *id.* at 38:15, and

that "most regulatory bodies and professional organizations[] conclude that there is what [is]

called a linear dose response between asbestos exposure and the development of cancer. And,

that's true for mesothelioma and it's true for lung cancer. And that's based on animal

experiments and human epidemiology." *Id.* at 38:21-25 and 39:1. Dr. Welch also referred to the

"Helsinki criteria" which was created by:

> a group of experts from around the world that met in Helsinki and
> developed a series of documents that were focusing on attribution
> of disease to asbestos. And they looked specifically about, how do
> you determine if a lung cancer is related to asbestos. And, in that
> document, they describe that it's not necessary to have asbestosis,
> that it's the asbestos that causes lung cancer and the asbestos also
> causes asbestosis. So, sometimes they can coexist in the same
> person. But it's the asbestos itself that's causing the cancer. And
> they make some recommendations and some assessment about
> what level of exposure over a certain number of years increases the
> risk of lung cancer to a certain degree. . . . They, as a group,
> reached a consensus on that particular opinion, that asbestosis is
> not a prerequisite for determining that a cancer is related to
> asbestos.

Transcript of 6/10/10 Hearing, Doc. No. 7852, at 39:3-22. *See also* P-135. Dr. Welch also cited

to three additional publications that supported her opinion that asbestosis is not a prerequisite to

the diagnosis of a lung cancer as asbestos-related: Douglas W. Henderson, *et al.*, *After Helsinki:*

*a multidisciplinary review of the relationship between asbestos exposure and lung cancer, with*

*emphasis on studies published during 1997-2004*, (2004) Pathology, 36(6):517 (updating the

Helsinki criteria and reviewing additional literature and studies published since the those criteria

to conclude that asbestosis is not required to attribute a lung cancer to asbestos exposure) (Transcript of 6/10/10 Hearing, Doc. No. 7852, at 41:3-9; *see also* P-136); Murray M. Finkelstein, *Radiographic Asbestosis Is Not a Prerequisite for Asbestos-Associated Lung Cancer in Ontario Asbestos-Cement Workers*, (1997) American Journal of Industrial Medicine, 32:341 (identifying a significant risk for lung cancer in the people with asbestos exposure but without asbestosis (Transcript of 6/10/10 Hearing, Doc. No. 7852, at 41:11-16; *see also* MMIC-9); A. Reid, *et al.*, *The effect of asbestosis on lung cancer risk beyond the dose related effect of asbestos alone*, (2005) Occup. Environ. Med., 62:885 (comparing people with asbestosis to those without asbestosis to compare the risk) (Transcript of 6/10/10 Hearing, Doc. No. 7852, at 41:17-19; *see also* MMIC-12).[46]

A third major criticism of the TDP by Dr. Renn related to "the issue of smoking – smoking and asbestos exposure and lung cancer and whether or not the TDP's definition of non-smoker is reasonable and whether the TDP adequately takes into account the role of smoking in lung cancer." Transcript of 6/10/10 Hearing, Doc. No. 7852, at 46:3-7. Dr. Welch's testimony indicates as follows:

> Q: Dr. Welch, in your opinion, is the TDP's definition of non-
> smoker and the treatment of the concept of smoking and asbestos
> exposure causing lung cancer medically reasonable?
> A: Yes.
> Q: What, in your view, supports your opinion that the TDP's
> definition of non-smoker is medically reasonable?

---

[46]The documents were admitted into evidence, not for the truth of the matter asserted, but instead as types of articles customarily reviewed in Dr. Welch's work as an internal medicine professional and an occupational medicine professional and for preparing her testimony as an expert in this case. Transcript of 6/10/10 Hearing, Doc. No. 7852, at 43. Essentially, the articles were admitted "as a shorthand way of showing what the witness has relied on, as she's testified to, here on [the] witness stand [during the confirmation hearing]." *Id.* at 45:1-3.

A:  Well, the TDP defines a non-smoker as . . . a claimant who has either (a) never smoked, or (b) has not smoked during any portion of the 12 years immediately prior to the diagnosis of lung cancer. So, everybody agrees, somebody who never smoked is a non-smoker and the TDP has come up with a definition of once you've had 12 years since you quit, you can be considered a non-smoker. There's some good studies that demonstrate when people quit smoking, their risk of lung cancer starts to go down and actually we have – there's several papers in my book here that illustrate that and there's some good graphs in those papers that show that it continues to go down a little bit.  When you're five years out, it's probably cut about in half and when you're ten years out, it's down substantially more.  The question of what actual number of years you choose is a judgment.  And my opinion, looking at those papers, I think it's medically reasonable because what the TDP is saying is that, the way I understand it, if someone is a non-smoker, they can come back and ask for additional – it primarily applies to – I mean in the lung cancer categories, they can come back and say, essentially that – well, asbestos was a higher contributor to my lung cancer because I never smoked or because I quit 12 years or more ago.  And, based on the reduction in risk of lung cancer after you quit smoking, it's apparent that the smoking contribution goes down when people have quit.  The TDP needs to choose a number and 12 is perfectly reasonable, based on that literature.

*Id.* at 47-48.  The papers cited by Dr. Welch include:  A. Crispo, *et al.*, *The cumulative risk of lung cancer among current, ex- and never-smokers in European men*, (2004) British Journal of Cancer 91:1280 (*See* Exhibit P-408); Nina S. Godtfredsen, *et al.*, (September 28, 2005) *Effect of Smoking Reduction on Lung Cancer Risk*, JAMA 294(12):1505 (*See* Exhibit P-409); Kenji Wakai, et al., *Decrease in Risk of Lung Cancer Death in Males after Smoking Cessation by Age at Quitting:  Findings from the JACC Study*, (Aug. 2001) Jpn. J. Cancer Res. 92:821 (*See* Exhibit MMIC-19).[47]  *See* Transcript of 6/10/10 Hearing, Doc. No. 7852, at 49-50.

Finally, on direct examination, Dr. Welch opined that the diagnostic and exposure criteria

_____

[47]The transcript of the June 10, 2010, hearing clearly indicates which portions of each article were relied upon by Dr. Welch in reaching her opinion.

for non-malignant diseases (i.e. TDP Category Levels 1, 2, 3 and 4) were medically reasonable.

Transcript of 6/10/10 Hearing, Doc. No. 7852, at 54:8-12.

> Q:  . . . [I]s there some kind of authoritative document put out by the American Thoracic Society that describes how you should go about diagnosing non-malignant asbestos diseases for clinical purposes?
>
> A:  Yes.  The American Thoracic Society is a pre-imminent organization of respiratory disease specialists in the U.S., and they put out what they call position statements and guidelines and in 2004 they published an update of the diagnosis for evaluation and management of non-malignant asbestos related diseases.  The previous one had been in 1986.  And, that does layout [sic] very clearly how physicians should approach diagnosis and management of asbestosis, asbestos related pleural disease.
>
> . . .
>
> Q:  . . . [W]hat are the criteria that the American Thoracic Society requires to diagnose a non-malignant asbestos related disease?
>
> A:  They require evidence of injury to the lung. . . .  That's the first one. . . .  The second is evidence of causation by asbestos, as documented by the occupational and environmental history. . . .  And then the third is exclusion of alternative plausible causes for the findings. . . .
>
> Q:  What are the types of asbestos related non-malignant disease that this American Thoracic Society document addresses?
>
> A:  Well, it talks about – it addresses asbestosis, asbestos related pleural scarring and obstructive lung disease.
>
> . . .
>
> Q:  . . . [W]hat is your view about what the ATS statement requires with respect to diagnosing asbestosis?
>
> A:  The ATS statement requires some imaging that shows structural pathology.  It definitely does not require a 1/1 film.  So, Dr. Renn's opinion is inconsistent with the opinion of the American Thoracic Society.  In the document, it talks about using a 1/0 film as the borderline between – the first stage of an abnormal x-ray.  But, it could be using the CAT scan or some other methods.
>
> Q:  . . . Is asbestos solely limited to the lower lobes of the lung?
>
> A:  No.
>
> Q:  It can spread throughout?
>
> A:  Correct.
>
> Q:  Does asbestos solely – people with asbestosis, do they solely have small irregular opacities, or can they also have rounded

opacities?

A: No, they can have rounded opacities.

Q: Another disease was pleural scarring. Are there different types of pleural scarring?

A: Yes. And, generally, the terms that people are now using is circumscribed pleural disease and diffuse pleural fibrosis. It's really two categories of pleural scarring, with the first one, the circumscribed pleural disease being located on the chest wall and diffuse pleural thickening being scarring on the lung side of the pleural space.

. . .

Q: Can you tell us the difference between a restrictive lung disease and an obstructive lung disease?

A: Yes. Restriction lung occurs when the lungs of the chest wall itself are smaller, the lungs are either pulled in by scarring or constricted by the chest surrounding it. . . . Obstruction is some problem with the airflow in and out of the lung. Now, the asbestosis and asbestos related pleural disease cause restriction. The American Thoracic Society also talks about how asbestos contributes to obstructive lung disease in individuals, but the TDP is focused on the traditional asbestosis, asbestos related pleural plaque, and their effect on lung function which is restriction.

Q: . . . [D]oes the American Thoracic Society require a demonstration of functional impairment in order to make a diagnosis of asbestosis or another non-malignant asbestos related disease?

A: No, it does not.

Q: The TDP combined asbestosis and pleural disease into the same category for Level 1, 2 and 3.

A: Correct.

Q: In your view, is it medically appropriate to do that?

A: Yes. And, that's because the TDP is designed to compensate individuals with different levels of impairment. The different categories focus on different levels of impairment and the pulmonary function criteria that are in the TDP focus on identifying restrictive lung disease. So, if someone has restrictive lung disease, whether it's caused by asbestosis or asbestos related pleural plaque, it's appropriate to combine them. It's an asbestos related disease causing the restriction. So, if you separated them out, you'd have the same – you'd have more categories, but you'd have the same functional result because they're grouped by the degree of impairment that they have. Level 3, Level 2, and Level 1 have different degrees of impairment as the underlying basis.

Q: And, Level 4 is just for severe asbestosis?

A:  Correct.

Q:  In your view is that category medically reasonable as well?

A:  Yes.

Q:  Some of the TDP criteria for some of the disease levels for non-malignary disease have pulmonary function testing criteria.  In your view, are those pulmonary function testing criteria medically reasonable?

A:  Yes, they are.

. . .

Q:  Dr. Welch, one of the things that Dr. Renn criticized as the latency period in the TDP.  What is your understanding of what the latency period is for the TDP?

A:  Ten years between asbestos exposure and diagnosis.

Q:  And is that medically reasonable in your view?

A:  Sure.

Q:  Why?

A: Well, the latency is only one of the criteria that are included to determine whether somebody has a compensable condition.  So, you don't get an asbestos related mesothelioma or lung cancer with fewer than ten years lapsed.  Now most people have a longer one, but if you're going to use it as kind of a line in the sand, you want to make sure that it excludes people whose disease is not asbestos related.  And then you're using other criteria to identify the people with latency longer than ten years.  If you set it at 20 years or 25 years, you'd be excluding people who could have an asbestos related disease and there's no reason to do that since the other criteria used to really hone it in is asbestos related.

. . .

Q:  . . . [W]hat, if anything, does the Helsinki criteria say about the minimum latency period for mesothelioma?

A:  Helsinki recommends a minimum of ten years. [*See* P-135, at 313].

Transcript of 6/10/10 Hearing, Doc. No. 7852, at 54-62.

In crediting Dr. Welch's testimony, the court also emphasizes the purpose of the TDP which is to provide a mechanism for the processing and settlement of claims.  The TDP contains medically reasonable criteria for purposes of the settlement mechanisms the trust created in this

bankruptcy must employ.[48]

We find no merit to Mt. McKinley's argument that the TDP was not proposed in good faith. Instead, we find that the Plan Proponents are correct in pointing out the fact that the TDP criteria are medically reasonable offers support for the proposition that the Modified Third Amended Plan was, in fact, proposed in good faith under § 1129(a).

### *Conclusion*

There is no question that (1) PC-Relationship and Non-PC-Relationship claims as to PPG that included "conspiracy theory" claims are properly within the scope of § 524(g) and can be channeled; (2) PC-Relationship claims and "conspiracy theory" claims against Corning are properly within the scope of § 524(g) and can be channeled; (3) Corhart claims, which by definition exclude claims based on exposure to Unibestos or any other asbestos containing product manufactured, marketed or sold by PCC, cannot be channeled unless they also include a "conspiracy theory" or § 524(g)(4)(a)(ii)(I)-(IV) relationship;[49] and (4) all Unibestos claims may be channeled. However, the problem remains that, in light of the guidance provided by *Combustion Engineering*, the scope of the Asbestos Permanent Channeling Injunction remains impermissibly broad such that the Channeling Injunction could cover independent nonderivative claims. Thus, inasmuch as such independent, nonderivative claims exist, the Modified Third Amended Plan cannot be confirmed as drafted.

---

[48]Dr. Welch testified that her "understanding of the purpose of the TDP is to establish a process by which individuals with asbestos related disease, and in this case, claims against [PCC], can file a claim and have it adjudicated in a streamline fashion by the trust." Transcript of 6/10/10 Hearing, Doc. No. 7852, at 33:2-6.

[49]Again, we note that no claim to date has raised the § 524(g)(4)(a)(ii)(I)-(IV) relationship between PCC and Corning as the basis for liability.

The court finds that the Debtor or Plan Proponents must file an amended plan that, at a minimum, clarifies the scope of the Channeling Injunction and modifies the insurance neutrality language to remove the ambiguity addressed in this Memorandum Opinion so that the language comports with *Combustion Engineering*.  The Debtor or Plan Proponents may consider a § 105 injunction to supplement the §524(g) injunction to the extent described herein.

A status conference will be scheduled to address these issues.  An appropriate Order is attached.

DATE:  June 16, 2011

Judith K. Fitzgerald
United States Bankruptcy Judge

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE

**PITTSBURGH CORNING**    **Bankruptcy No. 00-22876 (JKF)**
**CORPORATION,**      **Chapter 11**

  Debtor.        **Related to Doc. Nos. 7704, 7798**

## ORDER

  **AND NOW,** this **16**th day of **June, 2011,** for the reasons expressed in the foregoing Memorandum Opinion, it is hereby **ORDERED** that the Plan Proponents' and Plan Supporters' request for confirmation of the "Modified Third Amended Plan of Reorganization for Pittsburgh Corning Corporation Dated January 29, 2009 Jointly Proposed by Pittsburgh Corning Corporation, the Official Committee of Asbestos Creditors and the Future Claimants' Representative" is **DENIED**.

  It is **FURTHER ORDERED** that a status conference will be held on **July 20, 2011,** at **1:00 p.m., Eastern,** to address the additional steps to be taken in this case.

  It is **FURTHER ORDERED** that counsel for Debtor shall serve a copy of this Memorandum Opinion and Order on all parties in interest who do not receive electronic notice and shall file a certificate of service forthwith.

            _Judith K. Fitzgerald_ **rmab**
            Judith K. Fitzgerald
            United States Bankruptcy Judge