IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re: | |
| | Case No. 00-22876-JKF |
| PITTSBURGH CORNING CORPORATION, | Chapter 11 |
|     Debtor. | Jointly Administered |
| | |
| MT. MCKINLEY INSURANCE | Document No. _____ |
| COMPANY AND EVEREST | |
| REINSURANCE COMPANY, | Hearing Date & Time: |
|     Movants | August 26, 2011 at 1:00 p.m. ET |
| | |
| v. | Response Date: August 9, 2011 |
| | |
| | Relates to Docket Nos. 6623, 7132, |
| PITTSBURGH CORNING CORPORATION, | 7487, 7658, 7704, 7725, 7798, 7901, |
|     Respondent. | 7904, 7943, 7976 and 8321 |

**MT. MCKINLEY INSURANCE COMPANY'S AND EVEREST
REINSURANCE COMPANY'S MOTION FOR LIMITED RECONSIDERATION,
TO ALTER OR AMEND, AND FOR RELATED RELIEF**

COME NOW Mt. McKinley Insurance Company, formerly known as Gibraltar Casualty Company, and Everest Reinsurance Company, formerly known as Prudential Reinsurance Company (collectively, "Mt. McKinley") and, for the reasons set forth below, file this Motion for Limited Reconsideration, to Alter or Amend, and for Related Relief (the "Motion"), pursuant to Federal Rules of Bankruptcy Procedure 7052, 8002, 9014 and/or 9024, Federal Rules of Civil Procedure 52, 59 and/or 60, and such other provisions of law as may be applicable.

### I. Introduction

Mt. McKinley seeks reconsideration, amendment and alteration of this Court's Memorandum Opinion and Order [Dkt. No. 8321] (collectively, the "Opinion"), denying confirmation of the Modified Third Amended Plan of Reorganization for Pittsburgh Corning Corporation, as amended [Dkt. Nos. 7704 and 7798] (the "Plan").

1

The Court's Opinion correctly held that Mt. McKinley had standing, sustained several of Mt. McKinley's Plan objections and denied confirmation of the Plan. Mt. McKinley does not seek reconsideration or alteration of those rulings, conclusions and findings that required rejection of the Plan. Mt. McKinley does, however, seek relief with respect to certain of the Court's rulings that overruled Mt. McKinley's objections that the Plan was not proposed in good faith and its objections regarding the propriety, reasonableness and good faith of the TDP (the "Overruled Objections").[1]

As set forth below, and respectfully, the Court failed to fully consider or misapprehended certain facts and evidence that require the Court to sustain Mt. McKinley's Overruled Objections. For these reasons, Mt. McKinley requests that this Court take one or more of the following actions with respect to the Overruled Objections:[2]

- amend or make additional findings of fact pursuant to Bankruptcy Rule 7052 and Federal Rule 52;

---

[1] In denying confirmation of the Plan, the Court did not consider or address several of Mt. McKinley's objections, including its objections related to the "unnecessary findings" and to Plan § 11.9. *See* Opinion, n.21 & 23. As such, those objections have been neither sustained nor overruled by the Court.

[2] Before it even addressed Mt. McKinley's Overruled Objections, the Court had already determined the Plan could not be confirmed because, among other things, it failed to comply with the provisions of the Bankruptcy Code, including § 524(g). Thereafter, the Court had no need to even consider Mt. McKinley's other objections. In fact, as noted above, the Court expressly declined to address certain of Mt. McKinley's objections, reasoning it was unnecessary to do so because the Plan had already been found unconfirmable. Mt. McKinley prevailed in this litigation and obtained the outcome/relief it sought with respect to this Plan as formulated. Accordingly, Mt. McKinley believes it was unnecessary for the Court to address the Overruled Objections, and that it was not appropriate to have done so without fully considering all relevant evidence in a proper record. Mt. McKinley is not foreclosed from reasserting those objections in opposition to any amended or future plan should the same deficiencies remain. However, out of an abundance of caution, Mt. McKinley seeks reconsideration of those rulings and other appropriate relief as set forth in this Motion.

- alter or amend its Opinion pursuant to Bankruptcy Rule 9023 and Federal Rule 59;

- grant a new trial as to the Overruled Objections pursuant to Bankruptcy Rule 9023;

- grant relief from the Opinion pursuant to Bankruptcy Rule 9024 and Federal Rule 60; and/or

- grant such other and further relief as may be warranted.

## II. Standard for Motion for Reconsideration

The purpose of a motion to reconsider is to correct manifest errors of fact or law or to present newly discovered evidence. *See, Harsco Corp. v. Zlotnicki*, 779 F.2d 906, 909 (3d. Cir.1985). A motion to reconsider is appropriate, among other things, where the court has misapprehended either a party's position or the facts or the law. *Refrigeration Sales Co. v. Mitchell-Jackson, Inc.*, 605 F.Supp. 6, 7 (N.D.Ill.1983), aff'd 770 F.2d 98 (7th Cir. 1985). Here, Mt. McKinley respectfully contends the Court has misapprehended the facts and the law, particularly given the Third Circuit's recent decision in *GIT*.[3] Therefore, this Motion is appropriate.[4]

## III. Argument

### A. The Plan was not Proposed in Good Faith

Having already determined the Plan could not be confirmed, the Court turned to Mt. McKinley's objection that the Plan was not proposed in good faith. Instead of considering those

---

[3] *In re Global Industrial Technologies, Inc.,* 08-3650, -- F.3d --, 2011 WL 1662792 (3d. Cir., May 4, 2011 *en banc)* (also referenced herein as "the *GIT* decision" or "*GIT*").

[4] Pursuant to Bankruptcy Rule 9023, motions for reconsideration and similar relief must be filed no later than 14 days after entry of the judgment or order. Fed. R. Bankr. P. 9023. The Opinion and related Order were entered on June 16, 2011.

objections in the detail they warrant, Mt. McKinley respectfully submits that the Court incorrectly and summarily dispensed with Mt. McKinley's objection, stating "we find this objection to be meritless as there is no evidence of record to suggest that the Plan was proposed in bad faith." Opinion, p. 51. Without regard to whether the Court should ultimately find such evidence persuasive—and Mt. McKinley believes that it should—the Court's finding that there was "no evidence" to suggest the Plan was proposed in bad faith suggests the Court overlooked, or misapprehended, the extensive evidence in the record before it.[5]

Mt. McKinley believes the Court's summary disposition of its good faith objection—to which the Court devoted but a single paragraph in its 60-page Opinion—failed to take proper consideration of the meaningful evidence in the record that not only supports the objection but compels that it be sustained.[6] As described below, Mt. McKinley introduced and cited considerable evidence regarding several aspects of the Plan that were not proposed in good faith.

---

[5] As will be described fully in Mt. McKinley's future pleadings, Mt. McKinley contends that its ability to discover and present other significant evidence in support of its good faith and TDP objections was improperly limited by the Court's prior rulings prohibiting discovery into issues touching on "plan negotiations." The Third Circuit's recent opinion in *GIT* makes it clear that as a party in interest, Mt. McKinley must be given the "full opportunity to present evidence and argument" in support of its objections. *GIT*, at *8. Mt. McKinley was denied that opportunity in this case and during the Plan confirmation process regarding, inter alia, the Overruled Objections. Had Mt. McKinley been afforded the rights that *GIT* clearly says it has, Mt. McKinley would have been able to develop a fuller record in support of its Plan objections.

[6] Throughout this case, the Court has precluded discovery by the insurers into issues that would have allowed Mt. McKinley to fully develop and present its Plan objections and evidence in support of those objections so that the Court could have made its confirmation decision based on a full and complete record. For example, early in the life of this case, insurers sought discovery into the propriety of the TDP, including whether Plan Supporters had colluded in the development of overly lenient procedures that permitted payment of invalid claims. Being unable to obtain meaningful responses, insurers filed a motion to compel. During the hearing on that motion, the Court emphatically refused to permit such discovery. In doing so, the Court held that whether or not there was collusion was irrelevant to insurers and that providing for the payment of invalid claims did not go to the question of good faith. *See* Tr. 2/19/04 hearing, 74:23—79:6. During the same hearing, and in others that followed, the Court denied discovery

1. <u>The Plan significantly inflates liabilities and pays non-compensable claims</u>.

Immediately following its conclusion that no evidence existed to support Mt. McKinley's good faith objections, the Court stated "[t]o the contrary, the [Plan] was proposed by the Debtor to compensate asbestos personal injury claimants and to resolve tort liabilities that otherwise *remained actionable in the tort system*." Opinion, p. 51 (emphasis added). The Court's conclusion, however, is decidedly at odds with the uncontroverted evidence that the Plan recognizes and pays tens of thousands of invalid asbestos claims that are *not* actionable in the tort system. Such evidence demonstrates a lack of good faith and suggests collusion in the formulation of the Plan.

While the Plan Parties may urge the Court to disregard this evidence, the Third Circuit's recent *en banc* opinion in *In re Global Industrial Technologies, Inc.* ("*GIT*"), requires otherwise. In *GIT*, the Third Circuit was particularly troubled by allegations that the plan set up a system—in exchange for claimants supporting the plan—that would pay invalid claims that would not be recognized in the tort system and seek to pass that liability on to the insurers. *GIT* at *8. The Third Circuit went on to hold that such profoundly serious assertions implicate the integrity of the bankruptcy proceeding. *Id.* It is difficult to imagine anything more relevant to the question of good faith, and that is precisely what is occurring in this case.

The number of invalid claims recognized by the PCC Plan is far greater than the few thousand claims at issue in *GIT*. For example, undisputed evidence in this case shows that if the three-year statute of limitations period found in many states was applied, "approximately

---

into issues relating to the negotiation and formulation of the Plan—issues that go, among other things, to collusion and bad faith. *See e.g.*, *Id.* at 31:9-20.

5

104,000 claims would be time barred as to Corning." FOF 154.[7] Yet, PCC's David Ellis confirmed that these claims may still be paid under the TDP. FOF 153. In addition, the FCR—who acknowledged that fraudulent asbestos claims are a problem because plaintiffs' lawyers have manipulated medical information they produce in support of claims—testified that claimants who could not recover in the tort system because of (i) tort reform, (ii) deferred dockets, and (iii) judicial decisions like the Pennsylvania Supreme Court in *Pacor*, will nonetheless be entitled to payment under the TDP. *See* FOF 164, 168-170.[8]

The record evidence also shows that Corning's liabilities under the Plan will be inflated far beyond its pre-petition claims experience. For example, in its opinion denying confirmation of PCC's Second Amended Plan, this Court found there were only 11,400 Unibestos claims pending against Corning prepetition, whereas more than 235,000 such claims were pending against PCC. *In re Pittsburgh Corning Corp.*, 417 B.R. 289, 296 (Bankr. W.D. Pa. 2006). Moreover, Corning's William Eggers testified that the last time Corning contributed to the settlement of a Unibestos claim was almost 30 years ago—in the mid-1980s. Stipulated Findings of Fact, No. 263 [Dkt. No. 3603]; Tr. 5/4/04, at 76:15-22. In other words, in the pre-Plan world, Corning had minimal, if any, Unibestos liabilities and had not paid to resolve any such claims for at least 15 years prior to the bankruptcy. Under the Plan, however, Corning will become obligated to pay hundreds of millions of dollars to "resolve" its Plan-created liability for the hundreds of thousands of asbestos claims being addressed in the Plan. *See, e.g.,* Plan, §§ 8.1.26

---

[7] Citations in this Motion to "FOF ____" refer to Mt. McKinley's Proposed Findings of Fact and Conclusions of Law [Dkt. No. 7902] and to the evidence cited and referred to in each such proposed finding.

[8] The evidence that some 104,000 time-barred claims will nonetheless be paid under the TDP is equally relevant to Mt. McKinley's TDP objections discussed below. Mt. McKinley requests that the Court reconsider its decision overruling Mt. McKinley's TDP objections in light of this compelling and uncontroverted evidence.

to 8.1.32. These facts demonstrate the magnitude by which Corning's liabilities are being inflated under the Plan, and this, in turn, implicates whether the Plan was proposed in good faith. *See GIT*, at \*8.[9]

In short, the Court's conclusion that there was "no evidence" of bad faith indicates the Court did not consider this highly relevant and uncontroverted evidence when it concluded the Plan was proposed in good faith and summarily overruled Mt. McKinley's good faith objections. These problems with the PCC Plan are substantially identical to the problems the Third Circuit found so troubling in *GIT*, and the Court should reconsider its rulings and/or amend its findings to give appropriate consideration to this evidence. Additionally, the Court should not rule on the "good faith" of the Plan, and the related objections, while the Plan remains subject to amendment. Whether the Plan has been proposed in good faith must be viewed, among other things, in light of the Plan as a whole. Because the Plan is subject to being amended by the Plan Parties, the Court does not have the proposed Plan before it.

---

[9] Mt. McKinley tendered additional evidence demonstrating the extent to which the Plan pays claims that are not eligible for payment in the tort system, but that evidence was excluded by the Court. Specifically, Mt. McKinley tendered Mark Behrens as its expert witness on these issues, and the Court refused to allow Mr. Behrens to testify. Among other things, Mr. Behrens analyzed the PCC claims database and identified tens of thousands of claims that would likely be barred by existing tort reforms or applicable judicial decisions. These "barred claims" included, among others, 96,443 "unknown" claims and 3,619 pleural plaque claims. The undisputed evidence in this case is that such claims would be paid under the Plan regardless of whether they are compensable in the tort system. *See, e.g.,* FOF 164, 168-170. Although the Court refused to admit this testimony, such evidence is clearly relevant to the questions of good faith and the integrity of the bankruptcy proceeding under the Third Circuit's holdings in *GIT*.

2. <u>The Plan includes Unnecessary Findings that are intended to create a litigation advantage for Corning and PPG</u>.

The record evidence shows that the Plan includes numerous provisions and proposed findings that lack any legitimate bankruptcy purpose and are designed solely to assist Corning and PPG in coverage litigation against Mt. McKinley (the "Unnecessary Findings").[10] Because the Court declined to confirm the Plan on other grounds, however, the Court did not address Mt. McKinley's objections to these Unnecessary Findings. Opinion, p. 24, n.23. In doing so, the Court failed to consider the impact of these Unnecessary Findings on the question of whether the Plan was proposed in good faith.

Among other things, the Court failed to consider Corning and PPG's admissions that they intend to use these Unnecessary Findings in seeking to recover their trust contributions from Mt. McKinley. Specifically, PPG's 30(b)(6) witness, David C. Gallagher, testified that PPG may seek to use any or all of the proposed findings in the Plan against Mt. McKinley in coverage litigation. *Gallagher Dep*. (10-30-09), 37:2–40:21 and 45:7-20. FOF 53. Likewise, Corning's Rule 30(b)(6) witness, Vincent P. Hatton, testified that, despite "non-binding" language added to certain findings, Corning does not believe it is precluded from arguing that such findings have weight against Mt. McKinley in the coverage case. Hatton (2-16-10), 37:12-19. FOF 52, 53, 55, 66, and 67.

Such evidence is relevant to Mt. McKinley's good faith objection because it shows the Plan was the product of collusion and was proposed for an improper purpose. As discussed above, the Third Circuit was profoundly disturbed by evidence that the GIT plan set up a system

---

[10] *See* Mt. McKinley Insurance Company's and Everest Reinsurance Company's Post-Trial Brief in Opposition to Confirmation of the Modified Third Amended Plan (Dkt. No. 7901, "MMIC's Opening Brief"), at pp. 14-18 & 50-51.

8

through which GIT's insurers would be asked to pay for invalid, plan-created liabilities that would not be recognized in the pre-plan world. *GIT*, at *8. Here, in addition to paying invalid claims, the Plan sought to give Mt. McKinley's litigation adversaries—non-debtors PPG and Corning—post-bankruptcy proceeding litigation advantages. The Unnecessary Findings are part of the system through which Corning and PPG will try to pass the Plan-created liabilities on to Mt. McKinley, and that demonstrates both lack of good faith and collusion.

      3. <u>Fraudulent ballots were cast by asbestos claimants</u>.

In *GIT*, the Third Circuit was plainly concerned about the possibility of invalid or fraudulent claims being allowed and paid through a bankruptcy plan, and it instructed the bankruptcy court to make a more searching review of these problems before deciding whether to confirm the GIT plan.[11] In this case, these problems are more than just a possibility, they are an established fact. The evidence proves that at least some asbestos claimants and/or their counsel cast fraudulent ballots (in favor of the Plan, of course) based on fraudulent claims. Specifically, the uncontroverted evidence shows that ballots were cast in favor of the Plan by claimants who certified under penalty of perjury that they were harmed by PCC asbestos products. Those very same claimants later stated under oath, in litigation against other asbestos defendants, that they did not know if they were harmed by PCC asbestos products. FOF 197; Garlock Exhibits 121, 132, 147, 165, 167, 174, 178, 203, 245, 327, and 356.

These black and white facts cannot be explained away as fanciful imaginings or unsupported allegations. More importantly, however, these facts are unquestionably relevant to Mt. McKinley's good faith objections, and they support the conclusion that the Plan is the

---

[11] *See, GIT*, at *3-4 (discussing the well-documented problems of questionable and fraudulent activities by claimants, plaintiffs' attorneys and doctors) and *8-9 (finding that a system providing for the payment of such claims implicated the integrity of the bankruptcy proceeding and requiring a more searching review of those issues).

9

product of the fraudulent and collusive actions of the claimants and/or their counsel. Based on the analysis in the Opinion, the Court failed to consider or address this evidence in overruling Mt. McKinley's good faith objections. Regardless, given the *GIT* Court's mandate for a more complete record on issues such as this, further proceedings concerning the "good faith" of the Plan are in order and, accordingly, the Court should reconsider and withdraw its decision concerning the good faith of the Plan.[12]

    4. <u>The Plan impairs Mt. McKinley's contractual rights and claims</u>.

The evidence presented by Mt. McKinley also establishes that the Plan was not proposed in good faith because it would impair and enjoin Mt. McKinley's contractual and state law rights to assert claims, including contribution claims against other insurers, without compensation. MMIC's Opening Brief at p. 13-14 and p. 20, n.13. Mt. McKinley respectfully asserts that the Court failed to consider the evidence in support of this objection and should therefore reconsider or amend its ruling on this point.

For example, the Plan Parties admit that Mt. McKinley's contribution claims are enjoined by the Asbestos Permanent Channeling Injunction, *Id*. at p. 20, n.13, but they contend that any impairment of Mt. McKinley's contribution rights is cured by § 11.9,[13] the so-called "judgment reduction" provision. Section 11.9, however, fails to protect Mt. McKinley because its "protections" apply only at the whim of Corning, against whom Mt. McKinley is actively litigating. *See e.g.* MMIC's Response Brief at pp. 17-20.

---

    [12] Indeed, Mt. McKinley's position is that the *GIT* decision mandates that Mt. McKinley's party in interest standing entitles it to take discovery on issues this Court has precluded, such as Plan negotiations, for years.

    [13] The Court did not consider Mt. McKinley's objections based on § 11.9 of the Plan. Opinion, p. 20-21, n.21

Plan § 11.9 provides that Mt. McKinley can only settle its contribution claim against a settled insurer with Corning's consent, and Corning's general counsel, Vincent Hatton, has testified that consent can be withheld for any reason. Hatton (5-20-10) Tr., 89:10-15, 90:1-4 (testifying that Corning can withhold its consent to a settlement for any reason). The undisputed evidence in this case is that Mt. McKinley's contribution claims are being enjoined by the Plan, and Corning, in its sole discretion, may unilaterally prevent Mt. McKinley from receiving judgment reduction under § 11.9. *Id.*; *see also,* Plan § 11.9. Based upon all of the foregoing, Mt. McKinley respectfully submits that the Plan cannot be found to have been proposed in good faith where it strips away a party's pre-petition rights and places that party at the mercy of its litigation adversary without compensation under the Plan.

### B. The TDP are not Reasonable and may not be Approved

In overruling Mt. McKinley's objections to the TDP, the Court misapprehended or failed to consider numerous significant and relevant facts, many of which were undisputed, that support Mt. McKinley's TDP objections. The Court should reconsider its ruling and/or should alter or amend its findings concerning the TDP for at least the following reasons.

1. <u>The TDP create increased liability through an increase in non-compensable claims</u>.

The evidence presented in this case demonstrates that the TDP allow for the payment of unimpaired claims that are not compensable in the tort system. *See Simmons v. Pacor, Inc.*, 674 A.2d 232, 237 (Pa. 1996); *In re Hawaii Federal Asbestos* Cases, 734 F.Supp. 1563, 1567 (D. Haw. 1990). COL 292-297. *See also*, MMIC's Opening Brief at pp. 39-41 (citing numerous additional authorities regarding the invalidity of such claims). Even though these claimants would have no cognizable claim for compensation under applicable state tort law, they are nonetheless compensated under the TDP. This evidence is not only uncontroverted, it was

confirmed by the testimony of the FCR and Dr. Welch during the confirmation hearing.[14] The Court clearly failed to give this evidence proper consideration in overruling Mt. McKinley's objections to the TDP, and it is a problem the Third Circuit instructed cannot be ignored. *See, GIT*, at *8-9 & n.34 (expressing significant concerns about a system that provides for payment of invalid claims and encouraging the bankruptcy court on remand to address whether the distributions procedures properly account for defenses available under applicable law).

Dr. Welch's testimony on this issue was both clear and uncontroverted, and it supports Mt. McKinley's objections. For instance, Dr. Welch testified that Disease Levels I and II under the TDP do not require any impairment to qualify for compensation from the Trust—meaning, of course, that these Disease Levels will pay unimpaired claims that would not be compensated in the tort system. FOF 146; Tr. 6/10/10, 129:17-130:7.[15] Notably, although she opined that the payment of unimpaired claims under the TDP was appropriate in this case, Dr. Welch was forced to concede during cross-examination that she previously opined (during her testimony before the Senate Judiciary Committee) that such unimpaired claims are "junk claims" that should not be compensated.[16] FOF 146; Tr. 6/10/10, 130:14-133:7; MMIC Ex. 151, pp. 25 & 27. By allowing

---

[14] The FCR—who acknowledged that fraudulent asbestos claims are a problem because plaintiffs' lawyers have manipulated medical information they produce in support of claims—testified that claimants who could not recover in the tort system because of (i) tort reform, (ii) deferred dockets, and (iii) judicial decisions like the Pennsylvania Supreme Court in *Pacor*, will nonetheless be entitled to payment under the TDP. *See* FOF 164, 168-170.

[15] *See also,* FOF 87-89.

[16] This prior testimony was offered in connection with Dr. Welch's work on the failed attempt to enact a federal asbestos trust bill. Interestingly, before Dr. Welch's contradictory testimony about these "junk" unimpaired claims was brought out on cross, the ACC's counsel touted the significance of Dr. Welch having testified before the Senate Subcommittee and sought to bolster her expertise by comparing the PCC TDP to the trust fund procedures that were being considered by the Subcommittee. Specifically, Mr. Finch stated: "She's testified that she provided consultation and testimony at the United States Senate on the diagnostic criteria in a trust fund bill, *which is very similar to the TDPs in this case…*" Tr. 6/10/10, 29:3-9. Given the

for the payment of such "junk" unimpaired claims here, the Plan and TDP significantly inflate liabilities beyond what would exist in the tort system and demonstrate, among other things, that the Plan and TDP were not proposed in good faith and are not reasonable.

The Third Circuit in *GIT* found the payment of invalid claims to be an important issue that may not be ignored by this Court in ruling on confirmation of a plan. *GIT*, at *8-9 & n.34. The GIT insurers alleged, like Mt. McKinley does here, that the proposed GIT plan created a system that would allow and pay invalid or fraudulent claims at the insurers' expense, and the Third Circuit found those allegations to be so profoundly serious that they must be thoroughly considered by the bankruptcy court on a fully developed record.[17] *Id.* The same is true here. The Court should reconsider, or alter or amend, its rulings and findings accordingly.

2. <u>The TDP lack a mechanism for weeding out fraudulent claims</u>.

Mt. McKinley also objected to confirmation based on the TDPs failure to include a mechanism for weeding out fraudulent or otherwise invalid claims. MMIC's Opening Brief, at p. 46-47. The Court did not address this objection in its Opinion. Mt. McKinley has often stressed the significance of this objection, and the Third Circuit's *GIT* decision supports to merits of Mt. McKinley's position on this issue. *See GIT*, *3-4, 8 & n.34.

In this case, the TDP have no express requirements for investigating and weeding out bad claims. Instead, the TDP tilt in the opposite direction by requiring the Trust to consider the cost of investigating and uncovering invalid claims, and discouraging such investigation when the

---

strong similarity between these two sets of trust procedures, what constituted a junk claim under one must likewise be a junk claim under the other; yet Dr. Welch's testimony in the PCC case was diametrically opposed to her testimony before the Subcommittee on this issue.

[17] The Third Circuit also addressed the importance of the Bankruptcy Court considering, in its evaluation of the Plan and TDP, whether the TDP included sufficient procedures to ensure that only medically and legally valid claims were paid. *GIT*, at *9, n.34. Mt. McKinley has likewise stressed the importance of addressing such issues in considering whether to confirm the PCC Plan.

13

cost of doing so would reduce payments to valid claims. *See* TDP §§ 5.8 and 7.2. In other words, this provision virtually ensures that no effective investigation will ever be conducted, leaving such claims to be paid by the Trust and passed on to the insurers. The evidence in support of this objection include §§ 5.8 and 7.2 of the TDP.

*GIT* makes it clear the Court should have sustained Mt. McKinley's TDP objections. In connection with its analysis of the claims and distribution procedures in *GIT*, the Third Circuit was extremely troubled by evidence suggesting that a large number of GIT claimants had "diagnoses" by the doctors who were discredited in *In re Silica Products Liability Litig.*, 398 F.Supp.2d 563, 622 (S.D.Tex.2005), or banned by the Manville Trust. *GIT*, at *3-4. The Third Circuit noted the bankruptcy court's failure to make any findings as to the legitimacy of those claims, suggested such findings would be proper in considering whether to confirm the plan. *Id*. at *4, 8-9 & n.34. Accordingly, the Court should reconsider it rulings on this objection in light of *GIT* and take full consideration of the evidence presented.[18]

3. "Consistent with" and "compatible with" findings are not a diagnosis.

Both sides' experts agree that "consistent with" and "compatible with" findings by a physician are not appropriate for purposes of a medical diagnosis. Given that undisputed evidence, the Court should have declined to approve the TDP.

Although the Plan Parties sought to rebut Dr. Renn's testimony through their own expert, Dr. Welch, this Court need not decide which side's expert is correct, because this is one of the areas where both sides' experts agreed. Specifically, in addressing § 5.7(a)(1) of the TDP, which allows the Trust to accept a "consistent with" or "compatible with" finding as a diagnosis of an

---

[18] As noted above, Mt. McKinley contends that *GIT* requires the Court to allow full and complete discovery into these issues, but that discovery has been denied in this case. *GIT* recognizes the right of insurers with party in interest standing, like Mt. McKinley has here, to fully participate in the case and present their objections on a fully developed record. *GIT*, at *9.

14

asbestos-related disease, both experts testified similarly. Dr. Renn testified that such findings are equivocations that do not rise to the level of a diagnosis under accepted medical and diagnostic standards. Tr. 6/4/10, 86:5-24. Dr. Welch, the Plan Parties' expert, testified that "consistent with" is not a level of certainty rising to a diagnosis, and that she would not use such terms in a report because it is "less than straightforward." Tr. 6/10/10, 136:18 to 137:4. FOF 134-136. The evidence is clear: both experts agree that such findings are an "equivocation," are "less than straightforward," and are *not* a diagnosis.

Accordingly, the undisputed evidence shows that by allowing claims based on "consistent with" or "compatible with" findings, the TDP are permitting the payment of claims that lack proper proof and diagnosis of a disease. The Third Circuit's *GIT* decision says this problem is relevant to confirmation and cannot be ignored by the Court.[19] Because this Court failed to consider this evidence in its Opinion, the Court should reconsider its decision to overrule Mt. McKinley's TDP objections.

---

[19] In response to AIG's contention that the plan was unconfirmable "*because its distribution procedures permit payment of claims that could not be paid outside of bankruptcy . . .,*" *GIT* at *4, n.20 (emphasis added), the Third Circuit instructed the Bankruptcy Court on remand to evaluate the propriety of the trust distribution procedures to be implemented in the plan:

> *If it approves a plan of reorganization for GIT that includes a channeling injunction and trust for silicosis claims, the Bankruptcy Court may also need to address the procedures by which the trust calls for claim funds to be distributed.* For example, it may be advisable *to examine whether those procedures would require claims to be paid based upon proof of exposure and diagnosis alone, without regard to any affirmative defenses available under state law*, and, if so, whether those procedures would then cause the trust to violate 11 U.S.C. § 502, as argued by AIG.

*GIT* at *8, n.34 (emphasis added).

4. The Court failed to consider numerous other objections to the TDP.

In addition to the foregoing, had the Court properly considered significant other evidence, the Court would have sustained Mt. McKinley's other objections to the TDP. For example, and without limitation, the Court's Opinion does not address the following objections or the evidence in support of such objections:

- Evidence that there are no asbestos-related diseases that are not already accounted for in Disease Levels II-VIII of the TDP and there is no legitimate or appropriate purpose for the treatment of Disease Level I claims in the TDP. FOF 132, 133.

- Evidence that a "Bilateral Asbestos-Related Nonmalignant Disease" — a requirement for Levels I, II and III — can be shown by mere "bilateral pleural plaque" or "bilateral pleural thickening" on a chest x-ray and such minimal evidence is insufficient to indicate a bilateral asbestos-related nonmalignant disease. *See* TDP § 5.3(a)(3) & n.4 at 15. FOF 105, 140-144.

- Evidence that "Bilateral Asbestos-Related Nonmalignant Disease" may also be shown by the mere presence of interstitial fibrosis which is caused by exposure to numerous things other than asbestos, all of which can cause an x-ray to be interpreted by a B-reader as 1/0 or higher on the ILO scale, suggesting the presence of asbestosis when that disease is not, in fact, present. FOF 144.

- TDP § 4.4 requires multiple and additional payments to claimants who have already settled their claims against the Trust whenever there is an upward adjustment of the Payment Percentage. These supplemental payments for settled claims exceed what is permitted in the tort system in some jurisdictions. FOF 151, 152.

- TDP § 5.1(a)(2) impermissibly extends and revives expired limitations periods for otherwise time-barred claims. FOF 153-155.

- Colorectal, laryngeal, esophageal, pharyngeal and stomach cancers ("Other Cancers") are treated as Disease Level V claims and are compensable under the TDP. Ex. P-133, p. 16. FOF 124. Dr. Renn testified that of the five Other Cancers provided for by the TDP, only laryngeal cancer has been found by objective data and studies to be caused by asbestos exposure. Tr. 6/4/10, 79:6-13. FOF 125. Dr. Renn's testimony in this regard is fully supported by Asbestos: Selected Cancers, published in 2006 by the Committee on Asbestos of the Institute of Medicine of the National Academies (the "IOM Committee"), which, notably, was the text relied upon by Dr. Welch to support her opinion that it is medically reasonable for the TDP to pay these Other Cancers. Tr. 6/10/10, 115:12-16. FOF 126. Far from supporting Dr. Welch's rebuttal opinions, the IOM Committee unequivocally concluded that the body of existing medical evidence was not sufficient or

16

infer a causal link between asbestos exposure and colorectal, stomach or pharyngeal cancers and was inadequate to infer a causal link between asbestos exposure and esophageal cancer. FOF 127-131. In short, there is absolutely no evidence that refutes Dr. Renn's opinions or supports Dr. Welch's opinions relating to these Other Cancers.

- TDP § 2.2 expressly authorizes the payment of claims that do not meet the presumptive Medical/Exposure Criteria so long as the Trust is satisfied that the claimant has presented a claim that would be cognizable and valid in the tort system. There are no standards or guidelines by which the Trust is to make such determination, rendering the TDP Claims Criteria illusory and susceptible to abuse. FOF 150. This provision permits, if not encourages, the payment of legally questionable claims by a Trust that will be controlled by plaintiffs' lawyers representing those claimants.

- TDP § 4.4 authorizes and requires multiple and additional payments to claimants who have already settled their claims against the Trust whenever there has been an upward adjustment of the Payment Percentage. This precludes closure and finality as to "settled" claims, turning the Trust into an ATM instead of a litigation and claims resolution entity. There is no provision of the Bankruptcy Code that justifies supplemental payments to claimants who have previously settled their claims. FOF 151-152.

    o These provisions violate the policyholders' duties under the policies to resolve claims for the lowest amounts possible and materially increase the insurers' exposure. FOF 189, 190.

    o This perpetual payment system is also entirely contrary to the Debtor's prepetition settlement practices. There is no evidence that the Debtor, Corning or PPG ever made supplemental payments to previously settled claimants if later claimants settled for higher amounts.

- TDP § 5.1(a)(2) tolls the limitations period for claimants as of the filing of any asbestos related claim against PCC, any PPG entity or any Corning entity. This provision impermissibly extends and revives expired limitations periods for otherwise time-barred claims. FOF 153-155.

- TDP § 5.3 requires the Trust and Trustees (with consent of TAC and FCR) to "adopt procedures for reviewing and liquidating all unliquidated claims," but fails to specify any guidelines or standards for developing those procedures. FOF 156. All procedures governing the review and liquidation of claims should be set forth in the TDP at the time they are being approved by the Court. In the absence of such procedures, the Court cannot possibly determine that the TDP are reasonable and appropriate, especially when the parties representing the rights of the claimants are to develop those procedures after the fact and without judicial oversight. Moreover, these procedures will likely impact whether invalid claims are properly identified and whether Medical/Exposure Criteria and other Claims Criteria are properly enforced. Allowing the Trust and plaintiffs' lawyers to develop these procedures after confirmation increases the risk of improprieties and the likelihood that invalid claims will be paid and/or that valid claims will be

overpaid. This scenario is in clear and stark contrast to the procedures by which claims are handled in the tort system.

- TDP § 5.3(a)(3) allows the Trustees (with consent of TAC and FCR) to "add to, change, or eliminate" any of the Claims Criteria, and TDP § 8.1 allows the Trust, TAC and FCR to modify, delete or add to *any provision* of the TDP at will and without any judicial oversight. FOF 157. No adequate or meaningful controls are in place to determine whether the modified Claims Criteria or other terms will be otherwise proper. To the extent the Court is being asked to approve the TDP as part of the Plan and as a "settlement" of the asbestos liabilities, the TDP cannot be approved because they may be changed at will by those who represent the interests of the claimants. The Court simply cannot approve the TDP as reasonable, fair and appropriate when the key terms of those TDP may be changed at the whim of the Trust, TAC and FCR after confirmation and without any judicial oversight.

- TDP § 5.3(a)(3) allows the Trustees (with consent of the TAC and FCR) to "determine that a novel or exceptional" claim is compensable even though it does not satisfy the Claims Criteria. FOF 158. This renders the TDP illusory and subject to abuse in a manner that could significantly increase Mt. McKinley's potential exposure.

- TDP § 5.7(a)(2) requires the Trust to pay claims regardless of the results of any litigation between the claimant and "any other defendant" in the tort system. FOF 165. In other words, if a jury determined that a claimant's disease was caused by smoking and not asbestos, the Trust would be precluded from considering that fact, whereas such adverse litigation results would be highly relevant, if not preclusive, in any other.

- TDP § 6.2 provides that claimants "will not be required" to give the Trust evidence of recoveries from another trust or claims organization. This encourages double-dipping or multiple recoveries by claimants. The Trust should be required to consider the extent to which a claimant's injuries were compensated by another claims resolution entity or 524(g) Trust to ensure that, among other things, the claimant is not receiving multiple satisfactions of the same claim. FOF 171.

*See,* MMIC's Opening Brief, pp. 38-47.

By failing to address these numerous additional objections to the TDP, Mt. McKinley respectfully submits that the Court did not fully consider Mt. McKinley's TDP Objections and the evidence in support thereof. Mt. McKinley requests that the Court reconsider its rulings and issue amended or altered findings which address each of these significant problems. Mt. McKinley's request is supported, among other things, by the clear directions and guidance

provided by the Third Circuit in *GIT*, including that further proceedings based on a fuller record are required. *See, e.g., GIT*, *3-4, 8-9 & n.34.

## IV. Conclusion

The Court concluded in its Opinion that there was no evidence to support Mt. McKinley's Overruled Objections. Mt. McKinley respectfully submits that it has shown in this Motion that there is ample evidence—much of it uncontroverted—demonstrating otherwise. Moreover, the Court failed to fully consider or misapprehend certain facts and evidence that require the Court to sustain Mt. McKinley's Overruled Objections. Accordingly, and for the reasons set forth above, Mt. McKinley respectfully urges the Court to reconsider its rulings or, alternatively, to alter or amend its rulings, to give full consideration to each of Mt. McKinley's Overruled Objections in light of the extensive record evidence and *GIT*.

WHEREFORE, for the reasons set forth above, Mt. McKinley Insurance Company and Everest Reinsurance Company respectfully request that the Court enter an order reconsidering and sustaining their good faith and TDP objections, and granting all further and additional relief to which they are justly entitled.

DATED: June 30, 2011

Respectfully submitted,

MANION McDONOUGH & LUCAS, P.C.

By: __/s/ *James R. Walker*__
    James R. Walker (Pa. I.D. No. 42175)
    600 Grant Street, Suite 1414
    Pittsburgh, Pennsylvania 15219
    Telephone: (412) 232-0200

    Fred L. Alvarez
    WALKER WILCOX MATOUSEK LLP
    225 West Washington Street, Suite 2400
    Chicago, Illinois 60606
    Telephone: (312) 244-6700
    Facsimile: (312) 244-6800

Tony L. Draper
Britt Walther
711 Louisiana, Suite 3100
Houston, Texas 77002
Telephone: (713) 654-8001
Facsimile: (713) 654-8818

**ATTORNEYS FOR MT. MCKINLEY INSURANCE COMPANY AND EVEREST REINSURANCE COMPANY**