# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE

PITTSBURGH CORNING              Bankruptcy No. 00-22876 (JKF)
CORPORATION,                    Chapter 11

       Debtor.              Related to Doc. No. 8928,[1] dated January 29, 2009,
                                Modified Third Amended Chapter 11 Plan and
                                documents.

---

[1]On April 20, 2012, Plan Proponents filed Doc. No. 8781, Notice of Filing Plan Materials with Proposed Amendments. The documents include the Modified Third Amended Plan of Reorganization, Jointly Proposed by Pittsburgh Corning corporation, the Official Committee of Asbestos Creditors and the Future Claimants' Representative, dated January 29, 2009, as amended on September 23, 2011, Doc. Nos. 8459, 8485, and the proposed amendments filed after September 23, 2011, Doc. No. 8459, and supplemented October 5, 2011, Doc. No. 8485. The Plan Proponents are the Debtor, the Official Committee of Asbestos Creditors, and the Future Claimants' Representative. The documents filed at Doc. No. 8781 include proposed amendments to (1) the Plan and (2) Exhibit F (including Schedule L), Exhibit I (including Exhibits 1 and 4 and Schedule D), Exhibits M and N, and a proposed new exhibit, Exhibit O. All other exhibits are as they appeared in the September 23 and October 5, 2011, filings. On August 17, 2012, Plan Proponents filed the Modified Third Amended Plan at Doc. No. 8928. Doc. No. 8955, Plan Proponents' Summary of Plan Documents Attached as Exhibits, was filed on August 31, 2012. A Summary of the Modified Third Amended Plan was filed on August 31, 2012, Doc. No. 8956, and a Summary of Technical Amendments to Prior Plans was filed on the same date at Doc. No. 8957. The Notice Regarding Proposed Confirmation Order Language to Address Certain Mt. McKinley Objections, filed on October 25, 2012, at Doc. No. 9060 and Mt. McKinley's Notice Regarding Reservation of Rights, filed on October 30, 2012, at Doc. No. 9066, also resolved certain objections and modified the Plan accordingly. Additional technical amendments were filed on May 15, 2013 at Doc. No. 9402 to address deletions to the definition of Asbestos Protected Parties, to delete a *proviso* from 11.17.1 (insurance neutrality), to update Exhibits K (identifying the entities and affiliates of Corning) and L (identifying the entities and affiliates of PPG covered by the Asbestos Permanent Channeling Injunction) and Exhibit F (the Trust Funding Agreement) Schedules B, F and H regarding changes of names or contact information of certain insurers or their representatives.

1

**MEMORANDUM OPINION SETTING FORTH FINDINGS OF FACT AND
CONCLUSIONS OF LAW REGARDING CONFIRMATION OF THE MODIFIED
THIRD AMENDED PLAN OF REORGANIZATION AS MODIFIED THROUGH MAY
15, 2013, AND THE ASBESTOS PERMANENT CHANNELING INJUNCTION[2]**

## I.    <u>INTRODUCTION</u>

By Order dated December 21, 2006, this Court denied confirmation of the Second

Amended Plan of Reorganization Dated November 20, 2003.  Doc. No. 5192; 417 B.R. 289

(Bankr. W.D.Pa. 2006).  By Order dated June 16, 2011, this Court denied confirmation of the

Modified Third Amended Plan dated January 29, 2009, with Plan Amendments to Date (May 19,

2010,  Doc. No. 7704),[3] (as modified on June 8, 2010, Doc. No. 7798 ("Third Amended Plan")).

Doc. No. 8321; 453 B.R. 580 (Bankr. W.D.Pa. 2011).[4]  As further described below, the Third

Amended Plan provides for the channeling of "Channeled Asbestos PI Trust Claims" to an

Asbestos Personal Injury Trust ("Asbestos PI Trust").[5]  Plan Proponents (Pittsburgh Corning, the

Asbestos Creditors' Committee ("ACC") and the Future Claimants' Representative ("FCR"))

subsequently proposed additional amendments to the Third Amended Plan to address the Court's

---

[2]In some instances we have used the record cites provided by Plan Proponents in their
updated proposed findings at Doc. No. 9303.  However, where a docket number reference
existed we substituted the docket number for the Exhibit number where appropriate.  Where Plan
Proponents' record cites were incorrect we have corrected or deleted them.

[3]The Third Amended Chapter 11 Plan was initially dated January 29, 2009.  Doc. No.
6412.  Doc. No. 7704, January 29, 2009, Plan with amendments, was filed on May 19, 2010.

[4] The Third Amended Disclosure Statement had been approved by order of July 6, 2009.
Doc. No. 6747.  Debtor filed a Notice Regarding Description of Third Amended Disclosure
Statement to Accompany the Modified Third Amended Plan of Reorganization, Doc. No. 8954,
stating that although the Plan had changed in certain respects, no further disclosures were
necessary.

[5]Unless  otherwise defined herein, all capitalized terms shall have the meaning assigned
thereto in the Plan.

concerns and other pending objection. Those amendments are incorporated in the Modified

Third Amended Plan of Reorganization ("Plan") filed on August 17, 2012, at Doc. No. 8928.  It

is this Plan, as further modified, that is before the Court for confirmation and about which this

Memorandum Opinion and Order are issued.

      After considering the entire record of this case, the Plan and Plan Documents, the

Disclosure Statement, transcripts of testimony at the confirmation hearings held on May 3 to 6,

2004, and June 3, 4, 9 and 10, 2010, exhibits admitted into evidence, various briefs and argument

at hearings with respect to the August 17, 2012, amendments and additional proposed

amendments as well as the remaining objections of Garlock Sealing Technologies, Inc.

("Garlock") and Mt. McKinley Insurance Company and Everest Reinsurance Company

(together, "Mt. McKinley"), the Court makes the following Findings of Fact and Conclusions of

Law.  To the extent that a finding of fact is found to have been incorrectly designated herein as a

"Conclusion of Law," it shall be deemed a Finding of Fact.  Similarly, to the extent that a

conclusion of law is incorrectly designated herein as a "Finding of Fact," it shall be deemed a

Conclusion of Law.  As will be explained, *infra*, the Court makes these Findings and

Conclusions solely for purposes of determining that this Plan is confirmable.  Moreover, the Plan

is "insurance neutral" and preserves any and all coverage issues for resolution in a non-

bankruptcy proceeding, using applicable non-bankruptcy law.  Because none of the rights,

obligations, defenses, claims or issues concerning coverage are before this Court, and because

the Plan and Plan Documents preserve them for resolution elsewhere, the objections of insurers

Mt. McKinley and Everest Insurance Company (as defined above, "Mt. McKinley") are

overruled, as are the objections of Garlock Sealing Technologies, Inc. for lack of standing.

However, inasmuch as the record also demonstrates that the objections lack merit, they are

overruled on that basis as well.

 As an overview to what this Opinion does and does not do, and how this Plan has been

modified so as to cure what was previously unconfirmable, it is significant that in this version of

the Plan, the nature of the Plan funding has changed, as Corning no longer is contributing

proceeds of its insurance but is contributing other assets as the "Corning Trust Contribution."

*See infra*.  The Corning Trust Contribution has no direct connection to insurance. We express no

opinion as to whether the settled insurance policies or any policies are exhausted, which entities

they cover, what the policies require from the insured in order to attain payment for individual

claims or reimbursement of any contribution by PPG or Corning, or whether any settlement is

reasonable for coverage purposes notwithstanding the reasonableness of the settlements for Plan

purposes and as between the parties to the settlements.  We further express no opinion as to

whether any asbestos personal injury claims to be paid by the Trust, to the extent PPG  or

Corning seeks to recover its contributions from Mt. McKinley, were properly paid under any

PPG or Corning policy issued by Mt. McKinley.  The Trust Distribution Procedures are

reasonable and properly designed to pay claims for purposes of 11 U.S.C. §524(g) but this is not

a determination of whether Mt. McKinley will owe PPG or Corning.

 We find, in accord with §524(g)(4)(B)(ii), that the Plan is fair and equitable to those

holding Channeled Asbestos PI Trust Claims, including Demands, and that the Asbestos

Protected Parties are entitled to the protection of the Channeling Injunction.  The Asbestos PI

Trust will assume the liabilities of the Debtor which has been named in suits for damages

allegedly caused by the presence of or exposure to asbestos or asbestos-containing products.

The funding of the Plan by the Debtor and others is adequate to address the obligation to make payments to present Claimants and future Demand holders.  The Debtor, PPG and Corning are likely to be subject to substantial future demands for payment arising out of the same conduct, products and events to be addressed by the injunction but the amounts, numbers and timing of such future demands cannot be determined.  PPG and Corning are likely to continue to face allegations that they are responsible for the conduct of,  claims against, or demands on the Debtor by virtue of their corporate relationship.  The Plan and the Trust Distribution Procedures are constructed so as to deal equitably with Claims and Demands.

Thus, after 13 years in bankruptcy, objections to the Plan by non-creditor parties (attempts at resolutions of which resemble the game of Whack-a-Mole[6]) and the consensus of nearly all voting creditors, this Plan will be confirmed and the requested channeling injunction will be issued pursuant to §524(g) of the Bankruptcy Code.

## II.    PROCEDURAL BACKGROUND

1. On April 16, 2000 (the "Petition Date"), Pittsburgh Corning Corporation ("Debtor," "PCC" or "Pittsburgh Corning") filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

2. The Debtor experienced an influx of asbestos claims in the late 1990s and, as of the Petition Date, there were approximately 235,000 asbestos claims pending against it.  Doc. No. 6426, Third Amended Disclosure Statement at 31; Doc. No. 3308, Tr. 5/5/04 at 230:19-24 (Fitzpatrick).  Pittsburgh Corning also filed for bankruptcy in an effort to survive as a viable

---

[6] From http://en.wikipedia.org/wiki/Whac-A-Mole : "Colloquial usage - The term 'Whac-a-mole' (or 'Whack-a-mole') is used colloquially to denote a repetitive and futile task: each time an adversary is 'whacked' it only pops up again somewhere else."  Last visited May 16, 2013.

reorganized company. PM Tr. 5/3/2004 at 113:7-8 (Ellis). The financial burden on Pittsburgh

Corning caused by declining insurance, increasing "burn rate" of available insurance which rose

from $8 - $10 million per month in the mid-1990s to $26 - $34 million per month in 1999, and

increasing defense and indemnity costs led to its conclusion that its liabilities for asbestos claims

were greater than the value of its assets. PM Tr. 5/3/2004 at 108:16-109:8, 112:14-19 (Ellis);

PM Tr. 5/3/2004 at 111:25-113:3 (Ellis); PM Tr. 5/312004 at 119:22- 120:8 (Ellis); PM Tr.

5/3/2004 P.M. at 112:23-113:3 (Ellis).

     3. The Debtor was formed in 1937 by the Pittsburgh Plate Glass Company (now PPG

Industries, Inc.) ("PPG") and Corning Glass Works (now Corning Incorporated) ("Corning"),

with each owning, and continuing to own, fifty percent of the Debtor's capital stock. (PPG and

Corning are hereafter referred to as "Shareholders" or "Plan Supporters"). Doc. No. 6426 at 28;

Doc. No. 3290; PM Tr. 5/3/04 at 65:11-13 (Ellis); PM Tr. 5/4/04 at 11:17-21 (Eggers).

     4. Upon the filing of the Petition, this Court issued a series of first-day orders, including

orders authorizing the retention of Reed Smith Shaw and McClay LLP (now Reed Smith LLP) as

counsel for the Debtor. Doc. Nos. 35, 37, 38, 56, 57, 182.

     5. The U.S. Trustee appointed the Committee of Unsecured Trade Creditors on April 28,

2000 ("Trade Committee"). Doc. Nos. 69, 181, 344, 972.

     6. The U.S. Trustee appointed the Official Committee of Asbestos Creditors ("ACC") on

April 28, 2000. Doc. Nos. 59 and 273.

     7. The Court appointed Lawrence Fitzpatrick as the legal representative of persons who

may have asbestos-related claims against the Debtor in the future ("Future Claimants'

Representative" or "FCR"). Doc. No. 713. The FCR's authority was later expanded to include

representation of PPG and Corning Demand holders.  Doc. No. 2503.  The scope of the FCR's

authority was again modified on June 9, 2010, to clarify  that upon the occurrence of the

Effective Date, the FCR will represent only the interests of future holders of Channeled Asbestos

PI Trust Claims.  Doc. No. 7801.

      8. This Court also issued a series of general operating orders that permitted the Debtor to

continue in operation during its Chapter 11 Case.  Doc. Nos. 37, 38, 56, 57, 157, 235, 291, 297,

301, 536, 986, 1101, 1568, 3364, 3650, 4195, 4525, 5526, 5917, and 6042.

      9. By Order dated December 15, 2000, the Court authorized the Debtor to establish an

Interim Qualified Settlement Fund ("QSF") for the purpose of depositing any insurance proceeds

that were received by the Debtor from settling insurers for asbestos personal injury claims during

the Chapter 11 Case.  Doc. No. 633. The insurance proceeds in the QSF as of March 31, 2010,

were $154,067,056.35.  Doc. No. 7626.   As of February 28, 2013, they were $156,717,211.39.

Doc. No. 9274.  Such assets are among those intended to be part of the Plan funding and to

resolve competing claims to insurance proceeds potentially available to the Debtor for asbestos

personal injury claims.  Doc. No. 8928 at §9.1.3; *id*. at Exhibit M §II.A-D; PM Tr. 5/3/04 at

113:4-6, 18-21, 137:10-15 (Ellis); PM Tr. 5/4/04 at 44:14-18 (Eggers).

      10.  By Order dated December 10, 2004,[7] Doc. No. 3799,  the Court approved a

settlement by the Debtor and PPG with certain insolvent insurance companies (the "KWELMB

Companies") and designated an existing escrow account as a QSF (the "KWELMB QSF").  As

of April 30, 2010, the KWELMB QSF held $28,848,826.47 and, as of February 28, 2013, held

$28,837,787.35.  Doc. No. 9274.  *See* Doc. No. 9303, Plan Proponents' and Plan Supporters'

---

    [7]Although the Order is dated December 10, 2004, the docket entry was made on
December 9, 2004.

Proposed Findings of Fact and Conclusions of Law (hereafter "PFF") at ¶ 10.

11. Some of the competing claims to insurance coverage that would be resolved by the Plan, if confirmed, are those brought by PPG in Adversary No. 00-2201, *PPG Industries, Inc. v. Pittsburgh Corning Corporation, et al.*, which PPG filed on May 23, 2000, against Pittsburgh Corning and the insurers that issued hundreds of insurance policies to PPG and Pittsburgh Corning over a span of decades. *See* Doc. No. 8928, Exhibit M, Insurance Claims Agreement, at §II.A-D.

12. Additional competing claims to insurance coverage that will be resolved by the Plan, if confirmed, are those asserted by Pittsburgh Corning against certain policies of insurance issued to Corning. These claims were asserted in Adversary No. 02-2445, *Corning Incorporated v. Pittsburgh Corning Corporation, et al.,* filed on July 26, 2002, by Corning against Pittsburgh Corning and certain insurers, including those insurers that issued insurance policies to Corning against which Pittsburgh Corning also noticed a claim. On June 20, 2007, the District Court entered an order dismissing Corning's claims against the insurers without prejudice and staying Pittsburgh Corning's claims against the insurers until after plan confirmation. *See* Civ. Action No. 02-1898, Doc. No. 126. On July 11, 2007, the District Court entered a subsequent order which dismissed Pittsburgh Corning's claims against the insurers without prejudice and subject to a Tolling Agreement. Civ. Action No. 02-1898, Doc. No. 129. The conditional resolution of the Debtor's claim to insurance under certain Corning Insurance Policies is set forth in Exhibit M to the Plan (Insurance Claims Agreement), Doc. No. 8928, by which the Debtor, PPG, and Corning would resolve their respective competing claims for insurance coverage for Asbestos PI Trust Claims.

8

13. On November 20, 2003, Plan Proponents filed a Second Amended Plan, Doc. No.

2700, and later made technical amendments to it.  *See* Doc. No. 3120, Expedited Motion for

Entry of Order Approving Technical Amendments to Second Amended Plan; Doc. No. 3185,

Order dated April 20, 2004.

14. On May 3-7, 2004, a confirmation hearing was held.

15. On December 2, 2004, the Court of Appeals for the Third Circuit published its

decision in *In re Combustion Engineering, Inc.*, 391 F.3d 190 (3d Cir. 2004), which included a

discussion of the scope of protection available under 11 U.S.C. §524(g)(4)(A)(ii) to nondebtors.

16. Applying *Combustion Engineering* to the Second Amended Plan, this Court

concluded:

> As written, the plan runs afoul of the Combustion Engineering
> decision because it enjoins suits against the nondebtors PPG and
> Corning with respect to tort claimants on actions that do not arise
> derivatively from PCC.
>
> Based on the foregoing, we find that Corning and PPG are entitled
> to the channeling injunction for PC-Relationship claims, for
> Non-PC-Relationship claims arising from the "conspiracy theory"
> allegations such as concert of actions, conspiracy, alter ego, etc.,
> but not for claims that allege absolutely no connection with,
> interest in or involvement with PCC.

*In re Pittsburgh Corning Corp.*, 417 B.R. 289, 312 (Bankr. W.D. Pa. 2006).

17. The Court found that in all other respects, the Second Amended Plan satisfied the

requirements of §§524(g), 1123, 1124, 1125, 1126, 1127, 1128, and 1129 of the Bankruptcy

Code. 417 B.R. at 294-95.

18. Thereafter, various parties, including the Plan Proponents (Debtor, ACC and FCR)

and Plan Supporters (PPG and Corning), filed motions for reconsideration of the Court's order

denying confirmation of the Second Amended Plan.

19. At the request of various parties, the Court withheld ruling on the motions for reconsideration to allow the Plan Proponents and Plan Supporters an opportunity to revise the Second Amended Plan in order to address the issues that the Court identified as the reason for its denial of confirmation of the Second Amended Plan.  Doc. No. 5812, Tr. 1/10/08 at 20.

20. On January 29, 2009, the Plan Proponents filed a Modified Third Amended Plan of Reorganization (Doc. No. 6412) to which amendments were filed on February 20, 2009 (Doc. No. 6443); January 6, 2010 (Doc. No. 7386); January 26, 2010 (Doc. No. 7432), and April 29, 2010 (Doc. No. 7645).  An updated version of the Plan and all attachments, exhibits, and schedules including all amendments through April 29, 2010, was filed on May 19, 2010, at Doc. No. 7704.  Another amendment was filed on June 8, 2010, at Doc. No. 7798.

21. After a hearing, confirmation of that Plan was denied by Opinion and Order dated June 16, 2011, because the definition of "Asbestos Personal Injury Claim" was overbroad and because the Plan was not insurance neutral under *Combustion Engineering*.  *In re Pittsburgh Corning Corporation*, 453 B.R. 570 (Bankr. W.D. Pa. 2011).  Motions for reconsideration were filed and various hearings were held over the course of several months.

22. On April 20, 2012, Plan Proponents filed Doc. No. 8781, Notice of Filing Plan Materials with Proposed Amendments.  The documents include the Modified Joint Third Amended Plan of Reorganization dated January 29, 2009, as amended on September 23, 2011, Doc. Nos. 8459, 8485, and all proposed amendments filed after September 23, 2011, Doc. No. 8459, and supplemented October 5, 2011, Doc. No. 8485.  Documents filed at Doc. No. 8781 include proposed amendments to (1) the Plan and (2) Exhibit F (including Schedule L), (3)

10

Exhibit I (including Exhibits 1 and 4 and Schedule D), (4) Exhibit M, (5) Exhibit N, and a

proposed new exhibit, (6) Exhibit O.

     23.   After several hearings and negotiations between and among Plan Proponents and Mt.

McKinley, Plan Proponents filed the Modified Third Amended Plan on August 17, 2012.  Doc.

No. 8928.  Doc. No. 8955, Plan Proponents' Summary of Plan Documents Attached as Exhibits,

was filed on August 31, 2012.  A Summary of the Modified Third Amended Plan was filed on

August 31, 2012, Doc. No. 8956, and a Summary of Technical Amendments to Prior Plans was

filed on the same date at Doc. No. 8957.  Certain Underwriters at Lloyd's London, London

Market Companies, filed a Notice Regarding Notice of Proposed Clarifying Plan Amendments,

Doc. No. 8963, and  a stipulation between Pittsburgh Corning and Certain London Market

Insurers was filed on September 20, 2012, Doc. No. 8989.  Among other things, the amendments

changed the definitions of "Asbestos Permanent Channeling Injunction" and "Channeled

Asbestos PI Trust Claim" and added definitions of "Non-Derivative PPG/Corning Claim" and

"PCC Conspiracy Theory Claim."  The State of Michigan Department of Treasury objected to

confirmation, Doc. No. 8974, but withdrew its objection.  Doc. No. 9027.  A Stipulation by

Corning, PPG, and Reaud, Morgan Quinn, L.L.P was filed resolving the Reaud Morgan

Claimants' objections.  Doc. No. 8985.

     24.   Objections to confirmation were again filed by Mt. McKinley.  Doc. No. 8984.  After

a hearing on October 10, 2012, the Debtor proposed language for inclusion in any confirmation

order that would resolve two discrete Mt. McKinley objections.  Notice Regarding Proposed

Confirmation Order Language to Address Certain Mt. McKinley Objections, Doc. No. 9060.

Mt. McKinley acknowledged that the changes proposed in Doc. No. 9060 would resolve its

objections but only in part.  The changes included (1) removal of the phrase "or its predecessors

or Affiliates" from Plan §§8.1.18 and 8.1.28 and (2) a method by which Mt. McKinley would

have a means to satisfy potential Medicare, Medicaid, and SCHIP Extension Act of 2007

(hereafter "MMSEA") reporting requirements (*see infra*), if any, or by which it would otherwise

have access to information necessary to fulfill any reporting requirements.  The language in the

Notice (Doc. No. 9060) related to §§8.1.18 and 8.1.28 of the Plan did not, however, resolve all of

Mt. McKinley's objections to those sections and others.  Such unresolved objections include an

argument that such findings and others are unnecessary to Confirmation and are not supported by

the evidence.  Mt. McKinley's Notice Regarding Reservation of Rights, Doc. No. 9066.

25. Garlock Sealing Technologies, Inc., also objected to the Modified Third Amended

Plan.  Doc. No. 8983.  For the reasons stated herein and our prior decision with respect to

confirmation of the Plan in 2011, 453 B.R. 570 (Bankr. W.D. Pa. 2011), Garlock's objections are

overruled as discussed more fully *infra*.

## III.    HISTORY OF PITTSBURGH CORNING AND ITS SHAREHOLDERS, THE ASBESTOS CLAIMS AGAINST THEM, AND THE INSURANCE FOR SUCH CLAIMS

### A.    Pittsburgh Corning's Corporate History

26. Corning and PPG formed Pittsburgh Corning to develop, manufacture, and sell glass

building products.  PM Tr. 5/4/04 at 11:17-12:5 (Eggers).

27. Employees of PPG and Corning served as directors of Pittsburgh Corning.  The

number of directors varied over time but historically included representatives of the Shareholders

as well as Pittsburgh Corning.  For example, during the time David Ellis was the corporate

secretary of Pittsburgh Corning, from 1986 through 2001, there were five directors – two PPG

employees, two Corning employees, and Pittsburgh Corning's President/CEO.  PM Tr. 5/3/04 at 65:8-17 (Ellis).  *See also* Doc. No. 3308, Tr. 5/5/04 at 99:7-9 (Diggs).

28. Historically, Pittsburgh Corning's two principal products were glass block and Foamglas®, a cellular glass insulation product.  Neither product contained asbestos.  PM Tr. 5/3/04 at 65:18-66:8 (Ellis).

29. Foamglas® insulation is also produced by Pittsburgh Corning Europe, N.V. ("PCE"), a licensee of the Debtor in which PPG and Corning each own fifty percent of the capital stock.  PCE's manufacturing facilities are located in Belgium, Germany, and the Czech Republic. PM Tr. 5/3/2004 at 120:23-121:12 (Ellis); Doc. No. 6426 at 29.

30. Except for the effects of asbestos litigation against it, Pittsburgh Corning operates a profitable business.  Doc. No. 6426 at 30; Doc. No. 7823, Tr.6/3/10 at 77:1-5; Doc. No. 9274, Monthly Operating Report for period ending February, 2013.

## B.    The Background of PPG and Corning

31. PPG is a global manufacturer and distributor of basic materials and is headquartered in Pittsburgh, Pennsylvania.  PPG has manufactured coatings, glass, chemicals, and fiberglass, with operations throughout the world.  Tr. 5/5/04 at 94:15-23 (Diggs).

32. Corning manufactures and supplies specialty glass and glass ceramic products with primarily four product segments:  (1) optical fiber, optical communications cable, and related hardware and equipment to the telecommunications industry; (2) glass used in liquid crystal displays for computers and televisions; (3) ceramic honeycomb material used for emission control in automobiles; and (4) glass and plastic laboratory equipment for the life sciences industry.  PM Tr. 5/4/04 at 10:19-11:16 (Eggers).

13

C.    **Pittsburgh Corning's Unibestos Business**

33. From 1962 to 1972, Pittsburgh Corning manufactured and sold an asbestos containing molded pipe insulation called Unibestos, which was made of amosite asbestos fibers, diatomaceous earth, and sodium silicate.  PM Tr. 5/3/2004 at 66:9-67:1 (Ellis).

34. Unibestos was a high-temperature pipe insulation product manufactured by Pittsburgh Corning at its Tyler, Texas, and Port Allegany, Pennsylvania, plants.  *Id*. at 67:2-9 (Ellis).

35. Unibestos was installed at work sites requiring high temperature insulation, such as shipyards, naval facilities, steel mills, oil refineries, petrochemical plants and heavy industrial sites.  *Id*. at 67:10-15 (Ellis).

36. Pittsburgh Corning's manufacture of Unibestos eventually led to its being named a defendant in hundreds of thousands of asbestos-related personal injury lawsuits.  *Id*. at 68:11-16, 94:20-23 (Ellis); Doc. No. 6426 at 31.

37. In 1972, the Debtor ceased its Unibestos production.  PM Tr. 5/3/2004 at 66:24-67:1 (Ellis); Doc. No 6426 at 28.

38. Any exposure to the asbestos in Unibestos for the most part occurred in the years it was manufactured, 1962-1972.  PM Tr. 5/3/2004 at 68:11-21 (Ellis).

39. Neither PPG nor Corning manufactured, distributed, or sold Unibestos, with the exception of two sales of Unibestos by PPG'S fiberglass division in August and October 1969 for sales prices of $384.00 and $292.80, respectively.  PM Tr. 5/4/04 at 12:15-17, 73:8-11 (Eggers); Tr. 5/5/04 at 32:19-34:24 (Seymour); Doc. No. 6426 at 35.

D.    **The Unibestos Suits Against Pittsburgh Corning and its Shareholders**

14

40. Beginning in the mid- to late-1960s, Pittsburgh Corning began to face lawsuits alleging asbestos injuries from exposure to Unibestos.  PM Tr. 5/3/2004 at 68:11-14 (Ellis).

41. In 1974, former workers at Pittsburgh Corning's Tyler plant filed a series of cases called the *Yandle/Kay* cases.  These cases involved approximately 450 plaintiffs and were pending in the United States District Court for the Eastern District of Texas.  *Id.* at 79:9-80:1 (Ellis); PM Tr. 5/4/04 at 13:2-19 (Eggers); Exhibit P-5.

42. The named defendants in the *Yandle/Kay* cases included PPG, Dr. Lee Grant (Medical Director of PPG and medical consultant to Pittsburgh Corning), Corning, Pittsburgh Corning, and others.  PM Tr. 5/3/04 at 80:2-16 (Ellis); Exhibit P.

43. Paragraph 5 of the Complaint in *Yandle v. PPG Industries, et al.*, filed on or about January 2, 1974, alleged, *inter alia*, as follows:

> Defendants, PPG Industries, Inc. and Corning Glass Works, Incorporated at all times material hereto have been aware of the conditions existing at the Pittsburgh Corning Plant at Tyler, Texas which gave rise to the damages sustained by plaintiffs.  Said corporations, although knowing of the dangers and hazards, and being in a position to correct deficiencies at the said plant because of their beneficial ownership and right to control and manage Pittsburgh Corning Corporation have failed to correct such deficiencies or warn the employees there at of the dangers of exposure to asbestos in the concentration present therein, such acts being of omission and commission and constituting negligence and a proximate cause of the injuries and damage alleged herein. Defendant Dr. Lee B. Grant, an agent and employee of PPG Industries, Inc., on several occasions visited said Tyler plant and surveyed and monitored the conditions present therein.  Further, Dr. Grant, on several occasions, conducted examinations of the workers therein, yet failed and refused to advise such workers of health hazards and of their own physical problems.  Such acts and omissions constitute negligence and a proximate cause of the damages alleged herein.

PM Tr. 5/3/04 at 79:23-80:20 (Ellis); Exhibit P-5.

15

44. Ultimately, around 2000 individual claims were part of the *Yandle/Kay* cases. PM Tr. 5/3/04 at 80:21-81:3 (Ellis).

45. The *Yandle/Kay* cases were settled by the defendants for a total of approximately $20 million. Settlement payments were made by or on behalf of Pittsburgh Corning, PPG, and Corning. *Id*. at 80:21-81:13, 82:17-83:5 (Ellis); PM Tr. 5/4/04 at 13:16-14:6 (Eggers).

46. After the *Yandle/Kay* settlement, business invitees, temporary employees of the Tyler plant, and residents who lived within a mile or two of the Tyler plant filed another series of cases against Pittsburgh Corning, PPG, and Corning, generally referred to as the *Tyler II* cases. The *Tyler II* cases again alleged liability against PPG and Corning for exposures to asbestos. PM Tr. 5/3/04 at 83:6-84:11 (Ellis); PM Tr. 5/4/04 at 14:7-14 (Eggers); Exhibits P-6 to P-14.

47. There were thousands of plaintiffs in the *Tyler II* cases, and these cases were settled by Pittsburgh Corning, PPG, and Corning for approximately $1.2 million. PM Tr. 5/3/2004 at 84:12-24 (Ellis); Doc. No. 3287, AM Tr. 5/4/2004 at 82:9-19 (Ellis); PM Tr. 5/4/2004 at 14:7-23, 76:7-14 (Eggers).

48. Corning had moved for summary judgment in the *Tyler II* cases, but the Court did not act upon its motion. PM Tr. 5/4/2004 at 14:24-15:4 (Eggers).

49. Employees of Pittsburgh Corning's Port Allegany plant also sued Pittsburgh Corning, PPG, and Corning in a case called *Barber*. Pittsburgh Corning and Corning were dismissed from the case by a Pennsylvania trial court on different grounds. The *Barber* case was ultimately settled by PPG. PM Tr. 5/3/2004 at 84:25-85:15 (Ellis); AM Tr. 5/4/2004 at 82:20-83:5 (Ellis); PM Tr. 5/4/2004 at 15:5-15 (Eggers).

50. Cases alleging joint liability against Pittsburgh Corning, PPG, and Corning for

16

exposure to the Unibestos product were also filed in situations other than those involving the

Tyler and Port Allegany manufacturing operations.  PM Tr. 5/3/2004 at 86:2-8, 87:17-90:10

(Ellis); PM Tr. 5/4/2004 at 17:22-19:22 (Eggers); Exhibits P-15, P-16, P-18, P-19, P-120, P-121,

P-122, P-123, P-124, P-125, P-126, and P-127.

51. Some of the lawsuits naming PPG and Corning pled claims that allegedly arose out of

the Shareholders' ownership of a financial interest in Pittsburgh Corning and also out of their

alleged right to control and manage Pittsburgh Corning.  PM Tr. 5/4/2004 at 12:13-13:1,

15:25-16:22, :73:8-74:4 (Eggers); Tr. 5/5/2004 at 24:13-25:15 (Seymour), 98:17-99:17, 101:6-14

(Diggs); 10/28/2009 DEP. TR. 96:15-98:18 (Hatton); see, e.g. Exhibits P-5, P-15, P-16, P-18,

P-19, P-120, P-121, P-122, P-123, P-124, P-125, P-126, and P-127.

52. Among the several purported legal theories alleged against PPG and Corning for

Unibestos liability were:  alter ego, piercing the corporate veil, domination and control, concert

of action, common enterprise, aiding and abetting, respondeat superior, negligent provision of

services, principal/agent liability, mere instrumentality theory, successor-in-interest, and

conspiracy.  PM Tr. 5/3/2004 at 88:23-89:23, 96:13-98:8 (Ellis); AM Tr. 5/4/2004 at 108:5-16

(Ellis); PM Tr. 5/4/2004 at 12:18-13:1, 16:16-17:19, 73:14-74:4 (Eggers); Tr. 5/5/2004 at

24:13-25:15 (Seymour), 98:17-99:24, 101:6-23 (Diggs); Exhibits P-16, P-18, P-54, P-120,

P-121, P-122, P-123, P-124, P-125, P-126, and P-127.

53. In lawsuits filed against Pittsburgh Corning, PPG, and/or Corning, insurance carriers

of the defendants, including without limitation PCC Settled Insurers, were frequently included as

defendants.  See Exhibits P-120 ¶ 9 and attachment B, ¶¶ 27, 34, 46-53; P-121 (same); P-122

(same); P-123 ¶ 9 and attachment B, ¶¶ 27, 34, 46-53; P-121 (same); P-122 (same); P-123 ¶ 9

17

and attachment B, ¶ 29, 36, 48-55; P-124 (same references as P-120); P-125 (same); P-126

(same); and P-127 (same). Those complaints included allegations that the defendant insurers

conspired with, *inter alia*, Pittsburgh Corning to suppress information regarding the dangers

associated with asbestos exposure and that this alleged conspiratorial misconduct resulted in the

claimants' asbestos-related injuries. *Id*.

54. In 1981, Pittsburgh Corning had approximately 15,000 to 20,000 claims pending or

open against it. Between 1981 and 1985, the number of claims increased. By 1985, Pittsburgh

Corning had approximately 60,000 to 75,000 open claims. PM Tr. 5/3/2004 at 102:9-103:4

(Ellis).

55. Before the Petition Date, Pittsburgh Corning defended and resolved more than

200,000 Unibestos claims at a cost of approximately $1.2 billion. Doc. No. 6426 at 31; PM Tr.

5/3/2004 at 106:5-10 (Ellis).

56. As of the Petition Date, Pittsburgh Corning had approximately 235,000 Unibestos

claims pending against it. Doc. No. 6426 at 31; Tr. 5/5/2004 at 230:19-24 (Fitzpatrick).

57. At the time Pittsburgh Corning filed its Petition, PPG was named as a defendant by

approximately 116,000 Unibestos claimants, and Corning was named as a defendant by

approximately 11,400 Unibestos claimants. Doc. No. 6426 at 32, 38; Tr. 5/5/2004 at 230:19-24

(Fitzpatrick).

**E.    Asbestos Claims Against PPG**

58. PPG has been named as a defendant in lawsuits by claimants that allege that PPG is

liable for bodily injury they allegedly sustained as a result of exposure to Pittsburgh Corning's

Unibestos product. These Claims have been referred to as "PC-Relationship Claims." PM Tr.

18

5/3/2004 at 87:17-90:10 (Ellis); PM Tr. 5/4/2004 at 17:22-19:21 (Eggers); Tr. 5/5/2004  at

24:13-25:15, 27:5-29:20, 31:4-16 (Seymour), 98:17-103:5 (Diggs); Exhibits P-5, P-6, P-7, P-8,

P-9, P-10, P-11, P-12, P-13, P-15, P-16, P-18, P-19, P-27, P-28, P-120, P-121, P-122, P-123,

P-124, P-125, P-126, and P-127.

59. Over the last thirty years, asbestos Claimants have asserted against PPG liability for

the Pittsburgh Corning Unibestos product and have conducted discovery relating to the

relationship between PPG and Pittsburgh Corning.  *See* Tr. 5/5/2004 at 98:17-100:4 (Diggs).  By

way of example, asbestos Claimants have on numerous occasions over many years taken

depositions of Dr. Lee Grant, a physician and former employee of PPG who from time to time

provided advice on medical issues to Pittsburgh Corning, including medical advice regarding

asbestos.  PM Tr. 5/3/2004 at 80:2-8 (Ellis), Tr. 5/5/2004 at 99:18-100:4 (Diggs).

60. Asbestos Claimants seeking to impose liability on PPG for Unibestos Claims have

relied upon a number of facts, including but not limited to the facts that:  (1) PPG was a fifty

percent shareholder of Pittsburgh Corning; (2) employees of PPG were on the Pittsburgh

Corning Board of Directors; (3) PPG provided, at various times, certain services to Pittsburgh

Corning (including environmental, health and safety advice, and legal services); and (4) PPG and

Pittsburgh Corning have joint insurance coverage and PPG permitted Pittsburgh Corning to

participate in its insurance coverage program.  Tr. 5/5/2004 at  98:25-99:17 (Diggs); P-18 ¶¶

65-76; P-54 ¶¶ 59, 60, 61(b)(vi), 64, 70; P-120 ¶¶ 65-76; P-121 ¶¶ 65-76; P-122 ¶¶ 65-76; P-123

¶¶ 62- 73; P-124 ¶¶ 65-76; P-125 ¶¶ 65-76; P-126 ¶¶ 65-76; and P-127 ¶¶ 65-76.

61. As of the Petition Date, PPG was a defendant in asbestos-related lawsuits involving

approximately 116,000 claimants.  Tr. 5/5/2004 at 100:17-21 (Diggs).  As of the Petition Date,

there were fewer than 800 Asbestos PI Trust Claims against PPG that did not also assert claims against the Debtor.  Tr. 5/5/2004 at 31:18-34:24 (Seymour), 103:6-21 (Diggs); Doc. No. 6426 at 32-35.

62. PPG has raised a number of defenses to liability for the asbestos claims against it and has stated that it believes that it is not responsible for any alleged injuries caused by Pittsburgh Corning's products.  For instance, PPG has asserted that it cannot be held liable as a matter of law for any injuries caused by the product(s) of another corporation.  Similarly, PPG has contended that it did not have and did not voluntarily assume a duty to the users of Pittsburgh Corning's product to warn them of any alleged dangers of Unibestos or otherwise protect those users from such dangers.  Further, while the asbestos plaintiffs typically alleged that PPG should be held liable for the conduct of certain individuals employed by PPG, PPG has countered that there is no evidence that these individuals were acting within the scope of their employment with PPG at the time or that these individuals were subject to PPG's right of control.  Finally, PPG has argued that in any event, there is no evidence to support the imposition of liability on PPG for any injuries arising out of Unibestos under any of the theories advanced by the asbestos plaintiffs.  Doc. No. 6426 at 33.

63. Based on these and other defenses, prior to 2000, PPG had never been found liable for any claims arising out of an alleged exposure to Unibestos.  In a number of cases, PPG had been dismissed on motions prior to trial.  Doc. No. 6426 at 33; Tr. 5/5/2004 at 133:22-134:1 (Diggs). In a consolidated proceeding in West Virginia in 1998, a jury found that PPG was not liable under a claim of aiding and abetting.  Similarly, in January 2000, a jury found PPG not liable for negligence in a trial in Texas state court involving six plaintiffs.  Tr. 5/5/2004 at

20

103:1-5, 130:24-131:3 (Diggs).

64. When Pittsburgh Corning settled an asbestos bodily injury case, it typically obtained a release that also encompassed PPG with no additional payment by PPG.  Tr. 5/5/2004 at 25:16-26:15 (Seymour), 100:5-16 (Diggs).

65. PPG had only one adverse jury verdict on a Unibestos claim.  Specifically, on April 14, 2000, a final judgment in a Unibestos case was entered against PPG in a case styled *Jerry Sonnier, et al. v. Pittsburgh Corning Corporation, et al.* that was tried in the District Court of Jefferson County, Texas.  The final judgment in the *Sonnier* case provided, *inter alia*, that PPG'S negligence was a proximate cause of the asbestos related injuries and death and that PPG had provided substantial assistance or encouragement to the Debtor in the commission of wrongful conduct that was the proximate cause of asbestos-related injuries and death.  As a result of these findings, PPG was found to be at fault for ten percent of the asbestos related injuries and death, where applicable, of those plaintiffs.  Tr. 5/5/2004 at 130:20-23 (Diggs), Exhibits P-27, P-28.  The *Sonnier* Unibestos verdict is the only adverse asbestos verdict PPG experienced prior to the entry of the stay on April 16, 2000.  Tr. 5/5/2004 at 78-79 (Seymour).  The Sonnier claim is the subject of Adversary No. 00-2161.  An order was entered on May 11, 2010, approving a Stipulation in the Adversary to permit certain claims to go forward and retain the injunction as to others.  Adv. Doc. No. 462.

67. All or virtually all asbestos personal injury products liability claims against PPG have included allegations about Unibestos or about PPG's relationship with Pittsburgh Corning.  Tr. 5/5/2004 at 26:16-27:4 (Seymour), 103:10-13 (Diggs).

68. Typically, the asbestos claims against PPG contained general products liability

allegations, or allegations that might be interpreted in such a manner, asserted against all defendants, along with specific allegations about PPG's relationship with Pittsburgh Corning. Tr. 5/5/2004 at 31:18-32:9 (Seymour); 101:24-102:7, 103:6-13 (Diggs), Exhibit P-15 ¶ 39 (identifying PPG as a defendant); ¶ 72 (asserting general products liability allegations against all asbestos defendants), ¶¶ 106-113 (asserting allegations relating to Pittsburgh Corning).

69. Historically, PPG had manufactured a limited number of products that contained asbestos as a component part, and PPG had sold a limited number of products that contained asbestos, but were manufactured by others.  A description of products manufactured, distributed, or sold by PPG that may have contained asbestos can be found on pages 34-38 of the Third Amended Disclosure Statement, Doc. No. 6426.  *See also* Doc. No. 8954.[8]  *See also* Tr. 5/5/2004 at 32:10-34:24 (Seymour), 103:14-21 (Diggs).

70. One of the asbestos-containing products sold by PPG was manufactured by an unaffiliated company and sold by PPG under the brand name "Pyrocal."  PPG's Pyrocal sales totaled less than $625,000.  *See* Doc. No. 6426 at 35; Tr. 5/5/2004 at 104:6-10 (Diggs).

71. The Debtor did not manufacture, sell, and/or distribute Pyrocal or any other non-Unibestos asbestos-containing product described in Section VI.C (Claims Against PPG) of the Modified Third Amended Disclosure Statement filed with the Bankruptcy Court on February 6, 2009, Doc. No. 6426;  Doc. No. 7823, Tr. 6/3/2010 at 108:7-109:12 (Fitzpatrick).

---

[8]Doc. No. 6426 was filed on February 6, 2009.  On August 31, 2001, Debtor filed Doc. No. 8954, titled Description of Third Amended Disclosure Statement to Accompany the Modified Third Amended Plan of Reorganization for Pittsburgh Corning Corporation Dated January 29, 2009, Jointly Proposed by Pittsburgh Corning Corporation, the Official Committee of Asbestos Creditors, and the Future Claimants' Representative.  That document stated that, notwithstanding some changes to the Plan, none adversely changed the treatment of any creditor and therefore the Disclosure Statement approved by this court on July 6, 2009, Doc. No. 6747, was still adequate and did not need to be revised.

72. In cases alleging exposure to Pyrocal or other unspecified asbestos-containing products, claimants have alleged that, with respect to asbestos, PPG was, *inter alia*, engaged in a civil conspiracy or joint enterprise with, or otherwise aided and abetted, Pittsburgh Corning and also that PPG, Pittsburgh Corning, and other defendants were jointly liable for alleged injuries caused by each defendant's products. Exhibit P-15 ¶ 39 (identifying PPG as a "products defendant"), ¶ 72 (asserting joint and several products liability claims), ¶ 88 (asserting conspiracy claim), ¶¶ 105-114 (asserting specific allegations relating to Pittsburgh Corning); Exhibit P-53 ¶ 8(bc) (alleging PPG's manufacture and sale of Unibestos through Pittsburgh Corning and PPG's sale of Pyrocal), ¶ 14 (asserting existence of conspiracy), ¶¶ 16, 18-19 (asserting joint and several products liability claims against defendants); Exhibit P-54 ¶¶ 10-11 (asserting manufacture, distribution or sale of asbestos-containing products), ¶¶ 12-16 (asserting joint and several products liability claim); ¶¶ 58-73 (asserting specific allegations involving PPG and Pittsburgh Corning), and ¶¶ 75-83 (asserting conspiracy, concert of action, and common enterprise claim among all defendants).

73. Claimants in another suit, the Abernathy petition set forth in Exhibit P-18, have asserted claims against PPG relating to Pyrocal. *See* Doc. No. 7825, Tr. 6/4/2010 at 156:1-8, 168:18-169:4. That petition contains specific allegations that PPG acted in concert with Pittsburgh Corning. Exhibit P-18 at ¶¶ 65-76. By way of example, these include allegations that "[a]t all material times, PPG and Corning acted in concert with their subsidiary, PCC, in the research and investigation of the hazards of its products and the health consequences to humans of asbestos dust and fiber inhalation and ingestion." *Id.* at ¶ 67. Abernathy also alleged that "PPG, Corning, and PCC further acted in concert to suppress the information known to them of

23

the hazards of asbestos and to undertake and continue the marketing of the poisonous products well beyond the time any reasonable manufacturer would have suspended sales of the known carcinogen." *Id.* at ¶ 68.  The petition alleged that "PPG and Corning in concert with PCC implemented and began the manufacture of insulation products which injured Plaintiffs," *id.* at ¶ 70, and alleged the creation of dangers to persons exposed to "Unibestos and other such materials." *Id.* at ¶ 74.  The Abernathy petition also contains certain general allegations against the defendants, including allegations regarding joint "suppression" of  information, *id.* at ¶ 16, and action in concert and conspiratorial conduct.  *Id.* at ¶¶ 23, 24 and 30. The allegations in the Abernathy petition are virtually identical to those in other complaints admitted into evidence. *See* Exhibits P-120 (same ¶¶), P-121 (same ¶¶), P-122 (same ¶¶ other than ¶¶ 16 and 30), P-123 (¶¶ 25, 26, 64, 75, and 71), P-124 (same ¶¶ other than ¶¶ 16 and 30),  P-125 (same ¶¶), P-126 (same ¶¶ other than ¶¶ 16 and 30), and P-127 (same ¶¶ other than ¶¶ 16 and 30).

74. Beyond the allegations in the complaints, claimants have referred to PPG's historical relationship with Pittsburgh Corning in an attempt to establish that PPG had knowledge regarding the hazards associated with asbestos.  Tr. 5/5/2004 at 103:22-104:1 (Diggs).

75. PPG has never been found liable for a claim alleging asbestos-related bodily injury as a result of exposure to a product manufactured, distributed, or sold by PPG.  Tr. 5/5/2004 at 35:6-9 & 22-25 (Seymour), 104:2-5 (Diggs).  Pyrocal is the only asbestos-containing product manufactured, distributed, or sold by PPG that has ever given rise to a settlement payment by PPG.  *Id*. at 104:6-17 (Diggs).  The total settlements of Pyrocal claims have amounted to approximately $2 million over the course of the asbestos litigation against PPG.  *Id*. at 104:14-17 (Diggs).

24

### F.    Asbestos Claims Against Corning

76. Corning has been named as a defendant in lawsuits by claimants that allege that

Corning is liable for bodily injuries they allegedly sustained as a result of exposure to Pittsburgh

Corning's Unibestos product.  These claims are often referred to as "Unibestos" or

"PC-Relationship" claims.  Doc. No. 6426 at 38-39; PM Tr. 5/3/2004 at 64:2-7, 79:9-81:3,

83:6-85:15 (Ellis); PM Tr. 5/4/2004 at 12:13-19:21 (Eggers); Exhibits P-5, P-6, P-7, P-8, P-9,

P-10, P-11, P-12, P-13, P-18, P-19, P-120, P-121, P-122, P-123, P-124, P-125, P-126, and P-127.

77. Beginning in 1992, cases alleging personal injuries from exposure to Unibestos were

brought against Corning in Brazoria County, Orange County, and Jefferson County, Texas.  At

the time Pittsburgh Corning filed for reorganization under Chapter 11, there were approximately

11 cases, with approximately 11,400 claimants, pending against Corning in these Texas counties

and one case pending in Alabama.  PM Tr. 5/4/2004 at 15:22-17:19, 78:7-11 (Eggers); Tr.

5/5/2004 at 230:19-24 (Fitzpatrick); Doc. No. 6426 at 39; Exhibits P-18, P-120, P-121, P-122,

P-123, P-124, P-125, P-126, and P-127.

78. Corning was named as a defendant along with Pittsburgh Corning and PPG in the five

Texas Unibestos cases listed on Exhibit P-19:   *Cardwell, et al. v. ACANDS, Inc. et al.; Bailey, et*

*al. v. ACANDS, Inc., et al.; Gilbert v. ACANDS, Inc. et al.; Aaron, et al. v. Aber Insulation, et al;*

*Martin v. ACANDS, Inc., et al.*  PM Tr. 5/4/2004 at 17:22-19:21 (Eggers); Exhibit P-19, P-120,

P-121, P-123, and P-125.  In those cases Corning is alleged to be the alter ego of Pittsburgh

Corning.  *See, e.g.* Exhibits P-121 ¶ 5(r) ("Corning, Inc., a Pennsylvania [sic] corporation (alter

ego of PPG Industries, Inc. and Pittsburgh Corning Corporation)), ¶ 66 ("PPG and Corning are

the parent corporation of Pittsburgh Corning Corporation"); P-120 ¶¶ 5(r), 66 (same); P-123 ¶¶

25

12, 63 (same); P-124 ¶¶ 5(m), 66 (same)").

79. As of the Petition Date, Corning was a defendant in Unibestos/PC-Relationship cases

involving approximately 11,400 claimants. Pittsburgh Corning is one of the co-defendants in all

of these cases. PM Tr. 5/4/2004 at 15:25-19:21 (Eggers); Tr. 5/5/2004 at 230:19-24

(Fitzpatrick), Doc. No. 6426 at 39.

80. Asbestos claimants seeking to impose liability on Corning for

Unibestos/PC-Relationship claims have relied upon , *inter alia*, the fact that Corning was a fifty

percent shareholder of Pittsburgh Corning and the fact that employees of Corning were on

Pittsburgh Corning's Board of Directors. PM Tr. 5/4/2004 at 12:18-13:1, 73:14-74:4 (Eggers);

Doc. No. 6426 at 38; P-18 ¶¶ 65-76; P-120 ¶¶ 65-76; P-121 ¶¶ 65-76; P-122 ¶¶ 65-76; P-123 ¶¶

62-73; P-124 ¶¶ 65-76; P-125 ¶¶ 65-76; P-126 ¶¶ 65-76; and P-127 ¶¶ 65-76.

81. Among the several purported legal theories alleged against Corning for Unibestos

liability were: alter ego, piercing the corporate veil, domination and control, concert of action,

common enterprise, aiding and abetting, *respondeat superior*, negligent provision of services,

principal/agent liability, mere instrumentality theory, successor-in-interest, and conspiracy. *See*

PM Tr. 5/3/2004 at 98:4-8 (Ellis); PM Tr. 5/4/2004 at 12:18-13:1, 16:10-17:19, 73:14-74:4

(Eggers); Exhibits P-18, P-19, and P-54; Doc. No. 6426 at 38.

82. Virtually all of the cases against Corning alleging exposure to asbestos-containing

products also include a claim against Pittsburgh Corning for alleged exposure to Unibestos.  PM

Tr. 5/3/2004 at 67:16-68:10, 94:20-95:9 (Ellis); PM Tr. 5/4/2004 at 32:6-13 (Eggers).

83. Corning defended against liability in Unibestos cases and typically moved for

summary judgment on the grounds it could not be held liable for injuries allegedly caused by a

26

product manufactured, sold, or distributed by Pittsburgh Corning, that it did not owe a duty to any person claiming exposure to Unibestos, and that it was completely uninvolved in Pittsburgh Corning's manufacture, sale and distribution of Unibestos.  PM Tr. 5/4/2004 at 14:24-15:21, 24:9-25:6, 157:5-7, 158:17-21 (Eggers); Doc. No. 6426 at 39.

84. Although no Unibestos case against Corning ever proceeded to trial, there was (and is) considerable uncertainty as to how Corning would fare at trial in the Texas state courts in these asbestos cases. PM Tr. 5/4/2004 at 24:9-25:6, 158:17-159:2 (Eggers).

85. When Pittsburgh Corning settled an asbestos case, it typically obtained a release that also released Corning with respect to Unibestos claims, with no additional payment by Corning. PM Tr. 5/4/2004 at 24:25-25:3 (Eggers).

87. Claimants have alleged that Corning has potential asbestos liability arising out of a product distributed by Corhart Refractories Company ("Corhart").  PM Tr. 5/4/2004 at 26:19-30:4 (Eggers).

88. Corhart was formed in approximately 1927 by Corning and Hartford Empire Company ("Hartford") to manufacture and sell refractory bricks for use in constructing furnaces to make glass products at high temperatures.  Initially, Corning and Hartford each owned fifty percent of the stock of Corhart.  *Id*. at 25:10-25 (Eggers).

89. In the 1950s, Corning acquired all of the outstanding shares of Corhart, and Corhart became a wholly-owned subsidiary of Corning.  In 1974, Corhart was dissolved and its business became a division of Corning.  In 1985, Corning sold the assets of the Corhart business to an unaffiliated corporation in a management buy-out and, thereafter, Corning no longer had any interest in Corhart's business.  *Id.* at 25:21-26:9 (Eggers); Doc. No. 6426 at 41.

90. Claimants in the Abernathy petition set forth in Exhibit P-18 have asserted that such petition includes claims against Corning relating to Corhart. *See* Tr. 6/4/2010 at 156:1-8. That petition contains specific allegations that Corning acted in concert with Pittsburgh Corning. Exhibit P-18 at ¶¶ 65-76. By way of example, these include allegations that "[a]t all material times, PPG and Corning acted in concert with their subsidiary, PCC, in the research and investigation of the hazards of its products and the health consequences to humans of asbestos dust and fiber inhalation and ingestion." *Id.* at ¶ 67. Abernathy also alleged that "PPG, Corning, and PCC further acted in concert to suppress the information known to them of the hazards of asbestos and to undertake and continue the marketing of the poisonous products well beyond the time any reasonable manufacturer would have suspended sales of the known carcinogen." *Id.* at ¶ 68. The petition alleged that "PPG and Corning in concert with PCC implemented and began the manufacture of insulation products which injured Plaintiffs," *id.* at ¶ 70, and alleged the creation of dangers to persons exposed to "Unibestos and other such materials." *Id.* at ¶ 74. The Abernathy petition also contains certain general allegations against the defendants, including allegations regarding joint "suppression" of information, *id.* at ¶ 16, and action in concert and conspiratorial conduct. *See id.* at ¶¶ 23, 24 & 30. The allegations in the Abernathy petition are virtually identical to those in other complaints admitted into evidence. *See* Exhibits P-120 (same ¶¶), P-121 (same ¶¶), P-122 (same ¶¶ other than ¶¶ 16 & 30), P-123 (¶¶ 25, 26, 64, 75, and 71), P-124 (same ¶¶ other than ¶¶ 16 & 30), P-125 (same ¶¶), P-126 (same ¶¶ other than ¶¶ 16 & 30), and P-127 (same ¶¶ other than ¶¶ 16 & 30).

91. Other complaints assert Corhart claims and claims against the Debtor, and assert a conspiracy among the defendants. PM Tr. 5/4/2004 at 32:6-34:1 (Eggers); Exhibit P-53 ¶ 8(aa)

(alleging Corhart's manufacture and sale of asbestos-containing products or products designed to contain asbestos), ¶ 8(az) (alleging the Debtor's manufacture and sale of asbestos products); ¶ 14 (asserting existence of conspiracy) ¶¶ 16, 18-19 (asserting joint and several products liability claims against defendants); Exhibit P-54 ¶¶ 10-11 (asserting manufacture, distribution or sale of asbestos-containing products), ¶¶ 12-16 (asserting joint and several products liability claim), and ¶¶ 75-83 (asserting conspiracy, concert of action, and common enterprise claim among all defendants).

92. The Debtor did not manufacture, sell, and/or distribute Corhart spacers or any other non-Unibestos asbestos-containing product described in Section VI.D of the Modified Third Amended Disclosure Statement filed with the Bankruptcy Court on February 6, 2009, Doc. No. 6426 at 40-42; Am Tr. 5/4/2004 at 48:25-49:7, 90:8-91:2 (Ellis)  .

93. Pittsburgh Corning was named as a co-defendant in 93 percent to 97 percent of the Corhart cases.  PM Tr. 5/4/2004 at 32:6-34:1 (Eggers); *see* Exhibits P-53 and P-54.

**G.    Cross-Claims**

94. In asbestos cases where Pittsburgh Corning, PPG, Corning, and/or Corhart were named as defendants, cross-claims were asserted or deemed asserted between and among them and all defendants.  PM Tr. 5/3/2004 at 136:11-19 (Ellis); PM Tr. 5/4/2004 at 21:18-24:1, 33:3-5 (Eggers); Tr. 5/5/2004 at 105:15-18 (Diggs); Exhibits P-51 ¶ 15, P-60, and P-62 (p.7, ¶ B).

95. PPG and Corning have each filed separate Proofs of Claim in this Chapter 11 Case against Pittsburgh Corning which included claims asserted for contribution and indemnity with respect to asbestos personal injury claims.  PM Tr. 5/4/2004 at 20:1-21:7 (Eggers); Tr. 5/5/2004 at 104:24-105:14 (Diggs); Exhibits P-36 and P-103.

29

H.    **Pittsburgh Corning/PPG Insurance**

96. For a period beginning before the time when Pittsburgh Corning began to

manufacture Unibestos in 1962, and continuing until 1966, Pittsburgh Corning shared primary

insurance with PPG.  For a period beginning before the time when Pittsburgh Corning began to

manufacture Unibestos in 1962, and continuing until 1986 (when asbestos coverage was no

longer available), the Debtor was included as an insured under PPG's excess insurance program.

PM Tr. 5/3/2004 at 73:14-23 (Ellis); Tr. 5/5/2004 at 42:8-45:25, 47:15-51:10 (Seymour);

Exhibits P-40, P-57, P-57A, and P-57B.  Many of these insurers are PPG Participating Insurers

and are contributing to the funding of the Asbestos PI Trust.  *See* Doc. No. 8928, Plan (Exhibit F

– PPG Trust Funding Agreement, Schedules A-D).

97. Most of the $1.2 billion expended by Pittsburgh Corning in the defense and

indemnification of asbestos bodily injury claims was paid through the excess insurance program

shared with PPG.  PM Tr. 5/3/2004 at 106:5-10 (Ellis); Tr. 5/5/2004 at 25:6-26:15, 35:23-36:16,

55:5-24 (Seymour); Exhibits P-40, P-57A, and P-57B.

98. Certain insurers subscribed to or issued certain pre-July 1, 1981, excess insurance

policies ("Pre-7/1/81 PPG Policies") and certain post-July 1, 1981, excess insurance policies

("Post-7/1/81 PPG Policies") that include both PCC and PPG (collectively, the "PPG Excess

Policies") as insureds.  Tr. 5/5/2004 at 36:8-10, 42:22-43:9, 51:16-53:12 (Seymour); *see*

*also* Exhibits P-40 (PPG coverage chart), P-57A, and P-57B.

99. PPG secured these policies for its own benefit and for the benefit of PCC.

Tr.5/5/2004 at 104:22-23 (Diggs).  Filing for bankruptcy protection allowed Pittsburgh Corning

to preserve the remaining coverage under the Pre-711/81 PPG Policies while also providing an

opportunity to negotiate a settlement of its disputed claim to coverage under the Post-7/118 1

PPG Policies.  PM Tr. 5/3/2004 at 112:14-21, 113:25-114:6 (Ellis).

100. The Post-7/1/81 PPG Policies contain a statement that  "this Policy shall not apply

... (4) in respect of Pittsburgh Corning Corporation, to all claims arising out of the manufacture

and/or distribution of Asbestos products or products containing Asbestos fibre, and all claims

arising out of Asbestosis or any other Asbestos-related injuries or diseases."  Tr. 5/5/2004 at

41:924 (Seymour); Exhibit P-57C at BNKR 00023065; PM Tr. 5/3/2004 at 75:7-12 (Ellis).

101. Pittsburgh Corning has taken the position that the foregoing provision is not

enforceable because it was not approved by the Pennsylvania insurance regulators.  PM Tr.

5/3/2004 at 75:13-19 (Ellis); Tr. 5/5/2004 at 41:25-42:7.

102. Subject to their applicable terms and conditions, Pittsburgh Corning asserts that the

PPG Excess Policies potentially provide "products/completed operations" coverage (to the extent

that the products/completed operations limits have not been exhausted by PCC) and

non-products coverage.  Tr. 5/5/2004 at 55:5-58:1 (Seymour); Exhibits P-40, P-57A, and P-57B.

103. As of the Petition Date, Pittsburgh Corning asserts that the Pre-7/1/81 PPG Policies

had $250 to $300 million of unexhausted products/completed operations coverage limits.  PM

Tr. 5/3/2004 at 112:14-19 (Ellis); Tr. 5/5/2004 at 55:5-24 (Seymour).

104. As of the Petition Date, Pittsburgh Corning asserts that the Post-7/l/81 PPG Policies

(net of insolvencies) had approximately $1.122 billion in unexhausted products/completed

operations coverage limits.  Exhibits P-40, P-57A, and P-57B.

105. Corning has given notice of a claim to coverage under Pre-7/l/81 PPG Policies and

Post-7/l/81 PPG Policies under which Pittsburgh Corning is also insured.  PM Tr. 5/4/2004 at

36:10-23, 37:6-25 (Eggers), Exhibits P-35, P-57A, and P-57B.

106.  The basis of Corning's claim to coverage under certain of those policies is that

"insured " is defined to include shareholders of the insured, and Corning is a shareholder of

Pittsburgh Corning.  PM Tr. 5/4/2004 at 38:1-6 (Eggers); *see, e.g.,* Exhibits P-57A at 00018926,

00019022, 00020341, and 00020373, and P-57B.

107. Other  policies contain language indicating that "Named Insured" includes

"subsidiary, associated, affiliated companies or owned and controlled companies."  *See, e.g.,*

Exhibit P-57A at BNKR 00025922, 00026034, 00026071, and 00026215.

108. Corning has given notice of a claim to coverage under those policies as well.

Exhibits P-35, P-57A, and P-57B.

109. PPG asserts that any successful claim for coverage by PPG or Corning against the

products/completed operations limits of the relevant Pre-7/1/81 PPG Policies or Post-7/l/81 PPG

Policies under which Pittsburgh Corning is also insured could deplete the products coverage

available to Pittsburgh Corning or to which Pittsburgh Corning has asserted a claim.  Tr.

5/5/2004 at 55:5-56:23 (Seymour); Exhibits P-20, P-57A, and P-57B.  By way of example, the

PPG Policy in Exhibit 57C provides that "[t]he inclusion or addition hereunder of more than one

Assured shall not operate to increase Underwriters' limits of liability beyond those set forth in

the Declarations."  Exhibit P-57C at BNKR 00023068.

110. During the course of this Bankruptcy Case, the Debtor has reached settlements with

the PCC Settled Insurers.  Those settlement agreements generally call for the PCC Settled

Insurer to contribute assets to the Asbestos PI Trust, directly or via the QSF, in many cases in

contemplation of, *inter alia,* the protection afforded an Asbestos Protected Party under the Plan.

32

Plan at Exhibit N (identification of PCC Insurance Settlement Agreements); Docket Nos. 879, 970, 1133, 1177, 1271, 1272, 1366, 1367, 1501, 1502, 1503, 1565, 1693, 1694, 1695, 1696, 1768, 1896, 6410, and 6785.

111. Suits against the PPG Entities for Claims or Demands relating to asbestos or asbestos-containing products, other than Claims or Demands against the PPG Entities for PPG Asbestos Premises Claims, could reduce the amount of insurance coverage that would otherwise be available to the Debtor or the Asbestos PI Trust or the amount of insurance coverage to which the Debtor has asserted a right to coverage, and therefore there is an identity of interest of the Debtor and the PPG Entities in enjoining Channeled Asbestos PI Trust Claims against the PPG Entities.  PM TR. 5/3/2004 at 73:14-23, 75:3-19, 76:8-77:4 (Ellis); Tr. 5/5/2004 at 40:19-54:21, 55:5-58:1 (Seymour), Exhibits P-20, P-40, P-57A, P-57B, and P-57C; *see* Plan §8.1.20.  This finding, however, made for purposes of Plan confirmation, is not binding, shall not be binding, and shall not have collateral estoppel effect on the PPG Insurers in any coverage litigation regarding the insurance coverage rights[9] or obligations of the PPG Insurers.

112. Suits against the Corning Entities for Claims or Demands relating to asbestos or asbestos-containing products, other than Claims or Demands against the Corning Entities for Corning Asbestos Premises Claims, could reduce the amount of insurance coverage that would otherwise be available to the Debtor or the Asbestos PI Trust or the amount of insurance coverage to which the Debtor has asserted a right to coverage, and therefore there is an identity of interest of the Debtor and the Corning Entities in enjoining Channeled Asbestos PI Trust

---

[9]"Rights" is used throughout this Opinion and Order in its broadest and unlimited sense to include defenses, claims, and any and all other entitlements the parties to the insurance policies and settlements, as applicable, have.

Claims against the Corning Entities.  This finding, however, made for purposes of Plan

confirmation, is not binding, shall not be binding, and shall not have collateral estoppel effect on

the Corning Insurers in any coverage litigation regarding the insurance coverage rights or

obligations of the Corning Insurers.

     **I.**    <u>**Corning Insurance**</u>

    113. For the period from 1962 to 1974, Corning procured excess insurance policies

("Affiliate Policies"), against which Pittsburgh Corning has provided notice of a claim based

upon its assertion that those policies contain language which potentially provides coverage to

Corning's affiliates.  *See* PM Tr. 5/4/2004 at 35:22-36:9 (Eggers); Exhibit P-21; Exhibit P-141.

    114. Pittsburgh Corning has asserted that because Corning has been a fifty percent

shareholder of Pittsburgh Corning and has had board representation at Pittsburgh Corning,

Pittsburgh Corning is an "affiliated" or "associated" company of Corning and thus is insured

under its Affiliate Policies.  PM Tr. 5/3/2004 at 77:25-78:7 (Ellis); PM Tr. 5/4/2004 at

35:22-36:9 (Eggers).

    115. As examples, Pittsburgh Corning points to some of the Affiliate Policies that define

"Named Assured" to include Corning and any Corning  "subsidiary, associated, affiliated

companies or owned and controlled companies ..."  PM Tr. 5/3/2004 at 77:5-24 (Ellis); *see, e.g.,*

Exhibit P-2l (ninth page), Exhibit P-14l (London Policy Nos. 61577 (at CI 04440) and 6429 (at

CI 04501)) ("Assured is amended to read as follows:  Corning Glass Works ... and/or subsidiary,

associated, affiliated companies or owned and controlled as now or hereafter constituted.").

    116. The Corning Affiliate Policies also include as a named insured Corning and

"subsidiary, associated, affiliated companies or owned and controlled companies" and likewise

define as insureds those who are shareholders of the named insured.  *See, e.g.,* Exhibit P-2l

(seventeenth page, ¶ 1(a)) ( "The unqualified word 'Assured,' wherever used in this policy,

includes not only the Named Assured but also:  (a) any officer, director, stockholder, partner or

employee of the Named Assured ..."); *see also, e.g.,* Exhibit P-141 (Home Policy Nos. HEC

9544023 (at CI045 12) and HEC 9559388 (at CI 04596)) ("The unqualified word 'Insured',

wherever used in this policy, includes not only the Named Insured but also: (a) any officer,

director, stockholder, partner or employee of the Named Insured ....").

PPG, Pittsburgh Corning asserts, could claim that under the Affiliate Policies, it is

entitled to coverage as a  "stockholder " of Pittsburgh Corning, if Pittsburgh Corning is a Named

Assured.

In addition, Corhart Refractories Company is listed as a named insured on a number of

policies issued to Corning, including Affiliate Policies.  *See e.g.,* Exhibit P-141 (London Policy

Nos. 61576 (at CI 04420), 61577 (at CI04440), and 64249 (at CI 04501)).

117. Pittsburgh Corning asserts that any successful claim for coverage by Corning,

Corhart, or PPG against the products/completed operations limits of the Affiliate Policies could

deplete the products coverage to which Pittsburgh Corning has asserted a claim.  PM Tr.

5/4/2004 at 35:3-21 (Eggers).  However, as we previously ruled in our 2011 Opinion, 453 B.R.

at 596, citing our 2006 Opinion, 417 B.R. at 299-300, "[T]o the extent the argument is that the

channeling injunction is proper with respect to these suits as to Corning because there will be an

impact on insurance coverage as a result of Corhart claims, ... it is evident that such an impact

will not occur unless a separate contribution or indemnity action is brought.''  417 B.R. at

299–300 (internal citations omitted).  Thus, ''[e]ven though at least some of the suits against

35

Corhart name PCC and PPG, Corning is not named and a separate suit against Corning could be required to establish Corning's liability or to affect the insurance shared between PCC and Corning.''

118. Pittsburgh Corning cites, by way of example, the policy set forth as Exhibit P-21 which provides that "[t]he inclusion or addition hereunder of more than one Assured shall not operate to increase Underwriters' limit of liability." Exhibit P-21 (seventeenth page) (Umbrella Policy Form at 2).

## IV.    APPOINTMENT OF THE FCR AND HIS DUE DILIGENCE

119. Lawrence Fitzpatrick was appointed as the FCR to ensure that future claimants were treated fairly and equitably in the process of developing the Plan and related documents. Tr. 5/5/2004 at 138:1-5 (Fitzpatrick).

120. Mr. Fitzpatrick has more than thirty years of experience handling asbestos-related claims, and nearly ten years experience representing future claimants in asbestos bankruptcy matters. Tr. 5/5/2004 at 139:1-142:7 (Fitzpatrick); Tr. 6/3/2010 at 102:3-21, 103:18-106:1 (Fitzpatrick); P-146 (Fitzpatrick curriculum vitae).

121. The FCR retained Analysis Research and Planning Company ("ARPC") and, in particular, Dr. Thomas Florence, to assist in evaluating the asbestos claims history of the Debtor, PPG, and Corning. Tr. 5/5/2004 at 146:4-25 (Fitzpatrick); Tr. 6/3/2010 at 106:9-20 (Fitzpatrick),

122. ARPC investigated and advised the FCR as to the number, timing, and amounts of future claims against the Debtor, PPG, and Corning. Tr. 5/5/2004 at 146:19-20 (Fitzpatrick); Tr. 6/3/2010 at 106:21-24 (Fitzpatrick).

123. The FCR also retained a financial advisor, Bederson and Company. Tr. 6/3/2010 at 106:25-107:7 (Fitzpatrick).

124. The FCR and his advisors reviewed Pittsburgh Corning's pre-petition asbestos settlement and litigation history, and the nature and extent of the asbestos personal injury claims pending against the Debtor as of the Petition Date. Tr. 6/3/2010 at 107:8-16 (Fitzpatrick).

125. In addition, the FCR and his advisors reviewed the history of PC-related and other asbestos claims against PPG and Corning. Tr. 6/3/2010 at 107:8-108:3 (Fitzpatrick); Tr. 5/5/2004 at 147:20-150:8 (Fitzpatrick).

126. After conducting due diligence with respect to the asbestos liability of the Debtor and its Shareholders for Asbestos PI Trust Claims, the FCR determined that absent the Plan, the Debtor would be subject to substantial future asbestos-related demands. Tr. 5/5/2004 at 147:14-19 (Fitzpatrick).

127. The FCR has, in the fulfillment of his duties, considered the likelihood, merits, and value of Channeled Asbestos PI Trust Claims against the PPG Entities in combination with the likelihood, merits, and value of such claims against the Debtor. Tr. 5/5/2004 at 146:4-23, 147:14-19,149:14-21,149:25-150:5 (Fitzpatrick); Tr. 6/3/2010 at 107:8-108:3 (Fitzpatrick); *see* Plan §8.1.24.

128. The FCR has, in the fulfillment of his duties, considered the likelihood, merits, and value of Channeled Asbestos PI Trust Claims against the Corning Entities in combination with the likelihood, merits, and value of such claims against the Debtor. Tr. 515/2004 at 146:4-23, 147:14-19,149:14-21,149:25-150:5 (Fitzpatrick); Tr. 6/3/2010 at 107:8-108:3 (Fitzpatrick); *see* Plan §8.1.34.

37

129.  Following negotiation of the Modified Third Amended Plan, which, among other things, narrows and delineates the types of claims against PPG and Corning that will be included in the definition of "Channeled Asbestos PI Trust Claims" (as compared with the Second Amended Plan), the Plan Proponents and Plan Supporters moved for an order confirming that to the extent that the September 15, 2003, Order (Doc. 2503) expanded the scope of the FCR's representation to include claims not eventually encompassed by the Asbestos Permanent Channeling Injunction of the Modified Third Amended Plan, the FCR will, upon the Effective Date of the Plan, have satisfied and been discharged from any and all duties and responsibilities with respect to claims other than Channeled Asbestos PI Trust Claims.  Joint Motion to Discharge Lawrence Fitzpatrick as Legal Representative with Respect to Future Claims Not Subject to the Asbestos Permanent Channeling Injunction, Doc. 7700 ("Joint Motion to Discharge").

130. On June 9, 2010, the Court granted the Joint Motion to Discharge, Doc. No. 7801, ordering that:  " ... the record in this matter reflect[s] that in connection with his appointment in this case, Lawrence Fitzpatrick represents the future holders of Channeled Asbestos PI Trust Claims (as such term is defined in the Modified Third Amended Plan) only with respect to such Channeled Asbestos PI Trust Claims; and ... that the record in this matter reflect[s] that with respect  to claims encompassed by the Expansion Order, other than Channeled Asbestos PI Trust Claims, Lawrence Fitzpatrick upon the Effective Date will have satisfied and discharged any and all duties in this case."  The Order further provided that the Orders at Doc. Nos. 713 and 2503, *see* ¶ 7, *supra*, remained in effect otherwise.

131. The FCR represents and will continue after confirmation to represent the interests of

38

holders of Channeled Asbestos PI Trust Claims that will be asserted in the future.  *See* Doc. No.

8928, Plan, Exhibit A (Asbestos PI Trust Agreement) at §6.1 and Exhibit B (TDP) at §3.1.

132.  The FCR's due diligence continued during the negotiation of the Modified Third

Amended Plan.  Tr. 6/3/2010 at 108:4-6 (Fitzpatrick).

133. With respect to the Modified Third Amended Plan, the FCR considered the types of

claims subject to channeling (including the differences between the Second and Third Amended

Plans), Tr. 6/3/2010 at 108:7-109:12 (Fitzpatrick); the identity of the parties to be protected by

the Asbestos Permanent Channeling Injunction, Tr. 6/3/2010 at 109:13-110:18 (Fitzpatrick), and

the respective trust funding to be provided by or on behalf of the Asbestos Protected Parties,

including, but not limited to, Pittsburgh Corning, the PCC Settled Insurers, PPG, the PPG

Participating Insurers, Corning and the Corning Protected Insurers,  Tr. 6/3/2010 at 111:8-113:7

(Fitzpatrick), including the differences between funding under the Second Amended Plan and the

Modified Third Amended Plan.  Tr. 6/3/2010 at 113:8-114:1 (Fitzpatrick).

134. The FCR concluded that the respective contributions to be provided by or on behalf

of Pittsburgh Corning, the PCC Settled Insurers, PPG, Corning, the PPG Participating Insurers

and the Corning Protected Insurers were contingent upon Asbestos Protected Parties receiving

the protection of the Asbestos Permanent Channeling Injunction and the releases proposed under

the Modified Third Amended Plan.  Tr. 6/3/2010 at 114:2-11 (Fitzpatrick).

135. The FCR further concluded that the Plan's treatment of future claimants, vis-a-vis

the nondebtor Asbestos Protected Parties, was fair and equitable.  Tr. 6/3/2010 at 114:22-115:3

(Fitzpatrick).  The Court agrees.

136. Based on his due diligence, the FCR has concluded that the Plan and the Asbestos PI

Trust are fair and equitable to the future holders of Channeled Asbestos PI Trust Claims and provide reasonable assurance that the Asbestos PI Trust will value and be in a financial position to pay present claims and future demands that involve similar claims in substantially the same manner.  Tr. 6/3/2010 at 101:19-102:2 (Fitzpatrick).  The Court agrees.

## VI.   PLAN PROVISIONS

### A.   General Plan Overview

137. The Plan provides for the creation of the Pittsburgh Corning Asbestos PI Trust (the "Asbestos PI Trust ").  Doc. No. 8928, Plan §9.1.1, Exhibit A (Asbestos PI Trust Agreement).

138. The purpose of the Asbestos PI Trust is to assume all liabilities for and with respect to all Channeled Asbestos PI Trust Claims, and to use the assets contributed to it by Pittsburgh Corning, PPG, the PPG Participating Insurers, the PCC Settled Insurers, and Corning, and any other assets that may be contributed to or acquired by the Asbestos PI Trust from time to time, and the proceeds and income from all such assets, to resolve all Channeled Asbestos PI Trust Claims.  Doc. No. 8928, Plan, Exhibit A (Asbestos PI Trust Agreement) at §1.2.  Class 5, the Channeled Asbestos PI Trust Claims, will be dealt with through the Asbestos PI Trust and the Trust Distribution Procedures ("TDP") which implement the Trust.

139. The Plan also provides for (1) payment of 90 percent of the Allowed Amount of prepetition general unsecured claims for goods and services rendered in the ordinary course of the Debtor's business operations, Plan §3.2.4 (Class 4-A); (2) payment in full of workers compensation claims against the Debtor, Plan §3.2.4 (Class 4-B); (3) the assumption by the Reorganized Debtor of all rights and obligations under the Debtor's retiree health and life insurance benefit  plans, Plan §3.2.3 (Class 3-A); (4) payment in full of benefits earned through

40

the termination date of the Debtor's Salaried Pension Plan (December 31, 2006) and through the

benefit-accrual cessation date (December 31, 2007) of the Debtor's Hourly Pension Plan, Plan

§3.2.3 (Class 3-B); (v) payment in full of priority tax and other priority claims (Plan §3.2.1); and

(v) payment in full of secured claims under the Debtor's DIP Facility (Plan §3.2.2).

140. The Plan provides for the cancellation of Equity Interests.  Doc. No. 8928, Plan,

§3.2.6.

141. Except for the assets being contributed to the Asbestos PI Trust (as described below)

and for  "Debtor-Released Claims," title to all the Debtor's assets and properties and interests in

property will be vested in the Reorganized Debtor under the Plan.  Doc. No. 8928, Plan §11.10.

142. Upon the Plan Effective Date, 100 percent of the Reorganized PCC Common Stock

will be issued to the Asbestos PI Trust.  Doc. No. 8928, Plan §9.1.3.

### B.    Channeled Asbestos PI Trust Claims

143. Under the Plan, "Channeled Asbestos PI Trust Claim" means an "Asbestos PI Trust

Claim" against an "Asbestos Protected Party."  Plan §1.1 (definitions).  Accordingly, a claim

must satisfy both elements of the definition in order to be channeled.

144.  "Asbestos Protected Party" is defined in §1.1 of the Plan, as modified by the

Technical Amendments at Doc. No. 9402.[10]

---

[10]Asbestos Protected Party is defined in full in the Technical Amendments filed on May
15, 2013, Doc. No. 9402, as:

> Any of the following Entities:
> (a) the Debtor, Reorganized PCC and/or the PCC-Affiliated
> Parties;
> (b) the PPG Entities, the PPG Affiliates and the PPG-Affiliated
> Parties, with respect to Asbestos PI Trust Claims that arise, in
> whole or in part, out of exposure to:

(continued...)

[10](...continued)

(1) Unibestos, or any other asbestos or asbestos-containing
products manufactured, sold and/or distributed by the Debtor, or
asbestos on or emanating from any PCC premises; or

(2) any other alleged asbestos or asbestos-containing product to the
extent that a claimant is alleging or seeking to impose liability,
directly or indirectly, for the conduct of, claims against or demands
on the Debtor by reason of any of the PPG Entities', the PPG
Affiliates', the PPG-Affiliated Parties' or the PPG Participating
Insurer Entities': (i) ownership of a financial interest in the Debtor;
(ii) involvement in the management of the Debtor, or service as an
officer, director or employee of the Debtor or a related party; (iii)
provision of insurance to the Debtor or a related party; or (iv)
involvement in a financial transaction affecting the financial
condition of the Debtor or a related party;

(c) the PPG Participating Insurer Entities, in their capacity as such
and/or as issuers of PPG Participating Insurance Policies and
policies issued to or covering the Debtor;

(d) the PPG Non-Participating Insurer Entities, in their capacity as
such and/or as issuers of PPG Non-Participating Insurance Policies
and policies issued to or covering the Debtor;

(e) the Corning Entities, the Corning Affiliates, the
Corning-Affiliated Parties and the Corning Insurers, in their
capacity as such and/or as issuers of the Corning Insurance
Policies, with respect to Asbestos PI Trust Claims that arise, in
whole or in part, out of exposure to:

(1) Unibestos, or any other asbestos or asbestos-containing
products manufactured, sold and/or distributed by the Debtor, or
asbestos on or emanating from any PCC premises; or

(2) any other alleged asbestos or asbestos-containing product to the
extent that a claimant is alleging or seeking to impose liability,
directly or indirectly, for the conduct of, claims against or demands
on the Debtor by reason of any of the Corning Entities', the
Corning Affiliates', the Corning-Affiliated Parties' or the Corning
Insurers': (i) ownership of a financial interest in the Debtor; (ii)
involvement in the management of the Debtor, or service as an
officer, director or employee of the Debtor or a related party; (iii)
provision of insurance to the Debtor or a related party; or (iv)
involvement in a financial transaction affecting the financial
condition of the Debtor or a related party;

(f) without limiting any protection afforded by subsection (c)
above, and for the avoidance of doubt, the PCC Settled Insurer

(continued...)

42

145.  The definition of Asbestos Protected Party in the Plan limits the types of Asbestos

PI Trust Claims as to which PPG and Corning can be  "Asbestos Protected Parties," and

therefore limits the extent to which an "Asbestos PI Trust Claim" against PPG or Corning can be

a  "Channeled Asbestos PI Trust Claim."

146. With respect to claims arising from exposure to Unibestos or any other asbestos or

asbestos-containing products manufactured, sold, and/or distributed by the Debtor, or asbestos

---

[10](...continued)
      Entities, in their capacity as such and/or as issuers of the PCC
      Settled Insurance Policies;
      (g) [Intentionally Omitted];
      (h) [Intentionally Omitted];
      (i) any Entity to the extent he, she, or it is alleged to be directly or
      indirectly liable for the conduct of, Claims against, or Demands on
      the Debtor, Reorganized PCC, or the Asbestos PI Trust on account
      of Asbestos PI Trust Claims by reason of one or more of the
      following:
      (1) such Entity's involvement in the management of the Debtor,
      Reorganized PCC or an Affiliate of the Debtor or any predecessor
      in interest of the Debtor, Reorganized PCC, or an Affiliate of the
      Debtor, including PPG and Corning;
      (2) such Entity's ownership of a financial interest in the Debtor,
      Reorganized PCC, or a past or present Affiliate of the Debtor, or
      any predecessor in interest of the Debtor, Reorganized PCC, or an
      Affiliate of the Debtor, including PPG and Corning;
      (3) such Entity's service as an officer, director, or employee of the
      Debtor, Reorganized PCC, or predecessor in interest and/or
      Affiliate of the Debtor, including PPG and Corning;
      (4) such Entity's involvement in a transaction changing the
      corporate structure, or in a loan or other financial transaction
      affecting the financial condition of the Debtor, Reorganized PCC,
      or a predecessor in interest and/or Affiliate of the Debtor,
      including PPG and Corning.

      The Corning Parties and the Corning Insurers are not Asbestos
      Protected Parties among themselves with respect to Reserved
      Claims.

on or emanating from any Pittsburgh Corning premises, PPG and Corning are Asbestos

Protected Parties.  With respect to claims arising from exposure to any other asbestos or

asbestos-containing products, however, PPG and Corning are Asbestos Protected Parties only to

the extent that the claimant in asserting such claim alleges or seeks to impose liability, directly or

indirectly, for the conduct of, claims against, or demands on the Debtor by reason of certain

specified circumstances.  Plan §1.1 (definition of Asbestos Protected Party, parts (b) and (d)).

147. Specifically, paragraph (b) of the definition of "Asbestos Protected Party " provides

that the PPG Entities, the PPG Affiliates, and the PPG-Affiliated Parties are Asbestos Protected

Parties "with respect to Asbestos PI Trust Claim that arise, in whole or in part, out of exposure

to":

> (1) Unibestos, or any other asbestos or asbestos-containing
> products manufactured, sold and/or distributed by the Debtor, or
> asbestos on or emanating from any PCC premises; or
>
> (2) any other alleged asbestos or asbestos-containing product to the
> extent that a claimant is alleging or seeking to impose liability,
> directly or indirectly, for the conduct of, claims against or demands
> on the Debtor by reason of any of the PPG Entities', the PPG
> Affiliates', the PPG-Affiliated Parties' or the PPG Participating
> Insurer Entities': (i) ownership of a financial interest in the Debtor;
> (ii) involvement in the management of the Debtor, or service as an
> officer, director or employee of the Debtor or a related party; (iii)
> provision of insurance to the Debtor or a related party; or (iv)
> involvement in a financial transaction affecting the financial
> condition of the Debtor or a related party.

148. Similarly, paragraph (e) of the definition of "Asbestos Protected Party" provides that

the Corning Entities, the Corning Affiliates, the Corning-Affiliated Parties, and the Corning

Insurers, in their capacity as such and/or as issuers of the Corning Insurance Policies, "with

respect to Asbestos PI Trust Claims that arise, in whole or in part, out of exposure to":

(1) Unibestos, or any other asbestos or asbestos-containing products manufactured, sold and/or distributed by the Debtor, or asbestos on or emanating from any PCC premises; or

(2) any other alleged asbestos or asbestos-containing product to the extent that a claimant is alleging or seeking to impose liability, directly or indirectly, for the conduct of, claims against or demands on the Debtor by reason of any of the Corning Entities', the Corning Affiliates', the Corning-Affiliated Parties' or the Corning Insurers': (i) ownership of a financial interest in the Debtor; (ii) involvement in the management of the Debtor, or service as an officer, director or employee of the Debtor or a related party; (iii) provision of insurance to the Debtor or a related party; or (iv) involvement in a financial transaction affecting the financial condition of the Debtor or a related party.

149. The definition of "Channeled Asbestos PI Trust Claim" further provides, in part, that "Channeled Asbestos PI Trust Claims do not include any Reserved Claims, any PPG Coverage Claims nor any Non-Derivative PPG/Corning Claims."

150. The definition of "Non-Derivative PPG/Corning Claim" provides:

A Non-Derivative PPG/Corning Claim is an independent Claim against a PPG Entity, PPG Affiliate, PPG-Affiliated Party, Corning Entity, Corning Affiliate, or Corning-Affiliated Party or Corning Insurer (collectively, PPG/Corning) that alleges exposure to Pyrocal (or any other PPG product) or to Corhart spacers (or any Corning product) and that is wholly unrelated to the Debtor. For the avoidance of doubt, a Non-Derivative PPG/Corning Claim is any product Claim against PPG/Corning that does not involve Unibestos or other asbestos or asbestos-containing product manufactured, sold, and/or distributed by the Debtor, unless such Claim is a PCC Conspiracy Theory Claim or by pleading, evidence, proof, allegation, proffer of evidence or otherwise seeks to impose liability on PPG/Corning based on the liability of PCC or the conduct of PCC. For the further avoidance of doubt, a Claim against PPG/Corning that involves asbestos on or emanating from any PCC premises is excluded from this definition.

151. The definition of "PCC Conspiracy Theory Claim" provides:

45

> A PCC Conspiracy Theory Claim is a Claim that seeks to impose liability on PPG/Corning for the conduct of, claims against or demands on PCC in which PPG or Corning is alleged to be liable based on allegations of conspiracy, alter ego, piercing the corporate veil, domination and control, concert of action, common enterprise, aiding and abetting, respondeat superior, negligent provision of services, principal and agent, successor in interest, or other theories of liability involving PCC.

152. The express exception of Non-Derivative PPG/Corning Claims from the definition of Asbestos Permanent Channeling Injunction makes clear that an independent claim that alleges exposure to Pyrocal (or any other PPG product) or Corhart spacers (or any Corning product) and is wholly unrelated to the Debtor will not be channeled.

153. The provisions at the end of the definition of Non-Derivative PPG/Corning Claim, prefaced by "For the avoidance of doubt …," make clear, however, that products claims against PPG/Corning that do not involve Unibestos or other asbestos or asbestos-containing products manufactured, sold, and/or distributed by the Debtor can be channeled if they involve the circumstances set forth in those provisions, including if they are PCC Conspiracy Theory Claims. The inclusion of such provisions is important to prevent evasion of the Asbestos Permanent Channeling Injunction through artful pleading or proof implicating the Debtor and PPG/Corning's §524(g)(4)(A)(ii)(I-IV) relationships to the Debtor.

154. As noted above, Channeled Asbestos PI Trust Claims do not include "Reserved Claims," which is defined as:

> Any past, present or future claims, rights, remedies, liabilities, demands, defenses and/or causes of action by any of the Corning Parties, and/or their insurers (in their capacity as insurers of the Corning Parties) in connection with the Corning Insurance Policies and/or the Other Corning Policies including, but not limited to, any claims or demands for defense, indemnity, contribution, bad faith, breach of contract, reimbursement, Corning Trust Contribution

46

Recovery Claims and/or extra-contractual remedies. Reserved
Claims shall not include any claims for contribution, indemnity,
reimbursement, equitable subrogation, or similar claims-over by a
Corning Non-Stipulating Insurer against a Corning Stipulating
Insurer in connection with Corning Trust Contribution Recovery
Claims.

Plan §1.1 (definition of "Reserved Claims").

155. The sole and exclusive remedy on account of Channeled Asbestos PI Trust Claims

shall be against the Asbestos PI Trust, and no such Claims or Demands may be asserted against

the Debtor, Reorganized PCC, or any Asbestos Protected Party, directly or indirectly, and should

a legal action based on or arising from any Channeled Asbestos PI Trust Claim be commenced

directly against any Asbestos Protected Party, the Asbestos PI Trust shall, upon reasonable

notice, execute appropriate legal documents stipulating to the substitution of the Asbestos PI

Trust as a party defendant, or should such substitution not be permitted under applicable laws or

court rules, the joinder of the Asbestos PI Trust as a party defendant in any federal or state action

as permitted by applicable law.   *See* Doc. No. 8928, Plan, Article IV and Exhibit A (Asbestos PI

Trust Agreement) at §l.4(f); *see* Plan §8.1.4.

**C.**    **Funding of the Asbestos PI Trust**

156. We find that the contributions to the Trust are reasonable.  The liability of PPG and

Corning for the conduct of or claims against the Debtor is disputed.  Further, various insurance

settlements were approved by this Court and Mt. McKinley has a prepetition settlement.  If these

disputes were to be litigated, the result is unknowable.  Thus, the settlements represented by the

PPG and Corning Trust Contributions and the insurer settlements approved by this Court are

reasonable.  Notwithstanding this finding that the settlements are reasonable for purposes of Plan

confirmation, nothing in those settlements, the Plan, the Plan Documents, these Findings of Fact

47

and Conclusions of Law or the Confirmation Order are an adjudication of the merits of any

dispute for insurance coverage purposes.

### 1.    The Pittsburgh Corning Contribution

157. Under the Plan, the Debtor and/or the PCC Settled Insurers will pay or contribute

the following to the Asbestos PI Trust:

> a. Proceeds of insurance policies totaling more than $290 million,
> consisting of amounts already collected and paid into the Interim
> Qualified Settlement Fund, and amounts which insurers have
> agreed or are obligated to pay after confirmation of the Plan
> pursuant to any Pre-1981 PCC Settlement Agreement or PCC
> Insurance Settlement Agreement. Doc. No. 8928 Plan, §1.1
> (definitions of  "PCC Settled Insurer Entities" and "PCC Settled
> Insurers") and Exhibit N (identification of PCC Insurance
> Settlement Agreements).

> b. The Debtor's interest in all amounts in the qualified settlement
> fund established by this Court's order dated December 10, 2004,
> (relating to KWELMB), totaling more that $28,837,000 as of
> February 28, 2013.

> c. The Debtor's insurance rights against state insurance guarantee
> associations and insolvent insurers.  (*See* Plan definition  of
> "Assigned Claims"); and

> d. The Debtor's and the Reorganized Debtor's claims for
> contribution or other causes of action in connection with any
> Asbestos PI Trust Claim, except for (i) Debtor-Released Claims,
> (ii) any such claims against the PPG Entities, the PPG Affiliates,
> the PPG-Affiliated Parties, the PPG Participating Insurer Entities,
> the PCC Settled Insurers (as to Claims released by the Debtor), the
> Corning Entities, the Corning Affiliates, the  Corning-Affiliated
> Parties, and the Corning Insurers and (iii) any such claims to be
> released by the Debtor in the Insurance Claims Agreement.  Doc.
> No. 8928, Plan §9.1.3; Plan, Exhibit A (Trust Agreement) at §1.3;
> Tr. 6/3/2010 at 111:8-21 (Fitzpatrick).

158. The Asbestos Permanent Channeling Injunction, as applied to Channeled Asbestos

PI Trust Claims against the PCC Settled Insurer Entities, is essential and necessary to the

Debtor's reorganization because the PCC Settled Insurers would not be willing to make the

payments specified in the PCC Insurance Settlement Agreements without the protection provided

by the Asbestos Permanent Channeling Injunction.  This finding, however, made for purposes of

Plan confirmation, is not binding, shall not be binding, and shall not have collateral estoppel

effect on the Corning Insurers in any coverage litigation regarding the insurance coverage rights

or obligations of the Corning Insurers.  Doc. No. 8928, Plan, Exhibit N (list of PCC Insurance

Settlement Agreements); *see* Plan §8.1.45.

## 2.     The PPG Trust Contribution

159. Under the Plan, the "PPG Trust Contribution" consists of the contributions to the

Asbestos PI Trust made by and/or on behalf of the PPG Entities, the PPG Affiliates, the PPG

Affiliated Parties, the PPG Participating Insurer Entities and the PPG Non-Participating Insurer

Entities, as set forth in the PPG Trust Funding Agreement.  Doc. No. 8928, Plan §1.1 (definition

of  "PPG Trust Contribution ") and Exhibit F (PPG Trust Funding Agreement).

### a.     The PPG Contributions

160. Under the Plan, PPG will contribute the following to the Asbestos PI Trust:

a. $824,850,360 in a series of annual cash payments (subject to a pre-payment
discount of 5.5. percent per annum) beginning on the Funding Effective Date;

b. 1,388,889 restricted shares of PPG common stock, or its cash equivalent,
whose value on May 28, 2010, was over $88,980,000 and on April 5, 2013, was
over $182,958,000;

c. Relinquishment of PPG's claims to shared insurance proceeds in the Debtor's
Interim Qualified Settlement Fund and in the December 10, 2004, KWELMB
Qualified Settlement Fund (of which PPG's share was over $25,000,000, plus
interest).  *See* Exhibits P-150, P-151, and P-152;

d. Relinquishment of any claim to the remaining limits of liability applicable to
products/completed operations claims under the policies subject to any Pre-1981

PCC Settlement Agreement;

e. PPG's relinquishment of its 50 percent equity interest in the Debtor; and

f. PPG's transfer of its 50 percent equity interest in Pittsburgh Corning Europe, N.V.

*See* Doc. No. 8928, Plan §9.1.3[11] and Exhibit F (PPG Trust Funding Agreement) at 10-11 and Schedule A (first line); Exhibit P-150; Doc. No. 3799, Order Approving KWELMB QSF; Tr. 6/3/2010 at 111:22-112:18 (Fitzpatrick); Doc. No. 633, Order Approving QSF.

161. In addition, as a part of the agreement reached with the PPG Participating Insurers providing for the contributions to the Asbestos PI Trust described below by or on behalf of the PPG Participating Insurer Entities, PPG has agreed to grant releases to the Travelers

---

[11]Section 9.1.3 of the Plan says:

> On the Effective Date with respect to the Debtor, and in accordance with the PPG Trust Funding Agreement with respect to PPG and the PPG Participating Insurers and in accordance with the Corning Trust Funding Agreement with respect to Corning, the Debtor, PPG, the PPG Participating Insurers and Corning will transfer to the Asbestos PI Trust their respective interests (as applicable) in the following: (i) all amounts in the Interim Qualified Settlement Fund as set forth in Section 9.1.1 hereof; (ii) all amounts in the KWELMB QSF; (iii) all insurance proceeds received by the Debtor and held in its legal department asbestos account; (iv) the right to receive future insurance proceeds under any Pre-1981 PCC Settlement Agreement (with respect to policies with remaining payment obligations listed on Schedule H to the PPG Trust Funding Agreement) or any PCC Insurance Settlement Agreement (to the extent such right has not been released by the Debtor); (v) the Assigned Claims; (vi) the PPG Trust Contribution; and (vii) the Corning Trust Contribution. In addition, 100% of the Reorganized PCC Common Stock shall be issued to the Asbestos PI Trust.

Note that Schedule H was updated on May 15, 2013, at Doc. No. 9402.

Released/Releasing Entities, the Hartford Released/Releasing Entities, and the

Released/Releasing Excess and Other Primary Insurer Entities, as set forth in the PPG Trust

Funding Agreement.  *See* Doc. No. 8928, Plan, Exhibit F (PPG Trust Funding Agreement) at

Section VI.A and Section VII.A.

### b.    The PPG Participating Insurers' Contributions

162. For a number of years, PPG and many of the insurers that issued the insurance

policies that were shared by PPG and the Debtor were engaged in a court-approved mediation,

which led to an agreement in principle among PPG, the participating insurers, and the Debtor. *See*

PM Tr. 5/3/2004 at113:25-114:10 (Ellis); Tr. 5/5/2004 at 58:6-60:1 (Seymour).

163. During the period between the agreement reached for funding of the Second

Amended Plan and the agreement now reflected in the Plan, one formerly participating insurer

has dropped out, and another has joined, with a net decrease of approximately $6,000,000 in

funding.  Tr. 6/3/2010 at 110:9-18 (Fitzpatrick).

164. The insurer contributions have otherwise remained constant, subject to adjustments

in the timing for payments to be made.  Tr. 6/3/2010 at 113:22-25 (Fitzpatrick).

165. The Plan identifies as  "PPG Participating Insurers" the entities identified as

"Participating Insurers" in the PPG Trust Funding Agreement.  *See* Doc. No. 8928, Plan §1.1

(Definition of "PPG Participating Insurers").

166. The PPG Trust Funding Agreement defines "Participating Insurers" to mean the

"Travelers Companies" (as defined therein), the "Hartford Companies" (as defined therein), the

"Participating Other Primary Insurers" (as defined therein as those insurers identified in Column

1 on schedule C to the PPG Trust Funding Agreement), and the "Participating Excess Insurers"

(as defined therein as those insurers identified in Column 1 on schedule B to the PPG Trust

Funding Agreement) as schedule B was updated in Doc. No. 9402, filed May 15, 2013.. Doc. No.

8928, Plan, Exhibit F (PPG Trust Funding Agreement) at §§I.NN, I.III, I.AA., I.PP, and I.JJ.

167. The insurance policies addressed by the PPG Trust Funding Agreement are identified

on Schedules B, C, and D to the PPG Trust Funding Agreement.  Doc. No. 8928, Plan, Exhibit F

(PPG Trust Funding Agreement) at §I.LL (definition of "Participating Insurance Policies").

168. The aggregate payments that the PPG Participating Insurers have agreed to make to

the Asbestos PI Trust are set forth in Schedule A of Exhibit F, and total $1,696,498,979 (subject

to a pre-payment discount of 5.5 percent per annum).  *See* Doc. No. 8928, Plan, Exhibit F (PPG

Trust Funding Agreement) at §III.B and Schedule A.

169. The contributions by the PPG Participating Insurers (or their assignees) under the

PPG Participating Insurance Policies constitute reasonable settlements and fair resolutions of the

alleged liability of the PPG Participating Insurer Entities under such policies for the Channeled

Asbestos PI Trust Claims, including Demands.  The Plan Proponents and the Plan Supporters

agree that such contributions satisfy the liability, if any, of such insurers for Channeled Asbestos

PI Trust Claims under the PPG Participating Insurance Policies.  This finding, however, made for

purposes of Plan confirmation, is not binding, shall not be binding, and shall not have collateral

estoppel effect on the PPG Non-Participating Insurers in any insurance coverage litigation

between them and PPG.  Tr. 5/5/2004 at 56: 10-57:5, 57:23-60:1(Seymour); Doc. No. 8928, Plan,

Exhibit F (PPG Trust Funding Agreement) at §§I.LL (definition of "Participating Insurance

Policies") and III.B; Schedules A, B, C, and D.  *See* Plan §8.1.17.

170. Among the conditions to the obligations of the PPG Participating Insurers to make

their respective contributions under the PPG Trust Funding Agreement are that the Asbestos

Permanent Channeling Injunction expressly provide that the sole and exclusive remedy of holders

of Channeled Asbestos PI Trust Claims shall be against the Asbestos PI Trust, and that the

Asbestos PI Trust seek and receive releases from holders of Channeled Asbestos PI Trust Claims

who receive payment from the Asbestos PI Trust.  Doc. No. 8928, Plan, Exhibit F (PPG Trust

Funding Agreement) at §§II.C and II.J.

171. Under the Plan, "Channeled Asbestos PI Trust Claims" includes Asbestos PI Trust

Claims against the "PPG Participating Insurer Entities."  Doc. No. 8928, Plan, §1.1 (Definitions

of "Channeled Asbestos PI Trust Claim" and "Asbestos Protected Party" (part cc)).

172. The PPG Participating Insurer Entities are defined in the Plan to mean "Any of the

PPG Participating Insurers (or any past or present corporate parent, subsidiary, predecessor or

Affiliate of any PPG Participating Insurer), solely in their capacity as an insurer of any PPG

Entities, or their respective past or present officers, directors, employees, agents, representatives

and attorneys, or the successors of any of them, in their capacity as such."  Doc. No. 8928, Plan

§1.1 (Definition of  "PPG Participating Insurer Entities").

173. The PPG Participating Insurers' participation in the funding of the Plan is conditioned

on their receiving the benefits of the Asbestos Permanent Channeling Injunction and on receiving

releases from claimants who receive payment from the Asbestos PI Trust.  Tr. 5/15/2004 at 62:

10-18 (Seymour); Tr. 6/3/2010 at114:2-8 (Fitzpatrick); Plan, Exhibit F (PPG Trust Funding

Agreement) §III (first paragraph).

174. The Asbestos Permanent Channeling Injunction, as applied to Channeled Asbestos PI

Trust Claims against the PPG Entities, the PPG Affiliates, the PPG-Affiliated Parties, and the

PPG Participating Insurer Entities, is essential and necessary to the Debtor's reorganization because neither PPG nor any of the PPG Participating Insurers would be willing to make the PPG Trust Contribution, without the protection provided by the Asbestos Permanent Channeling Injunction.  Tr. 5/5/2004 at 62:10-18 (Seymour); Tr. 6/3/2010 at 114:2-8 (Fitzpatrick); Doc. No. 8928, Plan, Exhibit F (PPG Trust Funding Agreement) §§II (first paragraph) and II.C; *see* Plan §8.1.25.

**c.      Additional Findings Regarding the PPG Trust Contribution**

175. The PPG Trust Contribution is a substantial contribution to the Asbestos PI Trust and a fundamental component of the Debtor's reorganization.  Doc. No. 8928, Plan §9.1.3 and Exhibit F (PPG Trust Funding Agreement) at 10-11; PM Tr. 5/3/2004 at 112:6-113:21, 120:23-121:16, 122:8-24, 125:22-127:8, 135:8-13 (Ellis); Tr. 5/5/2004 at 169:21-23, 171:25-172:16 (Fitzpatrick). *See* Plan §8.1.21.

176. With respect to the holders of Channeled Asbestos PI Trust Claims, the PPG Trust Contribution is a reasonable contribution to the Asbestos PI Trust in consideration of the relief provided to the PPG Entities, the PPG Affiliates, the PPG-Affiliated Parties, and the PPG Participating Insurer Entities by the Asbestos Permanent Channeling Injunction, in view of the alleged and disputed liability of PPG for Channeled Asbestos PI Trust Claims.  This finding, however, made for purposes of Plan confirmation, is not binding, shall not be binding, and shall not have collateral estoppel effect on the PPG Non-Participating Insurers in any coverage litigation regarding the insurance coverage rights or obligations of the PPG Non-Participating Insurers.  Tr. 6/3/2010 at 114:2-115:7 (Fitzpatrick); Tr. 5/5/2004 at 56:4-60:9, 62:10-18 (Seymour); Tr. 5/5/2004 at 112:6-113:1 (Diggs); *see* Plan §8.1.22.

54

177. The PPG Trust Contribution fully resolves and satisfies the PPG Entities', the PPG Affiliates', and the PPG-Affiliated Parties' alleged and disputed liabilities for the Channeled Asbestos PI Trust Claims and is fair and equitable to the holders of such Channeled Asbestos PI Trust Claims, including, without limitation, the holders of Indirect Asbestos Claims.  This finding, however, made for purposes of Plan confirmation, is not binding, shall not be binding, and shall not have collateral estoppel effect on the PPG Non-Participating Insurers in any insurance coverage litigation regarding the rights or coverage obligations of the PPG-Non-Participating Insurers. *See* Plan §8.1.15.

### 3.  **The Corning Trust Contribution**

178. Pursuant to the terms and conditions of the Third Amended and Restated Trust Funding Agreement Among Corning Incorporated, Lawrence Fitzpatrick (Future Claimants' Representative) and the Trustees of the Asbestos PI Trust, in Connection with the Modified Third Amended Plan of Reorganization for Pittsburgh Corning Corporation (the "Corning Trust Funding Agreement"), upon the occurrence of the Funding Effective Date, Corning is to make contributions to the Asbestos PI Trust on behalf of the Corning Entities, the Corning Affiliates, the Corning-Affiliated Parties, and/or the Corning Insurers consisting of:

• A series of six installments (each an "Installment") (subject to a discount for pre-payment of 5.5 percent per annum) in cash or, at Corning's election, by transfer or issuance of the cash equivalent in restricted shares of Corning's common stock (the issuance and resale of which are subject to the Corning Registration Rights Agreement as defined in the Corning Trust Funding Agreement), totaling not less than $240 million nor more than $290 million, payable beginning on the one year anniversary of the Funding   Effective Date and annually thereafter, through the six year anniversary of

the Funding Effective Date;[12]

- Corning's transfer of its 50 percent equity interest in
  Pittsburgh Corning Europe, N.V.;

- Corning's relinquishment of its 50 percent equity interest in
  the Debtor;

- Corning's relinquishment of certain insurance rights against
  the PCC/PPG policies, the PPG Non-Participating Insurance
  Policies and the PPG Insolvent Insurance Policies as set
  forth in the Insurance Claims Agreement.

*See* Doc. No. 8928, Plan §1.1 (definition of "Corning Trust Contribution"), §9.1.3, Exhibit I

(Corning Trust Funding Agreement) §III.A, and Exhibit M (Insurance Claims Agreement), §II.A;

Tr. 6/3/2010 at 112:19-24 (Fitzpatrick).

179. The Asbestos Permanent Channeling Injunction, as applied to Channeled Asbestos PI

Trust Claims against the Corning Entities, the Corning Affiliates, the Corning-Affiliated Parties,

and the Corning Stipulating Insurers, is essential and necessary to the Debtor's reorganization

because Corning would not be willing to make the Corning Trust Contribution without the

protection provided by the Asbestos Permanent Channeling Injunction. This finding, however,

made for purposes of Plan confirmation, is not binding, shall not be binding, and shall not have

collateral estoppel effect in any coverage litigation. Tr. 6/3/2010 at 114:2-11 (Fitzpatrick); Doc.

No. 8928, Plan, Exhibit I (Corning Trust Funding Agreement) §§II (first paragraph), II.C, and

II.P). *See* Plan §8.1.35.

180. The Corning Trust Contribution is a substantial contribution to the Asbestos PI Trust

and a fundamental component of the Debtor's reorganization. This finding, however, made for

---

[12]The sixth Installment consists of $50 million less any Direct Claim Costs and Future
Direct Claim Costs, as defined in the Corning Trust Funding Agreement.

purposes of Plan confirmation, is not binding, shall not be binding, and shall not have collateral estoppel effect on the Corning Insurers in any coverage litigation.  Doc. No. 8928, Plan §9.1.3 and Exhibit I (Corning Trust Funding Agreement) at 9-10; PM Tr. 5/3/2004 at 112:6-113:21, 120:23-121:16, 122:8-24, 125:22-127:8,135:8-13 (Ellis); Tr. 5/5/2004 at 169:21-23,172:17-25 (Fitzpatrick).  *See* Plan §8.1.31.

181. With respect to the holders of Channeled Asbestos PI Trust Claims, the Corning Trust Contribution is a reasonable contribution to the Asbestos PI Trust in consideration of the relief provided to the Corning Entities, the Corning Affiliates, the Corning-Affiliated Parties, and the Corning Stipulating Insurers by the Asbestos Permanent Channeling Injunction, in view of the alleged and disputed liability of Corning for Channeled Asbestos PI Trust Claims.  This finding, however, made for purposes of Plan confirmation is not binding, shall not be binding, and shall not have collateral estoppel effect on the Corning Insurers in any coverage litigation regarding the insurance coverage rights or obligations of the Corning Insurers.  Tr. 5/3/2004 at 80:21-81:13, 82:17-23 (Ellis); PM Tr. 5/4/2004 12:13-19:25, 24:4-26:9, 26:19-27:20, 76:7-14 (Eggers).  *See* Plan §8.1.32.

182. The Corning Trust Contribution fully resolves and satisfies the Corning Entities' , the Corning Affiliates', and the Corning-Affiliated Parties' alleged and disputed liabilities for the Channeled Asbestos PI Trust Claims and is fair and equitable to the holders of such Channeled Asbestos PI Trust Claims, including, without limitation, the holders of Indirect Asbestos Claims. This finding, however, made for purposes of Plan confirmation, is not binding, shall not be binding, and shall not have collateral estoppel effect on the Corning Insurers in any insurance coverage litigation.  *See* Plan §8.1.26.

### D.    Resolution of Competing Claims to Insurance

183. As set forth above, the Debtor, PPG, and Corning have asserted or could assert competing claims to insurance coverage under each others' insurance policies.

184. Specifically, Pittsburgh Corning, PPG, and Corning assert competing claims against certain PCC/PPG Policies and certain Corning Insurance Policies.

185. A condition precedent to the Effective Date of the Plan is the execution of an Insurance Claims Agreement providing for releases by and among the Debtor, PPG, the PCC/PPG Insurers (as defined in the Insurance Claims Agreement),[13] and Corning, relating to respective insurance coverage and competing claims thereto, to be effective upon the Funding Effective Date.  Doc. No. 8928, Plan §8.2.7; Exhibit M (Insurance Claims Agreement).

186. Execution of the Insurance Claims Agreement by Corning is also a condition precedent to the obligations of PPG and the PPG Participating Insurers under the PPG Trust Funding Agreement.  Doc. No. 8928, Plan, Exhibit F (PPG Trust Funding Agreement) at §II.D.

187. Execution of the Insurance Claims Agreement by PPG, the PCC/PPG Insurers, and the Debtor is a condition precedent to the obligations of Corning under the Corning Trust Funding Agreement. Doc. No. 8928, Plan, Exhibit I (Corning Trust Funding  Agreement) at §II.I.

188. The Insurance Claims Agreement provides for releases of certain claims against the PCC/PPG Policies, the PPG Participating Insurance Policies, the PPG Non-Participating Insurance Policies, the PPG Insolvent Policies, and the Corning Insurance Policies, as specified in

---

[13]The term "PCC/PPG Insurers" as defined in the Insurance Claims Agreement means "the PPG Participating Insurers solely in their capacity as issuers of the PCC/PPG Policies, but not in their capacity as issuers of the Corning Insurance Policies and/or any insurance policies that:  (i) are referred to on Schedule E to the Corning Trust Funding Agreement; and/or (ii) were purchased by Corning or any of the Corning Policyholder Companies or in which Corning or any of the Corning Policyholder Companies is the named insured as set forth on the declarations page(s)."

the Insurance Claims Agreement.  Doc. No. 8928, Plan, Exhibit M (Insurance Claims

Agreement), §II.A - D.

189. Absent the Plan, the insurance assets potentially available to the Debtor could be

depleted by the asbestos claims tendered on behalf of PPG, Corning, and/or Corhart against the

same insurance policies.  *See* PM Tr. 5/3/2004 at 73:14-23, 75:3-19, 76:8-78:7 (Ellis); Tr.

5/5/2004  at 40:19-54:21, 55:5-58:1 (Seymour); PM Tr. 5/4/2004 at 35:3-36:23, 37:6-38:6,

53:10-13 (Eggers); Exhibits P-20,P-21, P-40, P-57A, P-57B, P-57C, and P-141.   As to Corning,

as we note in the 2006 Opinion, in some instances, a separate suit may be required but the

outcome could still adversely affect the Debtor.  417 B.R. at 299-300.

###   E.   Processing, Liquidation, and Payment of Present and Future Channeled Asbestos PI Trust Claims

190. The Plan provides that all Channeled Asbestos PI Trust Claims will be resolved

pursuant to the terms, provisions, and procedures set forth in the Asbestos PI Trust Agreement

and the Asbestos PI Trust Distribution Procedures ("TDP").  *See* Doc. No. 8928, Plan §3.2.5.

191. The Plan provides that the Asbestos PI Trust will value Channeled Asbestos PI Trust

Claims under either an Individual Review process or an Expedited Review process.  *See* Doc. No.

8928, Plan, Exhibit B (TDP) at §5.3(a)(l) and §5.3(b)(l).

192. Under the Expedited Review process, the Asbestos PI Trust will evaluate Channeled

Asbestos PI Trust Claims based upon eight separate disease levels, and payments to qualified

claims will be made pursuant to a matrix.  *See* Doc. No. 8928, Plan, Exhibit B (TDP) at §5.3(a)(3).

193. The Scheduled Values in the TDP are based on the Debtor's prepetition settlement

history.  *See* Doc. No. 8928, Plan, Exhibit B (TDP) at §2.1; Tr. 5/5/2004 at 242:7-12 (Fitzpatrick);

Tr. 6/3/2010 at 134:5-12 (Fitzpatrick).

194. The Plan provides that the Channeled Asbestos PI Trust Claims will be paid a percentage of the amount of the claim based upon the Trustees' estimates of total claims and assets available. *See* Doc. No. 8928, Plan, Exhibit B (TDP) at §§2.3 and 4.2.

195. The Initial Payment Percentage for Channeled Asbestos PI Trust Claims has been set at 37 percent, which was derived from comparing the assets available for Channeled Asbestos PI Trust Claims with the asbestos liabilities of the Asbestos PI Trust for the Channeled Asbestos PI Trust Claims. *See* Doc. No. 8928, Plan, Exhibit B (TDP) at §2.3.

196. The purpose of a payment percentage is to assure that present claimants will not receive all the trust assets in the early days of the trust and thus preserve trust assets for the future claimants who get sick later. Tr. 5/5/2004 at 164:24-165:5 (Fitzpatrick).

197. The FCR has concluded that the Plan and Plan Documents, including the TDP, which set forth the Initial Payment Percentage of 37 percent for Channeled Asbestos PI Trust Claims, are fair and reasonable to future claimants and provide reasonable assurance that funds will remain available to pay holders of current and future Channeled Asbestos PI Trust Claims in substantially the same manner. *See* Tr. 6/3/2010 at 101:19-102:2 (Fitzpatrick).

198. The Payment Percentage will be reviewed and adjusted periodically to provide reasonable assurance that the Asbestos PI Trust will be in a financial position to pay holders of present and future Channeled Asbestos PI Trust Claims in a substantially similar manner. *See* Doc. No. 8928, Plan, Exhibit B (TDP) at §4.2.

199.  If the Payment Percentage is raised due to a material change in the estimates of the Asbestos PI Trust's future assets and/or liabilities, the TDP provide for the Asbestos PI Trust to make supplemental payments to all claimants who had previously received payments based on a lower Payment Percentage, subject to an exception suspending any obligation to make a

supplemental payment of less than $100. *See* Doc. No. 8928, Plan, Exhibit B (TDP) at §4.4.

200. The TDP provide for Alternative Dispute Resolution Procedures ( "ADRP ") to

address, among other things, non-binding arbitration of (i) whether the Asbestos PI Trust's

outright rejection or denial of a Channeled Asbestos PI Trust claim was proper and (ii) whether a

claimant's medical condition or exposure history met the presumptive requirements of the TDP

for categorizing a Channeled Asbestos PI Trust Claim involving Disease Levels I-VIII.  The TDP

also provide for the option of binding or non-binding arbitration to resolve disputes over the

liquidated value of a Channeled Asbestos PI Trust Claim involving Disease Levels II-VIII and the

validity of an Indirect Asbestos Claim. *See* Doc. No. 8928, Plan, Exhibit B (TDP) at §5.10(a).

201. If a holder of a Channeled Asbestos PI Trust Claim who has elected non-binding

arbitration is still dissatisfied with his or her recovery after arbitrating his/her claim, the claimant is

permitted under the Plan to litigate the claim in the tort system. *See* Doc. No. 8928, Plan, Exhibit

B (TDP) at §5.11.

202. The medical criteria in the TDP are generally as stringent as what Pittsburgh Corning

experienced in the tort system. *See* PM Tr. 5/3/2004 at 125:2-12 (Ellis).

203. The requirement to demonstrate exposure to Unibestos in the TDP is equally as

stringent, if not more stringent, than what Pittsburgh Corning experienced in the tort system. *See*

PM Tr. 5/3/2004 at 125:15-21 (Ellis).

204. Pursuant to the Asbestos PI Trust Agreement, the Asbestos PI Trust is to have three

Trustees, all of whom are to act as fiduciaries to the Asbestos PI Trust, with the powers and

responsibilities set forth in the Asbestos PI Trust Agreement.  The initial Trustees are Jack

Marionneau, Philip A. Pahigian, and A. Andrew MacQueen. *See* Doc. No. 8928, Plan, Exhibit A

(Asbestos PI Trust Agreement), §§2.1-2.3 and 4.1, and ¶ 35-36 (signature pages, identifying initial

Trustees), Doc. No.6426, Disclosure Statement, Exhibit 4 (list of Trustees); Tr. 5/512004 at 248:4-5

(Fitzpatrick).

205. The Asbestos PI Trust Agreement also calls for the formation of a Trust Advisory

Committee (the "TAC"), which is to consist of five members.  *See* Doc. No. 8928, Plan, Exhibit A

(Asbestos PI Trust Agreement) at §5.  The initial five members of the TAC are to be Bryan O.

Blevins, Jr., Russell W. Budd, Theodore Goldberg, Joseph F. Rice, and Perry Weitz.  *See id.* at

31-32 (signature pages).  Each of the initial TAC members is a member of a firm that represents a

large number of plaintiffs in asbestos-related personal injury cases.  *See* Tr. 5/5/2004 at

248:17-249:8 (Fitzpatrick).  Members of the TAC are to serve in a fiduciary capacity representing

all holders of present Channeled Asbestos PI Trust Claims.  *See* Doc. No. 8928, Plan, Exhibit A

(Asbestos PI Trust Agreement) at §5.2.  *See* Tr. 5/5/2004 at 249:20-24 (Fitzpatrick).

206. The Trust Agreement provides that the FCR, currently Lawrence Fitzpatrick, is to

serve in a fiduciary capacity, representing the interests of holders of future Channeled Asbestos PI

Trust Claims for the purpose of protecting the rights of such persons.  *See* Doc. No. 8928, Plan,

Exhibit A (Asbestos PI Trust Agreement) at §6.1.

207. Pursuant to the Trust Agreement and the TDP, the Trustees are required to obtain the

consent of the TAC and the FCR before taking a number of actions under or in connection with the

TDP.  Doc. No. 8928, Plan, Exhibit A (Asbestos PI Trust Agreement), §§2.2(f), 5.2 and 6.1;

Exhibit B (TDP) at, *e.g.*, §§2.5 (last sentence), 4.2; 5.3(a)(3); 5.3(b)(l); 5.4(a); 5.8; 5.10(a); 6.1; 6.4;

7.3; 7.5(a); 7.8; and 8.1.

## VII.    OBJECTIONS TO PLAN CONFIRMATION

### A.      Garlock Objections and Rulings Thereon

208. Garlock relies entirely on the objections it filed and that were overruled by this Court

in 2011.  *In re Pittsburgh Corning Corp.*, 453 B.R. 570, 579 (Bankr. W.D. Pa. 2011).  So as to put

into one place the issues regarding the Plan now under consideration, the Court re-states Garlock's

objections and the rulings thereon.  Nonetheless, the rulings from the 2011 Opinion and Order are

incorporated herein by reference.

209. Garlock did not file an objection to the Second Amended Plan as to which

confirmation was denied in 2006.  In 2009 Garlock filed an objection to confirmation of the Third

Amended Plan before it was modified.  *See* Objection of Garlock Sealing Technologies, LLC to

Confirmation of Third Amended Plan of Reorganization.  Doc. No. 7045.  In response to the Plan

as filed in August 2012, Garlock continues its objections.  *See* Garlock Objection and Reservation

of Rights, Doc. No. 8983.

210. In its objection at Doc. No. 7045, filed in 2009 ("Garlock Objection"), Garlock

asserted that "for several decades" it has been a defendant in asbestos cases, and that prior to

Pittsburgh Corning's bankruptcy filing, both Garlock and Pittsburgh Corning were "routinely

named" as defendants in "thousands of asbestos cases annually."  Garlock Objection at 1.

211. In its 2009 objection Garlock contended that, during Pittsburgh Corning's Chapter 11

Case, "individuals claiming to hold Asbestos PI Trust Claims have continued to assert claims

against Garlock alleging that Garlock contributed to their injuries as well."  *Id.* 2.

212. Accordingly, the Garlock Objection asserted that Garlock has claims for contribution

against Pittsburgh Corning.  *Id.*

213. Despite this contention, at the 2010 confirmation hearing, Garlock's witness, Mr.

Turlik, testified that he did not recall any instance in which Garlock had prosecuted an independent

action for contribution against Pittsburgh Corning.  Tr. 6/9/2010 at 172:8-13 (Turlik).

214.  The bar date for claims to be filed in this case was November 30, 2001.  *See* Doc. No.

1097, Order dated September 21, 2001.  Notice of the deadline for filing claims was mailed to

Garlock.  *See* Certificate of Service of Proof of Claim Form and Notice of Bar Date (Doc. No.

1112).

215. Garlock did not file a proof of claim in this case and is not a creditor.

216. On June 5, 2010, Garlock filed its own Chapter 11 in the Bankruptcy Court for the

Western District of North Carolina, Case No. 10-31607.

217. As has Mt. McKinley, *see infra*, Garlock has objected to the confidentiality provisions

of §6.5 of the TDP.  However, the Plan imposes no more of an obligation on Garlock than it faced

in the tort system when attempting to access confidential documents and the objection is

overruled.  We credit the testimony that in the tort system, defendants generally try to keep the

terms of their settlements confidential, and settlement agreements generally contain

confidentiality provisions.  Tr. 6/3/2010 at 152:9-18 (Fitzpatrick). The confidentiality provision in

§6.5 of the TDP is materially similar to the confidentiality treatment generally available to

defendants in the tort system.

Furthermore, the confidentiality provision in the TDP states that the Asbestos PI Trust must

respond to a properly issued subpoena.  Plan, Exhibit B (TDP) at §6.5.  In addition, there is no

prohibition in the TDP preventing a co-defendant such as Garlock from obtaining materials

submitted to the Asbestos PI Trust from the claimants themselves.  *Id.*

218. Garlock objects to §5.6 of the TDP which deals with Indirect Asbestos Claims.  The

TDP permit those who have paid part or all of the Debtor's asbestos liability to make a contribution

claim against the Trust.  This treatment assures that those who pay a claim that otherwise would be

paid by the Trust, in the appropriate percentage, do not receive more than the injured asbestos

victim would have received.  That Indirect Claimants, which are properly classified in this Plan,

64

cannot sue the Debtor or the Trust or implead either in the tort system is not a function of the Plan,

Plan Documents, these Findings of Fact and Conclusions of Law or the Confirmation Order but of

§524(g) and the channeling injunction authorized thereunder. Enjoining actions against the Debtor

for recovery of such claims is part and parcel of a primary purpose of the §524(g) channeling

injunction, that is, to supplement the discharge and permit financial recovery for the distressed

business.

219.  Likewise, Garlock's objection that TDP §7.8 favors holders of Asbestos PI Trust

Claims over Indirect Asbestos Claimants is without merit as that provision makes no distinction

between the types of claims.[14]

220.  Garlock's argument that the Plan improperly classifies or treats Asbestos PI Claims

and Indirect Claimants is overruled.  Indirect Asbestos Claims are properly channeled as they

derive from Direct Claims.  *In re Armstrong World Industries, Inc.*, 348 B.R. 136, 168-69 (D.Del.

2006) ("Because Indirect PI Trust Claims, including those arising under contract, relate to direct

Asbestos Personal Injury Claims, they are appropriately channeled to the Asbestos PI Trust and

have historically been channeled to trusts established in connection with asbestos related chapter 11

cases").

221.  Moreover, all Class 5 claimants, both Direct and Indirect, enjoy equal treatment that

satisfies 11 U.S.C. §1123(a)(4).  To be confirmable, a plan must "provide the same treatment for

each claim or interest of a particular class, unless the holder of a particular claim or interest agrees

_____

[14]To the extent Garlock objects to §7.7 of the TDP on the basis that Indirect Claims
would not be treated in substantially the same manner as Direct Claims the objection is
overruled.  Section 7.7 provides a process for the circumstance in which a claimant obtains a
judgment in the tort system relating to the Asbestos PI Trust's liability to the claimant and by its
terms applies to all such claims.  The Plan also contains a Judgment Reduction provision, §11.9,
to address such situations.

to a less favorable treatment of such particular claim or interest." §1123(a)(4). *In re Dow Corning Corp.,* 255 B.R. 445, 500 (E.D. Mich. 2000) ("As to whether the claim is being treated fairly within the class, the inquiry is whether the claim is subject to the same process in satisfying the claim as the other claims within the class"). Under the Plan Direct and Indirect Claims are subject to the same claims process; i.e., the process set up in the TDP and implemented by the Asbestos PI Trust. The few provisions uniquely applicable to Indirect Asbestos Claims are narrowly tailored to the nature of those claims. Additionally, because Garlock failed to file a timely proof of claim, it is not a creditor in this case. We addressed Garlock's standing in our 2011 Opinion and found that it had none. *See* 453 B.R. at 578-83. Garlock has presented nothing that would indicate a change in our prior ruling is appropriate.

222. Garlock argues that the lack of a TDP or Plan provision protecting state law setoff rights of co-defendants leaves co-defendants to suffer the consequences of state law as interpreted and implied by state courts. This objection is moot as to Garlock, which is now a Debtor-in-Possession in its own bankruptcy (*In re Garlock Sealing Technologies LLC,* 10-31607 (Bankr. W.D.N.C. 2010)) and no longer a defendant in any state court proceeding. However, even if it were not moot, any effect arises by virtue of operation of state law and not because of the Plan, Plan Documents, these Findings of Fact and Conclusions of Law or the Confirmation Order. Further, any claim of this nature that Garlock may have is subject to provisions of the Plan and TDP governing indirect claims.

223. Garlock objects to §6.3 of the TDP, which permits claimants to withdraw claims submitted to the Trust, on the grounds that §6.3 allows claimants to "delay" and "defer[ ]" their claims against the Trust while pursuing Garlock in the tort system, Garlock Objection at 3, thereby allowing claimants to collect the full amount from co-defendants in the tort system and

collect a second time from the Trust in this case.  *See* Doc. No. 7900 at 31.  Garlock contends

that this section, along with §6.5 regarding confidentiality, frustrates its contribution rights.

Garlock is no longer a co-defendant in the tort system and this objection is moot.  Nonetheless,

the objection is also overruled on the merits.

224. Section 6.3 provides a process for a claimant to withdraw a claim and file another

without affecting the status of the claim for statute of limitations purposes but the claim's place

in the FIFO Processing Queue will be based on the date of the filing of what is, in effect, an

amended claim.  A claimant can also request that the Trust defer consideration of the claim for a

maximum of three years without affecting the claim's status for statute of limitation purposes.

This, in essence, is a tolling provision which will have no impact on Garlock, which is no longer

a co-defendant with contribution rights, and which, if it does later, somehow, pay a claim for

which it could seek contribution, has the same entitlement against the Trust as have all other

Indirect Claimants.  The objection is overruled.

225.   Garlock contended that there were intentional misrepresentations on certain ballots

and complained that, in the tort system, asbestos victims try to hide exposure to bankrupt entites.

 Tr. 6/9/2010 at 184:21-185:3 (Statement of Richard Worf, Counsel to Garlock).  In support of

this contention Garlock referred to ten discovery responses from *other* litigation, which, Garlock

asserted, has information that is not consistent with the ballots regarding exposure to Pittsburgh

Corning products.  Doc. No. 7900 at 31, citing Garlock Exhibits 121, 132, 147, 165, 174, 178,

203, 245, 327, and 356.  Garlock made no attempt to authenticate those and a similar document,

Garlock Exhibit 167, and no witness was offered to acknowledge or explain the documents, nor

was any explanation given as to the unavailability of a witness.  *See* Tr. 6/10/2010 at 6:13-7:23

(colloquy).  The documents were not offered as a random or representative sample.  *Id.* at

191:14-17, 193:2-9 (Statement of Richard Worf, Counsel to Garlock).   Further, seven of the

eleven responses were not signed by the plaintiff or plaintiff's personal representative as

required by the jurisdiction in which they were provided.  *See* Garlock Exhibits 121, 132, 165,

174, 178, 203, and 245.[15]  Thus, they are not admissible evidence.  Fed. R. Evid. 801(c), 804,

903.

226.   Nonetheless, even if the Court were to consider such evidence as admissible, seven

of the eleven discovery responses identify claimants' exposure to asbestos products for which

bankrupt entities other than Pittsburgh Corning allegedly had responsibility.  *See* Garlock

Exhibits 121, 132 165, 167, 178, 174, and 203.  For example, the discovery response marked as

Exhibit 203 identifies 10 bankrupt entities, including Armstrong, Babcock & Wilcox,

Fibreboard, Owens Corning, USG, and others.  *See* Garlock Exhibit 203 at 7-30.  To the extent

that Garlock offered these documents to prove a "propensity" to conceal exposure to bankrupt

entities, the documents themselves undercut that conclusion as multiple such defendants are

listed.

227. With respect to Garlock's objections addressed to the Trust Advisory Committee

("TAC"), essentially, that the composition of the TAC is somehow improper, the provisions of

---

[15]Even if, *arguendo*, the eleven discovery responses Garlock cites demonstrated that
intentional misrepresentations were made to Garlock in the tort system or that the claimants were
ineligible to cast a ballot in this case, there would be no effect on the voting as a total of 359,298
Class 5 votes were cast.  Doc. No. 7478, Logan Declaration at ¶21   No claims have been
presented to the Trust because the Plan has not yet been confirmed and the TDP and Trust are
not established.  There has been no showing that claimants would seek full payment for their
entire injury from Garlock and then again from this Trust or vice versa.  Furthermore, in order to
collect from the Asbestos PI Trust, evidence of "meaningful and credible exposure to the
Debtor's asbestos or asbestos-containing product(s)" must be presented.  TDP §5.7(b)(3).  We
note that many asbestos claimants allege and establish exposure to the products or conduct of
more than one defendant.  The TDP properly define the parameters of the claims that the Trust
may pay and the necessary evidence to support those claims.

the Asbestos PI Trust Agreement and the TDP define the powers of the TAC and Trustees, all of whom are fiduciaries.  There is nothing in the record suggesting that any of the TAC (or Trustees) will breach their fiduciary duties.

228.  Further, there is no provision in the Asbestos PI Trust Agreement or the TDP for involvement by the TAC in the processing of individual claims.  Under the TDP, the TAC has a right of consultation under the Asbestos PI Trust Agreement only with respect to general implementation and administration of the Trust and the TDP.

The Asbestos PI Trust Agreement, §2.2(e), provides that "[t]he Trustees shall consult with the TAC and the Future Claimants' Representative (i) on the general implementation and administration of the Asbestos PI Trust; (ii) on the general implementation and administration of the TDP; and (iii) on such other matters as may be required under this Asbestos PI Trust Agreement and the TDP."

Subsection (f) of §2.2 provides that "The Trustees shall be required to obtain the consent of the TAC and the Future Claimants' Representative pursuant to the Consent Process set forth in Section 5.7(b) and 6.6(b) below, in addition to any other instances elsewhere enumerated, in order to" perform various functions including, but not limited to, changing the Claims Payment Ratio, Disease Levels or Medical/Exposure Criteria, Scheduled, Average and/or Maximum Values, and proof of claim forms and materials.  *See also* TDP §§5.7 and 6.6 (consultation and consent processes with respect to the TAC and FCR, respectively).[16]

Thus, the TDP is properly crafted in this regard and Garlock's objection is overruled.

229. Garlock has reserved its right to appeal from any rulings regarding its standing and

---

[16]The Asbestos PI Trust also contains a dispute resolution provision in §7.11 which includes submission to an ADR process and ultimately to a court.

its substantive objections inasmuch as the denial of confirmation in 2011 precluded such an

appeal.  Doc. No. 8983.  In our 2011 Opinion we ruled that Garlock's objections were without

merit and that it is not a creditor of this Debtor.  *In re Pittsburgh Corning Corp.*, 453 B.R. 570,

579 (Bankr. W.D. Pa. 2011).  We further held that "[t]o the extent Garlock could be considered a

future demand holder based on a hypothetical possibility of a future contribution claim, such

claims are provided for in the Modified Third Amended Plan and the TDP and Garlock's

treatment thereunder, as is the treatment of all Indirect Asbestos Claimants, is fair and

equitable."  *Id*. at 580 and n.15.

Except for the fact that Garlock is now involved in its own Chapter 11 in the Bankruptcy

Court for the Western District of North Carolina (Charlotte), Bankr. No. 10-31607, nothing has

changed with respect to Garlock and nothing has been presented to this Court to indicate that a

change in our 2011 ruling is appropriate.  Therefore, we incorporate our prior rulings in this

regard and find that, although we have addressed Garlock's objections based on the complete

record, Garlock has no standing and we overrule Garlock's objection to the latest Plan.

## B.    The Sledz Claimants Objections and Rulings Thereon

230. Certain Pittsburgh Corning Cancer Claimants ("CPCCC") had filed objections to the

Plan.  Doc. No. 6624 (Preliminary Objections) and Doc. No. 7067 (Final Objections).

231. Plan Proponents and the CPCCC resolved these objections by modifying the Plan

definition of "Asbestos Protected Party."  *See* §1.1 of Plan, subpart (e)(1) of definition of

"Asbestos Protected Party."  *See also* Stipulation by Certain Pittsburgh Corning Cancer

Claimants, Futures Representative of Pittsburgh, Official Committee of Asbestos Creditors,

Pittsburgh Corning Corporation and Between The Certain Pittsburgh Corning Cancer Claimants,

the Debtor, the Future Claimants Representative, and the Official Committee of Asbestos

Creditors Resolving Certain Pittsburgh Corning Cancer Claimants' Plan Objection, Doc. No.

7400 ("Stipulation").

232. The Stipulation provided that the CPCCC's withdrawal of its objection did not

"withdraw the objections raised by the Sledz Claimants as previous members of the CPCCC"

and that nothing in the Stipulation would prejudice any rights the Sledz Claimants had to pursue

those objections in their individual capacities.  Doc. No. 7400 at 3, n.2.

233. The Sledz Claimants did not file a pretrial statement and did not appear at the

confirmation hearing.  Thus, no individual objection was raised.  To the extent one is deemed

raised, the objection has been abandoned or waived and, in any event, is overruled.

### C.    Mt. McKinley Objections and Rulings Thereon

#### 1.    Background

234. Mt. McKinley issued certain Pre-7/1/81 PPG Policies and Post-7/1/8l PPG Policies.

Doc. No. 8928, Plan, Exhibit F (PPG Trust Funding Agreement) at Schedule E; Exhibit P-57;

Exhibit P-57B.

235. In May 1997, Mt. McKinley entered into a settlement agreement with respect to

Pittsburgh Corning's asbestos-related liability claims under the Pre-7/1/81 PPG Policies issued

by Mt. McKinley.  3/10/2004 DEP. Tr. at 28:19-29:15 (Kenney); AM Tr. 5/4/2004 at

42:21-42:24 (Ellis).  Pursuant to that agreement, the aggregate limits of liability applicable to

products/ completed operations claims under the Pre-7/1/81 PPG Policies issued by Mt.

McKinley have been exhausted.  *See* AM Tr. 5/4/2004 at 42:21-43:10 (Ellis); Tr. 5/5/2004 at

81:20-82:17 (Seymour); 3/10/2004 DEP. Tr. at 36:7-19,50:25-51:1 (Kenney).

236.  Mt. McKinley elected not to become a PPG Participating Insurer with respect to its

Post-7/1/81 PPG Policies.  Doc. No. 8928, Plan, Exhibit F (PPG Trust Funding Agreement) at

Schedule E.

237. Mt. McKinley issued certain insurance policies to Corning. Doc. No. 8928, Plan,

Exhibit I (Corning Trust Funding Agreement) at Schedule B-3.

238. Mt. McKinley has not filed a proof of claim in this case.

239. Mt. McKinley admits that it does not have a present claim for reimbursement,

contribution, or indemnity with respect to the PPG Trust Contribution or the Corning Trust

Contribution.  5/26/2010 DEP. TR. at 47:16-48:11 (Kenney).

240. Following the proposal of amendments to Plan §11.9 (Judgment Reduction) (and

related changes to definitions), Mt. McKinley has withdrawn its objection to the treatment of its

potential claims to contribution, indemnity, reimbursement, subrogation, or similar claims over

in connection with Corning Trust Contribution Recovery Claims or PPG Coverage Claims.  Doc.

No. 8733, Tr. 3/16/2012 at 8:16-10:6.

241.  For purposes of addressing Mt. McKinley's numerous objections, we will

sometimes set out the objections and later the accompanying analysis and sometimes will include

analysis with the objections.

242.  So as to alleviate any doubt, in the event that a particular Finding or Conclusion

does not specify the following caveat, it is set out in full here and applies to all of Mt.

McKinley's objections and the rulings thereon:  Nothing in the Plan, Plan Documents, these

Findings of Fact and Conclusions of Law or the Confirmation Order are issued for any purpose

other than to determine whether the Plan is confirmable and to issue the Confirmation Order and

the Asbestos Permanent Channeling Injunction.  That is, nothing in the Plan, Plan Documents,

these Findings of Fact and Conclusions of Law or the Confirmation Order adjudicates, shall be

offered into evidence, or shall be interpreted as adjudicating any fact or legal issue in any

72

coverage litigation or proceeding between Mt. McKinley and PPG, between Mt. McKinley and

Corning or between Mt. McKinley and the PPG Participating Insurers.  This Court has no

opinion and expresses no opinion as to (1) any right, obligation, defense, claim or any other

provision or entitlement of any unsettled PPG or Corning insurance policy issued by Mt.

McKinley; (2) the effect, if any, of applicable nonbankruptcy law regarding any policy

requirement or provision (or the rights, obligations, defenses or claims which may inure thereto

or therefrom) in coverage litigation or proceedings by and between Mt. McKinley and PPG,

between Mt. McKinley and Corning or between Mt. McKinley and the PPG Participating

Insurers; (3) the effect, if any, of applicable nonbankruptcy law on Mt. McKinley based upon

Insurance Settlement Agreements as to which Mt. McKinley was not a party other than to note

that the Insurance Settlement Agreements to which Mt. McKinley was not a party are not

contractually binding upon Mt. McKinley.

243.   For the reasons which follow, all of Mt. McKinley's objections are overruled.

**2.      The Plan Does Not Alter Mt. McKinley's Coverage
Rights, Obligations or Defenses.**

244. Mt. McKinley objects that "The Plan not only impairs Mt. McKinley's right to

obtain [information about claims submitted for payment] from Plan Supporters (PPG and

Corning, *see* Doc. No. 8984 at 1), but it seeks to excuse Plan Supporters from their obligations

by erecting barriers that would make it exceedingly difficult, if not impossible, to [ ] obtain that

data post-confirmation."  Doc. No. 8984 at 3.

245. Mt. McKinley also objects on the grounds that, by not providing Plan Supporters

with access to claims information submitted to the Asbestos PI Trust, the Plan "will allow [PPG

or Corning] to argue in coverage litigation, and in response to Mt. McKinley's demands for

73

claim-specific information supporting any alleged coverage obligation, that they are unable to

comply with their policy obligations because of the terms of the Court-approved Plan, thus

seeking to self-interestedly excuse the breach of their duty to cooperate with and assist Mt.

McKinley under their policies." Doc. No. 8984 at 8.  We disagree as to both objections.

246. No provision of the Plan purports to alter Mt. McKinley's rights (if any) under its

PPG or Corning policies, its coverage obligations (if any) or its defenses (if any) to coverage.

247. Nothing in the Plan, the Plan Documents, these Findings of Fact or Conclusions of

Law, or the Confirmation Order alters, preempts, modifies, or supersedes any rights or

obligations that PPG or Corning may have as to Mt. McKinley or that Mt. McKinley has as to

PPG or Corning under the PPG Non-Participating Insurance Policies issued by Mt. McKinley or

the Corning Insurance Policies issued by Mt. McKinley, or alters the provisions of

nonbankruptcy law applicable to such rights or obligations.  This Court makes no findings or

conclusions regarding the provisions or effect of any insurance policy or of any entity's rights or

obligations with respect thereto, or regarding the consequences to a third party of any insurance

settlement agreement, any settlement agreements by, between and/or among Debtor, PPG,

Corning and other insurers as to which Mt. McKinley was not a party are not contractually

binding upon Mt. McKinley and the effect, if any, on Mt. McKinley shall be determined by a

court of competent jurisdiction, under applicable non-bankruptcy law, if and when the issue

arises.  The same is true whether the settlement agreements were reached during the course of

the bankruptcy or prior thereto; neither the bankruptcy nor the Plan creates this result.

248.  Moreover, the Court makes no findings or conclusions regarding PPG's or

Corning's obligations to Mt. McKinley, if any, with respect to claim handling or claim

information and nothing in the Plan, Plan Documents, these Findings of Fact and Conclusions of

74

Law or the Confirmation Order shall be offered as evidence or construed otherwise.  To the

extent, however, that any provision of the Plan renders it more difficult or impossible for PPG or

Corning to comply with any obligation that it may have to Mt. McKinley (if such obligation

exists) nothing in the Plan, Plan Documents, these Findings of Fact and Conclusions of Law or

the Confirmation Order excuses PPG or Corning from performing any such obligation or relieves

PPG or Corning from whatever consequences, if any, may result under applicable nonbankruptcy

law from any failure or inability to perform such an obligation.

249. Mt. McKinley next objects that "The Plan has been structured to allow payment of

… non-compensable and fraudulent claims, and this harms Mt. McKinley because Plan

Supporters will rely on this Court's confirmation order to establish that such liabilities are valid

when seeking coverage."  Doc. No. 8984 at 53. We disagree.

250. The Plan is not so structured.  To the contrary, the Trust and TDP are designed to

pay only valid claims.  What, if any, bearing the number of claims handled or paid by the Trust,

the aggregate amounts paid by the Trust, or the amounts paid to individual claimants has

regarding any coverage disputes between Mt. McKinley and PPG or between Mt. McKinley and

Corning is a matter for the coverage courts to determine, applying applicable nonbankruptcy

law.  Nothing in the Plan, the Plan Documents, these Findings of Fact and Conclusions of Law

or the Confirmation Order determines or purports to determine any fact or rule on any legal issue

in a coverage dispute between those parties.

251. Mt. McKinley also objects that "[t]he Plan harms Mt. McKinley by including

hundreds of non-debtors within the scope of the channeling injunction," Doc. No. 8984 at 56,

and that "[t]his structure harms Mt. McKinley because it imposes on Mt. McKinley massive

administrative burdens and associated costs to do something that the Plan Supporters were

obligated to do in the first instance – establish that a particular claim was covered under the

terms and conditions of the policies." *Id*. at 57.  We disagree.

252. First, no claims are channeled that do not meet the derivative liability test

established in the Plan and Plan Documents, and these are in accord with the requirements of

§524(g).  Second, the Court makes no finding or conclusion as to whether any claim that the

Trust may pay is covered under any Mt. McKinley policy and nothing in the Court's findings or

conclusions alters any burden of proof in coverage litigation involving Mt. McKinley.  Third,

§524(g)(4)(A),(B) specifically authorizes the extension of the channeling injunction to entities

like those included in the Asbestos Permanent Channeling Injunction in this case, *see*  Doc. No.

9402, Exhibits K and L, when the other requirements on §524(g) are met. *Cf. Matter of Emerson

Radio Corporation.*, 173 B.R. 490, 493 (D.N.J. 1994) (describing and applying "affiliate"as

defined in §101(2)(B) in context of Fed. R. Bankr. P. 1014).  This Plan satisfies the requirement

of §524(g) and the inclusion of the third parties in Exhibits K and L is appropriate.

253.  The Court makes no finding or conclusion regarding whether any of the policies

issued by Mt. McKinley imposes upon PPG or Corning any obligation to establish how much of

either of their respective trust contributions is being made on behalf of each PPG Entity, PPG

Affiliate, PPG-Affiliated Party, Corning Affiliated Parties, Corning Affiliates or Corning

Entities, as the case may be.  To the extent, however, that such an asserted obligation exists for

purposes of coverage disputes, nothing in the Plan, Plan Documents, these Findings of Fact and

Conclusions of Law or the Confirmation Order does or shall alter, preempt, modify, or supersede

any such obligation, if it exists.

Further, nothing in the Plan, Plan Documents, these Findings of Fact and Conclusions of

Law or the Confirmation Order excuses performance by PPG or Corning of any obligations it

may have under its policies with Mt. McKinley and nothing relieves PPG or Corning from

whatever consequences, if any, may result under applicable nonbankruptcy law from any failure

or inability to perform any such obligation, if it exists.

For Plan confirmation purposes, however, the Court notes that there is nothing in §524(g)

that requires a designation of any portion of PPG's or Corning's contribution to any related

entity in order to benefit from the Asbestos Permanent Channeling Injunction.  PPG's, PPG

Participating Insurers' and Corning's contributions to the Asbestos PI Trust, which together with

the Debtor's total over $3 billion, are sufficient to sustain the imposition of the injunction in

favor of the listed and identified entities and affiliates.

254.  Mt. McKinley objects that "The Plan impermissibly alters Mt. McKinley's policy

right to have its insured substantiate that claims submitted for payment are within the scope of

coverage and imposes additional burdens on Mt. McKinley."  Doc. No. 8984 at 11.  Mt.

McKinley also asserts that there exists a "fundamental insurance coverage principle that the

policyholder must prove that each of the claims for which it seeks coverage are [*sic*] in fact

covered under the policies."  *Id*. at 12.

255. The Court makes no finding or conclusion regarding whether any of the policies

issued by Mt. McKinley imposes upon PPG or Corning any obligation to substantiate that claims

submitted for payment are within the scope of coverage or whether PPG or Corning must prove

that each claim for which it seeks coverage is covered under the policies.  To the extent,

however, that such asserted obligations exist, nothing in the Plan alters, preempts, modifies, or

supersedes such obligations, or itself excuses performance by PPG or Corning of any such

obligations that either of them may have, and nothing in the Plan, Plan Documents, these

Findings of Fact and Conclusions of Law or the Confirmation Order relieves PPG or Corning

from whatever consequences, if any, may result under applicable nonbankruptcy law from any

failure or inability to perform such an obligation, if one exists.

256. Mt. McKinley objects that PPG or Corning will rely on this Court's approval of its

aggregate contributions to the Plan as evidence of a "reasonable global settlement" of its liability

related to Channeled Asbestos PI Trust Claims, regardless of the merits of the individual

claims." Doc. No. 8984 at 12. The objection is overruled as stated below.

257. Nothing in the Plan, Plan Documents, these Findings of Fact and Conclusions of

Law or the Confirmation Order refers to a "global settlement" nor does anything therein, nor

shall anything therein, constitute or be construed or interpreted as constituting, a finding or

conclusion that is binding for insurance coverage purposes regarding PPG or Corning's liability

for individual claims. However, PPG and Corning are capping their contributions to Channeled

Asbestos PI Trust Claimants and Demand Holders, as authorized by §524(g).

258. In order for the Court to confirm a plan, the Bankruptcy Code requires that "[a]ny

payment made or to be made by the proponent, by the debtor . . . or in connection with . . . the

plan and incident to the case, has been approved by, or is subject to the approval of, the court as

reasonable." 11 U.S.C. §1129(a)(4).

259. Furthermore, 11 U.S.C. §524(g) provides that "benefits" must be provided to the

Trust on behalf of the debtor or third party in order to have a channeling injunction issue. 11

U.S.C. §524(g)(4)(B)(ii). This Plan provides for those "benefits".

260. Therefore, the findings in Plan §§8.1.17 (PPG Participating Insurers' contributions),

8.1.22 (the PPG Trust Contribution), and 8.1.32 (Corning Trust Contribution) are necessary to

confirmation and, here, are proper and supported by the credible evidence, which, *inter alia,*

established the nature and amount of contribution. Such findings have no effect on rights,

78

obligations, claims or defenses in coverage litigation involving Mt. McKinley.

261. Despite Mt. McKinley's assertions to the contrary, the Plan is "insurance neutral" in

that revised §11.17.1, filed at Doc. No. 9402 on May 15, 2013, provides:

> Notwithstanding anything to the contrary in the Confirmation
> Order or the Plan, nothing in the Confirmation Order or the Plan
> (including any other provision that purports to be preemptory [*sic*]
> or supervening) shall in any way operate to impair, or have the
> effect of impairing the insurers' legal, equitable or contractual
> rights, if any, in any respect; the rights of the insurers shall be
> determined under: the PPG Non-Participating Insurance Policies,
> the Corning Insurance Policies, the Other Corning Policies, the
> PPG Participating Insurance Policies, the PCC Settled Insurance
> Policies and related Insurance Settlement Agreements, as
> applicable. The enjoining of insurers' contribution and subrogation
> claims under the Asbestos Permanent Channeling Injunction shall
> not be deemed to be impairment
> of the insurers' rights.

262. Further, Section 11.17.2 provides:

> The PPG Non-Participating Insurance Policies, the Corning
> Insurance Policies, the Other Corning Policies, the PPG
> Participating Insurance Policies, the PCC Settled Insurance
> Policies and related Insurance Settlement agreements are binding
> upon the parties thereto and as to non-parties have the effect as
> provided by applicable non-bankruptcy law.

263. Therefore, pursuant to §11.17.3:

> (A) The PPG Coverage Claim Parties are hereby permanently
> enjoined from offering into evidence in support or defense of a
> PPG Coverage Claim or PPG Coverage Claim Reduction, and and
> (B) the Corning Trust Contribution Recovery Claim Parties are
> hereby permanently enjoined from offering into evidence in
> support or defense of a Corning Trust Contribution Recovery
> Claim or Corning Trust Contribution Recovery Claim Reduction,
> any of the following as binding in any way (including as a basis for
> res judicata, collateral estoppel, issue preclusion or claim
> preclusion), as constituting an adjudication for coverage purposes,
> or otherwise being probative of the truth of any matter asserted
> therein: (i) any finding or conclusion by the Bankruptcy Court or
> the District Court adopting any of the findings or conclusions set

79

for in Section 8.1 of the Plan, or (ii) the second sentence of Section
1.1 of the TDP.

264. Mt. McKinley contends that §11.17.1 and §11.17.3 of the Plan do not prohibit the

Plan Supporters from using the Plan or Plan Documents in coverage litigation.  Doc. No. 8984 at

28, 30, 31, and 33. This Court makes no finding or conclusions regarding the effect of

nonbankruptcy law on the use of the Plan, Plan Documents, these Findings of Fact and

Conclusions of Law or the Confirmation Order in coverage litigation.  However, as noted

throughout, PPG and Corning have agreed that they will not offer into evidence or otherwise use

this Court's findings and conclusions regarding §8.1 of the Plan or the second sentence of §1.1

of the TDP, nor argue that the findings have collateral estoppel effect in coverage litigation

involving Mt. McKinley.  Likewise, this Court has narrowly tailored the findings and

conclusions to apply only to confirmation of this Plan and not to coverage issues inasmuch as

coverage issues are not before the Court and are not addressed herein.

265.  Mt. McKinley also contends that the last sentence of §11.17.1[17] is a "*proviso*" that

impermissibly impedes upon the concept of insurance neutrality.  This contention, too, is without

merit inasmuch as the last sentence merely clarifies, at the request of many insurers, that

"insurance neutrality" does not prohibit the imposition of the Asbestos Permanent Channeling

Injunction in this case.  As Mt. McKinley has agreed, the effect of the judgment reduction

provision of §11.9 of the Plan and the inclusion of Mt. McKinley as an Asbestos Protected Party

provide it with adequate protection of any contribution or subrogation claims..  The contentious

sentence, therefore, iterates the remedial effect of the channeling injunction, adds nothing

---

[17] "The enjoining of insurers' contribution and subrogation claims under the Asbestos
Permanent Channeling Injunction shall not be deemed to be impairment of the insurers' rights"

substantive and excludes nothing from the coverage court.

266.  Mt. McKinley's objects that the inclusion of certain language[18] in the insurance neutrality clause is a deficiency that affects Mt. McKinley because "Insurance Settlement Agreements" is "an open-ended list of past, present, and future agreements . . . whose contents are unknown and unknowable."  *Id.* at 5.  This objection is likewise without merit.  The Insurance Settlement Agreements clearly will govern the relationship of the parties to the agreements and inclusion of that fact in §11.17.1 is appropriate.

267.  The Court further finds and rules that language in the Plan, Plan Documents, these Findings of Fact and Conclusions of Law, the Confirmation Order or Insurance Settlement Agreements referring to or suggesting that coverage is exhausted under certain policies is (1) an agreement between the insured and insurer who settled, (2) is a finding for Plan confirmation purposes only, (3) insofar as Insurance Settlement Agreements are concerned, is binding on only the parties thereto and (4) as to non-parties to the Insurance Settlement  Agreements, the Agreements will have the effect, if any, provided by applicable nonbankruptcy law.

### 3.    Those Findings From §8.1 of the Plan as Set Forth Herein Do Not Harm Mt. McKinley and Do Not Alter Mt. McKinley's Coverage Rights, Obligations or Defenses

268.  Mt. McKinley objects that the findings in Article VIII of the Plan are unnecessary, are not required by the Bankruptcy Code and are included only to give Plan Proponents and Plan Supporters an advantage in coverage litigation.  We disagree. Nothing in those findings adopted

---

[18] "[T]he rights of the insurers shall be determined under:  the PPG Non-Participating Insurance Policies, the Corning Insurance Policies, the Other Corning Policies, the PPG Participating Insurance Policies, the PCC Settled Insurance Policies and related Insurance Settlement agreements, as applicable."

by this Court[19] as set forth in §8.1 of the Plan, or the Plan Documents, these Findings of Fact and

Conclusions of Law or the Confirmation Order purports to adjudicate the liability of PPG or

Corning to holders of asbestos Claims and Demands.  Rather, PPG and Corning are settling their

disputed liability with the Debtor and those holding Channeled Asbestos PI Trust Claims and

Demands through their Trust Contributions.   The findings in §8.1 of the Plan referring to "fair

and equitable" in connection with the Trust Contributions and, as stated *supra* are required by

§524(g)(4)(B)(ii).  *See* Plan §§8.1.15 and 8.1.26.  References in the Plan sections to the

resolution and satisfaction of disputed liability to the holders of Channeled Asbestos PI Trust

Claims are for Plan purposes only and have no bearing on PPG's or Corning's or Mt.

McKinley's rights, obligations, claims or defenses under Mt. McKinley's policies for purposes

of coverage litigation.

269. The findings in Plan §§8.1.22 and 8.1.32 that the PPG and Corning Trust

Contributions are reasonable, are required by 11 U.S.C. §§1129(a)(4) and, to the extent that they

are also fair and equitable, by §524(g)(4)(B)(ii).  In this case those findings are supported by the

credible evidence.  Moreover, as provided in the applicable sections of  Plan Article VIII, the

findings "shall not be binding and shall not have collateral estoppel effect on" the PPG

Non-Participating Insurers or the Corning Insurers "in any coverage litigation regarding the

insurance coverage obligations of" such Insurers.  We find, however, that they also have no

collateral estoppel effect on the rights or defenses of those parties in such litigation.

270. The finding in §8.1.17 that the contributions by the PPG Participating Insurers or

their assignees under the PPG Participating Insurance Policies are reasonable settlements and

---

[19]The Court has not incorporated all of the "Conditions Precedent to Plan Confirmation"
as listed in §8.1 of the Plan.  Others have been modified.

fair resolutions of those Insurers' alleged liability under the Policies for Channeled Asbestos PI

Trust Claims and Demands and that the settlements satisfy those Insurers' liability for channeled

Claims and Demands is based on the credible evidence and is required by 11 U.S.C.

§§1129(a)(4) and §524(g)(4)(B)(ii) in order for the PPG Participating Insurers to obtain the

benefit of the Channeling Injunction.  Further, this section of the Plan provides that it "shall not

be binding and shall not have collateral estoppel effect on the PPG Non-Participating Insurers in

any insurance coverage litigation between them and PPG."  Again, we find that the rights and

defenses as well as the obligations of those parties will be adjudicated without a collateral

estoppel effect in coverage litigation.  That is, nothing in the Plan, Plan Documents, these

Findings of Fact and Conclusions of Law or the Confirmation Order constitutes or shall be

construed or interpreted as constituting, a finding or conclusion that is binding for insurance

coverage purposes.

271.  Mt. McKinley objects to the requested finding in §8.1.45 of the Plan as impairing

its rights.  We disagree. This section provides that the Asbestos Permanent Channeling

Injunction, as applied to Channeled Asbestos PI Trust Claims against the PCC  (*i.e.* Debtor's)

Settled Insurer Entities, is "essential and necessary" to the Debtor's reorganization because the

PCC Settled Insurers would not otherwise be willing to make the payments specified in the PCC

Insurance Settlement Agreements without the protection of the Asbestos Permanent Channeling

Injunction and we so find.  The insurance proceeds funding the Plan through the Insurance

Settlement Agreements contribute to the feasibility of this Plan.  Further, the Plan provides in

§8.1.45 that the finding "shall not be binding and shall not have collateral estoppel effect on the

Corning Insurers in any coverage litigation regarding the insurance coverage obligations of the

Corning Insurers."  That is, nothing in the Plan, Plan Documents, these Findings of Fact and

Conclusions of Law or the Confirmation Order constitutes or shall be construed or interpreted as constituting, a finding or conclusion that is binding for insurance coverage purposes.

272. Mt. McKinley objects to §1.1 of the TDP in that it states that the TDP is "designed to provide fair, equitable, and substantially similar treatment for all Channeled Asbestos Trust Claims that may presently exist or may arise in the future in substantially the same manner," contending that such a finding is unnecessary. However, §524(g) requires that all Asbestos PI Trust Claims and Demands be dealt with "equitably," §524(g)(2)(B)(ii)(III) and (V) (the Trust "will value, and be in a financial position to pay, present claims and future demands that involve similar claims in substantially the same manner"). *See also id.* at §524(g)(4)(B)(ii) (channeling injunction valid and enforceable if it is "fair and equitable with respect to the persons that might subsequently assert such demands"). The credible evidence supports this finding and §1.1 of the TDP has no bearing on insurance coverage issues.

273. Thus, for the avoidance of doubt as to the purpose and applicability of the findings herein, the Court rules that findings requested in the Plan as a condition to confirmation regarding the reasonableness of the contributions made to the Asbestos PI Trust "shall not be binding and shall not have collateral estoppel effect on the PPG Non-Participating Insurers or the Corning Insurers."

274. Moreover, as set forth in §11.17.3 of the Plan, (1) the PPG Coverage Claim Parties are enjoined from offering into evidence in support or defense of a PPG Coverage Claim or PPG Coverage Claim Reduction, and (2) the Corning Trust Contribution Recovery Claim Parties are enjoined from offering into evidence in support or defense of a Corning Trust Contribution Recovery Claim or Corning Trust Contribution Recovery Claim Reduction, any of the following against Mt. McKinley as binding in any way (including as a basis for res judicata, collateral

84

estoppel, issue preclusion or claim preclusion), as constituting an adjudication for coverage

purposes, or as otherwise being probative of the truth of any matter asserted therein:

- any finding or conclusion by the Bankruptcy Court or the
  District Court adopting any of the findings or conclusions
  set forth in Section 8.1 of the Plan, or

- the second sentence of Section 1.1 of the TDP.

275. Accordingly, the Court finds that nothing in the §8.1 findings issued by the Court[20]

herein (or the second sentence of §1.1 of the TDP) harms Mt. McKinley.[21]

### 4.    The Criteria Set Forth in the Pittsburgh Corning Corporation Asbestos PI Trust Distribution Procedures Have No Impact on Mt. McKinley's Coverage Obligations or Defenses

276. Under the Plan, neither the Plan Supporters nor the Debtor will assign or transfer

their rights to insurance coverage, including any rights they may have to coverage from Mt.

McKinley, to the Asbestos PI Trust.

277. Because no rights to Mt. McKinley's unsettled insurance policies are being assigned

to the Asbestos PI Trust, the Asbestos PI Trust will not be able to seek reimbursement from Mt.

McKinley, or sue Mt. McKinley for insurance coverage or indemnity, for any claim paid by the

Asbestos PI Trust pursuant to the TDP.

278. Mt. McKinley contends that PPG and Corning "will seek to use [the TDP] as an

expeditious means to recover their Trust contributions against Mt. McKinley under one of two

theories." Mt. McKinley Brief in Response to Court's Directive at 4/16/2012 Omnibus Hearing

---

[20]*See* note 18, *supra.*

[21]Mt. McKinley complains that §11.17.3 is limited to findings in §8.1 of the Plan and the second sentence of TDP §1.1.  Doc. No. 8984 at 31. It is those sections, however, that form the basis of Mt. McKinley's objections regarding what will or will not happen in coverage litigation or proceedings.

to Identify Harm Caused by Plan, Doc. No. 8804 at 33.

279. Mt. McKinley's first theory is that, to the extent that PPG or Corning seeks to recover its Trust Contributions on a "lump sum" basis, it will use the TDP to substantiate their total aggregate contributions by arguing that otherwise non-compensable claims are valid and reimbursable under the Plan because they were paid pursuant to the TDP which the Court found to be "reasonable," "fair," "equitable," and otherwise in compliance with the provisions of the Bankruptcy Code.  Doc. No. 8984 at 54; Doc. No. 8404 at 33.  This contention is without merit as stated below.

280. Nothing in the Plan, Plan Documents, including the TDP, these Findings of Fact and Conclusions of Law or the Confirmation Order purports to justify or substantiate the amount of PPG's Trust Contribution or Corning's Trust Contribution for coverage purposes and nothing therein is to be construed or interpreted as making a finding for purposes of coverage litigation. Moreover, both PPG and Corning have agreed not to offer into evidence this Court's findings in coverage litigation.

281. Under its second theory, Mt. McKinley next contends that if the Plan Supporters seek to recover from Mt. McKinley, under their insurance policies with Mt. McKinley, on a "per claim" basis, they will rely on the TDP to excuse their obligations to cooperate and assist Mt. McKinley and to substantiate coverage claims under insurance policies, relying on the Court's approval of the TDP.  Doc. No. 8804 at 34-35.  This contention is also without merit as stated below.

282. Nothing in the Plan, Plan Documents, including the TDP, these Findings of Fact and Conclusions of Law or the Confirmation Order purports to justify or substantiate the amount of PPG's Trust Contribution or Corning's Trust Contribution for coverage purposes and nothing

86

therein is to be construed or interpreted as making a finding for purposes of coverage litigation.

The Plan does not bind any non-participating insurer, including Mt. McKinley, to settlements

made between the Asbestos PI Trust and asbestos claimants, nor does it require the objecting

insurers to pay claims that are resolved pursuant to the TDP.  Those issues, should they ever

arise, are preserved for coverage litigation.

283. This Court makes no finding or conclusion that any claim processed under the TDP

or paid by the Asbestos PI Trust is or is not a claim which requires an insurer to reimburse or pay

PPG or Corning, or for coverage litigation purposes.

### 5.    The Plan Does Not "Inflate" Liability

284. Mt. McKinley contends that TDP §5.1(a)(2) "extends and revives expired

limitations periods for otherwise time-barred claims."  Doc. No. 8984 at 45.  Section 5.1(a)(2),

however, addresses claimants who had timely asserted a claim prepetition against one or more

Asbestos Protected Parties, and with claimants whose ability to file claims postpetition had been

stayed.  Plan, Exhibit B (TDP) at §5.1(a)(2).[22]  Thus, Mt. McKinley's objection in this regard is

---

[22]Section 5.1(a) is titled "Effect of Statutes of Limitation and Repose" and provides:

> To be eligible for a place in the FIFO Processing Queue, (i) a Channeled Asbestos PI Trust Claim first filed in the tort system against any Asbestos Protected Party prior to the Petition Date must not be barred by the applicable federal, state and foreign statute of limitation and repose that was in effect at the time of the filing of the claim in the tort system, and (ii) a Channeled Asbestos PI Trust Claim that was not filed against any relevant Asbestos Protected Party in the tort system prior to the Petition Date must not be barred by the applicable federal, state and foreign statute of limitation that was in effect at the time of the filing with the Asbestos PI Trust.

> The running of the relevant statute of limitation shall be

(continued...)

87

without merit and overruled.

285. Mt. McKinley contends that the term "exposure to Unibestos" as defined in TDP

§5.3(a)(3)[23] is so broad that it could include products for which PPG or Corning has liability that

---

[22](...continued)

tolled for Channeled Asbestos PI Trust Claims as of the earliest of
(i) the actual filing of the claim against PCC or any PPG Entity or
any Corning Entity prior to the Petition Date, whether in the tort
system or by submission of the claim to PCC pursuant to an
administrative settlement agreement; (ii) the tolling of the claim
against PCC or any PPG Entity or any Corning Entity prior to the
Petition Date by an agreement or otherwise provided such tolling
was still in effect on the Petition Date; or (iii) the Petition Date.

If a Channeled Asbestos PI Trust Claim meets any of the
tolling provisions described in the preceding sentence and was not
barred by the applicable federal, state or foreign statute of
limitation at the time of the tolling event, it will be treated as
timely filed if it is actually filed with the Asbestos PI Trust within
three (3) years after the Initial Claims Filing Date.  In addition, any
holder of a Channeled Asbestos PI Trust Claim that was first
diagnosed after the Petition Date, irrespective of the application of
any relevant statute of limitation or repose, may file a claim with
the Asbestos PI Trust within three (3) years after the date of
diagnosis, or within three (3) years after the Effective Date,
whichever occurs later.  However, the processing of any
Channeled Asbestos PI Trust Claim by the Asbestos PI Trust may
be deferred at the election of the claimant pursuant to Section 6.3
below.

Section 6.3 provides a process for a claimant to withdraw a claim and file another
without affecting the status of the claim for statute of limitations purposes but the claim's place
in the FIFO Processing Queue will be based on the date of the filing of what is, in effect, an
amended claim.  A claimant can also request that the Trust defer consideration of the claim for a
maximum of three years without affecting the claim's status for statute of limitation purposes.
This in essence is a tolling provision.

[23]"The term 'exposure to Unibestos' means exposure to an asbestos-containing product
manufactured, marketed, sold or distributed by PCC under the 'Unibestos' or other label for
which PCC, any PPG Entity or any Corning Entity has direct or indirect liability; however, the
Asbestos PI Trust shall be free to contest whether a particular Unibestos product was in fact

(continued...)

cannot be channeled under §524(g). Doc. No. 8984 at 43. We disagree. "Exposure to

Unibestos" is a requirement for a Channeled Asbestos PI Trust Claim to be entitled to Expedited

Review. Plan, Exhibit B (TDP) at §5.7(b)(1) (second ¶). That section of the TDP also provides

that in order to qualify for payment under the TDP the claimant "must demonstrate a minimum

exposure to an asbestos-containing product for which the Asbestos PI Trust has liability" and

refers to §5.3(a)(3) (Disease Levels, Scheduled Values, and Medical/Exposure Criteria).

286. Therefore, Mt. McKinley has misinterpreted the term "exposure to Unibestos" as

used in the TDP. The definition expressly is limited to "an asbestos-containing product

manufactured, marketed, sold or distributed by PCC," whether under the "Unibestos" label or

another "label for which PCC, any PPG Entity or any Corning Entity" has liability. The

definition is expressly tied to the "conduct of, claims against, or demands on the debtor."

§524(g)(4)(A)(ii). Accordingly, regardless of the label used for the product, the product must

have been "manufactured, marketed, sold or distributed by" PCC in order to satisfy the definition

of "exposure to Unibestos" for purposes of Expedited Review and in addition must meet the

criteria set forth in §5.3(a)(3) of the TDP.

**6.    The TDP are Similar to Criteria Used by the Debtor to Settle Claims in the Tort System**

We credit the evidence, when cited, as to each of the following findings:

287. The TDP provide a mechanism for resolving all channeled Asbestos PI Trust claims

by determining (a) what can be settled and therefore paid and (b) what the settlement amount

will be. Plan, Exhibit B (TDP) at 1 (first paragraph).

---

[23](...continued)
manufactured, marketed, sold or distributed by PCC." Plan, Exhibit B, TDP §5.3(a)(3) at n. 3.

89

288. The primary purpose of the TDP is to distribute money fairly and equitably to all present claimants and future demand holders.  The TDP "is designed to "provide fair, equitable, and substantially similar treatment for all Channeled Asbestos PI Trust Claims."  Plan, Exhibit B (TDP) at §1.1.

289. The TDP operate by administratively resolving claims that satisfy enumerated medical and exposure criteria rather than litigating cases to closure in the tort system.  Plan, Exhibit B (TDP) at §2.2; *see also* Doc. No. 7823, Tr. 6/3/2010 at 118:22-24 (Fitzpatrick) ("If a claimant submits a claim that meets the disease requirements under this TDP, then that claimant will be offered a settlement offer").

290. The TDP's medical and exposure criteria are in keeping with the settlement criteria the Debtor applied when deciding whether to settle claims when it was a defendant in the tort system.  PM Tr. 5/3/2004 at 125:2-12, 20-21 (Ellis) ("equally as stringent, if not more stringent, than what we were finding in the tort system").

291. After the decision in *Simmons v. Pacor,* 674 A.2d 232 (Pa. 1996), limiting recovery for asymptomatic pleural thickening, and the adoption in some states of "tort reform" measures, the Debtor continued to settle with "unimpaired" claimants.  Tr. 6/3/2010 at 152:25-156:22 (Fitzpatrick).

292. After the *Pacor* decision, Mt. McKinley itself, in its capacity as an insurer of the Debtor, entered into a settlement with the Debtor to pay full policy limits, and reviewed the Debtor's files on claims settled and submitted to Mt. McKinley.  AM Tr. 5/4/2004 at 42:21-43:10 (Ellis); 3/10/2004 DEP. Tr. at 26:16-30:24, 31:20-34:25, 46:4-9 (Kenney).

293. Mt. McKinley contends that the TDP permit payment of claims with no evidence of pulmonary functional impairment (Disease Levels I and II).  However, the TDP require

90

diagnosis of certain diseases **and** exposure.[24]  Therefore, it is reasonable for the Plan to provide

for payment of such claims which meet the exposure and medical criteria set forth in the TDP

to avoid the risk of litigation over whether a particular jurisdiction's law limiting recovery

applies to a particular claim or whether the claim meets a particular jurisdiction's impairment

test.

Further, modest matrix-authorized payment of Disease Levels I and II claims that meet

the requisite exposure and medical criteria avoids the risk to the Trust that a claimant's level of

non-malignant disease may worsen to a more severe level of pleural thickening or asbestosis.

Plan, Exhibit B (TDP) at §5.3(a)(3).  A second claim may be asserted only when a claimant who

had a non-malignant disease later develops a malignant one.[25]

---

[24]Disease Levels I and II require:

> Asbestos/Pleural Disease (Level II): $5,500
> (1) *Diagnosis of a Bilateral Asbestos-Related Nonmalignant Disease, and* (2) six months *exposure* to Unibestos during July 31, 1962 - December 31, 1972, or to another asbestos-containing product manufactured, marketed, sold or distributed by PCC prior to December 31, 1982; and (3) five years cumulative occupational exposure to asbestos.

> Other Asbestos Disease (Level I - Cash Discount Payment): $400
> (1) *Diagnosis of a Bilateral Asbestos-Related Nonmalignant Disease or* an *asbestos-related malignancy* (other than mesothelioma)*, and* (2) *exposure* to Unibestos during the period July 31, 1962 - December 31, 1972, or to another asbestos containing-product manufactured, marketed, sold, or distributed by PCC prior to December 31, 1982.

[25]TDP §5.9, Second Disease (Malignancy) Claims, permits holders of Channeled Asbestos PI Trust Claims, including prepetition liquidated claims that involved a **non-malignan**t asbestos-related disease in Disease Levels I thorough IV to assert a new claim if the claimant develops a **malignant** disease (Disease Levels V through VIII).  The payments will not be reduced by any amount previously paid to the claimant as long as the malignant disease had not

(continued...)

294.  Mt. McKinley contends that the TDP definition of "Bilateral Asbestos-Related Nonmalignant Disease,"  TDP at n.4, might include some borderline cases that do not satisfy diagnostic criteria of the American Thoracic Society ("ATS") or otherwise might be attributable to causes other than asbestos (*see* Doc. No. 7902 at ¶¶ 105-121 and 144) and, therefore, the TDP criteria do not meet a minimum threshold.  Mt. McKinley's allegations that, because the TDP are too lax, the Court cannot find that the TDP are fair and equitable and must find that the TDP were not proposed in good faith, Doc. No. 8984, at 44, were addressed and rejected in our 2011 Opinion.  453 B.R. 605-10.[26]  We again overrule this objection.

295. We find that the provisions of TDP §5.7(a)(2) (Credibility of Medical Evidence) requires the Trust to have "reasonable confidence that the medical evidence provided in support of the claim is credible and consistent with recognized medical standards."  This section of the TDP requires that the Trust find that:

> medical evidence submitted comply with  recognized medical standards regarding equipment, testing methods and procedure to assure that such evidence is reliable. Medical evidence (i) that is of a kind shown to have been received in evidence by a state or federal judge at trial, (ii) that is consistent with evidence submitted to PCC, any PPG Entity or any Corning Entity to settle for

---

[25](...continued)
been diagnosed when the claimant was paid with respect to the original non-malignant disease claim.

[26]Mt. McKinley relied on the testimony of Dr. Joseph J. Renn III.  We credited then and do so now the testimony of Dr. Laura Welch finding that she had sufficiently supported the standards she employed in reaching her expert opinions.  We found that she specifically addressed each of Dr. Renn's criticisms of the TDP and based on the testimony and evidence we credited her conclusion that  Dr. Renn's opinion was inconsistent with the opinion of the American Thoracic Society.  We emphasize again, as we did in 2011, that "the purpose of the TDP . . . is to provide a mechanism for the processing and settlement of claims.  The TDP contains medically reasonable criteria for purposes of the settlement mechanisms the trust created in this bankruptcy must employ."  453 B.R. at 611.

payment similar disease cases prior to PCC's bankruptcy, or (iii) a diagnosis by a physician shown to have previously qualified as a medical expert with respect to the asbestos-related disease in question before a state or federal judge, is presumptively reliable, although the Asbestos PI Trust may seek to rebut the presumption.

296. Mt. McKinley also objects to the TDP criteria for mesothelioma, lung cancer, and other cancers asserting that they do not sufficiently exclude other potential causes of such cancers. *See* Doc No. 7902 at ¶¶ 91-99, 100-104, 124-131. Again, the sufficiency of the TDP criteria was addressed and approved in our 2011 Opinion and Mt. McKinley's objections on that score were overruled. There is nothing new to indicate that a different ruling should be made and we again make the same determination.

## 7.    The Expedited Review Criteria Set Forth in the TDP Are Medically Reasonable

297. The Plan Proponents' expert, Dr. Laura Welch, is an expert in the fields of internal medicine and occupational medicine and is well qualified to express opinions regarding the epidemiology of asbestos related diseases and the diagnosis of asbestos related diseases. Tr. 6/10/2010 at 30:23-25-31:1-2. The Court credits her testimony as we did in 2011. *See* 453 B.R. at 605 and n.44, 611.

298. Dr. Welch testified that the TDP are medically reasonable and are supported by the relevant science and medical literature. *See generally* Tr. 6/10/2010 at 33-62 (Welch) (testifying that the TDP are medically reasonable and that the following studies support the reasonableness of the TDP's criteria: Exhibit P-135 (Tossavainen, "Consensus Report: Asbestos, Asbestosis, and Cancer: The Helsinki Criteria for Diagnosis and Attribution" (1997)); Exhibit P-134 (American Thoracic Society, "Diagnosis and Initial Management of Nonmalignant Diseases Related to Asbestos" (Dec. 12, 2003)).

299. Dr. Welch testified that, although the TDP contain a presumption that a diagnosis of mesothelioma will be presumed to be malignant, the Trust may rebut the presumption, thereby allowing the Trust to distinguish benign from malignant mesothelioma. Tr. 6/10/2010 at 36:3-5; 36:21-37:2 (Welch); Plan, Exhibit B (TDP) at §5.7(a)(1), n.6.

300. Dr. Welch testified, and cited publications supporting her opinion, that asbestosis is not a prerequisite to diagnosing a lung cancer as asbestos-related. Tr. 6/10/2010 at 38:11-39:22; 41:3-19 (Welch); Exhibit P-135 (Consensus Report: Asbestos, Asbestosis, and Cancer: the Helsinki criteria for diagnosis and attribution); Exhibit P-136 (Douglas W. Henderson *et al.*, After Helsinki: A Multidisciplinary Review of the Relationship Between Asbestos Exposure and Lung Cancer, with Emphasis on Studies Published during 1997-2004, Pathology, 36(6):517-50) ("Helsinki"); Exhibit MMIC.-9 (Murray A. Finkelstein, Radiographic Asbestosis Is Not a Prerequisite for Asbestos-Associated Lung Cancer in Ontario Asbestos-Cement Workers, Am. J. of Industrial Medicine, 32:341-348); Exhibit MT. MCKINLEY-12 (A. Reid, *et al.*, The Effect of Asbestosis on Lung Cancer Risk Beyond the Dose-Related Effect of Asbestos Alone, Occupational Environmental Medicine 62:885-889).

301. Dr. Renn, Mt. McKinley's expert, questioned the reasonableness of the TDP's definition of "Non-Smoker" and whether the TDP adequately accounts for the role of smoking in lung cancer. Tr. 6/10/2010 at 46. We find that it does.

302. Dr. Welch, whose testimony we credit, testified that both asbestos and smoking increase the risk of lung cancer and both exposures together pose an even greater risk; the combination results in multiplication of effect. *Id*. at 46:15-22 (Welch); 47:7-13 (Welch).

303. Dr. Welch testified that there are

some good studies that demonstrate when people quit smoking,

94

their risk of lung cancer starts to go down and actually we have --
there's several papers in my book here that illustrate that and
there's some good graphs in those papers that show that it
continues to go down. So, the day you quit, it goes down a little
bit. When you're five years out, it's probably cut about in half and
when you're ten years out, it's down substantially more. The
question of what actual number of years you choose is a judgment.
And my opinion, looking at those papers, I think it's medically
reasonable because what the TDP is saying is that, the way I
understand  it, if someone is a non-smoker, they can come back
and ask for additional -- it primarily applies to -- I mean in the lung
cancer categories, they can come back and say, essentially that –
well, asbestos was a higher contributor to my lung cancer because
I never smoked or because I quit 12 years or more ago.  And,
based on the reduction in risk of lung cancer after you quit
smoking, it's apparent that the smoking contribution goes down
when people have quit. The TDP needs to choose a number and 12
is perfectly reasonable, based on that literature.

Tr. 6/10/2010 at 48:7-25 (Welch).

304. Dr. Welch testified, and cited publications supporting her opinion, that the TDP

definition of "Non-Smoker,"[27] used with respect to claims for lung cancer, is medically

reasonable.  *See* Tr. 6/10/2010 at 47:18-50:6; 52:10-53:16 (Welch).  Dr. Welch relied on

Exhibits P-408 and P-409 with respect to the decreased risk of lung cancer among non-smokers

and those who have not smoked in a certain number of years.  Exhibit P-408 (A. Crispo *et al.,*

The Cumulative Risk of Lung Cancer Among Current, Ex- and Never-Smokers in European

Men, British Journal of Cancer 91:1280); Exhibit P-409 (Nina S. Godtfredsen *et al.,* Effect of

Smoking Reduction on Lung Cancer Risk, JAMA 294(12):1505); Exhibit MT. MCKINLEY-19

(Kenji Wakai, *et al.,* Decrease in Risk of Lung Cancer Death in Males after Smoking Cessation

---

[27]"'Non-Smoker' means a claimant who either (a) never smoked or (b) has not smoked
during any portion of the twelve (12) years immediately prior to the diagnosis of the lung
cancer."  Plan, Exhibit B (TDP) at 16, n.5.

95

by Age at Quitting:  Findings from JACC Study, Jpn. J. Cancer Res. 92:821).[28]

305.  Dr. Welch also testified that the diagnostic and exposure criteria for nonmalignant asbestos-related disease in TDP Disease Levels I, II, III, and IV were medically reasonable.  *See* Tr. 6/10/2010 at 54:8-55:24 (regarding the American Thoracic Society 2004 position statements and guidelines with respect to the diagnosis and management of asbestosis, asbestos-related pleural disease).  *Id*. at 56:11-58:11, 58:16-61:5.  Dr. Welch testified concerning the requirements of the ATS with respect to diagnosing asbestosis, how asbestos contributes to obstructive lung disease and the fact that the ATS does not require a showing of functional impairment in order for a diagnosis of asbestosis or other non-malignant asbestos-related disease, to be made.  *Id*.  She also testified that the TDP focus on asbestosis, asbestos-related pleural plaque, and their restrictive effect on lung function.  *Id*.  She testified that it is medically appropriate for the TDP to combine asbestosis and pleural disease into the same category for Disease Levels I, II and III because the TDP is designed to compensate those with different levels of impairment.  *Id*. at 60:3-8.  She further testified that:

> The different categories focus on different levels of impairment and the pulmonary function criteria that are in the TDP focus on identifying restrictive lung disease.  So, if someone has restrictive lung disease, whether it's caused by asbestosis or asbestos related pleural plaque, it's appropriate to combine them.  It's an asbestos related disease causing restriction.
> So, if you separated them out, you'd have . . . more categories, but you'd have the same functional result because they're grouped by the degree of impairment . . . .

---

[28]Mt. McKinley's expert, Dr. Renn's testimony is consistent with Dr. Welch's opinion that one's chances of getting lung cancer decreased once one stops smoking.  Tr. 6/4/2010 at 52:14-5-53:1-3.  Dr. Renn agreed that the Helsinki criteria require "heavy" exposure to asbestos as sufficient to cause lung cancer, that for at least one lung cancer the TDP requires substantial occupational exposure to asbestos.  Tr. 6/4/2010 at 109.  We credit Dr. Welch's testimony and analysis.

*Id.* at 9-20.

306. Dr. Welch also testified that the ten year latency period set forth in the TDP was medically reasonable and that Helsinki (Exhibit P-135) recommends a minimum of ten years. Tr. 6/10/2010 at 61:10-62:13; Plan, Exhibit B (TDP) §5.7(a)(1) (providing for a period of at least ten years between the date of first exposure to asbestos/asbestos-containing products and diagnosis).

307. Dr. Welch testified that it is medically reasonable for Disease Level V of the TDP to provide compensation for claimants with colorectal, esophageal, pharyngeal, and stomach cancers (who also have evidence of bilateral asbestos-related nonmalignant disease and of exposure to Unibestos or other PCC product). Tr. 6/10/2010 at 115:4-124:20 (Welch). She reviewed the committee report of the Institute of Medicine ("IOM"), prepared at the request of Congress, on the relationship between asbestos and "other cancers," i.e., cancers other than lung and mesothelioma. Tr. 6/10/2010 at 116:12-13. Dr. Welch testified that although the IOM committee concluded that evidence is suggestive but not sufficient to infer a causal relationship between asbestos and certain cancers, Tr. 6/10/2010 at 118:10-11, 22-24; 119:3-5, it is proper to include those cancers in the TDP because the TDP has "substantial other requirements that someone with one of these other cancers has to meet to get compensation." Tr. 6/10/2010 at 120:3-6.

308. Dr. Welch testified that it is reasonable for the TDP to accept pre-Effective Date findings by a physician that a disease is "consistent with" or "compatible with" asbestosis, given that some physicians do use such terminology, although she herself would diagnosis asbestosis. Tr. 6/10/2010 at 137:4. Requiring claimants with existing medical records to obtain a new diagnosis to satisfy a more stringently worded standard could impose hardship. Tr. 6/10/2010 at

97

135:18-136:9, 137:5-6 (Welch).[29]

309. Dr. Welch is a credible and knowledgeable witness with extensive knowledge of the medical literature as it relates to asbestos diseases.  Her testimony on the TDP criteria is more persuasive on that topic than that of Dr. Renn.  The Court accepts her analysis and finds, as we did before, that the TDP Expedited Review criteria are medically reasonable.

## 8.    The Structural Features of the TDP are Reasonable and Appropriate

310. TDP §4.4, which provides that the Trustees, with the consent of the TAC and the FCR, may increase the "Payment Percentage" due to a material change in the estimates of the Asbestos PI Trust's future assets and/or liabilities, and, in such event, make supplemental payments to claimants who previously received payments from the Asbestos PI Trust based on a lower Payment Percentage, provides a reasonable accommodation of the interests of present claimants and future demand holders.  Plan, Exhibit B (TDP) at §4.4.

311.  Mt. McKinley objects that TDP §4.4 "requires multiple and additional payments to claimants who have already settled their claims against the Trust whenever there is an upward adjustment of the Payment Percentage."  Doc. No. 8984 at 45.  This objection misstates the purpose and effect of TDP §4.4, which exists because the Trust initially will pay only the "Payment Percentage" of 37 percent of the matrix scheduled amounts.  Plan, Exhibit B (TDP) §§2.3 and 4.4.  Because the Trust will pay less than the full scheduled or otherwise resolved

---

[29]"The way it's used in the TDP is reasonable, because it's used in the TDP for claims that were filed before the . . . effective date of the plan, and so . . . people are using existing medical records that couldn't have been asked to conform to the" TDP requirements.  Tr. 6/10/2010 at 135:24-25 - 136:1-3.  For example, if you do not accept a pre-Effective Date diagnosis that findings are "consistent with asbestosis" you could be asking a dead person to get an additional set of records and it is therefore reasonable to accept preexisting records even though there may be a higher standard for new claims.  Tr. 6/10/2010 at 4-9.  Note that this case has stayed all activity regarding asbestos claims and suits for over thirteen years.

amount of a claim at the outset of its distributions, it is appropriate for the TDP to supplement that partial payment with one or more additional payments, if and when the Trust's financial position and projected liabilities make it feasible to do so.

312. Furthermore, the TDP establishes a matrix of payments to be made to claimants who establish that they meet certain medical and exposure criteria. The payment percentage applies to that matrix amount and supplemental payments can be made until 100 percent of the matrix amounts are made to any claimant. Section 4.4 provides that if the Trustees determine that an increase in the payment percentage is in order "due to a material change in the estimates of the Asbestos PI Trust's future assets and/or liabilities," payment shall be made to those previously paid on a lower Payment Percentage.

Section 4.4 provides a formula for calculating those payments. The initial Payment Percentage will be calculated "on the assumption that the Average Values set forth in Section 5.3(c) below will be achieved with respect to existing and projected future Channeled Asbestos PI Trust Claims involving Disease Levels II–VIII." Plan, Exhibit B (TDP) §2.3.

The provision is fair and equitable to the asbestos claimants and future demand holders inasmuch as the Bankruptcy Code requires the TDP to pay similar claims in "substantially the same manner." *See* §524(g)(2)(B)(ii)(V); §1123(a)(4).

313. The Trustees have fiduciary duties to administer the Trust in accordance with the purposes set forth in §1.2 of the Asbestos PI Trust Agreement, including to resolve Channeled Asbestos PI Trust Claims in such a way that holders of such claims are treated fairly, equitably, and reasonably. The TAC and the FCR have their own fiduciary responsibilities. The parties anticipate that the Trust will operate for fifty or more years until all claims become known, filed and processed. Thus, §5.3 of the TDP enables changes to occur so as to comply with the dictates

99

of Congress.  We therefore approve:

- Section 5.3(a)(3) of the TDP which provides that for purposes of administering the Expedited Review Process, the Trustees, with the consent of the TAC and the FCR, may add to, change, or eliminate the Disease Levels, Scheduled Values, or Medical/Exposure Criteria; develop subcategories of Disease Levels, Scheduled Values, or Medical/Exposure Criteria; or determine that a novel or exceptional asbestos personal injury claim is compensable even though it does not meet the Medical/Exposure Criteria of the then-current Disease Levels.  Plan, Exhibit A (Trust Agreement) §§2.1 and 1.2, Exhibit B (TDP) §5.3(a)(3);[30] and

- The provision in §5.3 which allows the Trustees to develop "procedures for reviewing and liquidating all unliquidated Channeled Asbestos PI Trust Claims under the terms of this TDP, which shall also include deadlines for processing such claims," with the consent of the TAC and the FCR, and

- TDP §8.1 which allows the Trustees, with the consent of the TAC and FCR, to amend, modify, delete, or add to provisions of the TDP to the extent provided in §8.1. Plan, Exhibit B (TDP) §8.1;[31] and

---

[30]Section 2.1 of the Asbestos PI Trust Agreement provides that the "trustees shall have the power to take any and all actions that, in the judgment of the Trustees, are necessary or proper  to fulfill the purposes of the Asbestos PI Trust."  Section 1.2 of the TDP provides, *inter alia*, that "Except as may otherwise be provided below, nothing in this TDP shall be deemed to create a substantive right for any claimant."  *See* TDP §5.3(b)(1) (holder of channeled claim may elect to have claim individually reviewed for purposes of determining whether it would be compensable in the tort system even though the claim does not meet the presumptive  Medical and/or Exposure criteria).

[31]TDP §8.1 permits the Trustees to "amend, modify, delete, or add to any provisions of this TDP" with the consent of the TAC and the FCR.  This section further permits modifications which will "conform the TDP to advances in scientific or medical knowledge or other changes in circumstances."  The consent is obtained by the processes set forth in Asbestos PI Trust Agreement §§5.7(b) and 6.6(b).

The right to amend the Claims Payment Ratio, however, is governed by the restrictions in TDP §2.5 (regarding setting of the Claims Payment Ratio for Disease levels II-VIII that were

(continued...)

- TDP §5.8 which provides the Trust with necessary
discretion to develop methods for auditing information
provided for claims purposes, and to respond to evidence of
the submission of fraudulent information to the Trust.
Plan, Exhibit B (TDP) at §5.8.

314. The ability to make changes as claims are processed is reasonable.  One of the

purposes of a §524(g) channeling injunction is to ensure that future Demand holders are treated

similarly to present Claimants.  As claims are filed and paid and as medical science advances and

develops, it is crucial that some flexibility with respect to the provisions of the TDP be

preserved.  Furthermore, changes can only be made with the consent of the TAC and the FCR.[32]

315. Mt. McKinley's objection that TDP §5.4 (Categorizing Claims as Extraordinary

and/or Exigent) allows the Asbestos PI Trust "autonomy, with no judicial oversight and no

definitive criteria" to pay up to five times the Scheduled or Average Value "'in any case where

there is little likelihood of substantial recovery elsewhere,'" *see* Doc. No. 8984, Addendum 1 at

4, misstates the operation of §5.4 and is overruled.  By its terms, §5.4 is available only to

---

[31](...continued)
unliquidated on the Petition Date and providing that the Claims Payment Ratio does not apply to
Disease Level I claims) and the right to adjust the Payment Percentage is governed by TDP §4.2.
The TAC and FCR may propose amendments to the Trustees.  Such amendments are subject to
§7.3 of the Asbestos PI Trust Agreement regarding consultation, consent and requiring that
amendments be consistent with limitations on amendment of the Claims Payment Ratio is TDP
§2.5, the Payment Percentage as set forth in TDP §4.2, and the Plan, the PPG Trust Funding
Agreement and the Corning Trust Funding Agreement.  Section 7.3 also contains notice
provisions.

[32]One of Mt. McKinley's concerns is that there is no postconfirmation oversight by the
Court of the Trust operation.  However, §524(g) itself is designed so that perpetual oversight by
the Court is not required.  The court is responsible for determining whether the Plan is
confirmable; it is not charged with oversight of the Trust operations, the duration of which could
reach or exceed half a century.

claimants whose exposure to asbestos "(i) occurred predominantly as the result of working in a

manufacturing facility of PCC during a period in which PCC was manufacturing

asbestos-containing products at that facility, or (ii) was at least seventy-five percent (75%) the

result of exposure to an asbestos-containing product for which the Asbestos PI Trust has

liability," and who also establish that there is little likelihood of substantial recovery elsewhere.

Plan, Exhibit B (TDP) at §5.4.

316. TDP §5.7(a)(2) provides that litigation results between a claimant and another

defendant in the tort system will not preclude payment of a claimant who meets the TDP

requirements for payment of a Channeled Asbestos PI Trust Claim, while allowing consideration

of such evidence in an Individual Review proceeding or an Extraordinary Claim proceeding.

Plan, Exhibit B (TDP) at §5.7(a)(2).  Mt. McKinley objects that this and related provisions of the

TDP, such as §6.2, permit "double dipping."  We disagree.

317. The TDP Scheduled Values are intended to reflect the Debtor's prepetition

settlement history. *See Owens Corning v. Credit Suisse First Boston*, 322 B.R. 719, 722 (D.Del.

2005).  Section §6.1 provides that the proof of claim form "shall require the claimant to assert

the highest Disease Level for which the claim qualifies at the time of filing.  The proof of claim

form shall also include a certification by the claimant or his or her attorney sufficient to meet the

requirements of Rule 11(b)."  Section 5.3(a)(1) provides that those holding Channeled Asbestos

PI Trust Claims that do not meet the presumptive Medical/Exposure Criteria for the particular

disease Level and therefore cannot be liquidated through the Expedited Review process may

elect the Individual Review Process provided in §5.3(b).  Section 5.8, Claims Audit Program,

authorizes the Asbestos PI Trust to "penalize any claimant or claimant's attorney" if the Trust

finds that fraudulent information has been provided to the Trust.  These provisions work together

to prevent the "double dipping" alluded to by Mt. McKinley.  Therefore, this objection is overruled.

318.  TDP §2.2 provides that the Trust may offer a claimant who does not satisfy the presumptive Medical/Exposure Criteria for the relevant Disease Level an amount up to the Scheduled Value of that Disease Level if the Trust is satisfied that the claimant has presented a claim that would be cognizable and valid in the tort system.  *See* Plan, Exhibit A (Asbestos PI Trust Agreement) at §2.1 (Trustee powers and fiduciary duties) and §1.2 (Purpose); Plan, Exhibit B (TDP) at §2.2 (Claims Liquidation Procedures). Given the 13-year stay which has prevented asbestos victims from pursuing any claims, additional delays that will occur while appeals are resolved and the Trust is established and becomes operational, it cannot be gainsaid that without such a provision, some claimants who should be compensated will not be.  As Dr. Welch testified, claimants may have died while waiting for the outcome of this case and now lack the ability to obtain medical records in compliance with the TDP.  In the exercise of their fiduciary duties, the Trustees would be remiss if they failed to consider such claims based upon the provisions in §2.2 of the TDP.   The Medical and Exposure Criteria and review processes in the TDP coupled with the Trustees' fiduciary duties guard against payment of invalid claims.

319. TDP §7.2 requires the Trustees to give appropriate consideration to the costs of investigating and uncovering invalid claims, including the amount of transaction costs to be expended by the Asbestos PI Trust, so that valid Channeled Asbestos PI Trust Claims will not be unduly impaired by the costs of additional investigation.  *See* Plan, Exhibit B (TDP) at §7.2. Making this kind of cost-benefit analysis is entirely appropriate for the Trust as it is for any other entity charged with husbanding its assets for its beneficiaries.

### 9.    The Plan Was Proposed in Good Faith

320. Mt. McKinley's objections with respect to the foregoing as evidence of Plan

Proponents' or Plan Supporters' lack of good faith are overruled.[33]

321. Mt. McKinley asserts that it conducted a "preliminary comparison" of "the PCC

claims database" to the MDL Silica Claims database at issue in *In re Silica Products Liability*

*Litig.,* 398 F. Supp. 2d 563 (S.D.Tex 2005), and found "over 500 exact matches" and "more than

2,200 likely matches," from which Mt. McKinley infers that the putative overlapping claimants

have "fraudulent" asbestos claims.  Doc. No. 8984 at 35.[34]

322. Again, Mt. McKinley's assertions lack merit.  That a claimant's **silica** claim was

dismissed in *Silica Products Liability Litigation,* 398 F.Supp.2d 563 (S.D. Tex. 2005), does not

mean the claimant would not have an **asbestos** claim.[35]  The TDP address this situation.  TDP

§5.7(a)(2) requires that the Asbestos PI Trust have "reasonable confidence that the medical

evidence provided" in support of a claim is "credible and consistent with recognized medical

standards."  Further, a diagnosis by a physician "shown to have previously qualified as a medical

---

[33]We note that we previously overruled Mt. McKinley's good faith objections.  453 B.R. at 605.

[34]Even if we assume that 2,700 (or more) of the 359,298 ballots cast were fraudulent, that would not indicate lack of good faith by Plan Proponents and/or Plan Supporters.  (These are, after all, claims <u>against</u> the Debtor, not claims <u>by</u> the Debtor.)  Further, it would not cause the outcome of the balloting to fall below the §524(g) threshold and would not change the fiduciary duties of the Trustees to pay only those claims that meet the conditions in the TDP.

[35]*See, e.g., In re Global Indus. Technologies, Inc.*, 645 F.3d 201, 207, 208 (3d Cir. 2011)(noting that diagnoses of silica diseases was questionable when a claimant had been diagnosed with an asbestos-related disease; commenting that in the Silica Products case, the court "disparaged silica claims brought by people who had earlier been diagnosed with an asbestos-related disease or had filed an asbestos-related claim against an asbestos trust, noting that 'a golfer is more likely to hit a hole-in-one than an occupational medicine specialist is to find a single case of both silicosis and asbestosis'" and questioning the fact that one small diagnostic company had supposedly discovered 4,000 persons with both diseases by parking a van in some parking lots).

expert with respect to the asbestos-related disease in question before a state or federal judge, is

presumptively reliable" but the Asbestos PI Trust may seek to rebut that presumption.  TDP

§5.7(a)(2).  In addition, as noted above, the Asbestos PI Trust Agreement requires the Trustees

to obtain the consent of the TAC and the FCR in order to "develop methods for auditing the

reliability of medical evidence . . . as well as the reliability of evidence of exposure to asbestos,

including exposure to asbestos-containing products for which the Asbestos PI Trust has liability,

pursuant to" TDP §5.8 (Claims Audit Program).  Asbestos PI Trust Agreement §2.2(f)(xvi).

323. Mt. McKinley's assertion that the Plan was "not proposed in good faith because it

was proposed primarily for the benefit of  plaintiffs' attorneys and the Debtors' parents," Doc.

No. 8984 at 37, is without merit.  The Trust will be established to utilize the statutory framework

authorized by Congress in §524(g) to enable a company riddled with asbestos claims to resolve

those claims.  The Trust will be controlled by Trustees with fiduciary duties to Trust

beneficiaries who are entitled to payment, not to claimants who fail to prove entitlement to a

distribution.

## VIII.    11 U.S.C. §1129 ELEMENTS

324. The Plan designates classes of claims and interests.  Plan §3.2; Tr. 6/3/2010 at 72:2-

23, 72:8-11 (proffer); 11 U.S.C. §§1129(a)(1), 1123(a)(1).

325. The Plan specifies those claims that are not impaired.  Plan §§3.1, 3.2.1 (Class 1-A

and 1-B), 3.2.2, 3.2.3 (Class 3-A and 3-B), 3.2.4 (Class 4-B); Tr. 6/3/2010 at 72:24-73:7

(proffer); 11 U.S.C. §§1129(a)(1) and 1123(a)(2).

326. The Plan specifies the treatment of each class or claim or interest that is impaired.

Plan §§3.2.4 (Class 4-A), 3.2.5, 3.2.6; Tr. 6/3/2010 at 72:24-73:7 (proffer); 11 U.S.C.

§§1129(a)(1) and 1123(a)(3).

327. The Plan provides for the same treatment of each claim or interest of a particular class.  Plan §§3.2, 3.3, 3.4; Tr. 6/3/2010 at 73:6-7 (proffer); 11 U.S.C. §§1129(a)(1) and 1123(a)(4).

328. The Plan provides for adequate means of implementation.  Plan Article IV (Channeled Asbestos PI Trust Claims and the Asbestos Permanent Channeling Injunction); Article V (Executory Contracts and Unexpired Leases, including Compensation and Benefit Programs and Rejection Claims); Article IX (Implementation of the Plan); Tr. 6/3/2010 at 73:12-19 (proffer); 11 U.S.C. §§ 1129(a)(1) and 1123(a)(5).

329. The charter of the Reorganized Debtor provided for by the Plan prohibits the issuance of non-voting securities.  Plan §9.2.1 and  Exhibit C (Pittsburgh Corning Amended and Restated Articles of Incorporation), Article IV; Tr. 6/3/2010 at 73:20-22 (proffer); 11 U.S.C. §§1129(a)(1) and 1123(a)(6).

330. The Plan provides methods for selecting officers and directors that are consistent with the interests of creditors and with public policy.  Plan, Exhibit C (Pittsburgh Corning Corporation Amended and Restated Articles of Incorporation), Articles VI and VII, Exhibit D (Pittsburgh Corning Amended and Restated Bylaws) at §2.01; Tr. 6/3/2010 at 73:23-74:2 (proffer); 11 U.S.C. §§1129(a)(1) and 1123(a)(7).

331. Each class of claims under the Plan includes only substantially similar claims.  Plan §3.2; Tr. 6/3/2010 at 72:11-17 (proffer); 11 U.S.C. §§1129(a)(1) and 1122(a).

332. The disclosure statement contained adequate information, Doc. No. 6426, and the solicitation of votes was conducted in accordance with procedures approved by the Court.  *See* Order of Court dated July 1, 2009, Doc. No. 6740; Second Amended Order Approving (I) the Contents and Service of the Solicitation Package for the Modified Third Amended Plan of

Reorganization for Pittsburgh Corning Corporation, (II) the Procedures for Voting and

Tabulation of Ballots, (III) the Forms of Ballots, (IV) the Procedure for Allowance of Claims for

Voting Purposes, and (V) the Forms of Directives relating to Noticing and Voting Channeled

Asbestos PI Trust Claims, Doc. No. 6814; Proof of Publication of Advertising of Notice of

Voting Rights and Confirmation Hearing, dated February 5, 2010, Doc. No. 7468; Exhibit P-119,

Declaration of Kathleen Logan, Doc. No. 7478; Tr. 6/3/2010 at 74:8-17 (proffer); 11 U.S.C.

§§1129(a)(2), 1125, 1126.

333. The Debtor and the other Plan Proponents proposed the Plan to provide a

mechanism for the orderly resolution of pending asbestos-related Claims and potential future

asbestos-related Demands against the Debtor while preserving the Debtor's business as a viable

enterprise. *See* Plan, Exhibit A (Asbestos PI Trust Agreement), Exhibit B (TDP).

334. In consideration of all the foregoing, the Court finds that the Plan has been proposed

in good faith and not by any means forbidden by law. Tr. 6/3/2010 at 75:3-24 (proffer), 106:9-

115:7 (Fitzpatrick); 11 U.S.C. §1129(a)(3).

335. All payments made or to be made by the Plan Proponents, including the Debtor, for

services or for costs and expenses in connection with the Chapter 11 Case or in connection with

the Plan have been approved by or are subject to approval by the Court. Tr. 6/3/2010 at

75:17-19 (proffer); Plan §§2.1(c), 10.7; 11 U.S.C. §1129(a)(4).

336. The identity of the individuals proposed to serve, after confirmation of the Plan, as

officers or directors of the Reorganized Debtor has been disclosed, and the appointment to, or

continuance in, such offices of such individuals, is consistent with the interests of creditors,

equity security holders, and public policy. Plan §§8.1.42, 9.2.3; Tr. 6/3/2010 at 75:20-24

(proffer); 11 U.S.C. §1129(a)(5)(A).

337. The Plan Proponents have disclosed the identity of all insiders who will be employed or retained by the Reorganized Debtor, and the compensation of such insiders. Plan §9.2.4; Tr. 6/3/2010 at 75:20-24 (proffer).

338. Each holder of a Class 4-A or Class 5 Claim who or that has not accepted the Plan will receive or retain under the Plan on account of such claim property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain if the Debtor were liquidated under Chapter 7. Tr. 6/3/2010 at 76:2-9 (proffer), 111:8-113:7 (Fitzpatrick); 11 U.S.C. §1129(a)(7)(ii).

339. The Plan has been accepted by every class of impaired claims. Exhibit P-119, Doc. No. 7478 (Declaration of Kathleen Logan); Tr. 6/3/2010 at 76:9-13 (proffer); 11 U.S.C. §§1129(a)(8) and 1129(a)(10).

340. The Equity Interest holders have not opposed their treatment under the Plan. Tr. 6/3/2010 at 74:18-21, 76:21-23 (proffer); 11 U.S.C. §1129(a)(7)(i).

341. Equity Interest holders would receive nothing if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code. Doc. No. 2065 at Exhibit 3 (Liquidation Analysis); Tr. 6/3/2010 at 76:2-8 (proffer); 11 U.S.C. §1129(a)(7)(ii).

342. The Plan does not discriminate unfairly, and is fair and equitable to Equity Interest holders. Tr. 6/3/2010 at 74:18-21, 76:12-13 (proffer); 11 U.S.C. §§1129(a)(8) and 1129(b)(1).

343. The Plan is sufficiently funded to pay all administrative and priority claims, and all priority claims will be treated as well or better than required by §1129(a)(9) of the Bankruptcy Code. Plan §§2.1, 3.2.1; Tr. 6/3/2010 at 76:14-17 (proffer).

344. Confirmation of the Plan is not likely to be followed by liquidation or the need for further financial reorganization. Tr. 6/3/2010 at 76:24-77:5 (proffer). 11 U.S.C. §1129(a)(11).

108

345. The Plan provides for payment of all fees payable under §1930 of Title 28.  Plan §11.1; Tr. 6/3/2010 at 77:9-10 (proffer); 11 U.S.C. §1129(a)(12).

346. The Plan provides for the continuation of payment for all retiree benefits.  Plan §§3.2.3, 5.2; Tr. 6/3/2010 at 77:11-12 (proffer); 11 U.S.C. §1129(a)(13).

## IX.    11 U.S.C. §524(g) ELEMENTS

347. At the time of the order for relief with respect to the Debtor, the Debtor had been named as a defendant in personal injury, wrongful death, and/or property damage actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products.  PM Tr. 5/3/2004 at 68:11-16, 94:20-23, 110:16-21 (Ellis); 11 U.S.C. §524(g)(2)(B)(i)(I); Plan §8.1.1.

348. The Asbestos PI Trust, as of the Effective Date, will assume the liabilities of the Debtor and the Asbestos Protected Parties with respect to the Channeled Asbestos PI Trust Claims.  Tr. 6/3/2010 at 77:16-20 (proffer); Plan, Article IV; Plan §9.1.6; Plan, Exhibit A (Asbestos PI Trust Agreement) §§1.2 and 1.4(b).

349. The Asbestos PI Trust will be funded, in part, by 100 percent of the securities of Reorganized PCC and by the obligation of Reorganized PCC to make future payments, including dividends.  Tr. 6/3/2010 at 77:20-25 (proffer), 113:8-21 (Fitzpatrick); Tr. 5/5/2004 at 152:15-22 (Fitzpatrick); Plan §9.1.3; 11 U.S.C. §524(g)(2)(B)(i)(II).

350. In addition, upon the occurrence of the Funding Effective Date and the satisfaction of the respective terms and conditions of the PPG Trust Funding Agreement and the Corning Trust Funding Agreement, the Asbestos PI Trust will be entitled to receive the PPG Trust Contribution, the Corning Trust Contribution, and the transfer of insurance rights and proceeds by Pittsburgh Corning.  Plan §9.1.3.

109

351. The Asbestos PI Trust is to own a majority of the voting shares of Reorganized

PCC.  Plan §8.1.5; 11 U.S.C. §524(g)(2)(B)(i)(III)(aa).

352. One hundred percent of Reorganized PCC Common Stock will be issued to the

Asbestos PI Trust.  Plan §9.1.3.

353. Thus, the Asbestos PI Trust is to be funded by transfer of insurance proceeds and

insurance rights by the Debtor, by securities of Reorganized PCC, and by Dividend Payments to

be made by the Debtor in the future, as well as by the PPG Trust Contribution and the Corning

Trust Contribution.  Plan §8.1.6.

354. The Asbestos PI Trust is to use its assets and income to pay asbestos-related Claims

and Demands in accordance with the Asbestos PI Trust Distribution Procedures.  Tr.6/3/2010 at

77:23-78:1 (proffer); Plan, Exhibit A (Asbestos PI Trust Agreement) §1.2, Exhibit B (TDP);

Plan §8.1.7.

355. Each of PPG and Corning has been named in a substantial number of lawsuits

alleging that, with respect to asbestos, it was, *inter alia*, engaged in a civil conspiracy or joint

enterprise with, or otherwise aided and abetted, the Debtor.  PM Tr. 5/3/2004 at 88:23-89:23,

96:13-97:21, 98:4-8 (Ellis); AM Tr. 5/4/2004 at 108:5-16 (Ellis); PM Tr. 5/4/2004 at 12:18-13:1,

16:16-17:19, 73:14-74:4 (Eggers); Tr. 5/5/2004 at 24:13-25:15 (Seymour), 98:17-99:24,

101:6-23 (Diggs); Exhibits P-7, P-8, P-9, P-14, P-15, P-16, P-18, P-27, P-28, P-53, P-54, P-120,

P-121, P-122, P-123, P-124, P-125, P-126, P-127; Plan §8.1.8.

356. The Debtor is likely to be subject to substantial Demands for payment arising out of

the same or similar conduct or events that gave rise to the Channeled Asbestos PI Trust Claims

that are addressed by the Asbestos Permanent Channeling Injunction.  PM Tr. 5/3/2004 at

131:4-15 (Ellis); Tr. 5/5/2004 at 147:14-19 (Fitzpatrick); Tr. 6/3/2010 at 78:2-3 (proffer); 11

U.S.C. §524(g)(2)(B)(ii)(I); Plan §8.1.9.

357. The actual amounts, numbers, and timing of the Demands cannot be determined. PM Tr. 5/3/2004 at 131:16-19 (Ellis); Tr. 5/5/2004 at 175:5-25 (Fitzpatrick); Tr. 5/6/2004 at 27:17-28:5 (Fitzpatrick); Tr. 6/3/2010 at 78:4-5 (proffer), 133:24-134:4, 135:10-14 (Fitzpatrick). 11 U.S.C. §524(g)(2)(B)(ii)(II); Plan §8.1.10.

358. The Debtor is likely to be subject to substantial Demands for payment arising out of the same or similar conduct or events that gave rise to the Channeled Asbestos PI Trust Claims that are addressed by the Asbestos Permanent Channeling Injunction.  PM tr. 5/3/2004 at 131:4-15 (Ellis); Tr. 5/5/2004 at 147:14-19 (Fitzpatrick); Tr. 6/3/2010 at 78:2-3 (proffer); 11 U.S.C. §524(g)(2)(B)(ii)(I); Plan §8.1.9.

359. The actual amounts, numbers, and timing of the Demands cannot be determined. PM Tr. 5/3/2004 at 131:16-19 (Ellis); Tr. 5/5/2004 at 175:5-25 (Fitzpatrick); Tr. 5/6/2004 TR. 27:17-28:5 (Fitzpatrick); Tr. 6/3/2010 at 78:4-5 (proffer), 133:24-134:4, 135:10-14 (Fitzpatrick); 11 U.S.C. §524(g)(2)(B)(ii)(II); Plan §8.1.10.

360. Pursuit of asbestos Claims, and the future Demands referred to in ¶ 348, outside the procedures prescribed by the Plan is likely to threaten the Plan's purpose to deal equitably with Claims and Demands.  PM Tr. 5/3/2004131:24-132:18 (Ellis); Tr. 6/3/2010 at 78:6-13 (proffer). 11 U.S.C. §524(g)(2)(B)(ii)(III); Plan §8.1.1.

361. The terms of the injunction proposed to be issued under 11 U.S.C. §524(g)(1)(A), including provisions barring asbestos actions against third parties, are set out in the Disclosure Statement and the Plan.  Doc. No. 6426 at 1-3, 16-18, 26-28, 61-64, 79-80, Plan Article IV (providing for Asbestos Permanent Channeling Injunction), §1.1 (definitions of "Asbestos Permanent Channeling Injunction," "Channeled Asbestos PI Trust Claim," "Asbestos PI Trust

111

Claims," "Asbestos Personal Injury Claim," "Indirect Asbestos Claim," and "Asbestos Protected

Party"); 11 U.S.C. §524(g)(2)(B)(ii)(IV)(aa).

362. The Plan establishes, in Class 5, a class of persons whose Claims are to be addressed

by the Asbestos PI Trust, and Class 5 voted to approve the Plan in accordance with the

requirements of the Bankruptcy Code and applicable case law.  Plan §3.2.5; Plan §8.1.2; 11

U.S.C. 524(g)(2)(B)(ii)(IV)(bb).  The Plan was approved, by 99.49 percent in number and 98.96

percent in value, of the Class 5 claimants.  Exhibit P-119 (Declaration of Kathleen M. Logan);

11 U.S.C. §524(g)(2)(B)(ii)(IV)(bb).

363. The Asbestos PI Trust will operate through mechanisms such as structured, periodic,

or supplemental payments, pro rata distributions, matrices, or periodic review of estimates of the

numbers and values of present Claims and Demands, or other comparable mechanisms, that

provide reasonable assurance that the Asbestos PI Trust will value, and be in a financial position

to pay, present Claims and future Demands that involve similar claims in the same manner.  Tr.

6/3/2010 at 101:19-102:2 (Fitzpatrick); Tr. 6/3/2010 at 78:17-20 (proffer); Plan, Exhibit A

(Asbestos PI Trust Agreement) §1.2; Exhibit B (TDP) §§2.3, 2.5, 4.2, 4.4, 5.3(a)(3).  11 U.S.C.

§524(g)(2)(B)(ii)(V); Plan §8.1.12.

364. The Future Claimants' Representative was appointed as part of the proceedings

leading to issuance of the Asbestos Permanent Channeling Injunction as the legal representative

of persons who may have channeled Asbestos Personal Injury Claims against the Asbestos

Protected Parties in the future, in compliance with §524(g)(4)(B)(i).

365. The Asbestos Permanent Channeling Injunction applies to actions against "Asbestos

Protected Parties," a term that includes "third parties;" i.e., persons who are not the Debtor or the

Reorganized Debtor and who are identified in the Plan.  Plan §1.1 (definitions of "Asbestos

Permanent Channeling Injunction," "Channeled Asbestos PI Trust Claim," and "Asbestos

Protected Party").

366. The "PCC-Affiliated Parties" included in the definition of "Asbestos Protected

Party" are identifiable by reason of being part of an identifiable group of officers, directors, or

similar representatives of the Debtor.  Plan §1.1 (definitions of "Asbestos Protected Party" and

"PCC-Affiliated Parties"); 11 U.S.C. §524(g)(4)(A)(ii).

367. The "PPG Entities" included in the definition of "Asbestos Protected Party" are

identifiable as (i) PPG Industries, Inc.; (ii) the "PPG Policyholder Companies" listed in the

definition of "PPG Policyholder Companies;" and (iii) the Entities identified on Table 1 of

Exhibit L to the Plan, and do not include the Debtor or Corning.  Plan §1.1 (definitions of

"Asbestos Protected Party," "PPG Entities," and "PPG Policyholder Companies" and Exhibit L

to the Plan (schedule)); 11 U.S.C. §524(g)(4)(A)(ii).  Note, however, pursuant to the Technical

Amendments at Doc. No. 9402, "When PPG Entities is used in part (b) of the definition of

Asbestos Protected Party, Table 3 of Exhibit L hereto shall be substituted in place of Table 1 of

Exhibit L hereto."  Thus, for purposes of the Asbestos Permanent Channeling Injunction, the

PPG Entities on Table 3 of Exhibit L are those to whom that injunction will apply.

368. The "PPG Affiliates" included in the definition of "Asbestos Protected Party" are

identifiable as the Entities identified on Table 2 of Exhibit L to the Plan, and the successors of

any of them in their capacity as such, and do not include the Debtor or Corning.  Plan §1.1

(definitions of "Asbestos Protected Party" and "PPG Affiliate" and Exhibit L to Plan.  11 U.S.C.

§524(g)(4)(A)(ii).  Note, however, pursuant to the Technical Amendments at Doc. No. 9402,

"When PPG Affiliates is used in part (b) of the definition of Asbestos Protected Party, Table 4 of

Exhibit L hereto shall be substituted in place of Table 2 of Exhibit L hereto."  Thus, for purposes

113

of the Asbestos Permanent Channeling Injunction, the PPG Affiliates on Table 4 of Exhibit L are

those to whom that injunction will apply.

369. The "PPG-Affiliated Parties" included in the definition of "Asbestos Protected

Party" are identifiable as part of an identifiable group of officers, directors, or similar

representatives of the PPG Entities.  Plan §1.1 (definitions of "Asbestos Protected Party" and

"PPG-Affiliated Parties").  11 U.S.C. §524(g)(4)(A)(ii).

370. The "PPG Participating Insurer Entities" included in the definition of "Asbestos

Protected Party" are identifiable as the "PPG Participating Insurers" (as identified as the

"Participating Insurers" in §I.PP of the PPG Trust Funding Agreement solely in their capacity as

an insurer of any PPG Entities, and their respective  officers, directors, or similar representatives.

The "Participating Insurers" are, in turn, identifiable by references to the definitions of (i)

"Travelers Companies" set forth in §I.NNN of the PPG Trust Funding Agreement, (ii) "Hartford

Companies" set forth in §I.AA of the PPG Trust Funding Agreement, (iii) "Participating Other

Primary Insurers" defined in §I.RR (by reference to "Column 1" on Schedule C of the PPG Trust

Funding Agreement) of the PPG Trust Funding Agreement, and (iv) "Participating Excess

Insurers" defined in §I.LL (by reference to "Column 1" on Schedule B of the PPG Trust Funding

Agreement as updated at Doc. No. 9402) of the PPG Trust Funding Agreement.   Plan §1.1

(definitions of "Asbestos Protected Party," "PPG Participating Insurer Entities," and "PPG

Participating Insurers" and Exhibit F (PPG Trust Funding Agreement) (definitions and

Schedules B and C thereto); 11 U.S.C. §524(g)(4)(A)(ii).

371. The "PPG Non-Participating Insurer Entities" included in the definition of

"Asbestos Protected Party" are identifiable as the "PPG Non-Participating Insurers" (as

identified in "Column 1" of Schedule E to the PPG Trust Funding Agreement), solely in their

capacity as an insurer of any PPG Entities, and their respective officers, directors, or similar

representatives.  Plan §1.1 (definitions of "Asbestos Protected Party," "PPG Non- Participating

Insurer Entities," and "PPG Non-Participating Insurers" and  Exhibit F (PPG Trust Funding

Agreement)); 11 U.S.C. §524(g)(4)(A)(ii).

372. The "Corning Entities" included in the definition of "Asbestos Protected Party" are

identifiable as (i) Corning Incorporated f/k/a Corning Glass Works; (ii) the "Corning

Policyholder Companies" identified on Schedule C to the Corning Trust Funding Agreement;

and (iii) the Entities identified on Table 1 of Exhibit K to the Plan and the successors of any of

them in their capacity as such, and do not include the Debtor or PPG.  Plan §1.1 (definitions of

"Asbestos Protected Party," "Corning Entities," and "Corning Policyholder Companies"; Exhibit

I to Plan (Corning Trust Funding Agreement), Schedule C thereto; Exhibit K to the Plan as

substituted in Doc. No. 9402, in lieu of the original Exhibit K; 11 U.S.C. §524(g)(4)(A)(ii).

373. The "Corning Affiliates" included in the definition of "Asbestos Protected Party"

are identifiable as the Entities identified on Table 2 of Exhibit K to the Plan and the successors

of any of them in their capacity as such, and do not include the Debtor or PPG.  *See* Exhibit

P-112 (Plan), §1.1 (definitions of "Asbestos Protected Party" and "Corning Affiliates"); Exhibit

K to the Plan. as substituted in Doc. No. 9402, in lieu of the original Exhibit K; 11 U.S.C.

§524(g)(4)(A)(ii).

374. The "Corning-Affiliated Parties" included in the definition of "Asbestos Protected

Party" are identifiable by reason of being part of an identifiable group of officers, directors, or

similar representatives of the Corning Entities.  Plan §1.1 (definitions of "Asbestos Protected

Party" and "Corning-Affiliated Parties"); 11 U.S.C. §524(g)(4)(A)(ii).

375. The "Corning Insurers" included in the definition of "Asbestos Protected Party" are

identifiable as the insurers identified in column "1" on schedule B to the Corning Trust Funding

Agreement, and the successors of any of them, solely in their capacity as insurers of the Corning

entities, the Corning Affiliates, and/or the Corning-Affiliated Parties.  Plan §1.1 (definitions of

"Asbestos Protected Party" and "Corning Insurers"); Plan, Exhibit I (Corning Trust Funding

Agreement); 11 U.S.C. §524(g)(4)(A)(ii).

376. The "PCC Settled Insurer Entities" included in the definition of "Asbestos Protected

Party" are identifiable as the "PCC Settled Insurers" (insurers that are party to a PCC Insurance

Settlement Agreement, solely in their capacity as such).  *See* definition of "PCC Settled

Insurers."  (Exhibit N to the Plan identifies the PCC Insurance Settlement Agreements.)  *See also*

definition of Asbestos Protected Party at subpart (f) (includes "PCC Settled Insurer Entities, in

their capacity as such and/or as issuers of the PCC Settled Insurance Policies"); 11 U.S.C.

§524(g)(4)(A)(ii).

377. The PCC Settled Insurer Entities are alleged to be directly or indirectly liable for the

conduct of, claims against, or demands on the Debtor by reason of the PCC Settled Insurers'

provision of insurance to the Debtor.  *See* Exhibits P-120 ¶ 9 and  attachment B, ¶¶ 27, 34,

46-53; P-121 (same); P-122 (same); P-123 ¶ 9 and attachment B, ¶¶ 29, 36, 48-55; P-124 (same

references as P-120); P-125 (same); P-126 (same); P-127 (same); Plan §8.1.44.

378. Claims against PPG and Corning and their respective Affiliates and related entities

arising from alleged exposure to Unibestos or other asbestos or asbestos-containing products

manufactured, sold, or distributed by the Debtor, or to asbestos on or emanating from any of the

Debtor's premises, or based on "conspiracy theories" include claims alleging that such parties

are liable, directly or indirectly, for the conduct of, claims against, or demands on the Debtor,

arising by reason of such parties' (i) ownership of a financial interest in the Debtor; (ii)

116

involvement in the management of the debtor or service as an officer, director, or employee of

the Debtor; (iii) provision of insurance to the Debtor or a related party; or (iv) involvement in a

transaction or transactions affecting the financial condition of the Debtor or a related party.  PM

Tr. 5/3/2004 at 88:23-89:23, 96:13-21, 98:4-8 (Ellis); AM Tr. 5/4/2004 at 108:5-16 (Ellis); PM

Tr. 5/4/2004 at 12:18-13:1, 16:10-17:19, 73:14-74:4 (Eggers); Tr. 5/5/2004 at 22:20-26:15,

27:5-29:20; 31:4-16 (Seymour); 98:6-103:13 (Diggs); Exhibits P-5, P-6, P-7, P-8, P-9, P-10,

P-11, P-12, P-13, P-14, P-15, P-16, P-18, P-27, P-28, P-53, P-54, P-120, P-121, P-122, P-123,

P-124, P-125, P-126.  *See also* Tr. 5/5/2004 at 26:16-27:4, 31:18-32:9 (Seymour), 101:24-102:7,

103:6-13 (Diggs); Exhibit P-15, ¶ 39 (identifying PPG as a defendant); ¶ 72 (asserting general

products liability allegations against all asbestos defendants), ¶¶ 106-113 (asserting allegations

relating to relationship with Pittsburgh Corning); Exhibit P-15, ¶ 39 (identifying PPG as a

"products defendant"), ¶ 72 (asserting joint and several products liability claims) and ¶ 88

(asserting conspiracy claim); ¶¶ 106-113 (asserting specific allegations relating to Pittsburgh

Corning); Exhibit P-53 ¶ 8(bc) (alleging PPG's manufacture and sale of Unibestos through

Pittsburgh Corning and PPG's sale of Pyrocal), ¶ 14 (asserting existence of conspiracy) ¶¶ 16,

18-19 (asserting joint and several products liability claims against defendants); Exhibit P-54 ¶¶

10-11 (asserting manufacture, distribution or sale of asbestos-containing products), ¶¶ 12-16

(asserting joint and several products liability claim); ¶¶ 58-73 (asserting specific allegations

involving PPG and Pittsburgh Corning), and ¶¶ 75-83 (asserting conspiracy, concert of action,

and common enterprise claim among all defendants); PM Tr. 5/4/2004 at 32:6-34:1 (Eggers);

Exhibit P-53 ¶ 8(aa) (alleging Corhart's manufacture and sale of asbestos-containing products or

products designed to contain asbestos), ¶ 14 (asserting existence of conspiracy) ¶¶ 16, 18-19

(asserting manufacture, distribution or sale of asbestos-containing products), ¶¶ 12-16 (asserting

117

joint and several products liability claim), and ¶¶ 75-83 (asserting conspiracy, concert of action, and common enterprise claim among all defendants); 11 U.S.C. §524(g)(4)(A)(ii)(I-IV).

379.  The PCC Settled Insurer Entities, the PPG Participating Insurer Entities, the PPG Non-Participating Insurer Entities, and the Corning Protected Insurers are alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the Debtor by reason of their provision or alleged provision of insurance to the Debtor, PPG and/or Corning.  *See* Exhibits P-120 ¶ 9 & attachment B, ¶¶ 27, 34, 46-53; P-121 (same); P-122 (same); P-123 ¶ 9 and attachment B, ¶¶ 29, 36, 48-55; P-124 (same references as P-120); P-125 (same); P-126 (same); P-127 (same).

380. The Plan provides for the Debtor, PPG, Corning, and the PPG Participating Insurers to contribute in the aggregate approximately $3.1 billion dollars in cash, PPG stock with a recent market price of approximately $182,958,000, and the Pittsburgh Corning and Pittsburgh Corning Europe stock to resolve Channeled Asbestos PI Trust Claims.  Plan §9.1.3 and Exhibit F (PPG Trust Funding Agreement) at 10-11 and Schedule A (first line) and §III.B & Schedule A; Exhibit I (Corning Trust Funding Agreement) §III.A.

381. Without including its disputed claims to coverage under the Post-7/1/81 PPG Policies and the Corning Affiliate Policies, the Debtor alone would be able to fund a plan of reorganization only with approximately $350 million to $400 million.  PM Tr. 5/3/2004 at 119:22-120:8; Doc. No. 6426, Disclosure Statement, at 106 (approximately $293 million in insurance).

382. A Debtor-only plan would result in a significantly reduced payout to those people asserting Asbestos PI Trust Claims against the Debtor.

383. As set forth above, the Debtor, PPG, and Corning have, or have given notice of,

118

competing claims to shared or allegedly shared insurance, specifically the PPG Excess Policies and the Corning Affiliate Policies.

384. The Plan resolves these competing claims to insurance through execution of the Insurance Claims Agreement.  *See* Plan, Exhibit M (Insurance Claims Agreement).

385. Absent the Plan, the insurance assets potentially available to the Debtor could be depleted by the asbestos claims tendered by PPG and Corning against the same insurance policies.  PM Tr. 5/3/2004 at 73:14-23, 75:3-19, 76:8-78:7 (Ellis); Tr. 5/5/2004 at 40:19-54:21, 55:5-58:1 (Seymour); PM Tr. 5/4/2004 at 35:3-36:23, 37:6-38:6, 53:10-13 (Eggers); Exhibits P-20, P-21, P-40, P-57A, P-57B, P-57C, and P-141.

386. PPG and Corning each have filed a proof of claim in this case against the Debtor for contribution and indemnity with respect to asbestos personal injury claims.

387. The Plan provides a mechanism to resolve all Channeled Asbestos PI Trust Claims. Plan, Exhibit A (Asbestos PI Trust Agreement), Exhibit B (TDP). Plan §8.1.36.

388. Pursuant to the Asbestos Permanent Channeling Injunction, the sole and exclusive remedy of holders of Channeled Asbestos PI Trust Claims shall be against the Asbestos PI Trust as set forth in the Plan.  Plan Article IV; Plan §8.1.40.

389. The identification of each Asbestos Protected Party in the Asbestos Permanent Channeling Injunction is fair and equitable with respect to Entities that might subsequently assert Demands against each such Asbestos Protected Party, in light of the benefits provided, or to be provided, to the Asbestos PI Trust by or on behalf of any such Asbestos Protected Party.  Plan §8.1.14; 11 U.S.C. §524(g)(4)(B)(ii).

390. In view of the substantial contributions to the Asbestos PI Trust being made by or on behalf of the Asbestos Protected Parties, it is reasonable and fair for the Plan to provide that

those who accept payment from the Asbestos PI Trust will be deemed to have granted the release

set forth in §11.8 of the Plan.  Plan §8.1.37.

**CONCLUSIONS OF LAW RELATING TO THE CONFIRMATION OF THE
MODIFIED THIRD AMENDED PLAN OF REORGANIZATION AS MODIFIED
THROUGH MAY 15, 2013**

I.      **JURISDICTION AND VENUE**

401. The Court has jurisdiction over this Chapter 11 Case and to confirm the Plan

pursuant to 28 U.S.C. §§1334 and 157.

402. Venue of the Chapter 11 Case in this district was proper as of the Petition Date and

continues to be proper under 28 U.S.C. §§1408 and 1409.

403. The Asbestos Permanent Channeling Injunction is authorized as to the Debtor and

all parties as to which it issues by §524(g).

II.     **THE PLAN SATISFIES THE BANKRUPTCY CODE**

A.      **Section 1129(a)(1)**

404. Section 1129(a)(1) of the Bankruptcy Code requires that the Plan comply with the

applicable provisions of the Bankruptcy Code.  In this case, the Plan complies with all applicable

provisions of the Bankruptcy Code.  In addition, and as required pursuant to Bankruptcy Rule

3016(c), the Plan identifies the Debtor, the ACC, and the FCR as the Plan Proponents and

conspicuously identifies both the acts to be enjoined pursuant to the Asbestos Permanent

Channeling Injunction and the entities that are subject to the injunction.

405. Compliance with §§1122 and 1123 is also necessary for the Court to conclude that

the Plan complies with §1129(a)(l) of the Bankruptcy Code.  Here, the Plan complies with

§§1122 and 1123.

1.      **Section 1122**

406. Section 1122(a) of the Bankruptcy Code imposes a limitation on the classification of claims and interests, requiring that only substantially similar claims may be included in the same class.  If a reasonable basis exists for the classification structure and the claims or interests within a particular class are substantially similar, then §1122 of the Bankruptcy Code is satisfied. *Cf. Matter of Jersey City Medical Center,* 817 F.2d 1055, 1061 (3d Cir. 1987) (grouping of similar claims in different classes is permissible); *In re U.S. Truck Co. Inc.*, 800 F.2d 581, 587 (3d Cir. 1986) (in pre-Code cases courts were given broad discretion to determine proper classification of claims according to the facts of each case).

407. The Bankruptcy Code does not require that all claims with equal priority be classified in the same class.  Therefore, it is appropriate to classify Channeled Asbestos PI Trust Claims separately from other unsecured claims.  All Channeled Asbestos PI Trust Claims relate to  liability for asbestos personal injury and wrongful death claims arising from exposure to asbestos.  This differentiates all Class 5 Claims from other Claims.  In addition, §524(g)(2)(B)(ii)(IV)(bb) of the Bankruptcy Code requires, and the Plan establishes, a separate class or classes of claimants whose Claims are to be channeled to the Asbestos PI Trust.

408.  Asbestos Personal Injury Claims (as defined in the Plan) are substantially similar to Indirect Asbestos Claims (as defined in the Plan) in that all such claims are unsecured, nonpriority claims arising from personal injury caused by exposure to asbestos or asbestos-containing products.  *See* Plan §1.1 (definitions of Asbestos Personal Injury Claims and Indirect Asbestos Claims); 11 U.S.C. §§1129(a)(1) and 1122(a).

409.  The Plan complies with §1122(a) as each class of claims and interests as set forth in §3.2 of the Plan consists solely of substantially similar Claims or Equity Interests.  Plan §3.2.

410. Section 1122(b) is inapplicable in the instant case, as there are no convenience

121

claims.

## 2.    Section 1123

411. Section 1123(a)(1) of the Bankruptcy Code requires that the Plan designate classes

of claims and classes of interests, other than Administrative Expenses and Priority Tax Claims.

The Plan complies with §1123(a)(1), as it designates classes of claims and interests in §3.2 of the

Plan.  Plan §3.2.

412. Section 1123(a)(2) of the Bankruptcy Code provides that the Plan must specify any

class of claims or interests that is unimpaired.  Article III of the Plan identifies Classes 1-A, 1-B,

2, 3-A, 3-B, and 4-B as being unimpaired.  Accordingly, §1123(a)(2) is satisfied by the Plan.

413. The Plan complies with §1123(a)(3) of the Bankruptcy Code, which requires that the

Plan identify the treatment of each impaired class of claims and interests.  Section 3.2 of the Plan

identifies Classes 4-A, 5, and 6 as impaired and sets forth the treatment of each such impaired

class of claims or interests.  Plan §§3.2.4 (Class 4-A), 3.2.5 (Class 5), and 3.2.6 (Class 6).

414. Section 1123(a)(4) of the Bankruptcy Code requires that the Plan provide the same

treatment for all claims or interests in each class unless the holder of such claim or interest

agrees to less favorable treatment.  Section 1123(a)(4) of the Bankruptcy Code is satisfied

because Article 3.2 of the Plan provides for the same treatment within each class of Claims and

the class of Equity Interests.  Plan §3.2.

415. Section 1123(a)(5) of the Bankruptcy Code requires that the Plan include adequate

means for its implementation.  The Plan complies with §1123(a)(5) in that it provides for, among

other things, creation and funding of the Asbestos PI Trust, adoption of Amended and Restated

By-Laws of the Reorganized Debtor, issuance of Reorganized PCC Common Stock,

restructuring of the Board of Directors of Reorganized PCC, distribution of payments to

122

creditors, and assumption of executory contracts and unexpired leases of Pittsburgh Corning on the Effective Date.  Plan Articles IV, V, and IX.

416. Section 1123(a)(6) of the Bankruptcy Code requires a plan to provide for the inclusion in the charter of the debtor, if the debtor is a corporation, or of any corporation to which the debtor transfers all or any part of the debtor's estate or with which the debtor has merged or consolidated, a provision prohibiting the issuance of non-voting equity securities. The Plan complies with §l123(a)(6) in that it provides for the issuance of only one class of voting common stock of Reorganized PCC in the Amended and Restated Articles of Incorporation.  Plan §9.2.1 and Exhibit C (Amended and Restated Articles of Incorporation of Pittsburgh Corning Corporation), Article IV.

417. Section 1123(a)(7) of the Bankruptcy Code requires that the manner of selection of any officer, director, or trustee of the Reorganized Debtor, or any successor to such officer, director, or trustee, be consistent with the interests of creditors and equity security holders and with public policy.  The Plan complies with §l123(a)(7) by identifying those persons who will serve as directors and key management personnel for the Reorganized PCC, as well as biographical information of each. *See* Doc. No. 6426, Disclosure Statement, at Article XV. *See* Plan  Exhibit C (Amended and Restated Articles of Incorporation of Pittsburgh Corning Corporation), Exhibit D (Pittsburgh Corning Amended and Restated Bylaws) §2.01; 11 U.S.C. §§l129(a)(1) and 1123(a)(7).

418. Section 1123(a)(7) of the Bankruptcy Code does not apply to the selection of the Trustees or the TAC of the Asbestos PI Trust.  Notwithstanding the foregoing, the Plan also identifies each of the initial Trustees of the Asbestos PI Trust, the Future Claimants Representative and the TAC, and provides a mechanism for selection of successor Trustees.

Plan, Exhibit A (Asbestos PI Trust Agreement).

419. Section 5.1 of the Plan, providing for the assumption of executory contracts, is authorized by §1123(b)(2) of the Bankruptcy Code, subject to the requirements of §365 of the Bankruptcy Code.

**B.      Section 1129(a)(2)**

420. Section 1129(a)(2) of the Bankruptcy Code requires that the Plan Proponents comply with the applicable provisions of the Bankruptcy Code.  The Plan Proponents have complied. Compliance with §1125 of the Code is also necessary for the Court to conclude that the Plan Proponents have complied with §1129(a)(2) of the Bankruptcy Code.  The Plan Proponents have complied with §1125.

421. The Disclosure Statement distributed to creditors contained adequate information about the Plan in accordance with 11 U.S.C. §1125.  Order of Court dated July 1,2009, Doc. No. 6740.

422. The mailing and publication of notice of the Disclosure Statement and Plan provided adequate notice of the Disclosure Statement and Plan to all creditors entitled to vote as required by Bankruptcy Rules 2002 and 3017.  Order of Court dated August 5, 2009, Doc. No. 6814.

423. The Voting Procedures utilized by the Plan Proponents and approved by the Court satisfy all requirements of the Bankruptcy Code and Rules, including, without limitation, 11 U.S.C. §§1125 and 1126 and Fed. R. Bankr. P. 2002, 3May 16, 2013017, and 3018.

**C.      Section 1129(a)(3)**

424. Section 1129(a)(3) provides that the Plan must have been proposed in good faith and not by any means forbidden by law.

425. Whether a Plan satisfies the good faith requirement of §1129(a)(3) of the

Bankruptcy Code is determined by considering whether in light of the particular facts and circumstances of the case the plan will fairly achieve a result consistent with the Bankruptcy Code. *In re PWS Holding Corp.,* 228 F.3d 224, 242 (3d Cir. 2000).

426. Under the facts and circumstances of this Case, the Plan has been designed to achieve a fair and equitable treatment of all creditor Claims and Demands and is consistent with the purposes of the Bankruptcy Code.

427. Thus, Pittsburgh Corning has satisfied the "good faith and not by any means forbidden by law " requirement of §l129(a)(3) of the Bankruptcy Code.

428. The objection of Mt. McKinley and Garlock to the Plan's and Plan Proponents' compliance with the good faith requirement of §1129(a)(3) is overruled.

**D.     Section 1129(a)(4)**

429. Section 1129(a)(4) of the Bankruptcy Code provides that payments to be made to professionals for costs and expenses must be approved by the Bankruptcy Court.  This provision is satisfied.

430. The Plan complies with this requirement in §2.1(c), which requires the Court to establish a date for final applications for compensation to be filed for Court approval.  Plan §2.1(c).

431. The Plan further provides for payment of Allowed Administrative Expense Claims in accordance with the terms and conditions in the agreements underlying the transactions giving rise to such Administrative Expense Claims.  Plan §2.1(a).

**E.     Section 1129(a)(5)**

432. Section 1129(a)(5) of the Bankruptcy Code requires the proponents of a plan to disclose the identity and affiliations of any individual who will act as a director, officer, or

125

voting trustee of the debtor, as well as any insiders to be employed or retained by the debtor and their compensation.  The Plan Proponents have complied.

433. In the Disclosure Statement, the directors of Reorganized PCC are set forth, together with brief biographical information for each.  Doc. No. 6426 at Article XV at 107.

434. In addition, although disclosure of neither the identities of the Trustees or the members of the TAC is required, they are identified in the Asbestos PI Trust Agreement. Plan, Exhibit A, Asbestos PI Trust Agreement, §5.

**F.    Section 1129(a)(6)**

435. Section 1129(a)(6) of the Bankruptcy Code is not applicable, as it relates to obtaining the approval of any governmental regulatory commission with jurisdiction over rate changes.   The Debtor is not a public utility.

**G.    Section 1129(a)(7)**

436.  Section 1129(a)(7) of the Bankruptcy Code provides that each creditor or interest holder in an impaired class must either accept the plan or receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under Chapter 7 of the Bankruptcy Code.

437. Each impaired class voted in favor of the Plan by the required number, amount and percentage of claims voted.

438. Those holders of claims that have not voted in favor of the Plan would receive less in a liquidation under Chapter 7 than they would receive under the Plan, and, due to the insolvency of the Debtor, holders of interests would receive nothing in a liquidation under Chapter 7.

126

439. Based upon the findings of fact contained herein, the testimony at the confirmation hearing and the Debtor's liquidation analysis, the Plan satisfies §1129(a)(7) of the Bankruptcy Code.

### H.    Section 1129(a)(8)

440. Section 1129(a)(8) requires that each class of claims or interests be unimpaired or accept the Plan.  They have done so.

441. Section 1129(a)(8) of the Bankruptcy Code is satisfied in that all of the impaired classes of claims (Classes 4A and 5) have voted to accept the Plan.

442. With respect to the Class 6 Equity Interest holders, (i) §1129(a)(8) is satisfied because such interest holders have not opposed their treatment under the Plan, or (ii) satisfaction of §1129(a)(8) is not required, because, under §1129(b), the treatment of such Equity Interests is fair and equitable in that (A) in a liquidation of the Debtor, due to the insolvency of the Debtor, holders of such Equity Interests would receive or retain nothing on account of such interests, and/or (B) no classes junior to them will receive anything under the Plan.

### I.    Section 1129(a)(9)

443. In accordance with §1129(a)(9)(A) of the Bankruptcy Code, §2.1 of the Plan provides for payment of Allowed Administrative Expense Claims for professional fees, in full, in cash, on the later of the Effective Date and the date such claim is Allowed, or as soon thereafter as is practical, or under such terms and conditions as Pittsburgh Corning and the Administrative Expense Creditor agree.   Plan §2.1.

444. Pursuant to §1129(a)(9)(B) of the Bankruptcy Code, §3.2.1 of the Plan provides that Allowed Priority Claims other than Priority Tax Claims are to be paid in full, in cash, on the Effective Date.

445. Consistent with §1129(a)(9)(C) of the Bankruptcy Code, §3.2.1 of the Plan provides

that Priority Tax Claims are to be paid in full, in cash within 30 days after the Effective Date, or

upon such other terms as the holder of such Claim and Reorganized Pittsburgh Corning agree.

Plan, §3.2.1.

446. The Plan is sufficiently funded to pay the Administrative Expense Claims, the

Priority Claims, and Priority Tax Claims.  Therefore, the Plan satisfies §1129(a)(9) of the

Bankruptcy Code.

**J.**    **Section 1129(a)(10)**

447. Section 1129(a)(10) is satisfied because at least one impaired class has voted to

accept the Plan.  Here, the impaired classes, 4A and 5, have voted to accept the Plan.

**K.**    **Section 1129(a)(11)**

448. Section 1129(a)(11) of the Bankruptcy Code is satisfied because confirmation is not

likely to be followed by the liquidation or need for further reorganization of the debtor or any

successor.  In other words, the Plan is feasible.  *See, e.g., In re NII Holdings,* 288 B.R. 356, 364

(Bankr. D.Del. 2002).

449. As evidenced by the Findings of Fact, the Debtor will be in a position to

consummate the Plan.  The funding for the Plan, which derives, not only from Pittsburgh

Corning, but from its shareholders, PPG and Corning, the PPG Participating Insurers, and the

PCC Settled Insurers, is  available and sufficient to carry out the purposes and goals of the Plan.

The Plan further provides for the creation of mechanisms to implement the Plan.

**L.**    **Section 1129(a)(12)**

450. Section 1129(a)(12) is satisfied because the fees payable under 28 U.S.C. §1930, as

determined by the Court at the Plan Confirmation Hearing, either have been paid or are to be

paid under the Plan on its Effective Date.   Section 11.1 of the Plan provides for payment of such

fees on or before the Effective Date of the Plan.

**M.    Section 1129(a)(13)**

451. Section 1129(a)(13) of the Bankruptcy Code is satisfied because the Plan provides

for continuation of retiree benefits after the Effective Date at the level established under §1114

of the Bankruptcy Code for the duration of the period for which the Debtor has obligated itself

for payment of such retiree benefits.

**III.    THE ASBESTOS PERMANENT CHANNELING INJUNCTION AND THE
ESTABLISHMENT OF THE ASBESTOS PI TRUST SATISFY §524(g) OF
THE BANKRUPTCY CODE**

452. The Asbestos Permanent Channeling Injunction is being implemented in connection

with the Asbestos PI Trust pursuant to the Plan.  11 U.S.C. §524(g)(2)(B)(i).

453. Pursuant to the Plan, the Asbestos PI Trust is to assume the liabilities of the Debtor,

which at the time of entry of the Order for Relief had been named as a defendant in personal

injury and wrongful death actions seeking recovery for damages allegedly caused by the

presence of, or exposure to, asbestos or asbestos-containing products.  11 U.S.C.

§524(g)(2)(B)(i)(I).

454. The Asbestos PI Trust is to be funded in whole or in part by the securities of the

Debtor and by the obligation of the Reorganized Debtor to make future payments, including

dividends.  11 U.S.C. §524(g)(2)(B)(i)(II).

455.  The Asbestos PI Trust is to own a majority of the voting shares of Reorganized

PCC.  Plan §8.1.5.  11 U.S.C. §524(g)(2)(B)(i)(III)(aa).

456. The Asbestos PI Trust is to use its assets and income to pay claims and demands.  11

U.S.C. §524(g)(2)(B)(i)(IV).

129

457.  The Court has determined that the Debtor is likely to be subject to substantial future demands for payments arising out of the same or similar conduct or events that gave rise to the claims that are addressed by the Asbestos Permanent Channeling Injunction.  11 U.S.C. §524(g)(2)(B)(ii)(I).

458. The Court has determined that the actual amounts, numbers, and timing of future demands for payment arising out of the same or similar conduct or events that gave rise to the claims that are addressed by the Asbestos Permanent Channeling Injunction cannot be determined.  11 U.S.C. §524(g)(2)(B)(ii)(II).

459. The Court has determined that pursuit of demands for payment arising out of the same or similar conduct or events that gave rise to the claims that are addressed by the Asbestos Permanent Channeling Injunction outside the procedures prescribed by the Plan is likely to threaten the Plan's purpose to deal equitably with claims and future demands.  11 U.S.C. §524(g)(2)(B)(ii)(III).

460. The terms of the Asbestos Permanent Channeling Injunction, including any provisions barring actions against third parties, are set out in the Disclosure Statement Plan and as modified by the Technical Amendments filed on May 15, 2013 at Doc. No. 9402.  11 U.S.C. §524(g)(2)(B)(ii)(IV)(aa).

461. The Asbestos PI Trust will operate through mechanisms such as structured, periodic, or supplemental payments, pro rata distributions, matrices, or periodic review of estimates of the numbers and values of present claims and future demands, or other comparable mechanisms, that provide reasonable assurance that the Asbestos PI Trust will value, and be in a financial position to pay, present claims and future demands that involve similar claims in substantially the same manner.  11 U.S.C. §524(g)(2)(B)(ii)(V).

130

462. The Asbestos Protected Parties identified in or pursuant to the Plan are all third parties who, if alleged to be directly or indirectly liable for Channeled Asbestos PI Trust Claims, may be protected by such an injunction under §524(g)(4)(A)(ii) of the Bankruptcy Code.

463. More specifically, the identification of the PPG Entities, the PPG Affiliates, and the PPG-Affiliated Parties and the Corning Entities, the Corning Affiliates, and the Corning Affiliated Parties as Asbestos Protected Parties in the Asbestos Permanent Channeling Injunction is authorized by §524(g)(4)(A)(ii) because their respective alleged liability as Asbestos Protected Parties for Channeled Asbestos PI Trust Claims arises out of (i) PPG and Corning's ownership of 50 percent of the shares of the Debtor; (ii) PPG and Corning's (or the PPG Affiliated Parties' and Corning Affiliated Parties') alleged involvement in the management of the Debtor or service as an officer, director, or employee of the Debtor; (iii) PPG's provision of insurance to the Debtor; and/or (iv) PPG's and Corning's alleged involvement in transactions affecting the financial condition of the Debtor or related parties.

464. The identification of the PPG Participating Insurer Entities, the PPG Non-Participating Insurer Entities, the PCC Settled Insurer Entities and the Corning Insurers as Asbestos Protected Parties in the Asbestos Permanent Channeling Injunction is authorized by §524(g)(4)(A)(ii) because their respective alleged liability for Channeled Asbestos PI Trust Claims arises from the provision of insurance to the Debtor or related parties.

465. For all the above reasons, and in view of the substantial contributions being made by or on behalf of the Asbestos Protected Parties the identification of each Asbestos Protected Party in the Asbestos Permanent Channeling Injunction is fair and equitable with respect to Entities that might subsequently assert Demands against each such Asbestos Protected Party, in light of the benefits provided, or to be provided, to the Asbestos PI Trust by or on behalf of any such

131

Asbestos Protected Party.  11 U.S.C. §524(g)(4)(B)(ii).

466. Accordingly, the Asbestos Permanent Channeling Injunction is authorized by §524(g) of the Bankruptcy Code.  Plan §8.1.38.

## IV.    OBJECTIONS ARE OVERRULED

### A.    Mt. McKinley Objections[36]

#### 1.    Mt. McKinley Lacks Standing

467. Mt. McKinley is not a creditor of the estate and its sole role in this bankruptcy case is an insurer of the Debtor, PPG and Corning. Its objections relate to its unsettled policies with PPG and Corning.

468. By virtue of its May 1997 settlement with the Debtor and by virtue of the releases to be granted by the Debtor under §II.B of the Insurance Claims Agreement, the Debtor will have resolved all of its claims for coverage for Asbestos PI Trust Claims against Mt. McKinley.  Plan, Exhibit M (Insurance Claims Agreement) §II.B.  Accordingly, this is not a case where a debtor

---

[36]In Doc. 9080 at 2,  Mt. McKinley states that "the Court has suggested that it may not consider certain evidence from the prior confirmation hearings because that evidence was offered in support of a 'different' Plan" citing Doc. No. 8782, Tr.  4/16/12 at 120:23-121:6. Although the Plan now at bar is a different document (amended to resolve matters that led to the denial of confirmation), Mt.. McKinley misconstrues the Court's statement, which was clarified at page 122 of the same transcript:

> No, no.  I think you're extending what I said.  I think I said that the evidence that was relevant to the second amended plan in this respect, where the parties at that hearing testified that they may attempt to use findings in a certain way, they've backed off that provision, so that particular testimony isn't relevant anymore because you've got the agreement of counsel on the record that they won't use those findings in the way that their witnesses said they would be used before."

Tr. 4/16/12 at 122:1-9.  The evidence before the Court has not changed and Mt. McKinley's objections are overruled on the basis of that evidence.

or a trust claiming by assignment from the debtor has preserved asbestos-related coverage claims

against an objecting insurer.

469. Mt. McKinley's policy obligations to PPG and Corning have not been settled or

otherwise resolved by the Plan, nor have any of them been assigned to the Asbestos PI Trust.

Instead, those policies remain with PPG and Corning, respectively.  PPG and Corning have

asserted rights under those policies to recover all or portions of their respective contributions to

the Asbestos PI Trust, and Mt. McKinley vigorously disputes that either Plan Supporter has any

such rights. Because this Plan is "insurance neutral," all of Mt. McKinley's coverage disputes

are preserved and will be resolved outside this bankruptcy case either by agreement of the parties

or by coverage litigation in a state or federal court having jurisdiction.  Moreover, the Findings

of Fact herein and Conclusions of Law are solely for purposes of determining that this Plan is

confirmable and that the channeling injunction provided by §524(g) to supplement the discharge

is appropriate.  They have nothing to do with insurance coverage allegedly provided by the non-

participating insurers including Mt. McKinley. Thus, Mt. McKinley is not adversely affected by

this Plan, which imposes no burden on Mt. McKinley than it has absent bankruptcy and Mt.

McKinley has no cognizable injury sufficient to award it "party in interest" status.  Mt.

McKinley lacks standing to pursue objections to this Plan.

470. Mt. McKinley is not harmed by this Plan.  It is now an Asbestos Protected Party, as

defined in the Plan, based on its provision of insurance to PPG and Corning, parties related to the

Debtor.  As such, Mt. McKinley will be protected by the Asbestos Permanent Channeling

Injunction from Channeled Asbestos PI Claims even though neither those policies nor proceeds

of policies are contributed to the Trust.

471.  Moreover, although Mt. McKinley initially objected to the Plan on the ground that

133

the Plan failed to provide adequate protection for its potential claims against other settling

insurers, after the addition of §11.9, Judgment Reduction, and numerous modifications to that

section, Mt. McKinley ultimately withdrew its objections to §11.9. This provision preserves Mt.

McKinley's right to be made whole, in the event that it ever has contribution, indemnification,

subrogation or similar claim.

472. Mt. McKinley's objection to §11.17 was that the *proviso* in that section excluded

from its effect various agreements including the PPG  Trust Funding Agreement, the Insurance

Claims Agreement and various insurance settlement agreements.  The *proviso* of §11.17 has

been deleted.  *See* Doc. No. 9383.  Therefore, the objection is moot.

473.  Mt. McKinley continues to assert that this Plan is not "insurance neutral."  We

disagree and conclude to the contrary.  The assurances: (a) in §11.17.1, 11.17.2 and 11.17.3; (b)

coupled with the agreement of PPG and Corning that they will not introduce into evidence in any

coverage action with Mt. McKinley any of this Court's findings or conclusions regarding the

sufficiency of their contributions to the Trust; (c) the acknowledgment of the Plan Proponents,

Plan Supporters and PPG Participating Insurers that the contributions satisfy their disputed

liability, if any, for Channeled Asbestos PI Trust Claims or any other finding related to same;

and (d) the inability of the Trust to pursue Mt. McKinley because Mt. McKinley's insurance

policies and proceeds are not being contributed to the Trust so that any actions against Mt.

McKinley are left solely to their policy holders and/or others who may have those actions

pursuant to applicable nonbankruptcy law; plus (d) the Judgment Reduction provision of §11.9

of the Plan all leave Mt. McKinley with its prepetition rights, obligations, claims, defenses, etc.

for all of its unsettled policies.

474.  Mt. McKinley's concern that Insurance Settlement Agreements may adversely

affect it is likewise without merit.  Any effect, if there is one, exists by operation of state law, which law may differ from state to state but not as a function of the Plan, Plan Documents, these Findings of Fact and Conclusions of Law or the Confirmation Order.   Thus, Mt. McKinley suffers no impairment as the result of the confirmation of this Plan.

475. At various points, Mt. McKinley has asserted that the protection afforded PPG and Corning by the Asbestos Permanent Channeling Injunction is overbroad.  The Plan has been amended to address the overbreadth of the Channeling Injunction noted in our earlier opinions and this objection, to the extent it remains, is overruled.

476. Mt. McKinley's objections to the TDP and the Asbestos PI Trust Agreement ("the Trust Documents") include an assertion that the Trust will pay noncompensable claims.  There are medical and exposure criteria established to guard against the payment of invalid claims.  The Trust has the authority to investigate claims.  There are provisions providing for establishing or implementing methods for auditing the reliability of medical evidence and the reliability of evidence of exposure to asbestos products for which the Trust will have liability.  Furthermore, the Trust will not seek reimbursement from Mt. McKinley for claims that it pays.  To the extent PPG or Corning seeks reimbursement from Mt. McKinley for their Trust Contributions, Mt. McKinley retains all its coverage rights and defenses.

477.  Mt. McKinley contends that the findings in §8.1 of the Plan will be used by PPG and Corning as a legal basis for recovering their Trust Contributions in coverage litigation.  However, §11.17.3 of the Plan enjoins PPG and Corning from offering into evidence, in support or defense of certain[37] coverage and trust contribution recovery claims, any of the findings

---

[37]Section 11.17.3 provides that the PPG Coverage Claim Parties and the Corning Trust
(continued...)

required by §8.1 of the Plan as binding in any way, as constituting an adjudication for coverage

purposes, or otherwise as being probative of the truth of any matter asserted therein.

## 2.    Mt. McKinley's Objections are Legally Unfounded

478. None of the Plan, Plan Documents, these Findings of Fact and Conclusions of Law

or the Confirmation Order impair Mt. McKinley's ability to assert any of its defenses to

coverage or its rights under its policies in any separate coverage proceeding.  Nothing in the

Plan, Plan Documents, these Findings of Fact and Conclusions of Law or the Confirmation

Order alters or relieves PPG or Corning of any obligation either may have under applicable

non-bankruptcy law to cooperate with Mt. McKinley or to establish that any assertion of

coverage either may make in coverage litigation is founded.  Further, nothing in the Plan, Plan

Documents, these Findings of Fact and Conclusions of Law or the Confirmation Order purports

to adjudicate or determine the outcome of any coverage litigation.

---

[37](...continued)
Contribution Recovery Claim Parties shall be enjoined from offering into evidence in support or
defense of a PPG Coverage Claim or PPG Coverage Claim Reduction, or of a Corning Trust
Contribution Recovery Claim or Corning Trust Contribution Recovery Claim Reduction,
whether as a basis for res judicata, collateral estoppel, issue preclusion or claim preclusion, as
constituting an adjudication for coverage purposes, or as otherwise being probative of the truth
of any matter asserted therein (i) any finding or conclusion by the this Court or the
District Court adopting any of the findings or conclusions set forth in §8.1 of the Plan or the
second sentence of §1.1 of the TDP providing that the TDP is designed to provide fair, equitable
and substantially similar treatment for Channeled Asbestos PI Trust Claims or Demands.
    Furthermore, technical amendments to the Plan filed on August 31, 2012, Doc. No. 8957,
added to the definition of "Asbestos Permanent Channeling Injunction" a provision stating that it
shall not apply to the following types of claims, all of which are defined in the Plan: (i) any
Non-Derivative PPG/Corning Claim; (ii) any Reserved Claims; (iii) any PPG Coverage Claims;
and (iv) any PPG Non-Participating Insurer's or Corning Non-Stipulating Insurer's right to
enforce judgment reduction pursuant to the terms of Section 11.9.  In other words, the
Channeling Injunction does not apply to actions with respect to these identified types of claims
by any PPG Party (PPG Entities, PPG Affiliates and PPG-Affiliated Parties) or Corning Party
(Corning Entities, Corning Affiliates and Corning-Affiliated Parties) in coverage litigation.

479. Nothing in TDP §6.5 is intended to or shall be construed or interpreted as having any effect whatsoever on any Non-Participating or Non-Stipulating Insurer's rights, remedies, or obligations of any kind or their insureds' rights, remedies or obligations of any kind in coverage litigation.  Applicable nonbankruptcy law will apply.

480. Nothing in the Plan, Plan Documents, these Findings of Fact and Conclusions of Law or the Confirmation Order excuses or purports to excuse PPG or Corning from obligations, if any, that either of them may have to cooperate with or assist Mt. McKinley.

481.  Nothing in the Plan, Plan Documents, these Findings of Fact and Conclusions of Law or the Confirmation Order prohibits Mt. McKinley from arguing that PPG's or Corning's contributions to the Asbestos PI Trust are not "reasonable" in light of the TDP's medical criteria in any separate coverage proceeding.

482. Nothing in the Plan, Plan Documents, these Findings of Fact and Conclusions of Law or the Confirmation Order prohibits Mt. McKinley from asserting in any coverage action that its policies or applicable law require it to pay only individual claims that satisfy certain criteria and that some or all claims paid pursuant to the TDP for which recovery against Mt. McKinley is sought do not satisfy such criteria.  Moreover, the Confirmation Order, in accord with §11.17.3 will

> enjoin (A) the PPG Coverage Claim Parties from offering into evidence in support or defense of a PPG Coverage Claim or PPG Coverage Claim Reduction, and (B) the Corning Trust Contribution Recovery Claim Parties from offering into evidence in support or defense of a Corning Trust Contribution Recovery Claim or Corning Trust Contribution Recovery Claim Reduction, any of the following as binding in any way (including as a basis for res judicata, collateral estoppel, issue preclusion or claim preclusion), as constituting an adjudication for coverage purposes, or as otherwise being probative of the truth of any matter asserted therein: (i) any finding or conclusion by the Bankruptcy Court or

the District Court adopting any of the findings or conclusions set
forth in Section 8.1 of the Plan, or (ii) the second sentence of
Section 1.1 of the TDP.

483.  Section 11.17.2 of the Plan appropriately provides that  "[t]he PPG Non-

Participating Insurance Policies, the Corning Insurance Policies, the Other Corning Policies, the

PPG Participating Insurance Policies, the PCC Settled Insurance Policies and related Insurance

Settlement agreements are binding upon the parties thereto and as to non-parties have the effect

as provided by applicable non-bankruptcy law."

484. The supplemental payment provision of §4.4 of the TDP is expressly authorized by

11 U.S.C. §524(g)(2)(B)(ii)(V).

485. The Trustees, the members of the TAC, and the FCR, when acting under the terms

of the Asbestos PI Trust Agreement, each will be acting in a fiduciary capacity.  Plan, Exhibit A

(Trust Agreement) §§2.1(a), 5.2, and 6.1.

486. All of Mt. McKinley's objections are overruled.

**B.      Garlock Objections**

487.  For the reasons stated, *supra*, and as we found in our 2011 Opinion, Garlock lacks

standing in this case and its objections lack merit.  *See* 453 B.R. at 578-83.  Garlock relies on its

prior filings and has submitted nothing additional. As stated, there is no basis to change our prior

ruling and we again find that Garlock is not a creditor; and, even if it had standing, its objections

are without merit.  All of Garlock's objections are overruled.

**C.      All Other Objections**

488.  For the reasons stated, *supra,* all other objections, if any remain and to the extent

not overruled in our Memorandum Opinion and Order of June 16, 2011, 453 B.R. 570 (Bankr.

W.D. Pa. 2011) and in these Findings of Fact and Conclusions of Law are overruled.

138

V.      **CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN ARE SATISFIED**

489. Section 8.1 of the Plan lists the findings and conclusions that are conditions precedent to confirmation of the Plan.  For the reasons set forth above, the Court hereby finds and concludes that it is appropriate for the Confirmation Order to include those findings and conclusions from §8.1 as modified herein.

For the foregoing reasons, this Court will enter an order confirming the Plan and issuing the §524(g) injunction and will recommend that the District Court affirm confirmation and the §524(g) injunction.


DATE: May 16, 2013

_Judith K. Fitzgerald_

cjs

Judith K. Fitzgerald
United States Bankruptcy Judge

139