IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

MT. McKINLEY INSURANCE
COMPANY and EVEREST
REINSURANCE COMPANY,

          Appellants,

    v.

PITTSBURGH CORNING
CORPORATION, et al.

          Appellees.

Civil Action No. 13-1639

*Appeal from:*

Bankruptcy Case No. 00-22876

## MEMORANDUM OPINION

CONTI, Chief District Judge

## I.    Introduction

This case is an appeal from the bankruptcy court's order confirming the Modified Third Amended Plan of Reorganization ("plan") of debtor Pittsburgh Corning Corporation ("Pittsburgh Corning") and issuing an asbestos permanent channeling injunction under 11 U.S.C. § 524(g). The bankruptcy court explained the reasons for the order in an opinion entered on May 24, 2013. *In re Pittsburgh Corning Corp.*, No. 00-22876, 2013 WL 2299620 (Bankr. W.D. Pa. May 24, 2013) [hereinafter "Bankr. Op."]. Appellants Mt. McKinley Insurance Company and Everest Reinsurance Company (collectively "Mt. McKinley")[1] object to the plan and filed a brief seeking reversal of the confirmation order. (ECF No. 56.) Appellees Pittsburgh Corning, the Official Committee of Asbestos Creditors, the Legal Representative for Future Asbestos Claimants, PPG Industries, Inc. ("PPG"), and Corning Incorporated ("Corning") (collectively "plan parties") support the

---

1    Throughout the briefing all parties, including Mt. McKinley, refer to both appellants collectively as Mt. McKinley and use singular verb forms. The court will do likewise and refer to Mt. McKinley in the singular.

plan. The plan parties filed a motion for an order affirming the bankruptcy court's confirmation order (ECF No. 63) and a joint brief in response to Mt. McKinley's brief (ECF No. 64). Appellees Certain Underwriters at Lloyd's, London, and Certain London Market Companies ("LMI") filed a separate brief urging affirmance. (ECF No. 65.) For the reasons set forth below, the court will affirm the decision of the bankruptcy court.

## II.  Background[2]

### A.  *Pittsburgh Corning's Asbestos History*

Pittsburgh Corning was formed in 1937 by PPG and Corning, which were then respectively called the Pittsburgh Plate Glass Company and Corning Glass Works. Bankr. Op. ¶ 3. PPG and Corning each owned—and continue to own—50 percent of Pittsburgh Corning's capital stock. *Id.* Pittsburgh Corning manufactured and sold glass products. *Id.* ¶ 26. From 1962 to 1972, Pittsburgh Corning manufactured and sold a high-temperature pipe insulation product called Unibestos, which contained asbestos. *Id.* ¶¶ 33–34.

As early as the mid-1960s, Pittsburgh Corning was named a defendant in lawsuits alleging personal injury from exposure to Unibestos. *Id.* ¶ 40. The volume of lawsuits increased over the years, particularly in the 1980s and 1990s. *Id.* ¶ 2. In 1981, there were approximately 15,000 to 20,000 pending claims against Pittsburgh Corning. *Id.* ¶ 54. In 1985 there were 60,000 to 75,000 claims open. *Id.* By 2000, there were approximately 235,000 pending Unibestos claims. *Id.* ¶ 56. Pittsburgh Corning had resolved, by 2000, more than 200,000 claims, at a cost of about $1.2 billion. *Id.* ¶ 55.

The mounting Unibestos liability, coupled with declining insurance coverage, caused Pittsburgh Corning to conclude that its liabilities for asbestos claims exceeded the value of its assets. *Id.* ¶ 2. On April 16, 2000, Pittsburgh Corning

---

2    The parties do not contest the historical background leading to Pittsburgh Corning's bankruptcy and the procedural history before the bankruptcy court. The court adopts the bankruptcy court's findings on those uncontested matters.

filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. *Id.*
¶ 1.

### B.   Involvement of PPG and Corning

Although PPG and Corning did not manufacture Unibestos, they were also
named as defendants in Unibestos lawsuits under a variety of legal theories
including alter ego, piercing the corporate veil, respondeat superior, conspiracy,
and negligence. *Id.* ¶ 52. At the time of the bankruptcy petition, PPG faced
approximately 116,000 Unibestos claims. *Id.* ¶ 57. All but 800 of these claimants
also asserted claims against Pittsburgh Corning. *Id.* ¶ 61. When Pittsburgh Corning
settled a Unibestos case, it typically obtained a release of any claims against PPG
without an additional payment by PPG. *Id.* ¶ 64. By the petition date, PPG had
suffered only one adverse final judgment in a Unibestos case; a jury in April 2000
found PPG liable for 10 percent of the asbestos-related injuries of the plaintiffs in
that case. *Id.* ¶ 65. PPG, unconnected to its relationship with Pittsburgh Corning
and Unibestos, manufactured or sold some products containing asbestos. *Id.* ¶ 69.
PPG has never been found liable for an asbestos personal injury related to any
non-Unibestos product, although it has settled some cases for a total aggregate
value of approximately $2 million. *Id.* ¶ 75.

At the time of the bankruptcy petition, Corning was a named defendant in
eleven Unibestos lawsuits with approximately 11,400 claimants. *Id.* ¶ 77. These
cases also included claims against Pittsburgh Corning. *Id.* ¶ 82. None of these
cases went to trial. *Id.* ¶ 84. When Pittsburgh Corning settled a Unibestos case, it
typically obtained a release of any claims against Corning without an additional
payment by Corning. *Id.* ¶ 85.

PPG and Corning each filed claims in the bankruptcy proceeding against
Pittsburgh Corning for contribution and indemnity of Unibestos claims against
them. *Id.* ¶ 95.

### C. *Insurance*

More than forty insurers are involved in this case in various capacities. (*See* Plan sched. F, T56:5077–92.)[3] During the period when Pittsburgh Corning manufactured Unibestos, Pittsburgh Corning was insured under PPG's primary insurance (from before 1962 to 1966) and PPG's excess insurance (from before 1962 until 1986). Bankr. Op. ¶ 96. Most of the $1.2 billion Pittsburgh Corning used to resolve Unibestos claims before the petition date came from PPG's excess insurance policies under which it was insured. *Id.* ¶ 97. Pittsburgh Corning asserts that more than $1.3 billion of PPG's excess insurance coverage under which it was insured remained unexhausted as of the petition date. *Id.* ¶¶ 103, 104. A significant amount of this coverage was disputed, but Pittsburgh Corning settled with many insurers during the pendency of this bankruptcy case. *Id.* ¶¶ 100–02, 110. Pittsburgh Corning also claimed coverage under Corning's excess insurance policies that covered companies "affiliated" or "associated" with Corning. *Id.* ¶ 114.

Mt. McKinley's role in this case is as an insurer to PPG and Corning.[4] (Mt. McKinley's Br. 7, ECF No. 56.) Mt. McKinley's predecessors issued excess insurance policies to PPG and Corning potentially covering millions of dollars. (*Id.* at 8 n.10.) The coverage is disputed. PPG and Corning each seek coverage from Mt.

---

3    After fourteen years and several confirmation hearings, the record in this case is voluminous. Because many of the parties' filings in the bankruptcy court predate the CM/ECF system, they exist in paper copy only. In the interest of a speedy and just determination of this appeal, the court instructed the parties to file electronically an appendix including only those documents necessary for the resolution of the case and cited in the parties' briefing. The court reviewed this portion of the record in reaching its decision. The appendix is organized by tab and sequentially paginated, and the court cites that record in the form T[tab number]:[page number].

4    Mt. McKinley also directly insured Pittsburgh Corning, but it entered into a settlement agreement with Pittsburgh Corning to pay full policy limits. Bankr. Op. ¶ 292. Mt. McKinley's objections to the plan all stem from its role as insurer to PPG and Corning.

McKinley for contributions they will make to the trust established by the plan in two pending coverage actions.[5] (*Id.* at 7–8.)

### D. Procedural Background

Pittsburgh Corning filed its voluntary petition for relief under chapter 11 on April 16, 2000. Shortly thereafter, the U.S. Trustee appointed the Official Committee of Asbestos Creditors ("ACC") to represent holders of asbestos claims against Pittsburgh Corning. Bankr. Op. ¶ 6. The bankruptcy court appointed a Future Claimants' Representative ("FCR") to represent the interests of individuals who assert asbestos personal injury claims against Pittsburgh Corning in the future. *Id.* ¶ 7.

After several iterations, Pittsburgh Corning, the ACC, and the FCR proposed a second amended plan of reorganization on November 20, 2003. (Second Amended Plan, T5.) This plan garnered the support of PPG, Corning, and more than forty insurers. (Second Amended Plan Trust Funding Agreement, T176:11137–11201.) Other insurers, including Mt. McKinley, objected to this plan. After confirmation hearings in May 2004, the bankruptcy court denied confirmation. *In re Pittsburgh Corning Corp.*, 417 B.R. 289 (Bankr. W.D. Pa. 2006). Pittsburgh Corning, the ACC, and the FCR proposed a third amended plan on January 29, 2009. (Third Amended Plan, T16.) After additional amendments and modifications, all objecting insurers except Mt. McKinley withdrew their objections. (Amended and Restated Stipulation Resolving Plan Objections, T182.)

The bankruptcy court held confirmation hearings on the third amended plan in June 2010 and again denied confirmation. *In re Pittsburgh Corning Corp.*, 453 B.R. 570 (Bankr. W.D. Pa. 2011). After additional modifications, the bankruptcy court issued an opinion and order confirming the plan on May 24, 2013. Bankr.

---

5    The actions are *PPG Industries, Inc. v. Pittsburgh Corning Corp.*, an adversary proceeding filed in this case as Adversary No. 00-2201, and *Mt. McKinley Insurance Co. v. Corning Inc.*, pending in New York state court. (Mt. McKinley's Br. 8, ECF No. 56.)

Op., 2013 WL 2299620, at *1–2. After issuing the opinion and final order, the bankruptcy judge who presided over the case retired from the bench. Mt. McKinley filed a motion for reconsideration. The newly assigned bankruptcy judge granted the motion for reconsideration with respect to an uncontested clarification of the plan and denied the motion in all other respects. *In re Pittsburgh Corning Corp.*, No. 00-22876, 2013 WL 5994979 (Bankr. W.D. Pa. Nov. 12, 2013.)

### E.  Substance of the Plan

The key feature of the plan is the creation of the "Pittsburgh Corning Asbestos PI Trust" (the "trust"). (Plan § 9.1.1, T56:4858.) The trust will resolve and pay asbestos personal injury claims asserted against it. Pittsburgh Corning, PPG, Corning, and certain insurers will contribute assets to fund the trust. In return, the plan calls for the bankruptcy court to issue a permanent injunction under 11 U.S.C. § 524(g) channeling "Asbestos PI Trust Claims" to the trust and enjoining recovery of such claims against "Asbestos Protected Parties."[6] The plan channels asbestos claims against Pittsburgh Corning to the trust. With respect to PPG and Corning, however, the plan channels only asbestos claims arising out of exposure to Unibestos or other asbestos products manufactured, sold, or distributed by Pittsburgh Corning. (Plan § 1.1, T56:4820–24.) Claims against PPG or Corning arising out of exposure to asbestos through PPG or Corning products not related to Pittsburgh Corning are not channeled. (*Id.*, T56:4820, 4834–35.)

Fully funded, the trust will control assets worth more than $3 billion. *Id.* ¶ 380. These assets include 100 percent of the stock of the reorganized Pittsburgh Corning and $290 million in insurance payments or settlements between Pittsburgh Corning and its insurers. (Plan § 9.1.3, T56:4858.) PPG will contribute approximately $825 million in a series of cash payments, 1,388,889 shares of PPG

---

6   "Asbestos Protected Parties" is defined as Pittsburgh Corning and its affiliates, PPG and its affiliates, "participating" and "nonparticipating" insurers of PPG (including Mt. McKinley), and Corning and its affiliates. (Plan § 1.1, T56:4822–24.)

common stock or its cash equivalent,[7] its 50 percent stake in Pittsburgh Corning, and its 50 percent stake in Pittsburgh Corning Europe.[8] (PPG Trust Funding Agreement 11–12, T56:5025–26; PPG Trust Funding Agreement sched. A, T56:5051–52.) Corning will contribute between $240 million and $290 million in cash, its 50 percent stake in Pittsburgh Corning, and its 50 percent stake in Pittsburgh Corning Europe. (Corning Trust Funding Agreement 9–10, T56:5160–61.) Forty-eight insurers (the "participating insurers") will contribute cash payments totaling in aggregate approximately $1.7 billion. (PPG Trust Funding Agreement sched. A, T:56:5051–52.) As part of the trust funding agreement, PPG and Corning will relinquish certain insurance claims against the participating insurers. (Insurance Claims Agreement 2–3, T56:5242–43.)

The trust will have three trustees selected by the ACC and FCR. (Plan § 9.1.2, T56:4858.) The trust will also have an advisory committee of five members. (Asbestos PI Trust Agreement § 5.1, T56:4898.) The initial members of the advisory committee are members of law firms representing asbestos claimants. (Confirmation Hr'g Tr. 248:17–20, May 5, 2004, T12:1412.) The advisory committee members have a fiduciary responsibility to the present holders of channeled asbestos claims. (Asbestos PI Trust Agreement § 5.2, T56:4899.) The FCR has a fiduciary role representing the interests of future claimants. (*Id.* § 6.1, T56:4902.)

The trust will resolve channeled asbestos claims according to the terms of the trust distribution procedures. (Plan § 3.2.5, T56:4846.) The trust distribution procedures provide for an expedited review process to evaluate asbestos claims. (Trust Distribution Procedures § 5.3(a), T56:4932–36.) Under expedited review,

---

7   The value of the stock is determined by the twenty-day moving average three days prior to the funding effective date. (PPG Trust Funding Agreement 12, T56:5026.) On September 30, 2014, the market price of 1,388,889 shares of PPG common stock was more than $280,000,000.

8   Pittsburgh Corning Europe, N.V., is a licensee of Pittsburgh Corning with production facilities in Belgium, Germany, and the Czech Republic. Bankr. Op. ¶ 29.

claims are categorized into eight disease levels with defined medical diagnoses and levels of exposure to Unibestos or another Pittsburgh Corning asbestos product. (*Id.*) Each disease level has an accompanying scheduled value. The scheduled values range from $400 for level I (other asbestos disease) to $175,000 for level VIII (mesothelioma). (*Id.*) A claimant who receives payment for a nonmalignant asbestos-related disease (disease levels I–IV) may assert a second claim if the claimant develops and is diagnosed with a malignant disease (disease levels V–VIII). (*Id.* § 5.9, T56:4945.) Instead of expedited review, a claimant may elect individual review, in which case the trust will liquidate the value of the claim based upon the historical value of similar claims in the tort system. (*Id.* § 5.3(b), T56:4936–38.) The liquidated value of claims is subject to a maximum value limit based upon the applicable disease level. (*Id.* § 5.3(b)(1), T56:4937.) The maximum values range from $10,000 for disease level II to $500,000 for disease level VIII.[9] (*Id.* § 5.3(c), T56:4938–39.) If a claimant meets certain criteria—for example, where the claimant was exposed only to Pittsburgh Corning asbestos products and has little likelihood of a substantial recovery elsewhere—the claim may be categorized as "extraordinary" and the maximum value is increased. (*Id.* § 5.4(a), T56:4939.)

It is unknown whether the trust will have sufficient assets to pay the full liquidated value of each claim. Therefore, except for claims based upon disease level I, claimants will receive a percentage of the liquidated value of the claim based upon the number of claims and remaining assets. (*Id.* § 2.3, T56:4923.) This payment percentage is designed to protect the interests of future claimants. (*Id.* § 4.1, T56:4926.) The initial payment percentage is 37 percent. (*Id.* § 4.2, T56:4926.) The trustees, with the agreement of the advisory committee and the

---

9    For disease level I there is a cash discount payment with a scheduled value of $400. This payment is not subject to the payment percentage, and the maximum value is not applicable to disease level I. (Trust Distribution Procedures §§ 2.3, 5.3(c), T56:4923, 4939.)

FCR, can increase the payment percentage if they determine a change is appropriate and required. (*Id.*, T56:4927.) If the payment percentage is increased, the trust will make supplemental payments to claimants who previously received a payment at the lower payment percentage. (*Id.* § 4.4, T56:4928.)

The trust distribution procedures provide for arbitration to review the trust's rejection of a claim, determination of disease level, or determination of a claim's liquidated value. (*Id.* § 5.10, T56:4945–46.) Claimants who reject a nonbinding arbitral award may litigate their claims against the trust in the tort system. (*Id.* § 5.11, T56:4947.) Any money judgment obtained by a claimant in the tort system is subject to the payment percentage and maximum value or maximum extraordinary value limitation. (*Id.* § 7.7, T56:4951.)

### F.  Findings of the Bankruptcy Court

The Bankruptcy Code requires the bankruptcy court to make a number of findings before confirming a plan of reorganization under chapter 11 and issuing an asbestos channeling injunction under § 524(g). The bankruptcy court made the requisite findings and conclusions under chapter 11, Bankr. Op. ¶¶ 324–46, 404–51, and it made the required findings for issuing an injunction under § 524(g). *Id.* ¶¶ 347–90, 452–66.

The bankruptcy court addressed and overruled Mt. McKinley's objections to confirmation of the plan. First, the bankruptcy court concluded that Mt. McKinley lacked standing to raise any objections. *Id.* ¶ 469. The bankruptcy court found the plan did not harm Mt. McKinley. *Id.* ¶ 470 ("Despite [Mt. McKinley's] protestations to the contrary, its burdens are not increased and its rights under the subject insurance policies are not impaired."). The bankruptcy court reached this conclusion based upon plan provisions that purportedly make the plan "insurance neutral." *Id.* ¶ 469. The insurance-neutrality language provides that all of Mt. McKinley's coverage disputes are preserved and will be resolved outside the bankruptcy case in coverage litigation between the parties. *Id.* The bankruptcy

court nevertheless overruled Mt. McKinley's objections on the merits. *Id.* ¶¶ 478–86.

### G. Mt. McKinley's Arguments on Appeal

Mt. McKinley alleges that, despite the insurance-neutrality provisions of the plan, the plan erodes Mt. McKinley's contractual rights and will be used against it in coverage litigation by PPG and Corning. Mt. McKinley maintains the plan will pay fraudulent and invalid claims and thus will increase Mt. McKinley's risk and exposure. Because the plan allegedly harms Mt. McKinley and is not insurance neutral, Mt. McKinley argues it had standing before the bankruptcy court. Mt. McKinley challenges various discovery and evidentiary rulings made by the bankruptcy court and the bankruptcy court's finding that the plan was proposed in good faith. Mt. McKinley wanted broad discovery into potential fraud and collusion in the creation of the plan, which the bankruptcy court refused to permit. Finally, Mt. McKinley argues that key funding agreements are unsigned and unenforceable.

## III.    Jurisdiction and Standard of Review

The court has jurisdiction over this appeal because the confirmation order is a final order of the bankruptcy court. 28 U.S.C. § 158. Additionally, a § 524(g) channeling injunction must be "issued or affirmed by the district court that has jurisdiction over the reorganization case" before the injunction becomes "valid and enforceable." 11 U.S.C. § 524(g)(3)(A).

The bankruptcy court's conclusions of law are reviewed de novo. *In re Makowka*, 754 F.3d 143, 147 (3d Cir. 2014). The parties dispute the standard of review applicable to the bankruptcy court's findings of fact. In an appeal from a final or dispositive order of the bankruptcy court on a core proceeding, the district court reviews the bankruptcy court's findings of fact for clear error. Fed. R. Bankr. P. 8013; *In re Heritage Highgate, Inc.*, 679 F.3d 132, 139 (3d Cir. 2012). The bankruptcy court, however, lacks jurisdiction to issue a final order about noncore matters. 28 U.S.C. § 157(c)(1). In such a case, the bankruptcy court "shall submit

proposed findings of fact and conclusions of law to the district court," which reviews de novo "those matters to which any party has timely and specifically objected." *Id.*; *see* FED. R. BANKR. P. 9033.

Mt. McKinley argues that the issues in this appeal are noncore and the bankruptcy opinion should be viewed as a report and recommendation. (Mt. McKinley's Br. 5–6, ECF No. 56.) Because the validity of an asbestos channeling injunction is predicated on district court affirmation, Mt. McKinley argues, as a matter of statutory interpretation, that confirmation of a plan of reorganization containing a § 524(g) injunction is a noncore matter. (*Id.* at 5.) Mt. McKinley also argues that the Supreme Court's decision in *Stern v. Marshall*, 131 S. Ct. 2594 (2011), requires this court to review the bankruptcy court's factual findings de novo as a matter of constitutional law. The plan parties argue that the district court should review the bankruptcy court's findings of fact for clear error. (Plan Parties' Br. 4, ECF No. 64.)

Bankruptcy courts in this circuit have recognized uncertainty about whether confirmation of a plan of reorganization with a § 524(g) injunction is a core or noncore proceeding. *See In re ABB Lummus Global Inc.*, No. 06-10401, 2006 WL 2052409, at *1 (Bankr. D. Del. June 29, 2006) ("Because of the unique nature of the difficulty of ascertaining on an issue by issue basis whether the Bankruptcy Court's jurisdiction is core or non-core, the Bankruptcy Court will recommend to the District Court entry of a final order confirming the Plan."); *In re U.S. Mineral Prods. Co.*, No. 01-2471, 2005 WL 5898300, at *2 (Bankr. D. Del. Nov. 29, 2005) ("With respect to the issuance of the Permanent Channeling Injunction, this Court may hear and report to the District Court pursuant to 28 U.S.C. § 157(c), to the extent necessary, concerning the entry of that relief."); *In re ACandS, Inc.*, 311 B.R. 36, 38 (Bankr. D. Del. 2005) ("Although there is some doubt whether this court has core or noncore jurisdiction under 28 U.S.C. § 157(b)(2) as to the confirmation of a Chapter 11 plan in which the debtor seeks relief under 11 U.S.C. § 524, the court will assume that this proceeding is noncore, and issue these proposed findings in

accordance with Bankruptcy Rule 9033."). *But see In re Plant Insulation Co.*, 734 F.3d 900, 908 (9th Cir. 2013) (holding that confirmation of a plan of reorganization with a § 524(g) injunction is a final decision as a matter of statutory interpretation, but not ruling on the constitutional issue because that argument was waived).

Because the appropriate standard of review is uncertain, the court will assume without deciding that the bankruptcy opinion is a report and recommendation. The bankruptcy court's factual findings, including those dealing with the § 524(g) injunction, will therefore be reviewed de novo.

## IV.    Discussion

The bankruptcy court held Mt. McKinley lacked standing to object to the plan. This court agrees. The standing issue is dispositive, and the court will affirm the plan on that basis.

### A.    Standing Overview

This case involves two levels of standing. The first level is the standing of Mt. McKinley to object to the plan in the bankruptcy court ("bankruptcy standing").[10] The second level is Mt. McKinley's standing to appeal the bankruptcy court's confirmation order to the district court ("appellate standing"). As explained below, only bankruptcy standing is at issue in this appeal.

Bankruptcy standing is governed by both Article III of the Constitution and the Bankruptcy Code. The Constitution limits the judicial power of the United States to "Cases" and "Controversies." U.S. Const. art. III. "[A]n essential and unchanging part of the case-or-controversy requirement" is the doctrine of standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). To have standing under Article III, "a plaintiff must present an injury that is concrete, particular-

---

[10]    One court has called "bankruptcy standing" a "misnomer." *In re C.P. Hall Co.*, 750 F.3d 659, 660 (7th Cir. 2014). The court will use the term to distinguish between standing at the bankruptcy court level and standing to appeal to the district court.

ized, and actual or imminent; fairly traceable to the defendant's challenged action; and redressable by a favorable ruling." *Horne v. Flores*, 557 U.S. 433, 445 (2009). The injury need not be great—"some specific, 'identifiable trifle' of injury" suffices. *Bowman v. Wilson*, 672 F.2d 1145, 1151 (3d Cir. 1982) (quoting *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n.14 (1973)). The "critical question" is whether a plaintiff "has 'alleged such a personal stake in the outcome of the controversy as to warrant *his* invocation of federal-court jurisdiction.'" *Horne*, 557 U.S. at 445 (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)).

The right to be heard in a bankruptcy case is governed by 11 U.S.C. § 1109: "A party in interest … may raise and may appear and be heard on any issue in a case under this chapter." 11 U.S.C. § 1109(b). Specifically, and as applicable in this case, "[a] party in interest may object to confirmation of a plan." 11 U.S.C. § 1128(b). The party in interest standard "'must be construed broadly to permit parties affected by a chapter 11 proceeding to appear and be heard.'" *In re Global Indus. Techs., Inc.*, 645 F.3d 201, 211 (3d Cir. 2011) (en banc) (quoting *In re Amatex Corp.*, 755 F.2d 1034, 1042 (3d Cir. 1985)). Indeed, the Court of Appeals for the Third Circuit noted that "[p]ersuasive authority indicates that Article III standing and standing under the Bankruptcy Code are effectively coextensive." *Id.* Although the court of appeals had no occasion to decide whether they are coextensive, it found standing under § 1109 to be "at least [as] broad" as constitutional standing. *Id.* at 211 n.25.

Appellate standing, however, is more exacting than constitutional standing. *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 215 (3d Cir. 2004). "Standing to appeal in a bankruptcy case is limited to 'persons aggrieved' by an order of the bankruptcy court." *Id.* at 214. The persons aggrieved standard is a prudential limit on standing. *Id.* To have standing to appeal an order of the bankruptcy court under the persons aggrieved standard, a party must show that the order "'diminishes [its] property,

increases [its] burdens, or impairs [its] rights.'" *Id.* (quoting *In re PWS Holding Corp.*, 228 F.3d 224, 249 (3d. Cir. 2000)).

Standing to appeal "the substance of the bankruptcy court's decision" is distinct from standing to appeal the bankruptcy court's denial of bankruptcy standing. *Global Indus. Techs.*, 645 F.3d at 209 n.23. A party denied standing by the bankruptcy court may appeal that decision. *Id.* To hold otherwise "would risk leaving parties in interest who have been erroneously denied bankruptcy standing, but who do not meet the more stringent requirements for appellate standing, without legal redress for that error." *Id.* Therefore, in this case, the court need not reach the issue of appellate standing. Because the bankruptcy court denied Mt. McKinley bankruptcy standing, Mt. McKinley has appellate standing to raise that issue. The issue with respect to standing is whether the bankruptcy court properly denied Mt. McKinley standing to object to the plan.

### B.  Combustion Engineering *and* Global Industrial Technologies

The bankruptcy court found that the plan does not harm Mt. McKinley because it is "insurance neutral." Bankr. Op. ¶ 470. In reaching this conclusion, the bankruptcy court relied, in part, on *In re Combustion Engineering, Inc.*, 391 F.3d 190 (3d Cir. 2004). *Combustion Engineering* involved the confirmation of a plan of reorganization with an asbestos channeling injunction.[11] Before the bankruptcy court, certain insurers of the debtor and two nondebtor affiliates argued the plan impaired their interests. *Id.* at 213 & n.16. In response, the bankruptcy court added a "super-preemptory" provision to the plan. *Id.* at 216. The super-preemptory

---

11    The channeling injunction in *Combustion Engineering* included independent, nonderivative claims against nondebtor third parties. Because this extension to nonderivative claims is not permitted under § 524(g), the bankruptcy court issued the injunction under the equitable power authorized by 11 U.S.C. § 105(a). The court of appeals vacated the § 105 injunction. *Combustion Eng'g*, 391 F.3d at 234. This case does not involve an extension of an injunction to independent, nonderivative claims or § 105. Under those circumstances, the *Combustion Engineering* rationale in that respect does not affect the standing analysis in this case.

provision provided that "nothing in the Plan 'shall in anyway [sic] operate to, or have the effect of, impairing insurers' legal, equitable or contractual rights, if any, in any respect.'" *Id.* at 217 (quoting plan) (alteration in original). The court of appeals held that "this language broadly preserves insurers' pre-petition rights under the subject insurance policies and settlements." *Id.* The insurers were not required to pay more than their preexisting policy limits, and they retained all the coverage challenges and defenses they had prepetition. *Id.* The court concluded that the plan did "not diminish the rights of insurers or increase their burdens under the subject insurance policies and settlements." *Id.* Therefore, the insurers were not "persons aggrieved" and did not have appellate standing to challenge the plan as confirmed by the bankruptcy court.[12] *Id.*

The plan in this case contains insurance-neutrality language based upon the super-preemptory provision in *Combustion Engineering*. (Plan § 11.17.1, T56:4872). This "insurance-neutrality language" is found in § 11.17 of the plan, which provides:

> 11.17.1 Notwithstanding anything to the contrary in the Confirmation Order or the Plan, nothing in the Confirmation Order or the Plan (including any other provision that purports to be preemptory or supervening) shall in any way operate to impair, or have the effect of impairing, the insurers' legal, equitable or contractual rights, if any, in any respect; the rights of the insurers, shall be determined under: the PPG Non-Participating Insurance Policies, the Corning Insurance Policies, the Other Corning Policies, the PPG Participating Insurance Policies, the PCC Settled Insurance Policies; and related Insurance Settlement Agreements, as applicable. The enjoining of insurers'

---

[12]  The district court modified the super-preemptory provision to preserve "'the insurers' legal, equitable or contractual rights, if any, *in respect of any claims* (as defined by section 101(5) of the Bankruptcy Code).'" *Combustion Eng'g*, 391 F.3d at 217 (quoting the district court). By referring to "claims" rather than the broader "rights" language in the bankruptcy court's order, the district court narrowed the applicability of the provision. *Id.* The court of appeals found that the insurers had "limited standing" to challenge the modification, *id.* at 202, and vacated the modified provision, restoring the broader language drafted by the bankruptcy court, *id.* at 218.

> contribution and subrogation claims under the Asbestos
> Permanent Channeling Injunction shall not be deemed to
> be impairment of the insurers' rights.

(Plan § 11.17.1, T56:4872, *as modified by* Proposed Amendment, T190:13587); *see*
Bankr. Op. ¶ 472 (noting that the modification deleted a "proviso" Mt. McKinley
found objectionable). The first sentence of § 11.17.1 is similar to the insurance-
neutral language contained in the plan of reorganization in *Combustion Engineering*.
The second sentence was not contained in the *Combustion Engineering* plan. Mt.
McKinley argued below that the second sentence "impermissibly detracts from the
concept of insurance neutrality." Bankr. Op. ¶ 265. The bankruptcy court dis-
missed this contention because the inclusion of Mt. McKinley as an "Asbestos
Protected Party" and the "Judgment Reduction" provisions of § 11.9 protected its
interests. *Id.* Section 11.9 provides that any judgment against Mt. McKinley in
coverage litigation by PPG or Corning will be reduced by any amount Mt.
McKinley would have been entitled to recover through "contribution, indemnity,
reimbursement, subrogation or other similar claims" against an Asbestos Protected
Party. (Plan §§ 1.1, 11.9, T56:4840, 4866–67.) While the channeling injunction
prevents Mt. McKinley from seeking contribution or indemnity directly from an
Asbestos Protected Party, the Judgment Reduction provisions remediate this
otherwise detrimental effect of the injunction. LMI advised the court that the
second sentence of § 11.17.1 is beneficial to Mt. McKinley and other nonsettling
insurers because it clarifies that the protection of the injunction extends to them.
(LMI Resp. Br. 12, ECF No. 65.) In other words, Mt. McKinley cannot be sued by
any asbestos plaintiff or any other entity except PPG and Corning. Mt. McKinley
did not raise the issue of the second sentence of § 11.17.1 in its appeal, and the
court need not address it further.

Mt. McKinley argues the plan will harm it despite the insurance-neutrality language and distinguishes *Combustion Engineering*.[13] The key factual difference between *Combustion Engineering* and the present case is, according to Mt. McKinley, that the debtor and insurers in *Combustion Engineering* had agreed, nearly twenty years before the bankruptcy, to an asbestos claims-handling procedure solely overseen by the debtor and later delegated to a third-party servicer. (Mt. McKinley's Standing Reply Br. 2, ECF 78); *see Combustion Eng'g*, 391 F.3d at 207 & n.12. The insurers had no say in what claims were paid prepetition. *Combustion Eng'g*, 391 F.3d at 209. The procedure for distribution of the trust was the same as the claims-handling procedure used by the third-party servicer. *Id.* In this case, Mt. McKinley did not agree to any payment protocols prepetition and did not agree to limit any rights under its policies in any way. Accordingly, it argues *Combustion Engineering* is inapposite. (Mt. McKinley's Standing Reply Br. 3, ECF No. 78.)

Instead, Mt. McKinley urges the court to rely on the *Global Industrial Technologies* decision, in which the Court of Appeals for the Third Circuit, sitting en banc, found that insurers had standing despite the presence of insurance-neutrality language similar to the language in this case. The plan of reorganization in *Global Industrial Technologies* included injunctions channeling asbestos claims and silica claims.[14] Insurers objected to the plan and, in particular, questioned the legitimacy of silica claims asserted against the debtor. *Global Indus. Techs.*, 645 F.3d at 207. The objecting insurers presented evidence to the bankruptcy court about the suspect nature of these claims. Fifty-seven percent of the silica claims were diagnosed by physicians whom another asbestos trust banned as not credible.

---

13   Mt. McKinley correctly points out that *Combustion Engineering* dealt with appellate standing, not bankruptcy standing. (Mt. McKinley's Standing Reply Br. 3 n.1, ECF No. 78.)

14   Inhalation of silica dust can cause silicosis, a serious lung disease. Stedman's Medical Dictionary 1773 (28th ed. 2006).

*Id.* More than half the silica claimants also asserted claims against an asbestos trust or had been diagnosed with an asbestos-related disease, although it is extremely unlikely for an individual simultaneously to have silicosis and asbestosis.[15] *Id.* at 208. In sum, the bankruptcy court heard evidence challenging the legitimacy of 91.5 percent of the silica claims. *Id.* The bankruptcy court found the insurers lacked standing to object and confirmed the plan, and the district court affirmed. *Id.* Before the court of appeals, the debtor argued that the plan was insurance neutral because it preserved the insurers' coverage defenses. *Id.* at 212.

The court of appeals called "'[i]nsurance neutrality' … a meaningful concept where, as in *Combustion Engineering*, a plan does not materially alter the quantum of liability that the insurers would be called to absorb." *Id.* The court distinguished *Combustion Engineering*, where "the pre-petition quantum of asbestos liability was known from four decades of asbestos litigation, and moving the pre-petition asbestos claims out of the tort system and into a trust system did not increase in any meaningful way the insurers' pre-petition exposure to asbestos liability." *Id.* In contrast, the "quantum of liability" of the silica claims in *Global Industrial Technologies* "staggeringly increased" from 169 prepetition to 4,626 after the plan was proposed. *Id.* at 204, 207, 212. The court of appeals held that, under those circumstances, the insurers were entitled to bankruptcy standing and "their proper place at the litigation table." *Id.* at 204 & n.4. The court summarized its decision as "no more far-reaching than this: when a federal court gives its approval to a plan that allows a party to put its hands into other people's pockets, the ones with the pockets are entitled to be fully heard and to have their legitimate objections addressed." *Id.* at 204.

---

15    In discussing the likelihood of a person simultaneously suffering from silicosis and asbestosis, the court of appeals quoted a district court in a multidistrict silica case, which noted that "'a golfer is more likely to hit a hole-in-one than an occupational medicine specialist is to find a single case of both silicosis and asbestosis.'" *Global Indus. Techs.*, 645 F.3d at 207 (quoting *In re Silica Prods. Liab. Litig.*, 398 F. Supp. 2d 563, 603 (S.D. Tex. 2005)).

### C.  Mt. McKinley's Arguments for Standing

Mt. McKinley argues it has standing under *Global Industrial Technologies* because, as in that case, the quantum of liability has increased dramatically from the *status quo ante*, the plan negatively affects its rights under its insurance policies with PPG and Corning, there is evidence questioning the legitimacy of the underlying claims, and the plan imposes massive administrative costs on Mt. McKinley.

#### 1.  Quantum of Liability

Mt. McKinley argues the quantum of liability of Corning "would increase from minimal to hundreds of millions of dollars." (Mt. McKinley's Standing Reply Br. 6, ECF No. 78.) Before the bankruptcy court, a Corning representative testified that Corning, in the mid-1980s, contributed "a small part" toward the settlement of approximately 2,500 Unibestos claims, but had not contributed to any Unibestos settlements after that time. (Confirmation Hr'g Tr. 76:7–18, May 4, 2004, T11:1069.) Corning's contribution to the trust, however, is more than $200 million. (Corning Trust Funding Agreement 9–10, T56:5160–61.) Corning was defending 11,400 Unibestos claims as of the petition date. Bankr. Op. ¶ 57. PPG, which contributed $2 million to Unibestos settlements prepetition, faced approximately 116,000 Unibestos claims as of the petition date. *Id.*

Although Corning and PPG spent comparatively little settling Unibestos suits prepetition, the bankruptcy court found the ultimate result of the outstanding suits was "unknowable."[16] Bankr. Op. ¶ 156. The unknowable determination is particularly true in light of the insolvency of Pittsburgh Corning. If Unibestos

---

16    The bankruptcy court stated that "[n]otwithstanding this finding that the settlements are reasonable for purposes of Plan confirmation, nothing in those settlements, the Plan, the Plan Documents, these Findings of Fact and Conclusions of Law or the Confirmation Order are an adjudication of the merits of any dispute for insurance coverage purposes." Bankr. Op. ¶ 156. To the extent this court adopts this and other findings of the bankruptcy court for the purpose of affirming the plan, this court's rulings must not be considered a merits determination for purposes of insurance coverage litigation and do not have preclusive or any other effect in any insurance coverage litigation.

plaintiffs were not able to recover from Pittsburgh Corning, they likely would more aggressively pursue PPG and Corning. In this light, the court concludes the prepetition liability of PGG and Corning for Unibestos was unknowable. Because PPG and Corning were exposed to an unknown amount of risk prepetition, the count cannot find that the plan materially increased their quantum of liability, as measured by the value of claims.

The overall prepetition quantum of liability of all Unibestos claims was known from decades of litigation, as it was in *Combustion Engineering. See Global Indus. Techs.*, 645 F.3d at 212 ("Indeed, in *Combustion Engineering*, the pre-petition quantum of asbestos liability was known from four decades of asbestos litigation, and moving the pre-petition asbestos claims out of the tort system and into a trust system did not increase in any meaningful way the insurers' pre-petition exposure to asbestos liability."). The issue the court of appeals identified in *Global Industrial Technologies* was an explosion in silica claims—a "staggering[]" twenty-seven-fold increase. *Id.* In *Combustion Engineering*, 25,000 to 30,000 additional claimants came forward during the claims process, but this was not "a material increase in pre-petition obligations" because Combustion Engineering had "dealt with hundreds of thousands of asbestos claims" in the decades before its bankruptcy. *Id.* at 212 n.28.

In this case there is no explosion of claims or material alteration in the overall quantum of liability. At the petition date, approximately 235,000 claims were pending, and about 200,000 claims had been resolved. Bankr. Op. ¶¶ 55–56. Between September and November 2009, channeled asbestos claim holders voted on the plan of reorganization, and 359,298 valid ballots were cast. (Tabulation of Votes, T31:2460–66.) The number of claims increased by about 125,000 from the prepetition level, an increase of approximately 50 percent, which is a large amount in both absolute and relative terms. The increased number of claims, however, is reasonable under the circumstances in this case because the vote occurred nine years after the petition and the increase is consistent with the rate at which claims

were increasing prepetition. For example, pending claims increased from 15,000–20,000 in 1981 to 60,000–75,000 in 1985, a three- to five-fold increase. Bankr. Op. ¶ 54. From 1985 to 2000 pending claims increased from 60,000–75,000 to 235,000, a three- to four-fold increase. *Id.* ¶ 56. These increases in pending claims do not include the approximately 200,000 claims that had been resolved by 2000. *Id.* ¶ 55. Thus, a 50 percent increase in claims from 2000 to 2009 is not inordinate. The court finds that the plan did not materially alter the quantum of asbestos liability, as measured by the number of claims.

### 2. *Contractual Rights*

Mt. McKinley asserts the plan derogates contractual rights it has under its insurance policies with PPG and Corning. (Mt. McKinley's Br. 50, ECF No. 56.) Under the policies, Mt. McKinley is entitled to its insureds' "fullest cooperation and assistance." (*Id.*) This cooperation and assistance includes providing Mt. McKinley with information and documents about claims, and PPG and Corning provided this information to its insurers prepetition. (*Id.* at 51.) The trust distribution procedures, however, do not provide for Mt. McKinley's participation in the handling of claims channeled to the trust. (*Id.*) Under the trust distribution procedures, the trust shall treat claims information as confidential and shall not disclose the information except to another trust, with the permission of the holder, or in response to a valid subpoena. (Trust Distribution Procedures § 6.5, T56:4948.)

Mt. McKinley asserts that to obtain the information about claims it was entitled to prepetition, the plan will force it to retain counsel, file a lawsuit, and issue subpoenas. (Mt. McKinley's Br. 52, ECF No. 56.) According to Mt. McKinley, this derogation of its contractual rights and imposition of additional burdens is sufficient to confer standing. (Mt. McKinley's Standing Reply Br. 6, ECF No. 78.) Thus, Mt. McKinley argues the bankruptcy court's finding that nothing in the plan "excuses or purports to excuse PPG or Corning from obligations, if any, that either of them may have to cooperate with or assist Mt. McKinley," Bankr. Op. ¶ 480, is unsupported. (Mt. McKinley's Br. 52–53, ECF No. 56.)

The bankruptcy court's finding is correct. Whether PPG or Corning has a contractual duty to cooperate with Mt. McKinley under the relevant insurance policies is a matter to be resolved in coverage litigation. Nothing in the plan or the bankruptcy court's confirmation opinion and order made any determination with respect to this issue. Bankr. Op. ¶ 478. The failure of an insured to cooperate is a defense to coverage and may relieve the insurer of liability under the policy. *See Verdetto v. State Farm Fire & Cas. Co.*, 510 F. App'x 209, 211 (3d Cir. 2013); *Forest City Grant Liberty Assocs. v. Genro II, Inc.*, 652 A.2d 948, 951 (Pa. Super. Ct. 1995). Should either PPG or Corning breach a contractual duty it owes under the policies, Mt. McKinley may assert that as a defense in coverage litigation. Neither PPG nor Corning may claim that § 6.5 of the trust distribution procedures—or any part of the plan, the bankruptcy court's opinion, or this opinion—excuses it from any duty under the relevant insurance policies. If either PPG or Corning fails to cooperate with Mt. McKinley, it will do so at its peril.

Mt. McKinley argues the plan contains findings that will harm its rights by "facilitate[ing] recovery" of PPG and Corning's trust contributions from it in coverage litigation. (Mt. McKinley's Br. 55, ECF No. 56.) Mt. McKinley points to findings that the trust contributions are "fair and equitable" to claimants, the contributions "constitute reasonable settlements and fair resolutions of the alleged liability" of insurers, and the trust contributions of PPG and Corning are "reasonable." (*Id.* at 56; Plan §§ 8.1.15, .17, .22, .26, .32, T56:4852–54; Trust Distribution Procedures § 1.1, T56:4920.) These findings, Mt. McKinley complains, were made on an insufficient record because the bankruptcy court "impermissibly denied discovery into the negotiation of the Plan." (Mt. McKinley's Br. 56, ECF No. 56.)

Regardless of Mt. McKinley's assertions with respect to the denial of discovery, which are more fully addressed below, these findings do not harm it. The following language—or substantially similar language—accompanies each finding that the contribution to the trust by one of Mt. McKinley's insureds is reasonable: "This

finding, however, shall not be binding and shall not have collateral estoppel effect on the PPG Non-Participating Insurers [i.e., Mt. McKinley] in any insurance coverage litigation regarding the insurance coverage obligations of the PPG Non-Participating Insurers." (*See, e.g.*, Plan §§ 8.1.15, .17, .22, .26, .28, .30, .31, .32, T56:4852–54.) The bankruptcy court carefully included similar language to accompany its findings. *See, e.g.*, Bankr. Op. ¶ 111 ("This finding, however, made for purposes of Plan confirmation, is not binding, shall not be binding, and shall not have collateral estoppel effect on the PPG Insurers in any coverage litigation regarding the insurance coverage rights or obligations of the PPG Insurers." (footnote omitted)). Moreover, PPG and Corning agreed not to introduce into evidence in coverage litigation with Mt. McKinley any of the bankruptcy court's findings or conclusions about the sufficiency of their trust contributions. Bankr. Op. ¶ 473. The plan provides that the confirmation order "shall enjoin" PPG and Corning and their affiliates from offering into evidence in any coverage litigation

> any of the following as binding in any way (including as a basis for res judicata, collateral estoppel, issue preclusion or claim preclusion), as constituting an adjudication for coverage purposes, or *as otherwise being probative of the truth of any matter asserted therein*: (i) any finding or conclusion by the Bankruptcy Court or the District Court adopting any of the findings or conclusions set forth in Section 8.1 of the Plan, or (ii) the second sentence of Section 1.1 of the [trust distribution procedures].

(Plan § 11.17.3, T56:4872 (emphasis added).) The bankruptcy court correctly found that Mt. McKinley is free to argue in coverage litigation that the trust contributions of PPG and Corning are not reasonable. *Id.* ¶ 481. If Mt. McKinley does so, neither PPG nor Corning may introduce the findings of the bankruptcy court or this court about the reasonableness of any plan provision.

Mt. McKinley worries that a court in coverage litigation might ignore the nonbinding, non-collateral estoppel provisions and nevertheless consider itself bound by the findings. (Mt. McKinley's Standing Reply Br. 9, ECF No. 78.) Mt.

McKinley points to *ARTRA 524(g) Asbestos Trust v. Fairmont Premier Insurance Co.*, Civil No. 09-458, 2011 WL 4684356 (N.D. Ill. Sept. 30, 2011), and *National Union Fire Insurance Co. of Pittsburgh, PA v. Porter Hayden Co.*, Civil No. 03-3408, 2012 WL 734176 (D. Md. Mar. 6, 2012), as examples of courts purportedly ignoring plan provisions or stipulations with insurance-neutrality language. These courts did not contravene the insurance-neutrality provisions or stipulations. While courts are not to give the findings of the plan collateral estoppel effect, the insurance-neutrality provisions do not prevent a court from independently reaching a conclusion that mirrors plan findings. *See Nat'l Union Fire Ins.*, 2012 WL 734176, at \*3 n.4 ("The parties entered into a stipulation before the Bankruptcy Court in March 2006. The Bankruptcy Insurance Stipulation expressly provided that neither court approval of the plan and plan documents, nor the confirmation order, could be relied on for certain purposes . . . . That stipulation, however, does not preclude this court from determining what approach is appropriate under law.").

Mt. McKinley's fear about how a court might interpret the plan in the future is neither a concrete injury, actual or imminent, nor fairly traceable to the plan. The Supreme Court is "reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment." *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1150 (2013). The respondents in *Clapper* sought a declaration that a surveillance statute was unconstitutional. They argued they could establish an injury in fact because there was "an objectively reasonable likelihood that their communications will be acquired under [the statute] at some point in the future." *Id.* at 1143. The statute, however, required the government to obtain the authorization of the Foreign Intelligence Surveillance Court before it could conduct the surveillance at issue. *Id.* at 1142. Respondents could "only speculate as to whether that court will authorize such surveillance" and could not establish that injury was "certainly impending" or "fairly traceable" to the statute. *Id.* at 1150; *see Whitmore v. Arkansas*, 495 U.S. 149, 159 (1990) ("It is just not possible for a litigant to prove in advance that the judicial system will lead to any

particular result . . . ."). Mt. McKinley's speculation about how a court may rule in coverage litigation does not establish an imminent injury, much less one that is fairly traceable to the plan.

### 3.  Legitimacy of Underlying Claims

Mt. McKinley has long questioned the legitimacy of the underlying claims and the propriety of the settlement negotiations in this case. Mt. McKinley and other insurers "believe[d] the Debtor did not ultimately propose reorganization in good faith to rid itself of its own asbestos liabilities, but instead, for the improper purpose of assisting its parents, PPG and Corning." (Mot. Hr'g Tr. 73:18–21, Feb. 19, 2004, T8:674.) Because there was substantial evidence of illegitimate claims in *Global Industrial Technologies*, the Third Circuit Court of Appeals found a need for the bankruptcy court to permit supplementation of the factual record and perform "a more searching review" of the insurers' allegations of collusion. *Global Indus. Techs.*, 645 F.3d at 215. "[A] party, granted standing and a full opportunity to participate, may add something meaningful to the record on which the Bankruptcy Court is called to make a decision." *Id.* at 215 n.33. The court of appeals believed the bankruptcy court was obligated to "render[] some judgment regarding the allegations of fraud and collusion." *Id.* Mt. McKinley argues the bankruptcy court improperly denied it a full opportunity to participate and refused to grant it discovery into fraud and collusion as required by *Global Industrial Technologies*.

Mt. McKinley and the other insurers sought discovery about the settlement negotiations to determine whether PPG and Corning colluded with claimant's lawyers to permit PPG and Corning to eliminate asbestos liability in return for granting overly lenient trust distribution procedures. (Mot. Hr'g Tr. 75:2–24, Feb. 19, 2004, T8:676.) The bankruptcy court denied the motion to compel, in part, because the substance of settlement negotiations was not reasonably calculated to

lead to admissible evidence.[17] (*Id.* at 106:16–20, 107:6–11, T8:707–08.) In addition, the insurers did not provide enough context for the court to know whether the motion to compel was relevant to a specific plan provision. (*Id.* at 91:6–15, T8:692.) The court after de novo review agrees that discovery into settlement discussions was not warranted. Fed. R. Evid. 408 (substance of settlement negotiations is not generally admissible); Fed. R. Civ P. 26 (to be discoverable, information must appear "reasonably calculated to lead to the discovery of admissible evidence"). The argument made by Mt. McKinley is based upon conjecture, and there is no evidence to implicate that discovery would lead to admissible evidence.

Mt. McKinley also objects to the bankruptcy court's handling of exhibits at the confirmation hearing purporting to show fraudulent behavior by certain claimants' law firms. (Mt. McKinley's Br. 21, ECF No. 56.) At the confirmation hearing in June 2010, Garlock Sealing Technologies, LLC, submitted eleven documents to the bankruptcy court indicating that law firms that had submitted ballots in this case subsequently submitted, in litigation in other cases, answers to requests for admission disclaiming knowledge about whether the client had exposure to Unibestos. (*Id.* at 22; *see, e.g.*, Garlock Ex. 121, T93:6555.) Mt. McKinley argues the bankruptcy court initially admitted these documents into evidence, but sua sponte reconsidered various objections and "un-admitted" them three years later in its confirmation opinion. (Mt. McKinley's Br. 21, 24, ECF No. 56.)

The bankruptcy court, however, admitted the exhibits conditionally and specifically subjected the admissibility, weight, relevance, and materiality of the

---

17    Mt. McKinley argues the bankruptcy court denied the motion because the insurers lacked standing. (Mt. McKinley's Br. 12, ECF No. 56.) The bankruptcy court was concerned about the insurers' standing to seek discovery about collusiveness. (Mot. Hr'g Tr. 76:1–5, Feb. 19, 2004, T8:677.) Standing, however, was not the only reason for the decision, and the bankruptcy court permitted discovery about issues of "good faith" that did not delve into settlement negotiations. (*Id.* at 107:6–11, T8:708.)

exhibits to post-trial consideration. Bankr. Op. ¶ 226; (Confirmation Hr'g Tr. 196:12–14, 198:21–25, June 9, 2010, T40:3204, 3206.) In the confirmation opinion, the bankruptcy court found, among other things, that the documents were not authenticated. Bankr. Op. ¶ 225. No witness was offered to acknowledge or explain the documents, and no explanation was given about the unavailability of a witness. *Id.* The bankruptcy court found that the documents were not admissible evidence. *Id.* (citing FED. R. EVID. 801(c), 804, 903).

Mt. McKinley argues the plan parties did not object to the lack of authentication at the time of the hearing, so that objection was waived. (Mt. McKinley's Br. 26, ECF No. 56.) The plan parties did object on hearsay grounds, however. (Confirmation Hr'g Tr. 195:23–25, June 9, 2010, T40:3203.) Mt. McKinley admits that the bankruptcy court "was open to reconsidering a hearsay objection." (Mt. McKinley's Br. 26, ECF No. 56.) The principal reason for the bankruptcy court's decision to exclude the evidence was hearsay. Bankr. Op. ¶ 225 (citing FED. R. EVID. 801(c), definition of hearsay, and FED. R. EVID. 804, hearsay exceptions when declarant unavailable).

Even if this court considers the eleven answers to requests for admission as evidence of record, which it will do for the purpose of resolving the issue of standing, those documents do not demonstrate that Mt. McKinley has standing. They show that eleven claimants may have supplied misleading or false answers to requests for admission in other litigation subsequent to filing ballots in this case.[18]

---

18  For example, the request for admission in *Andrews v. Rapid-American Corp.*, filed in in Massachusetts state court on February 9, 2010, stated:

**REQUEST NO. 66.**

Mr. Andrews was exposed to asbestos-containing materials … manufactured, fabricated, supplied and/or sold by Pittsburgh Corning.

Response:

Plaintiff objects to this request as it is unduly burdensome and calls for information that is neither relevant to the subject matter of this action nor reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding and without waiving said objection, Plaintiff

Even if those eleven ballots were invalid, it is a minuscule number compared to the more than 350,000 counted ballots. Even if all 2,469 ballots submitted by the two firms who authored the questioned discovery responses are invalid or fraudulent, a logical leap that Mt. McKinley asks the court to take, they amount to less than 1 percent of the number of claims in this case. This is dramatically different from *Global Industrial Technologies*, where there was an explosion of claims and the bankruptcy court heard evidence questioning the legitimacy of 91.5 percent of those claims. *Global Indus. Techs.*, 645 F.3d at 208.

As the bankruptcy court noted, Mt. McKinley made "no showing that claimants would seek full payment for their entire injury from Garlock and then again from this Trust or vice versa." Bankr. Op. ¶ 225 n.20. Further, the bankruptcy court correctly identified procedures in the trust to handle misleading or fraudulent information or claims:

> [I]n order to collect from the Asbestos PI Trust, evidence of "meaningful and credible exposure to [Pittsburgh Corning's] asbestos or asbestos-containing product(s)" must be presented. [Trust Distribution Procedures § 5.7(b)(3), T56:4944.] We note that many asbestos claimants allege and establish exposure to the products or conduct of more than one defendant. The [trust distribution procedures] properly define the parameters of the claims that the Trust may pay and the necessary evidence to support those claims.

*Id.* The trust distribution procedures provide for a claims audit program to examine the reliability of diagnoses and exposure evidence. (Trust Distribution Procedures § 5.8, T56:4945.) The trust may decline to accept evidence from a medical provider that has "engaged in a pattern or practice of providing unreliable medical evidence" and may penalize any claimant or claimant's attorney that

---

can neither admit nor deny this request as investigation is still ongoing.

(Garlock Ex. 121, at 21, T93:6555.)

submits fraudulent information to the trust. (*Id.*) The penalties include disallow-
ing claims, imposing the costs associated with the audit on the party responsible
for the fraudulent information, reordering priority levels, raising the level of
scrutiny applied to information from same source, and seeking criminal prosecu-
tion or sanctions from the bankruptcy court. (*Id.*) The trustees, the trust advisory
committee, and the FCR have fiduciary duties to the holders of *legitimate* current
and future claims, and they have an interest in assuring that only claims based on
reliable evidence are paid.

This case is not *Global Industrial Technologies*. The court of appeals in *In re
Federal-Mogul Global Inc.* distinguished that decision by recognizing

> that insurers' risk [in *Global Industrial Technologies*]
> altered when a reorganization plan's creation of a Silica
> Trust expanded the number of silica claims from 169 to
> over 4,600, a twenty-seven-fold increase, and when there
> was substantial evidence of collusion. No record evidence
> supports a similar finding here. Instead, Insurers argue
> transfer to the asbestos trust increases their risk solely
> because it may "put[] administration of the trust and
> claims resolution process in the hands of plaintiffs'
> lawyers" or may "pay[] claims that would not be entitled to
> payment in the tort system." These bare assertions do not
> rise to the exceptional and well-documented increase in
> risk we found in *Global Industrial Technologies*.

*In re Federal-Mogul Global Inc.*, 684 F.3d 355, 379 n.37 (3d Cir. 2012).[19] The record
in this case, like the record in *Federal-Mogul*, does not contain the extreme
evidence of fraud and collusion found in *Global Industrial Technologies*.[20] Mt.

---

19  The decision in *Federal-Mogul* dealt with whether bankruptcy law preempted
    antiassignment provisions in the insurance policies and did not directly address
    standing. The court of appeals did address whether assignment of insurance
    policies to an asbestos trust increased the exposure of the insurers, and that dis-
    cussion is relevant to the question whether Mt. McKinley is harmed by the plan
    in this case.

20  Mt. McKinley urges the court not to accept "the denial of discovery into
    collusion as 'evidence' of its absence." (Mt. McKinley's Reply Br. 7, ECF No. 77.)
    As addressed above, however, the bankruptcy court's ruling with respect to

McKinley's allegations of collusion and fraud and the evidence of the eleven purportedly misleading or false answers filed in other cases are not a basis to reverse the bankruptcy court's order and require "a more searching review." *Global Indus. Techs.*, 645 F.3d at 215. The allegations and evidence do not convince the court that the plan injures Mt. McKinley.

### 4.  Administrative Costs

Mt. McKinley argues the plan harms it by requiring it to incur "massive administrative burdens and associated costs." (Mt. McKinley's Br. 48, ECF No. 56.) The Court of Appeals for the Third Circuit found that the plan in *Global Industrial Technologies* imposed additional administrative costs on insurers, and those costs alone were sufficient to give the insurers standing:

> [T]he plan's creation of the APG Silica Trust led to a manifold increase in silica-related claims. That constitutes a tangible disadvantage to [the insurers], which, despite having their coverage defenses available, will be faced with coverage obligations to the APG Silica Trust in a world that recognizes the existence of over 4,600 silica-related claims, as opposed to a pre-Plan world that recognized only 169. Indeed, the Plan-triggered explosion of new claims creates an entirely new set of administrative costs, including the investigative burden of finding any meritorious suits in the haystack of potentially fraudulent ones. Those costs will be enormous, even if [the insurers] never pay a single dollar of indemnity. Accordingly, even if [the insurers'] ultimate liability is contingent, the harm to [the insurers] from the Plan is hardly too speculative for them to be parties in interest.

*Global Indus. Techs.*, 645 F.3d at 213–14 (footnote omitted). The plan identifies more than 200 "PPG Entities" and "PPG Affiliates" receiving the protection of the channeling injunction. (Plan Ex. L, T61:5595–5610.) Mt. McKinley asserts it will be disadvantaged because many of the PPG Entities and PPG Affiliates are not

discovery of settlement negotiations was correct. The record in this case does not contain sufficient evidence of collusion or fraud to support a finding of harm to Mt. McKinley.

covered by Mt. McKinley's insurance policies. "Because the Plan fails to indicate what contributions are being made on behalf of each of [PPG and Corning's] related entities, Mt. McKinley may never be able to establish in coverage litigation what part, if any, of the contributions were made on behalf of entities it did not insure." (Mt. McKinley's Br. 49, ECF No. 56.)

Mt. McKinley asserts that prepetition, PPG and Corning "were obligated to … establish that a particular claim or liability is covered under the terms and conditions of the policies." (*Id.* at 48–49.) Mt. McKinley offered no explanation how the plan alters this burden. The plan preserves all rights under the applicable insurance policies. (*See, e.g.*, Plan § 11.17.2, T56:4872 ("The PPG Non-Participating Insurance Policies, the Corning Insurance Policies, the Other Corning Policies, the PPG Participating Insurance Policies, the PCC Settled Insurance Policies; [sic] and related Insurance Settlement Agreements are binding upon the parties thereto and as to non-parties have the effect as provided by applicable non-bankruptcy law.").) If PPG or Corning had the duty to establish that its coverage claims are covered prior to the plan, then that duty remains with it after the plan effective date. Mt. McKinley's fear of increased administrative burdens is unjustified with respect to this issue.

### D. *Mt. McKinley Lacks Standing*

As set forth above, Mt. McKinley's arguments that it has standing are without merit. The plan did not dramatically increase the "quantum of liability," harm Mt. McKinley's contractual rights, or increase its administrative burdens. Although the court considered the evidence of purportedly misleading or false discovery responses submitted in other cases, that evidence is insufficient to support Mt. McKinley's contention that the plan harms Mt. McKinley. In short, this case is not *Global Industrial Technologies*. The insurance-neutrality provisions in the plan protect Mt. McKinley's interests, and it is free to assert its rights under its policies in coverage litigation. Because the plan does not harm Mt. McKinley, it lacks standing to object to the plan.

## V.     Conclusion

Mt. McKinley lacks standing, and its other objections are dismissed as moot. The plan parties' motion for an order affirming the bankruptcy court (ECF No. 63) will be granted. The "Final Order Confirming Modified Third Amended Plan of Reorganization as Modified Through May 15, 2013, and, Pursuant to 11 U.S.C. § 524(g), Issuing Asbestos Permanent Channeling Injunction," as clarified by the order of the bankruptcy court dated November 12, 2013, (T81:6369), will be adopted by this court and issued pursuant to 11 U.S.C. § 524(g)(3)(A). An appropriate order will follow.

Dated: September 30, 2014         /s/ Joy Flowers Conti
                                  Joy Flowers Conti
                                  Chief United States District Judge

32